NOS. 15-2579, 16-1019

# United States Court of Appeals

*for the*

# Fourth Circuit

PHILLIP J. SINGER, Individually
and on Behalf of All Other Persons Similarly Situated,

*Plaintiff-Appellant,*

– and –

JOEL CAPLIN, Individually and on behalf of all others similarly situated,

*Plaintiff,*

– v. –

KENNETH REALI; JOSEPH P. SLATTERY; RICHARD RANDALL;
MICHAEL LUETKEMEYER; TRANS1, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT WILMINGTON

## JOINT APPENDIX
## Volume 1 of 3 (Pages JA-1 to JA-464)

JOHN F. CANNON
STRADLING YOCCA CARLSON & RAUTH, P.C.
660 Newport Center Drive, Suite 1600
Newport Beach, California 92660
(949) 725-4000

– and –

KELLY MARGOLIS DAGGER
JONATHAN DREW SASSER
THOMAS HAMILTON SEGARS
ELLIS & WINTERS LLP
P.O. Box 33550
Raleigh, North Carolina 27636
(919) 865-7000

*Attorneys for Defendants-Appellees*

MICHELE S. CARINO
JEREMY ALAN LIEBERMAN
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

*Attorneys for Plaintiff-Appellant*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Sheet .................................... JA-1

Amended Complaint, dated July 9, 2012.................. JA-15

Affidavit of Chontté Hocum in Support of
  Defendants' Motion to Dismiss Amended
  Complaint, sworn to September 6, 2012 .............. JA-60

Index of Exhibits............................................... JA-67

  Exhibit 1 to Hocum Affidavit –
  Form 8-K: February 23, 2009 Analyst Call ........... JA-69

  Exhibit 2 to Hocum Affidavit –
  Form 10-K for Fiscal Year 2008 .......................... JA-88

  Exhibit 3 to Hocum Affidavit –
  Form 8-K: April 27, 2009 Press Release and
  Analyst Call .............................................. JA-183

  Exhibit 4 to Hocum Affidavit –
  Form 10-Q for Q1 2009 ........................................ JA-205

  Exhibit 5 to Hocum Affidavit –
  Form 8-K: July 30, 2009 Press Release................. JA-227

  Exhibit 6 to Hocum Affidavit –
  Form 10-Q for Q2 2009 ........................................ JA-238

  Exhibit 7 to Hocum Affidavit –
  Form 8-K: October 29, 2009 Press Release........... JA-262

  Exhibit 8 to Hocum Affidavit –
  Form 10-Q for Q3 2009 ........................................ JA-274

  Exhibit 9 to Hocum Affidavit –
  Form 8-K: February 23, 2010 Press Release ......... JA-298

ii

Page

Exhibit 10 to Hocum Affidavit –
Form 10-K for Fiscal Year 2009 ........................... JA-310

Exhibit 11 to Hocum Affidavit –
Form 8-K: May 4, 2010 Press Release and
Analyst Call ............................................... JA-423

Exhibit 12 to Hocum Affidavit –
Form 10-Q for Q1 2010 ...................................... JA-444

Exhibit 13 to Hocum Affidavit –
Form 8-K: August 5, 2010 Press Release .............. JA-465

Exhibit 14 to Hocum Affidavit –
Form 10-Q for Q2 2010 ...................................... JA-477

Exhibit 15 to Hocum Affidavit –
Form 8-K: November 9, 2010 Press Release......... JA-500

Exhibit 16 to Hocum Affidavit –
Form 10-Q for Q3 2010 ...................................... JA-512

Exhibit 17 to Hocum Affidavit –
Form 8-K: February 22, 2011 Press Release ......... JA-535

Exhibit 18 to Hocum Affidavit –
Form 10-K for Fiscal Year 2010 ........................... JA-547

Exhibit 19 to Hocum Affidavit –
Form 8-K: May 12, 2011 Press Release ................ JA-622

Exhibit 20 to Hocum Affidavit –
Form 10-Q for Q1 2011 ...................................... JA-634

Exhibit 21 to Hocum Affidavit –
Form 8-K August 9, 2011 Press Release ................ JA-655

Exhibit 22 to Hocum Affidavit –
Form 10-Q for Q2 2011 ...................................... JA-667

iii

                                                                    **Page**

Exhibit 23 to Hocum Affidavit –
Form 8-K: October 17, 2011 Subpoena
Announcement ....................................................... JA-690

Exhibit 24 to Hocum Affidavit –
Form 8-K: March 5, 2012 Press Release ............... JA-694

Exhibit 25 to Hocum Affidavit –
Form 4 for Richard D. Randall, filed
May 27, 2010 ......................................................... JA-700

Exhibit 26 to Hocum Affidavit –
Form 4 for Richard D. Randall, filed
August 18, 2011 ..................................................... JA-702

Exhibit 27 to Hocum Affidavit –
Schedule 14A for TranS1's June 3, 2010 Annual
Stockholder Meeting ............................................... JA-704

Exhibit 28 to Hocum Affidavit –
NASDAQ Chart of TranS1 Closing Stock Prices.. JA-740

Exhibit 29 to Hocum Affidavit –
NASDAQ Table of TranS1 Closing Stock Prices
for last four Years .................................................. JA-743

Motion to Dismiss Amended Complaint, by
  Defendants, dated September 7, 2012 ................... JA-759

Defendants' Memorandum in Support of Motion to
  Dismiss, dated September 7, 2012 ........................ JA-762

Plaintiff's Memorandum in Opposition to Motion to
  Dismiss, dated November 6, 2012 ........................ JA-800

Defendants' Reply in Further Support of Motion to
  Dismiss, dated December 6, 2012 ......................... JA-837

Letter from Jeremy A. Lieberman to the Honorable
  James C. Fox, dated January 8, 2013 .................... JA-853

iv

**Page**

Notice of Filing of Response to Plaintiff's January
8, 2013 Letter to Judge Fox, dated
January 18, 2013 .................................................... JA-857

Exhibit A to Notice –
Letter from Jeremy A. Lieberman to the
Honorable James C. Fox, dated January 8, 2013... JA-862

Letter from Jeremy A. Lieberman to the Honorable
James C. Fox, dated August 9, 2013..................... JA-867

Attachment to Letter –
*Qui Tam* Settlement Agreement ............................ JA-870

Notice of Filing of Response to Plaintiff's August 9,
2013 Letter to Judge Fox, dated August 30, 2013 . JA-894

Exhibit A to Notice –
Letter from Jeremy A. Lieberman to the
Honorable James C. Fox, dated August 9, 2013.... JA-901

Attachment to Letter –
Settlement Agreement ........................................ JA-905

Attachment to Letter –
Complaint and Jury Demand in *United States,
et al. v. Trans1, Inc.* ........................................... JA-929

Attachment to Letter –
[Proposed] Second Amended Complaint, dated
August 9, 2013 (redlined) .................................. JA-966

Attachment to Letter –
[Proposed] Second Amended Complaint, dated
August 9, 2013 .................................................. JA-1016

Vacated Order, dated September 19, 2013................. JA-1065

v

**Page**

Plaintiff's Motion to Alter or Amend the Order and
Judgment of Dismissal with Prejudice, dated
October 17, 2013 .................................................. JA-1095

Plaintiff's Memorandum in Support of Motion to
Alter Judgment, dated October 17, 2013 ............... JA-1098

Defendants' Memorandum in Opposition to Motion
to Alter Judgment, dated November 12, 2013 ....... JA-1121

Plaintiff's Reply Memorandum in Further Support
of Motion to Alter Judgment, dated
November 25, 2013 .............................................. JA-1147

Order Granting Motion to Alter Judgment, dated
May 5, 2014 ......................................................... JA-1156

Second Amended Complaint, dated August 9, 2013
and filed May 5, 2014 .......................................... JA-1173

Affidavit of Teresa K. Rodriguez, for Defendants, in
Support of Defendants' Request for Judicial
Notice, sworn to July 3, 2014 .............................. JA-1222

Exhibit 1 to Rodriguez Affidavit  –
Form 4s reported by Joseph P. Slattery.................. JA-1225

Motion, by Defendants, to Dismiss Second
Amended Complaint, dated July 3, 2014............... JA-1234

Defendants' Memorandum in Support of Motion to
Dismiss, dated July 3, 2014 .................................. JA-1237

Plaintiff's Memorandum in Opposition to Motion to
Dismiss, dated September 2, 2014........................ JA-1275

Defendants' Reply in Further Support of Motion to
Dismiss, dated October 2, 2014 ............................ JA-1314

vi

**Page**

Notice by TranS1 of Bankruptcy Filing, dated
    November 18, 2014 ............................................. JA-1330

Order Staying Case, dated November 20, 2014......... JA-1333

Order Granting Motion to Dismiss as to Individual
    Defendants, dated May 14, 2015 .......................... JA-1335

Order Requesting Supplemental Briefing, dated
    October 21, 2015 ................................................ JA-1359

Defendants' Supplemental Memorandum in Support
    of Motion to Dismiss, dated November 2, 2015.... JA-1360

Plaintiff's Supplemental Response in Opposition
    regarding Motion to Dismiss, dated
    November 12, 2015 ............................................. JA-1369

Defendants' Supplemental Reply in Support of
    Motion to Dismiss, dated November 17, 2015 ...... JA-1380

Order Granting Motion to Dismiss as to TranS1,
    dated December 7, 2015 ...................................... JA-1387

Judgment in favor of Defendants, dated
    December 8, 2015................................................ JA-1395

Notice of Appeal, by Plaintiff, dated
    December 16, 2015.............................................. JA-1397

Notice of Cross-Appeal, by Defendants, dated
    January 6, 2016.................................................. JA-1400

APPEAL,CLOSED,Jury Trial,MEDIATION,USMJ Jones

**U.S. District Court**
**EASTERN DISTRICT OF NORTH CAROLINA (Southern Division)**
**CIVIL DOCKET FOR CASE #: 7:12–cv–00023–F**

| | |
|---|---|
| Caplin v. Trans1, Inc. et al | Date Filed: 01/24/2012 |
| Assigned to: Senior Judge James C. Fox | Date Terminated: 12/08/2015 |
| Case in other court:  4th Circuit Court of Appeals, 15–01542 | Jury Demand: Plaintiff |
|                     15–02579 | Nature of Suit: 190 Contract: Other |
|                     4th Circuit Court of Appeals, 16–01019 | Jurisdiction: Diversity |
| Cause: 28:1332 – Diversity: Securities Fraud | |

**Plaintiff**

**Joel Caplin**                                    represented by   **Jeremy A. Lieberman**
*Individually and on behalf of all others*                          Pomerantz LLP
*similarly situated*                                                600 Third Ave., 20th Floor
*TERMINATED: 05/05/2014*                                            New York, NY 10016
                                                                    212–661–1100
                                                                    Fax: 212–661–8665
                                                                    Email: jalieberman@pomlaw.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Tamar A. Weinrib**
                                                                    Pomerantz Grossman Hufford Dahlstrom
                                                                    &Gross LLP
                                                                    600 Third Ave.
                                                                    New York, NY 10016
                                                                    212–661–1100
                                                                    Fax: 212–661–8665
                                                                    Email: taweinrib@pomlaw.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Gary W. Jackson**
                                                                    The Jackson Law Group, PLLC
                                                                    225 E. Worthington Ave., Suite 200
                                                                    Charlotte, NC 28203
                                                                    704–247–3247
                                                                    Fax: 704–208–4645
                                                                    Email: gjackson@ncadvocates.com
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Marcus Samuel McGee**
                                                                    Jackson &McGee, LLP
                                                                    225 E. Worthington Ave., Suite 200
                                                                    Charlotte, NC 28203
                                                                    704–338–1220
                                                                    Fax: 704–338–1312
                                                                    Email: smcgee@tinfulton.com
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Phillip J. Singer**                              represented by   **Jeremy A. Lieberman**
*Individually and on Behalf of All Other*                           (See above for address)
*Persons Similarly Situated*                                        *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

JA-1

**Trans1, Inc.**                              represented by   **John F. Cannon**
                                                              Stradling Yocca Carlson &Rauth
                                                              660 Newport Center Dr., Suite 1600
                                                              Newport Beach, CA 92660
                                                              949–725–4107
                                                              Fax: 949–823–5107
                                                              Email: jcannon@sycr.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Jonathan D. Sasser**
                                                              Ellis &Winters, LLP
                                                              P.O. Box 33550
                                                              Raleigh, NC 27636
                                                              919–865–7002
                                                              Fax: 919–865–7010
                                                              Email: jon.sasser@elliswinters.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Stephen L. Ram**
                                                              Stradling Yocca Carlson &Rauth
                                                              660 Newport Center Dr., Suite 1600
                                                              Newport Beach, CA 92660
                                                              949–725–4102
                                                              Fax: 949–823–5102
                                                              Email: sram@sycr.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Aaron C. Humes**
                                                              Stradling Yocca Carlson &Rauth
                                                              660 Newport Center Dr., Suite 1600
                                                              Newport Beach, CA 92660
                                                              415–321–6026
                                                              Fax: 415–283–1446
                                                              Email: ahumes@sycr.com
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Kent W. Easter**
                                                              Stradling Yocca Carlson &Rauth
                                                              660 Newport Center Dr., Suite 1600
                                                              Newport Beach, CA 92660
                                                              949–725–4220
                                                              Fax: 949–823–5220
                                                              Email: keaster@sycr.com
                                                              *TERMINATED: 09/21/2012*

                                                              **Thomas Hamilton Segars**
                                                              Ellis &Winters
                                                              P.O. Box 33550
                                                              Raleigh, NC 27636
                                                              919–865–7000
                                                              Fax: 919–865–7010
                                                              Email: tom.segars@elliswinters.com
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Kenneth Reali**                             represented by   **John F. Cannon**
*TERMINATED: 05/14/2015*                                      (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Jonathan D. Sasser**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen L. Ram**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Hamilton Segars**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron C. Humes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kent W. Easter**
(See above for address)
*TERMINATED: 09/21/2012*

**Defendant**

| **Joseph P. Slattery** | represented by | **John F. Cannon** |
| *TERMINATED: 05/14/2015* | | (See above for address) |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan D. Sasser**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen L. Ram**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Hamilton Segars**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron C. Humes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kent W. Easter**
(See above for address)
*TERMINATED: 09/21/2012*

**Defendant**

| **Richard Randall** | represented by | **John F. Cannon** |
| *TERMINATED: 05/14/2015* | | (See above for address) |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan D. Sasser**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen L. Ram**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Hamilton Segars**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron C. Humes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kent W. Easter**
(See above for address)
*TERMINATED: 09/21/2012*

**Defendant**

**Michael Luetkemeyer**                  represented by   **John F. Cannon**
*TERMINATED: 05/14/2015*                                 (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Jonathan D. Sasser**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen L. Ram**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Hamilton Segars**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron C. Humes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kent W. Easter**
(See above for address)
*TERMINATED: 09/21/2012*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/24/2012 | 1 | COMPLAINT against All Defendants ( Filing fee $ 350 receipt number 0417–1919216.), filed by Joel Caplin. (Attachments: # 1 Exhibit Certification of Plaintiff, # 2 Civil Cover Sheet, # 3 Summons, Trans1, # 4 Summons, Kenneth Reali, # 5 Summons, Joseph Slattery, # 6 Summons, Richard Randall, # 7 Summons, Michael Luetkemeyer) (McGee, Marcus) (Entered: 01/24/2012) |
| 01/24/2012 | 2 | FINANCIAL DISCLOSURE STATEMENT by Joel Caplin. (McGee, Marcus) (Entered: 01/24/2012) |
| 01/24/2012 |   | NOTICE TO COUNSEL – For future reference, counsel should include an email address in the electronic signature block on all pleadings pursuant to Section J of the Court's Electronic Policy and Procedure Manual. (Heath, D.) (Entered: 01/24/2012) |
| 01/24/2012 |   | NOTICE TO COUNSEL – Counsel should file a Notice of Appearance pursuant to Local Civil Rule 5.2(a). (Heath, D.) (Entered: 01/24/2012) |

| 01/25/2012 | | Case Selected for Mediation – A printable list of certified mediators for the Eastern District of North Carolina is available on the court's Website, http://www.nced.uscourts.gov/attorney/mediators.aspx. Please serve this list on all parties. (Horton, B.) (Entered: 01/25/2012) |
|---|---|---|
| 01/25/2012 | 3 | Summons Issued as to Michael Luetkemeyer. (Edwards, S.) (Entered: 01/25/2012) |
| 01/25/2012 | 4 | Summons Issued as to Richard Randall. (Edwards, S.) (Entered: 01/25/2012) |
| 01/25/2012 | 5 | Summons Issued as to Kenneth Reali. (Edwards, S.) (Entered: 01/25/2012) |
| 01/25/2012 | 6 | Summons Issued as to Joseph P. Slattery. (Edwards, S.) (Entered: 01/25/2012) |
| 01/25/2012 | 7 | Summons Issued as to Trans1, Inc. (Edwards, S.) (Entered: 01/25/2012) |
| 02/15/2012 | 8 | NOTICE of Appearance by Jonathan D. Sasser on behalf of Trans1, Inc. (Sasser, Jonathan) (Entered: 02/15/2012) |
| 02/15/2012 | 9 | 'REFILED ON 2/15/12 AT 9 ' MOTION for Extension of Time to File Response as to 1 Complaint, by Trans1, Inc. (Attachments: # 1 Text of Proposed Order). (Sasser, Jonathan) Modified on 2/16/2012 to include the refiled information. (Edwards, S.) (Entered: 02/15/2012) |
| 02/15/2012 | 10 | FINANCIAL DISCLOSURE STATEMENT by Trans1, Inc. (Sasser, Jonathan) (Entered: 02/15/2012) |
| 02/15/2012 | 11 | NOTICE of Appearance by Thomas Hamilton Segars on behalf of Trans1, Inc. (Segars, Thomas) (Entered: 02/15/2012) |
| 02/15/2012 | 12 | NOTICE of Appearance by Jonathan D. Sasser on behalf of Trans1, Inc. (Sasser, Jonathan) (Entered: 02/15/2012) |
| 02/15/2012 | 13 | Corrected MOTION for Extension of Time to File Response as to 1 Complaint, by Trans1, Inc. (Attachments: # 1 Text of Proposed Order). (Sasser, Jonathan) (Entered: 02/15/2012) |
| 02/15/2012 | 14 | NOTICE of Appearance by Thomas Hamilton Segars on behalf of Trans1, Inc. (Segars, Thomas) (Entered: 02/15/2012) |
| 02/16/2012 | 15 | FINANCIAL DISCLOSURE STATEMENT by Trans1, Inc. (Sasser, Jonathan) (Entered: 02/16/2012) |
| 02/16/2012 | | MOTION REFERRED to Dennis P. Iavarone, Clerk of Court: 13 Corrected MOTION for Extension of Time to File Response/Reply as to 1 Complaint. (Edwards, S.) (Entered: 02/16/2012) |
| 02/16/2012 | | TEXT ORDER granting 13 TRANS1 Motion for Extension of Time until 3/16/12 to File Response re 1 Complaint. Response due by 3/16/2012. Signed by Dennis P. Iavarone, Clerk of Court on February 16, 2012. (Iavarone, Dennis) (Entered: 02/16/2012) |
| 03/01/2012 | 16 | NOTICE of Appearance by Jeremy A. Lieberman on behalf of Joel Caplin (Lieberman, Jeremy) (Entered: 03/01/2012) |
| 03/08/2012 | 17 | Joint MOTION for Extension of Time *and for an Order Setting Certain Procedures for Plaintiff's Amendment of Complaint and Defendants' Response* by Trans1, Inc., Joel Caplin, Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Exhibit A – Stipulation, # 2 Text of Proposed Order) (Segars, Thomas) (Entered: 03/08/2012) |
| 03/09/2012 | | Motion Submitted to Senior Judge James C. Fox: 17 Joint MOTION for Extension of Time *and for an Order Setting Certain Procedures for Plaintiff's Amendment of Complaint and Defendants' Response*. (Edwards, S.) (Entered: 03/09/2012) |
| 03/16/2012 | 18 | ORDER granting 17 Motion for Extension of Time. Counsel is reminded to read the order in its entirety for critical deadlines and information. Signed by Senior Judge James C. Fox on 3/16/2012. (Edwards, S.) (Entered: 03/16/2012) |
| 03/26/2012 | 19 | 'REFILED ON 4/2/2012 AT 21 ': MOTION to Appoint Counsel (*Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and* |

JA-5

| | | |
|---|---|---|
| | | *Liaison Counsel)* by Phillip J. Singer. (Attachments: #_1_ Text of Proposed Order Appointing Lead Plaintiff and Approving Selection of Lead Counsel). (Lieberman, Jeremy) (Entered: 03/26/2012) |
| 03/26/2012 | 20 | **'REFIRED ON 4/2/2012 AT 22 '**: Memorandum in Support re _19_ MOTION to Appoint Counsel *(Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and Liaison Counsel)* filed by Phillip J. Singer. (Attachments: #_1_ Affidavit of Jeremy A. Lieberman in Support of the Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and Liaison Counsel, #_2_ Exhibit A, #_3_ Exhibit B, #_4_ Exhibit C, #_5_ Exhibit D, #_6_ Exhibit E) (Lieberman, Jeremy) (Entered: 03/26/2012) |
| 03/29/2012 | | NOTICE OF DEFICIENCY re: _20_ Memorandum in Support and _19_ Motion to Appoint Counsel. Counsel failed to identify exhibits and failed to provide a complete signature block on the Certificate of Service pursuant to Section L(2)(b) and Form A attached to the Court's Electronic Policy and Procedure Manual. Counsel should refile the memorandum and identify each exhibit. (Heath, D.) (Entered: 03/29/2012) |
| 04/02/2012 | 21 | MOTION to Appoint Counsel *(Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and Liaison Counsel)* by Phillip J. Singer. (Attachments: #_1_ Text of Proposed Order). (Lieberman, Jeremy) (Entered: 04/02/2012) |
| 04/02/2012 | 22 | Memorandum in Support re _21_ MOTION to Appoint Counsel *(Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and Liaison Counsel)* filed by Phillip J. Singer. (Attachments: #_1_ Affidavit of Jeremy A. Lieberman in Support of the Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and Liaison Counsel, #_2_ Exhibit A – Press Release, #_3_ Exhibit B – Plaintiff Certification, #_4_ Exhibit C – Loss Chart, #_5_ Exhibit D – Firm Resume of Pomerantz Haudek Grossman &Gross LLP, #_6_ Exhibit E – Firm Resume of Jackson &McGee LLP). (Lieberman, Jeremy) (Entered: 04/02/2012) |
| 04/03/2012 | 23 | RESPONSE in Support re _21_ MOTION to Appoint Counsel *(Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and Liaison Counsel)* filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 04/03/2012) |
| 05/01/2012 | | Motion Submitted to Senior Judge James C. Fox: _21_ MOTION to Appoint Counsel *(Motion of Phillip J. Singer for Appointment as Lead Plaintiff and Approval of Lead and Liaison Counsel)*. (Edwards, S.) (Entered: 05/01/2012) |
| 05/01/2012 | 24 | NOTICE of Appearance by Stephen L. Ram on behalf of All Defendants. (Ram, Stephen) (Entered: 05/01/2012) |
| 05/01/2012 | 25 | NOTICE of Appearance by Stephen L. Ram on behalf of All Defendants. (Ram, Stephen) (Entered: 05/01/2012) |
| 05/02/2012 | 26 | NOTICE of Appearance by Kent W. Easter on behalf of All Defendants. (Easter, Kent) (Entered: 05/02/2012) |
| 05/08/2012 | | NOTICE TO COUNSEL regarding _24_ , _25_ and _26_ Notices of Appearance. Counsel should reflect on all future filings the "Division" in which the case has been assigned. (Heath, D.) (Entered: 05/08/2012) |
| 05/08/2012 | 27 | ORDER granting _21_ Motion to Appoint Lead Plaintiff and Lead Counsel. The court appoints movant Philip J. Singer as lead plaintiff and the law firm of Pomerantz Haudek Grossman &Gross LLP as lead counsel as well as Jackson &McGee LLP. Counsel is reminded to read the order in its entirety for further instructions. Signed by Senior Judge James C. Fox on 5/8/2012. (Edwards, S.) (Entered: 05/08/2012) |
| 07/09/2012 | 28 | **'REFIRED ON 7/11/12 AT 29 '** – AMENDED COMPLAINT against All Defendants, filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 07/09/2012) |
| 07/10/2012 | | NOTICE OF DEFICIENCY regarding _28_ Amended Complaint. Incomplete case caption and no Certificate of Service attached. Counsel is directed to refile the document and include a complete case caption and a Certificate of Service. (Heath, |

| | | D.) (Entered: 07/10/2012) |
|---|---|---|
| 07/11/2012 | 29 | AMENDED COMPLAINT against All Defendants, filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 07/11/2012) |
| 09/07/2012 | 30 | MOTION Request for Judicial Notice by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Sasser, Jonathan) (Entered: 09/07/2012) |
| 09/07/2012 | 31 | Memorandum in Support regarding 30 MOTION Request for Judicial Notice filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Sasser, Jonathan) (Entered: 09/07/2012) |
| 09/07/2012 | 32 | NOTICE by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery *of Appendix of Unpublished Cases*. (Sasser, Jonathan) (Entered: 09/07/2012) |
| 09/07/2012 | 33 | AFFIDAVIT *of Chontte Hocum in Support of Defendants' Request for Judicial Notice* by Michael Luetkemeyer, Joseph P. Slattery, Kenneth Reali, Trans1, Inc., Richard Randall filed by Michael Luetkemeyer, Joseph P. Slattery, Kenneth Reali, Trans1, Inc., Richard Randall. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1. Form 8–K: February 23, 2009 Analyst Call, # 3 Exhibit 2. Form 10–K for Fiscal Year 2008, # 4 Exhibit 3. Form 8–K: April 27, 2009 Press Release and Analyst Call, # 5 Exhibit 4. Form 10–Q for Q1 2009, # 6 Exhibit 5. Form 8–K: July 30, 2009 Press Release, # 7 Exhibit 6. Form 10–Q for Q2 2009, # 8 Exhibit 7. Form 8–K: October 29, 2009 Press Release, # 9 Exhibit 8. Form 10–Q for Q3 2009, # 10 Exhibit 9. Form 8–K: February 23, 2010 Press Release, # 11 Exhibit 10. Form 10–K for Fiscal Year 2009, # 12 Exhibit 11. Form 8–K: May 4, 2010 Press Release and Analyst Call, # 13 Exhibit 12. Form 10–Q for Q1 2010, # 14 Exhibit 13. Form 8–K: August 5, 2010 Press Release, # 15 Exhibit 14. Form 10–Q for Q2 2010, # 16 Exhibit 15. Form 8–K: November 9, 2010 Press Release, # 17 Exhibit 16. Form 10–Q for Q3 2010, # 18 Exhibit 17. Form 8–K: February 22, 2011 Press Release, # 19 Exhibit 18. Form 10–K for Fiscal Year 2010, # 20 Exhibit 19. Form 8–K: May 12, 2011 Press Release, # 21 Exhibit 20. Form 10–Q for Q1 2011, # 22 Exhibit 21. Form 8–K August 9, 2011 Press Release, # 23 Exhibit 22. Form 10–Q for Q2 2011, # 24 Exhibit 23. Form 8–K: Oct. 17, 2011 Subpoena Announcement, # 25 Exhibit 24. Form 8–K: March 5, 2012 Press Release, # 26 Exhibit 25. Form 4 for Richard D. Randall Filed 5/27/2010, # 27 Exhibit 26. Form 4 for Richard D. Randall Filed 8/18/2011, # 28 Exhibit 27. Schedule 14A for TranS1s June 3, 2010 Annual Stockholder Meeting, # 29 Exhibit 28. NASDAQ Chart of TranS1 Closing Stock Prices, # 30 Exhibit 29. NASDAQ Table of TranS1 Closing Stock Prices for Last 4 Years) (Sasser, Jonathan) (Entered: 09/07/2012) |
| 09/07/2012 | 34 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Sasser, Jonathan) (Entered: 09/07/2012) |
| 09/07/2012 | 35 | Memorandum in Support regarding 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Sasser, Jonathan) (Entered: 09/07/2012) |
| 09/10/2012 | 36 | CERTIFICATE OF SERVICE by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery regarding 30 MOTION Request for Judicial Notice, 31 Memorandum in Support, 32 Notice–(other), 33 Affidavit. (Sasser, Jonathan) (Entered: 09/10/2012) |
| 09/21/2012 | 37 | NOTICE of Appearance by John F. Cannon on behalf of Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Cannon, John) (Entered: 09/21/2012) |
| 09/21/2012 | 38 | NOTICE of Appearance by Aaron C. Humes on behalf of Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery (Humes, Aaron) (Entered: 09/21/2012) |
| 09/21/2012 | 39 | Notice of Substitution of Counsel by John F. Cannon on behalf of Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery |

|  |  | substituting for Kent W. Easter. (Cannon, John) (Entered: 09/21/2012) |
|---|---|---|
| 09/27/2012 | 40 | NOTICE of Appearance by Tamar A. Weinrib on behalf of Joel Caplin (Weinrib, Tamar) (Entered: 09/27/2012) |
| 10/15/2012 |  | Motions Submitted to Senior Judge James C. Fox: 30 MOTION Request for Judicial Notice and 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Edwards, S.) (Entered: 10/15/2012) |
| 10/16/2012 |  | Motions No Longer Submitted to Senior Judge James C. Fox: 30 MOTION Request for Judicial Notice and 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Edwards, S.) (Entered: 10/16/2012) |
| 11/06/2012 | 41 | Memorandum in Opposition regarding 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Joel Caplin. (Lieberman, Jeremy) (Entered: 11/06/2012) |
| 12/06/2012 | 42 | REPLY to Response to Motion regarding 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Appendix of Unpublished Cases) (Sasser, Jonathan) (Entered: 12/06/2012) |
| 12/07/2012 |  | Motions Submitted to Senior Judge James C. Fox: 30 MOTION Request for Judicial Notice, 34 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Edwards, S.) (Entered: 12/07/2012) |
| 01/18/2013 | 43 | NOTICE by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery *of Filing of Response to Plaintiff's Letter to Judge Fox Dated January 8, 2013* (Attachments: # 1 Exhibit A– Letter with Enclosed Press Release) (Segars, Thomas) (Entered: 01/18/2013) |
| 01/18/2013 |  | Submitted the Notice of Filing at 43 to Senior Judge James C. Fox for his review. (Edwards, S.) (Entered: 01/18/2013) |
| 05/30/2013 | 44 | NOTICE of Appearance by Gary W. Jackson on behalf of All Plaintiffs (Jackson, Gary) (Entered: 05/30/2013) |
| 06/19/2013 | 45 | Consent MOTION to */Modify Case Caption* by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Text of Proposed Order) (Segars, Thomas) (Entered: 06/19/2013) |
| 06/20/2013 |  | Motion Submitted to Senior Judge James C. Fox: 45 Consent MOTION to */Modify Case Caption*. (Edwards, S.) (Entered: 06/20/2013) |
| 08/09/2013 | 46 | NOTICE by Phillip J. Singer *Letter to Hon. James C. Fox* (Attachments: # 1 Exhibit Settlement Agreement, # 2 Exhibit Qui tam Complaint, # 3 Exhibit redlined proposed Second Amended Complaint, # 4 Exhibit Proposed Second Amended Complaint) (Lieberman, Jeremy) (Entered: 08/09/2013) |
| 08/09/2013 |  | REMINDER TO COUNSEL regarding 46 = Pursuant to Judge Fox's Practice and Procedures located on the courts website, http://www.nced.uscourts.gov/judges/fox.aspx, counsel shall provide a courtesy copy of motions and memoranda for documents over 20 pages, by mailing or delivering to the clerk's office in Wilmington. If your recently filed document(s) is less than 20 pages or if you have already mailed the courtesy copy(ies), please disregard this notice. Thank you. (Edwards, S.) (Entered: 08/09/2013) |
| 08/09/2013 |  | Submitted the Notice at 46 to Senior Judge James C. Fox. (Edwards, S.) (Entered: 08/09/2013) |
| 08/30/2013 | 47 | NOTICE by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery regarding 46 Notice–(other), *Of Filing Of Response To Plaintiff's Letter To Judge Fox Dated August 9, 2013* (Attachments: # 1 Exhibit A– August 9, 2013 letter to The Honorable James C. Fox from J. Lieberman) (Sasser, Jonathan) (Entered: 08/30/2013) |
| 09/03/2013 |  | REMINDER TO COUNSEL regarding 47 – Pursuant to Judge Fox's Practice and Procedures located on the courts website, http://www.nced.uscourts.gov/judges/fox.aspx, counsel shall provide a courtesy |

| | | copy of motions and memoranda for documents over 20 pages, by mailing or delivering to the clerk's office in Wilmington. If your recently filed document(s) is less than 20 pages or if you have already mailed the courtesy copy(ies), please disregard this notice. Thank you. (Edwards, S.) (Entered: 09/03/2013) |
|---|---|---|
| 09/03/2013 | | Submitted the Notice at 47 to Senior Judge James C. Fox for his review. (Edwards, S.) (Entered: 09/03/2013) |
| 09/19/2013 | 48 | **'VACATED PURSUANT TO THE ORDER DATED 5/5/2014 AT 54 '** – ORDER for judicial notice; granting 34 Motion for judicial notice; granting 34 Motion to Dismiss for Failure to State a Claim with prejudice and denying as moot 45 Motion to Modify the Case Caption. Signed by Senior Judge James C. Fox on 9/19/2013. (Edwards, S.) (Entered: 09/19/2013) |
| 09/19/2013 | 49 | **'VACATED PURSUANT TO THE ORDER DATED 5/5/2014 AT 54 '** – JUDGMENT – IT IS ORDERED, ADJUDGED AND DECREED that TranS1's motion to dismiss is ALLOWED and the amended complaint is DISMISSED WITH PREJUDICE. TranS1's motion to modify case caption is DENIED AS MOOT. The parties various requests for judicial notice are ALLOWED. The Clerk of Court is DIRECTED to close this case. Signed by Julie A. Richards, Clerk of Court on 9/19/2013. (Edwards, S.) (Entered: 09/19/2013) |
| 10/17/2013 | 50 | MOTION to Alter Judgment by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 10/17/2013) |
| 10/17/2013 | 51 | Memorandum in Support regarding 50 MOTION to Alter Judgment filed by Phillip J. Singer. (Attachments: # 1 Exhibit Proposed Second Amended Complaint – redline, # 2 Exhibit Proposed Second Amended Complaint) (Lieberman, Jeremy) (Entered: 10/17/2013) |
| 11/12/2013 | 52 | Memorandum in Opposition regarding 50 MOTION to Alter Judgment filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Appendix, # 2 Armstrong v. Sumner, # 3 Barefoot v. Derry, # 4 In re Immucor Inc. Sec. Litg., # 5 Mohammadi v. Islamic Republic of Iran, # 6 Richard v. Northwest Pipe Co.) (Sasser, Jonathan) (Entered: 11/12/2013) |
| 11/13/2013 | | REMINDER TO COUNSEL regarding 52 – Pursuant to Judge Fox's Practice and Procedures located on the courts website, http://www.nced.uscourts.gov/judges/fox.aspx, counsel shall provide a courtesy copy of motions and memoranda for documents over 20 pages, by mailing or delivering to the clerk's office in Wilmington. If your recently filed document(s) is less than 20 pages or if you have already mailed the courtesy copy(ies), please disregard this notice. Thank you. (Edwards, S.) (Entered: 11/13/2013) |
| 11/25/2013 | 53 | REPLY to Response to Motion regarding 50 MOTION to Alter Judgment filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 11/25/2013) |
| 11/26/2013 | | Motion Submitted to Senior Judge James C. Fox: 50 MOTION to Alter Judgment . (Grady, B.) (Entered: 11/26/2013) |
| 05/05/2014 | 54 | ORDER granting 50 Motion to Alter Judgment. The court VACATES the prior judgment entered on 9/19/2013 [DE–49] and the courts 9/19/2013 order [DE–48] under Federal Rules of Civil Procedure 59 and 60. The Clerk of Court is DIRECTED to separately docket the proposed amended complaint at [DE–51–2] as the operative complaint in this case. Trans1 shall have twenty–one days to file a responsive pleading or motion under Rule 12 of the Federal Rules of Civil Procedure from the date the complaint is docketed, though the court will consider extending this deadline as needed. Signed by Senior Judge James C. Fox on 5/5/2014. (Edwards, S.) (Entered: 05/05/2014) |
| 05/05/2014 | 55 | SECOND AMENDED COMPLAINT against Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery, filed by Phillip J. Singer (the operative complaint in this case). (Edwards, S.) (Entered: 05/05/2014) |
| 05/05/2014 | | NOTICE TO COUNSEL regarding: 55 Amended Complaint. Each attorney should file a Notice of Appearance pursuant to Local Civil Rule 5.2(a). (Edwards, S.) (Entered: 05/05/2014) |

JA-9

| 05/12/2014 | 56 | Joint MOTION for Extension of Time *and Order Setting Schedule for Briefing* by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Text of Proposed Order) (Segars, Thomas) (Entered: 05/12/2014) |
| 05/13/2014 | | Motion Submitted to Senior Judge James C. Fox: 56 Joint MOTION for Extension of Time *and Order Setting Schedule for Briefing*. (Edwards, S.) (Entered: 05/13/2014) |
| 05/14/2014 | 57 | ORDER granting 56 Motion for Extension of Time. Counsel is reminded to read the order in its entirety for critical deadlines and information. Signed by Senior Judge James C. Fox on 5/14/2014. (Edwards, S.) (Entered: 05/14/2014) |
| 05/14/2014 | | At the direction of the Court, United States Magistrate Judge Robert B. Jones, Jr. is reassigned as the magistrate judge in this case. (Edwards, S.) (Entered: 05/14/2014) |
| 06/17/2014 | 58 | MOTION Order Modifying Existing Briefing Schedule by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Text of Proposed Order) (Segars, Thomas) (Entered: 06/17/2014) |
| 06/18/2014 | | Motion Submitted to Senior Judge James C. Fox: 58 MOTION Order Modifying Existing Briefing Schedule . (Grady, B.) (Entered: 06/18/2014) |
| 06/18/2014 | 59 | ORDER granting 58 Motion for Order Modifying Existing Briefing Schedule. The parties should read the order in its entirety for detailed information and deadlines. Signed by Senior Judge James C. Fox on 6/18/2014. (Grady, B.) (Entered: 06/18/2014) |
| 07/03/2014 | 60 | MOTION Request for Judicial Notice by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Segars, Thomas) (Entered: 07/03/2014) |
| 07/03/2014 | 61 | Memorandum in Support regarding 60 MOTION Request for Judicial Notice filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Exhibit Unpublished Case, In Re Cree) (Segars, Thomas) (Entered: 07/03/2014) |
| 07/03/2014 | 62 | AFFIDAVIT in Support regarding 60 MOTION Request for Judicial Notice filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Exhibit 1 – Form 4s reported by Joseph P. Slattery) (Segars, Thomas) (Entered: 07/03/2014) |
| 07/03/2014 | 63 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Segars, Thomas) (Entered: 07/03/2014) |
| 07/03/2014 | 64 | Memorandum in Support regarding 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Segars, Thomas) (Entered: 07/03/2014) |
| 07/03/2014 | 65 | NOTICE by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery regarding 64 Memorandum in Support *Appendix of Unpublished Cases* (Attachments: # 1 Exhibit 1 Abuhamdan, # 2 Exhibit 2 Eshelman, # 3 Exhibit 3 Karam, # 4 Exhibit 4 NECA–IBEW, # 5 Exhibit 5 Pipefitters) (Segars, Thomas) (Entered: 07/03/2014) |
| 08/01/2014 | | Motions Submitted to Senior Judge James C. Fox: 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and 60 MOTION Request for Judicial Notice. (Grady, B.) (Entered: 08/01/2014) |
| 08/01/2014 | | Motions No Longer Submitted to Senior Judge James C. Fox: 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and 60 MOTION Request for Judicial Notice. No longer submitted to account for the additional response time granted in 59 Order. (Grady, B.) (Entered: 08/01/2014) |
| 09/02/2014 | 66 | Memorandum in Opposition regarding 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Phillip J. Singer. (Lieberman, Jeremy) Modified on 9/3/2014 to link to motion. (Grady, B.) (Entered: 09/02/2014) |

JA-10

| 10/02/2014 | 67 | REPLY to Response to Motion regarding 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Exhibit Unpublished Case—Proter v. Medifast) (Segars, Thomas) (Entered: 10/02/2014) |
| 10/03/2014 | | Motions Submitted to Senior Judge James C. Fox: 60 MOTION Request for Judicial Notice and 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Grady, B.) (Entered: 10/03/2014) |
| 11/18/2014 | 68 | NOTICE by Trans1, Inc. *of Bankruptcy Filing and Automatic Stay* (Attachments: # 1 Exhibit A – Voluntary Chapter 11 Petition of TranS1, Inc.) (Segars, Thomas) (Entered: 11/18/2014) |
| 11/18/2014 | | Submitted the Notice at 68 to Senior Judge James C. Fox. (Edwards, S.) (Entered: 11/18/2014) |
| 11/20/2014 | 69 | ORDER STAYING CASE – This action is STAYED as to any claims asserted against TranS1, Inc. However, it is unclear whether this action should be stayed as to Defendants Reali, Slattery, Randall, and Luetkemeyer. The parties are DIRECTED to brief whether this case may proceed as to the individual defendants. The parties shall have up to and including December 12, 2014 to file their briefs. When the briefs are filed, the parties may move to respond if they wish to do so. Signed by Senior Judge James C. Fox on 11/20/2014. (Tripp, S.) (Entered: 11/20/2014) |
| 12/12/2014 | 70 | Memorandum in Opposition *MEMORANDUM OF LAW OPPOSING EXTENSION OF AUTOMATIC STAY* filed by Phillip J. Singer. (Attachments: # 1 Affidavit Declaration of Jeremy A. Lieberman in Support of Lead Plaintiff's Memorandum Opposing Extension of Automatic Stay, # 2 Exhibit 1) (Lieberman, Jeremy) (Entered: 12/12/2014) |
| 12/12/2014 | 71 | RESPONSE by Defendants Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery *to the Court's November 20, 2014, Order*. (Attachments: # 1 Exhibit A – In re Colonial Bancgroup (unpublished case), # 2 Exhibit B – Gulfmark Offshore (unpublished case)) (Segars, Thomas) (Entered: 12/12/2014) |
| 12/15/2014 | | Submitted the Responses at 70 and 71 to Senior Judge James C. Fox pursuant to the order at 69 . (Edwards, S.) (Entered: 12/15/2014) |
| 05/14/2015 | 72 | ORDER granting 60 Motion for Judicial Notice; granting 63 Motion to Dismiss for Failure to State a Claim. The plaintiffs claims against the individual defendants are hereby DISMISSED WITH PREJUDICE. The stay of the plaintiffs claims against Defendant TranS 1 remains in effect; however, the Clerk of Court is DIRECTED to administratively close this case from the active docket, subject to the same being reopened by any party upon the resolution of TranS 1 's bankruptcy action in the Bankruptcy Court for the District of Delaware, or otherwise upon good cause shown. Signed by Senior Judge James C. Fox on 5/14/2015. (Edwards, S.) (Entered: 05/14/2015) |
| 05/18/2015 | 73 | NOTICE OF APPEAL by Phillip J. Singer. Filing fee $ 505, receipt number 0417–3295611. (Lieberman, Jeremy) (Entered: 05/18/2015) |
| 05/18/2015 | 74 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 73 Notice of Appeal by Phillip J. Singer. (Fogle, L.) (Entered: 05/18/2015) |
| 05/19/2015 | 75 | US Court of Appeals Case Number 15–1542, RJ Warren, Case Manager for 73 Notice of Appeal filed by Phillip J. Singer. (Fogle, L.) (Entered: 05/19/2015) |
| 06/09/2015 | 76 | MOTION for Entry of Judgment under Rule 54(b) *as to the Individual Defendants* filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 06/09/2015) |
| 06/09/2015 | 77 | Memorandum in Support regarding 76 MOTION for Entry of Judgment under Rule 54(b) *as to the Individual Defendants* filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 06/09/2015) |

| | | |
|---|---|---|
| 06/16/2015 | 78 | ORDER of US Court of Appeals as to 73 Notice of Appeal filed by Phillip J. Singer – Upon consideration of the stipulated motion to voluntarily dismiss, the court dismisses this appeal, upon such terms as have been agreed to by the parties, pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure. (Tripp, S.) (Entered: 06/16/2015) |
| 06/16/2015 | 79 | MANDATE of US Court of Appeals (certified copy) as to 73 Notice of Appeal filed by Phillip J. Singer – This court's order dismissing this appeal pursuant to Local Rule 42(b) takes effect today. This constitutes the formal mandate of this court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. (Tripp, S.) (Entered: 06/16/2015) |
| 07/02/2015 | 80 | RESPONSE in Opposition regarding 76 MOTION for Entry of Judgment under Rule 54(b) *as to the Individual Defendants* filed by Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Segars, Thomas) (Entered: 07/02/2015) |
| 07/02/2015 | 81 | APPENDIX TO RESPONSE in Opposition regarding 76 MOTION for Entry of Judgment under Rule 54(b) *as to the Individual Defendants , Appendix filed separately,* filed by Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 In re Fairchild Corp., # 2 Wooton v. CL, LLC, # 3 Peace Coll. of Raleigh, Inc. v. Am. Int'l Specialty Lines Ins. Co., # 4 Carolina Power &Light Co. v. 3M Co., # 5 Heckman v. Ryder Truck Rental, # 6 Cason v. S.C. State Ports Auth., # 7 David v. Alphin) (Segars, Thomas) (Entered: 07/02/2015) |
| 07/02/2015 | 82 | AFFIDAVIT regarding 80 Response in Opposition to Motion by Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: # 1 Index Affidavit of Aaron Humes, # 2 Exhibit A. March 24, 2015 Order, # 3 Exhibit B. March 25, 2015 Affidavit of Service, # 4 Exhibit C. July 1, 2015 Claims Register, # 5 Exhibit D. June 2, 2015 Amended Chapter 11 Plan, # 6 Exhibit E. June 2, 2015 Disclosure Statement, # 7 Exhibit F. June 3, 2015 Order) (Segars, Thomas) (Entered: 07/02/2015) |
| 07/16/2015 | | REMINDER TO COUNSEL Regarding 81 and 82 . Pursuant to Judge Fox's Practice Preferences located on the court's website, counsel shall provide a courtesy copy of lengthy briefs, by mailing or delivering to the clerk's office in Wilmington. (Edwards, S.) (Entered: 07/16/2015) |
| 07/24/2015 | | Motion Submitted to Senior Judge James C. Fox: 76 MOTION for Entry of Judgment under Rule 54(b) *as to the Individual Defendants*. (Edwards, S.) (Entered: 07/24/2015) |
| 08/13/2015 | 83 | Notice filed by Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery regarding 72 Order on Motion for Miscellaneous Relief, Order on Motion to Dismiss for Failure to State a Claim,,,, *Notice of Lifting of Automatic Bankruptcy Stay*. (Attachments: # 1 Exhibit A. Confirmation Order, # 2 Exhibit B. Bankruptcy Notice, # 3 In re Fairchild Corp.) (Segars, Thomas) (Entered: 08/13/2015) |
| 08/13/2015 | | Submitted the Notice at 83 to Senior Judge James C. Fox for his review. (Edwards, S.) (Entered: 08/13/2015) |
| 10/02/2015 | 84 | MOTION to Stay *PLAINTIFFS MOTION TO LIFT STAY AS TO DEFENDANT TRANS1, INC.* filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 10/02/2015) |
| 10/02/2015 | 85 | Memorandum in Support regarding 84 MOTION to Stay *PLAINTIFFS MOTION TO LIFT STAY AS TO DEFENDANT TRANS1, INC.* filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 10/02/2015) |
| 10/07/2015 | 86 | ORDER denying 76 Motion for Entry of Judgment under Rule 54(b); dismissing as moot 84 Motion to Stay. The parties are DIRECTED to jointly file a status report by 12:00 PM on October 16, 2015 informing the court of whether they wish to file supplemental briefing. Signed by Senior Judge James C. Fox on 10/7/2015. (Edwards, S.) (Entered: 10/07/2015) |
| 10/07/2015 | | Case reopened pursuant to the court's order at 86 . Signed by Senior Judge James C. Fox on 10/7/2015. (Edwards, S.) (Entered: 10/08/2015) |

| 10/16/2015 | 87 | STATUS REPORT *(Joint) Re Supplemental Briefing* by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Segars, Thomas) (Entered: 10/16/2015) |
| 10/16/2015 | | Submitted the Joint Status Report at 87 to Senior Judge James C. Fox. (Edwards, S.) (Entered: 10/16/2015) |
| 10/21/2015 | 88 | ORDER regarding 87 Status Report filed by Kenneth Reali, Joseph P. Slattery, Richard Randall, Michael Luetkemeyer, Trans1, Inc. The court DIRECTS the parties to file supplemental briefing on the Motion to Dismiss as it relates to TranS 1. Counsel is reminded to read the order in its entirety for critical deadlines and information. Signed by Senior Judge James C. Fox on 10/21/2015. (Edwards, S.) (Entered: 10/21/2015) |
| 11/02/2015 | 89 | Memorandum in Support regarding 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *As To TranS1, Inc. Submitted In Accordance With the Court's Order of October 21, 2015* filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Attachments: #1 Exhibit Unpublished Case – Ash v. PowerSecure Int'l, Inc., #2 Exhibit Unpublished Case – In Re Swisher Hygine, Inc., #3 Exhibit Unpublished Case – Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec) (Segars, Thomas) (Entered: 11/02/2015) |
| 11/04/2015 | | REMINDER TO COUNSEL regarding 89 . Pursuant to Judge Fox's Practice Preferences located on the court's website, counsel shall provide a courtesy copy of lengthy briefs, by mailing or delivering to the clerk's office in Wilmington. (Edwards, S.) (Entered: 11/04/2015) |
| 11/12/2015 | 90 | RESPONSE in Opposition regarding 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Phillip J. Singer. (Lieberman, Jeremy) (Entered: 11/12/2015) |
| 11/17/2015 | 91 | REPLY to Response to Motion regarding 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *As To TranS1, Inc. Submitted In Accordance With the Court's Order of October 21, 2015* filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery. (Segars, Thomas) (Entered: 11/17/2015) |
| 11/18/2015 | | Submitted the Supplemental Brief 89 , response 90 and reply 91 to Senior Judge James C. Fox pursuant to the order at 88 . (Edwards, S.) (Entered: 11/18/2015) |
| 12/08/2015 | 92 | ORDER granting 63 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM as to Trans1, Inc. The plaintiff's claims against Trans1 are hereby DISMISSED WITH PREJUDICE. The Clerk of Court is DIRECTED to close this case. Signed by Senior Judge James C. Fox on 12/7/2015. (Edwards, S.) (Entered: 12/08/2015) |
| 12/08/2015 | 93 | JUDGMENT in favor of Trans1, Inc. against Phillip J. Singer. Signed by Senior Judge James C. Fox on 12/8/2015. (Edwards, S.) (Entered: 12/08/2015) |
| 12/16/2015 | 94 | Notice of Appeal filed by Phillip J. Singer as to 72 Order on Motion for Miscellaneous Relief, Order on Motion to Dismiss for Failure to State a Claim,,,, 92 Order, 93 Judgment. Filing fee, receipt number 0417–3519688. (Lieberman, Jeremy) (Entered: 12/16/2015) |
| 12/21/2015 | 95 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 94 Notice of Appeal. (Tripp, S.) (Entered: 12/21/2015) |
| 12/28/2015 | 96 | US Court of Appeals Case Number: 15–2579 (R. Sewell, Case Manager) as to 94 Notice of Appeal. (Foell, S.) (Entered: 12/29/2015) |
| 01/06/2016 | 97 | Notice of Cross Appeal filed by Trans1, Inc., Michael Luetkemeyer, Richard Randall, Kenneth Reali, Joseph P. Slattery as to 54 Order on Motion to Alter Judgment,,. Filing fee, receipt number 0417–3538018. (Segars, Thomas) (Entered: 01/06/2016) |
| 01/07/2016 | 98 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 97 Notice of Cross Appeal. (Tripp, S.) (Entered: 01/07/2016) |

JA-13

| 01/07/2016 | 99 | US Court of Appeals Case Number 16–1019 (Richard H. Sewell, Case Manager) as to 97 Notice of Cross Appeal filed by Kenneth Reali, Joseph P. Slattery, Richard Randall, Michael Luetkemeyer, Trans1, Inc. (Tripp, S.) (Entered: 01/07/2016) |
|---|---|---|
| 01/07/2016 | 100 | ORDER of US Court of Appeals as to 94 Notice of Appeal, filed by Phillip J. Singer, 97 Notice of Cross Appeal filed by Kenneth Reali, Joseph P. Slattery, Richard Randall, Michael Luetkemeyer, Trans1, Inc. – The court consolidates Case No. 15–2579 and Case No. 16–1019 as cross appeals. The appellant in Case No. 15–2579 shall be considered the appellant for purposes of the consolidated appeals and shall proceed first at briefing and at oral argument. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. (Tripp, S.) (Entered: 01/07/2016) |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JOEL CAPLIN, Individually and on Behalf of All Other Persons Similarly Situated, | Civil Action No.: 7:12-cv-00023-F |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| TRANS1 INC., KENNETH REALI, JOSEPH P. SLATTERY, RICHARD RANDALL, and MICHAEL LUETKEMEYER, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Phillip J. Singer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Trans1 Inc. ("Trans1" or the "Company"), analysts' reports and advisories about the Company, interviews with confidential informants, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all

JA-15

persons other than defendants who purchased Trans1 securities between February 23, 2009 and

October 17, 2011, both dates inclusive (the "Class Period"), seeking to recover damages caused

by Defendants' violations of the federal securities laws and to pursue remedies under the

Securities Exchange Act of 1934 (the "Exchange Act") against the Company and certain of its

top officials.

2.     Trans1 designs, develops, and markets medical devices to treat degenerative disc

disease affecting the lower lumbar region of the spine. Trans1 received its first 510(k) clearance

from the Food and Drug Administration ("FDA") to manufacture, market, and sell its AxiaLIF

line of products (collectively "AxiaLIF") in the fourth quarter of 2004, a clearance process that is

less costly and requires less supportive clinical data than the FDA's Pre-Market Approval

("PMA") application process. AxiaLIF, which utilizes a "pre-sacral approach," is designed to

provide the least invasive approach for surgeons to perform fusion and motion preserving

surgeries in the L4/L5/S1 region of the spine. One of the unique characteristics of the AxiaLIF

procedure is that it is performed straight up the tailbone, rather than through the anterior (front)

portion of the spine. The patient is on his/her stomach throughout the entire procedure.

3.     Trans1 derives its revenue almost *entirely* from sales of its AxiaLIF products and

related surgical instruments. In other words, Trans1's financial viability rests on the successful

sale of AxiaLIF to surgeons.

4.     Trans1, like all medical device companies, primarily derives its revenues from

surgeons who utilize the device in surgeries and are thereafter reimbursed for the procedure from

private or federally funded insurance companies. Trans1's financial viability is directly linked to

a surgeon's ability to get reimbursed for AxiaLIF. If insurance companies refused to reimburse

surgeons for an AxiaLIF procedure, they would simply stop utilizing the device. In order to

submit a procedure for reimbursement to an insurance company, providers must enter a code, known as a Current Procedural Terminology ("CPT")[1] code, which classifies the procedure and helps the insurance company determine whether it qualifies for reimbursement. Such codes are issued by the American Medical Association ("AMA"). Where applicable, the AMA often adopts the classification recommendation of the National Association of Spine Surgeons ("NAS").

5.    Prior to 2009, surgeons using AxiaLIF obtained reimbursement from insurance companies using CPT codes reserved for spinal procedures that approach the anterior portion of the spine. This allowed surgeons to procure reimbursement for AxiaLIF unperturbed, securing a viable revenue stream for the Company. In 2008, however, a seismic shift occurred in AMA's coding for AxiaLIF which threatened the future viability of the Company. Specifically, the NAS concluded that AxiaLIF was not in fact a traditional anterior procedure, because it was performed straight up the tailbone, and not through the anterior portion of the spine. In other words, the AxiaLIF approach did not compare sufficiently to the traditional anterior approach used in other widely tested fusion surgeries. As a result of the NAS's conclusion, the AMA assigned a Category III (also known as an "experimental" or "T-Code") CPT code to AxiaLIF effective January 2009.

6.    The new experimental designation by the AMA presented a serious threat to the Company's future revenue stream. Insurance companies generally do not grant reimbursement to surgeons for performing experimental procedures, opting to reimburse only those procedures identified as traditional ("Category I") by the AMA. Facing the risk of not getting paid for their work and not receiving reimbursement for procedures done with a costly device, surgeons shied

---

[1] CPT® is a registered trademark of the American Medical Association ("AMA").

away from using AxiaLIF, turning instead to other fusion surgeries where reimbursement was assured.

7.    Desperate to maintain the Company's sole source of revenue, Defendants embarked on a campaign to encourage surgeons to disregard the Category III code and employ alternate, wholly inapplicable, CPT codes to receive reimbursement. Examples of this illicit campaign include Defendants: (1) forming a reimbursement committee to "coach" surgeons on how to avoid using the assigned Category III CPT code and utilize an inapplicable CPT code meant for anterior procedures; (2) holding conference calls with distributors during which they were trained on how to convince surgeons to use the CPT code for anterior procedures rather than the mandatory Category III code; (3) creating a template setting forth specific steps surgeons should take to avoid using the assigned Category III coding and fraudulently obtain reimbursement; (4) drafting and dispersing a Reimbursement Guide setting forth alternate codes to use in place of the mandatory Category III code; and (5) promoting the use of the anterior CPT code rather than the assigned Category III code at the Company's National Meeting held in January 2009, attended by Defendant Randall.  Such blatant machinations directly violated the False Claims Act and other federal fraud and healthcare statutes, and were hidden from investors.

8.    Defendants' deceptive tactics inevitably caught the notice of regulators.  On October 18, 2011, after the market closed, the Company revealed that it had received a subpoena from the Department of Health and Human Services ("DHHS"), Office of Inspector General. The subpoena, issued under the authority of the federal healthcare fraud and false claims statutes, requested documents for the period January 1, 2008 through October 6, 2011.

Case 7:12-cv-00023-F   Document 29   Filed 07/11/12   Page 4 of 45

JA-18

9.    As a result of this disclosure, investors engaged in a massive selloff of Trans1 shares the following day, causing its share price to plummet $1.27 or more than 40%, on unusually heavy trading volume of 2.1 million shares.

10.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants engaged in a scheme to encourage surgeons to continue using the CPT code for anterior procedures in direct disregard of the AMA's Category III code assignment for AxiaLIF; (2) the Company's revenues, derived primarily from sales of AxiaLIF, were generated as a direct result of Defendants' improper coding scheme; (3) the Company was in  violation of the False Claims Act and other federal healthcare fraud statutes; (4) the Company's improper reimbursement practices rendered it highly likely that it would face regulatory scrutiny; (5) the Company lacked adequate internal and financial controls; and (6) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

Case 7:12-cv-00023-F   Document 29   Filed 07/11/12   Page 5 of 45

JA-19

13. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

14. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as Trans1's principal place of business is located within this District.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. Lead Plaintiff, as set forth in his Certification previously filed with this Court, purchased Trans1 securities at artificially inflated prices during the Class Period and has been damaged thereby.

17. Defendant Trans1 is a Delaware corporation, with its principal place of business located at 301 Government Center Drive, Wilmington, N.C. 28403. Trans1's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "TSON." The Company sells its products directly to hospitals and surgical centers in the United States and certain European countries, and to independent distributors elsewhere.

18. Defendant Kenneth Reali ("Reali") has been the Company's Chief Executive Officer ("CEO") and a director on the Board of Directors ("Board") since January 4, 2011 and President since January 2010. Defendant Reali served as the Company's Chief Operating Officer from January 4, 2010 through January 2011.

19.    Defendant Joseph Slattery ("Slattery") has been the Company's Executive Vice President and Chief Financial Officer ("CFO") since April 2010.  Defendant Slattery served as a director on the Board from November 2007 through April 2010.

20.    Defendant Richard Randall ("Randall") served as the Company's Chief Executive Officer from June 2002 to January 2011, and served as its President from June 2002 until January 2010.  Defendant Randall has been a member on the Company's Board since June 2002 and has served as the Company's Executive Chairman of the Board since January 4, 2011.  During the Class Period, between May 26, 2010 and May 27, 2010, Defendant Randall disposed of a massive 100,000 shares of Company stock at inflated prices.  He sold an additional 20,000 shares of stock at inflated prices on August 17, 2011, a mere two months before the end of the Class Period.

21.    Defendant Michael Luetkemeyer ("Luetkemeyer") served as the Company's Chief Financial Officer from April 2007 through March 2010.

22.    The defendants referenced above in ¶¶ 18 through 21 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.    Trans1 is a medical device company focused on designing, developing and marketing products that implement its minimally invasive surgical approach to treat degenerative conditions of the spine affecting the lower lumbar region.  The Company currently markets the AxiaLIF ® family of products, ***which is its primary source of revenue***.

24.    AxiaLIF utilizes a "pre-sacral" approach designed to provide the least invasive means for surgeons to perform fusion and motion preserving surgeries in the L4/L5/S1 region of

7

JA-21

the spine as compared to the current alternative lumbar fusion procedures. The AxiaLIF procedure is performed straight up the tailbone, rather than through the anterior (front) portion of the spine. In other words, as explained in the Company's own filings, the patient is on his/her stomach for the entire procedure, rendering the procedure distinct from traditional fusion surgeries which utilize an "anterior", or frontal, approach.

25.     The Company received 510(k) clearance from the FDA for AxiaLIF 1L in the fourth quarter of 2004, and commercially introduced its AxiaLIF 1L product in the United States in the first quarter of 2005. It received FDA 510(k) clearance for AxiaLIF 2L and began marketing this product in the United States in the second quarter of 2008. The AxiaLIF 2L product was discontinued in 2010 after Trans1 launched the AxiaLIF 2L+™ product in July 2010, for which it received FDA 510(k) clearance in January 2010. The FDA's 510(k) approval process, through which all of the Company's products were marketed, is far less costly and rigorous than the FDA's Pre-Market Approval process for a device or pharmaceutical, and *requires less supporting clinical data*. As a result, the Company did not have substantial long-term clinical data supporting the safety and efficacy of its AxiaLIF products.

26.     While the 510(k) process made it easier, and quicker, for the Company to obtain FDA approval, it resulted in a dearth of evidence to evaluate whether AxiaLIF is as effective or as safe as other surgical approaches to lumbosacral interbody fusion. This was especially true in light of the fact that the AxiaLIF procedure, unlike other fusion surgeries which have been adequately tested and studied, does not employ an anterior approach but rather is solely performed straight up the tailbone. It is this lack of evidence, as well as its unique procedure, which ultimately led the AMA to consider AxiaLIF "investigational" or "experimental."

## The AMA Issues a Category III Code for AxiaLIF

27.    In order to facilitate reimbursement to doctors for services rendered, the AMA developed a system of CPT codes, divided into three categories, which is utilized by insurance companies and federally funded insurance programs to determine eligibility and levels of reimbursement.  Federal law, including the False Claims Act, requires surgeons to label services rendered with an appropriate CPT code, to insure that reimbursement from these sources are legitimately procured.  Thus, to submit a claim for reimbursement for the AxiaLIF procedure to insurance companies, surgeons must utilize the proper CPT code.  Prior to 2009, AxiaLIF could be coded in one of three ways: a) as an anterior fusion procedure, b) as a posterior fusion procedure, or c) as a lateral fusion procedure.  Trans1 identified AxiaLIF as an anterior fusion procedure and the surgeons generally coded it accordingly.  When coded as an anterior fusion procedure, surgeons had no problem obtaining reimbursement for AxiaLIF, insuring a consistent revenue stream for the Company.

28.    However, in February 2008, the National Association of Spine Surgeons Reimbursement Coding Committee, which is charged to monitor new procedures and devices and there reimbursement, proposed a Category III CPT code for the AxiaLIF procedure to the AMA.  Category III coding is typically applied when there is a lack of clinical data regarding a device which renders it a "new and emerging" technology.  Indeed, because Defendants obtained approval for AxiaLIF using the 510(k) process, it suffered from a dearth of safety and efficacy data.  In addition, the AxiaLIF procedure did not employ an anterior (frontal) approach like many other traditional fusion surgeries, and thus could not be sufficiently compared to such surgeries to assure safety and efficacy.  Due to the scarcity of supportive data and the uniqueness of the AxiaLIF procedure, the AMA assigned a Category III CPT code 0195T to the device,

9

JA-23

effective January 1, 2009. The assignment of a Category III, or "T Code" to AxiaLIF identified the procedure as "investigative" or "experimental" to insurance companies. In light of this designation, most insurance companies (including federally funded programs) refused to reimburse surgeons for the procedure, thereby threatening the Company's revenue stream and financial viability.

### Defendants Encourage Physicians to Engage in Improper Reimbursement Tactics

29.    Desperate to maintain its primary source of income, Defendants embarked upon an extensive scheme to convince surgeons to engage in improper reimbursement practices in direct violation of the False Claims Act, and other federal healthcare statutes. Specifically, Defendants encouraged and coached surgeons to utilize alternate codes, instead of the mandated experimental Category III designation assigned to AxiaLIF, in order to allow for reimbursement for the procedure.

30.    To execute this scheme, Defendants formed a reimbursement committee, headed by Amy Conners, for the sole purpose of training surgeons to avoid the mandatory Code III designation. At Defendants' direction, Conners and her team drafted presentations for surgeons detailing exactly which non-experimental codes to use, and in what manner, so that insurance companies would reimburse them for the AxiaLIF procedure. Conners also created a hotline to which surgeons could call for tips on how to code the procedure and avoid the Category III code.

31.    Trans1 also held periodic conference calls on which distributors were coached to tell surgeons to use the Category I CPT code intended for anterior fusion procedures, a non-experimental code, even though the AMA required them to use the experimental 0195T Category III code. Aside from the fact that such instructions clearly violated the AMA's Category III designation, AxiaLIF clearly did not qualify as an anterior procedure, because: 1) it is performed

straight up the tailbone and never approaches the anterior portion of the spine; and 2) the device is inserted through the back with patient lying on his stomach throughout the entire procedure. To assuage nervous doctors who were aware of the Category III designation, distributors were advised to tell surgeons that this is how all surgeons coded for the procedure.

### Trans1's Suspicious "Training Sessions"

32.    In a further attempt to encourage doctors to manipulate their reimbursement coding, Trans1 held on site training sessions for surgeons at locations where they knew the physicians were utilizing improper coding for AxiaLIF, such as the code for anterior fusion procedures, as opposed to the proper Category III code.  The most popular of these training sites was in Cincinnati, Ohio where Dr. William Tobler conducted training sessions. Dr. Tobler, Trans1's top consultant, conducted frequent training sessions and gave numerous presentations during the Class Period promoting the Company's AxiaLIF procedure.  At those training sessions, Dr. Tobler coded for the AxiaLIF procedure as a Category I procedure.  These training sessions were crafted to create the optimal environment for surgeons to share tips on how to manipulate the coding to get reimbursed.

### The Illicit "Reimbursement Guide" and "Template"

33.    Defendants also developed and distributed to surgeons a "Reimbursement Guide," dated January 1, 2009 through June 30, 2009.  The Reimbursement Guide enumerates multiple codes which it states "may be appropriate during an AxiaLIF procedure", the overwhelming majority of which are not the mandated Category III code.  It is only on the last page of the guide that physicians learn that in fact AxiaLIF had been assigned a Category III CPT billing code. The Reimbursement Guide acknowledges that payors may deny claims submitted under the

11

Category III CPT code and brazenly directs physicians to use alternate codes to secure reimbursement.

34.     Going even further in their effort to encourage surgeons to break the law, the Company directed Dr. Tobler to create a reimbursement template that discussed precisely how to code AxiaLIF as an anterior procedure to enable reimbursement.  The template went so far as to suggest post operation notes to disguise the fact that the procedure was an AxiaLIF procedure, which might trigger the denial of a reimbursement claim.

35.     Moreover, during the Class Period, Trans1 held annual National Meetings, attended by the Company's employees and executives.  At the 2009 meeting, which Defendant Randall attended, the Company continued to promote the use of the anterior CPT code, despite the fact that the Category III code had already been assigned to AxiaLIF.

36.     As a result of these machinations, all of which were undisclosed to investors, the Company violated the False Claims Act, as well as other federal anti-fraud and healthcare statutes.  Indeed, Defendants' blatant gamesmanship created an acute risk that the Company would be subject to scrutiny by the DHHS and other regulatory bodies.

## **Confidential Witnesses**

37.     Several former Trans1 employees have confirmed Defendants' systematic attempt to convince surgeons to submit improper reimbursement requests to insurance companies and federally funded healthcare programs.

38.     Confidential Witness 1 ("CW1"), a former product manager at Trans1 from August 2007 until April 2010, stated that when he first joined Trans1 in 2007, the insurance companies had not assigned a specific CPT code for Trans1's AxiaLIF procedure.  As such, doctors used a series of "general" codes to obtain reimbursement for the procedure. CW1

Case 7:12-cv-00023-F   Document 29   Filed 07/11/12   Page 12 of 45

JA-26

explained that there were 3 possible codes for a spinal fusion procedure available before Trans1 was assigned the experimental T-code in January 2009: a) an ALIF or anterior lumbar interbody fusion; b) a PLIF, or posterior lumbar interbody fusion or c) a TLIF, a transforaminal lumbar interbody fusion. According to CW1, Trans1 coded its AxiaLIF procedure as an ALIF procedure. However, CW1 explained that although the procedure was coded as an ALIF procedure, it did not truly meet the requirements for this code because access to the spine was achieved through the posterior region of the body, not the anterior. According to CW1, an ALIF procedure is supposed to go through the patient's stomach.

39.     CW1 stated that Trans1 received an "experimental" code in January 2009, which caused insurance companies to cease reimbursing surgeons for the AxiaLIF procedure. According to CW1, because Trans1's code was designated "experimental," the new code served as a red flag to insurance companies to deny coverage of the procedure. CW1 said that NAS recommended that AMA assign an experimental T-code to the AxiaLIF procedure. CW1 said that surgeons did not gravitate toward using the AxiaLIF procedure because it was "different" and was not the "standard of care."

40.     CW1 further stated that Amy Conner (the former head of reimbursement) told him that she warned the Vice President of Sales, Rick Simmons, in the fall of 2008 that if Trans1 received the new Category III "experimental" T-code, it would have a very negative impact on sales.

41.     From conversations with Conner and other colleagues, CW1 learned that after the implementation of the new code in January 2009, "doctors were being coached on how to code it so they could bury the [newly designated] code" and get the procedure reimbursed. According to CW1, at the direction of senior management, Conner gave presentations to surgeons showing

13

JA-27

them how to code the procedure in order to get reimbursed. CW1 explained that during these presentations, Conner showed how surgeons typically coded a general spinal fusion procedure using other companies' products. Then she demonstrated how to code it using Trans1's AxiaLIF's device. CW1 observed Conner showing surgeons how to input the numbers in a certain order to ensure reimbursement for the procedure. CW1 said that Conner's presentations focused on showing surgeons how to bury the new T-Code in the bottom part of the reimbursement request so that insurance companies might overlook it. According to CW1, Conner also made presentations to the Trans1's Board regarding reimbursement issues. In addition, Trans1 set up a "hotline," staffed with Conner's people, that doctors could call to get their questions answered regarding coding.

42.    Confidential Witness 2 ("CW2") was the clinical data manager in the research division of Trans1, from May 2008 until he was laid off in April 2011. He reported to the director of clinical operations. CW2 was hired to build an electronic database for Trans1 clinical trials, and his job included verifying research documents and ensuring that clinical data was properly prepared and entered into a database. According to CW2, from 2005 to 2009, insurance companies covered the AxiaLIF procedure as "an anterior procedure." According to CW2, the NAS decided in 2008 that Trans1's procedure was "not a traditional anterior procedure." The AMA, which considered the NAS the experts in the field, followed its decision and assigned an "exploratory" code to the AxiaLIF procedure effective January 2009. CW2 explained that during a review of many non-traditional minimally invasive surgeries, the NAS made this decision because the point of entry for the AxiaLIF procedure is straight up the tailbone, instead of through the anterior portion of the spine.

14

JA-28

43.    CW2 stated that the code change led to financial difficulties for the Company because most insurance companies no longer covered the AxiaLIF procedure, and fewer doctors used it due to concerns about reimbursement.  "It's a very competitive market and there are multiple solutions" for surgeons to utilize in treating back problems, CW2 said.  "If one procedure has a blight on it, they won't use it.  If there are financial difficulties they won't use it."

44.    According to CW2, shortly after the AMA announced the code change, Trans1 formed a reimbursement group to "coach" physicians on how to code the AxiaLIF procedure to get reimbursed for AxiaLIF.  In fact, as CW1 explains, after the new "T-code" was assigned, Conner (former head of reimbursement) gave PowerPoint presentations to surgeons, which CW1 attended, showing them how to code the AxiaLIF procedure by burying the new code lower on the list so that they would get reimbursed.

45.    Confidential Witness 3 ("CW3") was a distributor of Trans1 and other spinal products since December 2006.  He began distributing Trans1's AxiaLIF in 2008.  According to CW3, there were always coding and reimbursement issues with AxiaLIF because it did not utilize a "traditional approach."  CW3 stated that in 2009 at the National Society of Spine Surgeons conference in Las Vegas, Nevada, Dr. Will Smith was scheduled to speak about the AxiaLIF procedure.  Smith, who had done more AxiaLIF procedures than any other surgeon in the country, and had helped found the Company, gave a scathing review of AxiaLIF at the conference.  Smith reported poor success rates, infections, and cases where the implants did not fuse to the spine.  As a result of this speech, CW3 said that surgeons avoided AxiaLIF "like the plague" and Trans1 never got the Category I code it needed to ensure reimbursement for the procedure.

15

46.     According to CW3, Trans1 had a coding department which held periodic conference calls with distributors about coding and told distributors what to tell surgeons about coding. Trans1 told distributors to use an "ALIF" code, despite the fact that it did not qualify as an anterior procedure. CW3 explained that if the implant does not end up in the anterior third of the vertebral body during the procedure, the surgeon cannot claim he has performed an anterior procedure and use the ALIF code. AxiaLIF did not end up in the anterior third of the spine so it did not qualify as an anterior procedure.

47.     According to CW3, distributors were told to tell surgeons to "flip the patient over" and do anterior and posterior fusion (also known as a 360). According to CW3, Trans1 advised distributors that if some surgeons were not comfortable and did not want to be "seen as coding something that is not there," distributors were supposed to tell them: "We have seen other surgeons use this code and be successful." As a result of all these code changes, Trans1 lost credibility with surgeons, who thought using some of the Company's code suggestions were unethical. According to CW3, "Trans1 told us to do whatever we had to do," to get surgeons to use its product. He recalled after another call he was told to suggest a T-LIF code.

48.     As CW3 stated, "[AxiaLIF] was doomed to fail without its own code." CW3 stopped selling its products in April 2011 because Trans1 "sold a lot of lies and hurt a lot of people…I felt they were asking me to say stuff that was not true."

49.     Confidential Witness 4 ("CW4"), a regional sales manager for Trans1 from January 2011 until he was laid off in February 2012, explained that when the AxiaLIF procedure is performed, the patient is always placed face down on the table. The tables are specially constructed to enable the patient to be in a prone position on their knees with their buttocks in the air and their face on the table. The incision is made about 2 inches north of the rectum and the

16

JA-30

device is implanted along the lower portion of the spine. According to CW4, at no point is the patient flipped over.   In other words, use of the anterior procedure coding was wholly inappropriate, because the device never passed through the stomach, and was not implanted in the anterior third of the spine.

50.    According to CW4, when he started working at Trans1, it was already using the new T-Code for reimbursement. CW4 said the T-Code was categorized as an "investigational" code, and as a result, surgeons who tried to use it did not get reimbursed for the procedure from insurance companies. As a result, CW4 says he "didn't have any business…because the doctors couldn't get paid."  He explained that none of the physicians he called wanted to use the T-code and not get reimbursed for the procedure.  CW4 explained that, "the only way to get paid for it was for the doctor to do something shifty."

51.    Confidential Witness 5 ("CW5") worked as a District Sales Manager at Trans1 covering four mid-Western states from March 2008 until January 2010 and as Regional Sales Manager for 10 mid-Western states from around October 2011 until he was laid off on May 31, 2012.  CW5 explained that he was laid off because Trans1 couldn't get any business since it did not have the right code to get reimbursed for the AxiaLIF procedure. According to CW5, until January 2009, Trans1 had not yet received a separate "T-Code" for its AxiaLIF procedure.  As a result it could be coded in one of three ways: a) as an anterior fusion procedure, b) as a posterior fusion procedure, or c) as a lateral fusion procedure. According to CW5, Trans1 coded it as an anterior fusion procedure and surgeons had no problem getting reimbursement from insurance companies. CW5 said that "All the surgeons I worked with coded it that way" because it "was the only code available to use." Once the new CPT code came out in January 2009, however, Trans1 continued to encourage surgeons to code the procedure as an anterior fusion procedure in

17

JA-31

order to continue to get reimbursed. CW5 stated that "When we got the T-code, surgeons couldn't get it approved, so they had to use another approach…There were still some backdoor … 'hey just code it as an anterior and it'll get reimbursed.'"

52.    CW5 explained that Trans1 routinely sent prospective surgeons and its sales reps to participate in onsite training where surgeons performed the AxiaLIF procedure on cadavers. According to CW5, Trans1 made sure to schedule the onsite visits at places that were using the anterior coding, despite the T-code assignment, and the fact that AxiaLIF was clearly not an anterior procedure. CW5 explained: "We were definitely instructed to tell them to code it as an anterior procedure." According to CW5, A lot of onsite visits took place in Cincinnati, Ohio, where the procedure was performed by a surgeon named Dr. William Tobler. CW5 said the training visits were set up so that the surgeons could talk amongst themselves about anything involving the procedure, including coding.

53.    According CW5, Dr. Tobler created a template that discussed exactly how to code the procedure as an anterior procedure so that the surgeons could get reimbursed. CW5 stated that the template even contained suggested post-operation notes so the insurance companies would not view the procedure as an AxiaLIF procedure and deny reimbursement. According to CW5, he was instructed to tell surgeons: "I can't give you direct advice on how to code, but here is what I've heard other people are doing."

54.    CW5 attended regular Regional Sales Managers Meetings and National Meetings for Trans1 which occurred at least once a year. At the 2008 National Meeting in Las Vegas, Nevada, Trans1 was still using the "anterior" code for the AxiaLIF procedure and sales were strong. According to CW5, at the National Meeting in January 2009 held in Nevada, Trans1 was still promoting use of the anterior coding for the AxiaLIF procedure, despite the fact that the

18

JA-32

AMA had already assigned it a Category III code. CW5 said the official company line was to tell surgeons, "We have a T-code, but here's how other guys are coding it." Defendant Randall attended these meetings.

55.     Indeed, CW5 stated that he heard from the former Regional Sales Manager in North Carolina that Dwayne Montgomery, Vice President of Sales, instructed him to tell surgeons to inappropriately code the procedure. The former Regional Sales Manager refused and lost his job as a result.

56.     Confidential Witness 6 ("CW6") was the international marketing coordinator for Trans1 from December 2007 to February 2011 when she was laid off. During that time, CW6 reported to the vice president of international sales. CW6 also worked as an administrative assistant to Defendants Randall and Reali until April 2010. According to CW6, when she first joined Trans1, doctors received reimbursement for the AxiaLIF procedure and it was not considered experimental. After AxiaLIF received the Category III code in January 2009, the new code "red flagged" the procedure as "experimental." Up until that point, Trans1 had been gaining market share. CW6 described the new code as "pretty devastating to the bottom line." According to CW6, surgeons "won't do the procedure if they're not paid."

57.     Confidential Witness 7 ("CW7"), a former South East sales manager for Roundtable Medical from April 2008 until November 2011, was the largest Trans 1 distributor in South Florida. CW7 worked with doctors already using AxiaLIF rather than selling to new accounts. According to CW7, there were reimbursement issues with Trans1's AxiaLIF fusion system, and "a lot of accounts stopped using us." CW7 stated that after AxiaLIF received the new coding, providers became unsure they would be reimbursed for the AxiaLIF procedure and "business literally went from great to nothing."

19

58.    CW7 explained that prior to 2009, surgeons often used a 360 code to obtain reimbursement for AxiaLIF, a code used for an anterior and posterior fusion.  In this procedure, "you lay the patient on their back, put the device in from the front, flip the patient over and put the screws in the back."  The 360 was "the highest reimbursement code."  According to CW7, at some point in time the AMA assigned a "T-code", generally used for experimental procedures. CW7 learned that the 360 code should never have been used in the first place.  Doctors began to steer clear of the AxiaLIF procedure because of the reimbursement confusion.  CW7 stated that "we were always trying to figure out what code to tell doctors to use." Both doctors and hospitals were worried about reimbursement for the AxiaLIF system.

### Materially False and Misleading
### Statements Issued During the Class Period

59.    On February 23, 2009, Trans1 held an analyst earnings call for the fourth quarter of 2008.  On that call, Defendants Randall and Luetkemeyer spoke about the migration to Category III coding, which when used, would prevent surgeons from receiving reimbursement for the AxiaLIF procedure.  Specifically, the Defendants stated in relevant part:

Defendant Randall: On the reimbursement front, we remain diligent about helping our surgeons obtain appropriate reimbursement for our procedure. We have an 800 number and a call-in resource center up and running to assist surgeons with reimbursement issues that may arise.

As many of you know, a portion of our surgeon fee migrated from an unlisted code to a category three CPT tracking code in January 2009. While we remain focused on supporting our surgeons through this transition, we do not anticipate that this will create any significant additional headwind with regards to adoption.

\*\*\*

Defendant Luetkemeyer: Doug, what we said in the script was that the conversion from unlisted to category three, we didn't see giving us any significant additional headwind. I think the metric that we've provided in the past is that we feel, and it's hard to really quantify it, but we feel that unlisted code gave us about a 5% kind of a headwind and it's probably consistent again this year. We don't feel that

20

moving from unlisted to category three is going to provide any significant additional headwind.

60.    On March 13, 2009, the Company filed an annual report for the period ended December 31, 2008 on Form 10-K with the SEC, which was signed by, among others, Defendants Randall, Luetkemeyer and Slattery, and reiterated the Company's previously announced annual financial results and financial position.  In addition, the Form 10-K contained signed certifications by Defendants Randall and Luetkemeyer, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

61.    The 10-K represented the following:

Our revenue is derived entirely from sales of our AxiaLIF products and related surgical instruments. We expect that sales of our AxiaLIF products will continue to account for a substantial portion of our revenues for the foreseeable future.

***

Surgeons use the American Medical Association's Current Procedural Terminology, or CPT, system to bill payors for the AxiaLIF procedure. CPT codes describe the services and procedures provided for patients to third party payors so that physicians may be reimbursed. Effective January 1, 2009, AxiaLIF has a dedicated Category III CPT code (0195T-arthrodesis, presacral interbody technique, including instrumentation). Unlike Category I CPT codes, Category III codes do not have a set value which physicians use to set their charge for a particular code. Additionally, some payors view Category III codes as "investigational" or "experimental" and may not reimburse them. However, AxiaLIF adoption continues to grow and unlike many new or novel procedures, AxiaLIF is an access variation on the current standard of care (spinal fusion). As the availability of peer-reviewed research continues to grow, we will diligently work with the private payor community to ensure continued patient access to the procedure. Furthermore, AxiaLIF is only one of up to 10 different CPT codes physicians may submit to capture the entirety of a spinal fusion procedure lessening the impact should payment for our code be initially denied.

62.    The foregoing statements were false and/or misleading because they failed to disclose to investors that: (1) Defendants engaged in a scheme to encourage surgeons to employ

21

JA-35

CPT codes meant for anterior and other non-Category III procedures in direct disregard of the AMA mandated Category III code for AxiaLIF; (2) a substantial portion of the Company's earnings and revenues were thereby earned as a result of violations of the False Claims Act and other healthcare fraud statutes; and (3) as a result of the Company's practices, there was a substantial risk that Trans1 would encounter regulatory scrutiny.

63.    On April 27, 2009, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2009. For the quarter, the Company reported a net loss of $5 million, or $0.25 diluted LPS and revenue of $9 million, as compared to a net loss of $2 million, or $0.12 diluted LPS and revenue of $6 million for the same period a year ago.

64.    On a conference call that same day, Defendant Randall updated investors regarding reimbursement and coding issues. Defendant Randall stated in relevant part:

> On the reimbursement front, we remain diligent about helping our surgeons obtain appropriate reimbursement for our procedure. We have an 800 number and call-in resource center, up and running to assist surgeons with reimbursement issues that may arise.
>
> We have also added two additional reimbursement specialists in the field to work with our surgeon customers and their billing specialists, to help them determine the appropriate coding for the fusion procedures they are performing.
>
> As a strong case volume this quarter would suggest, we have not seen a drop off in procedure volumes as a result of the current weak economic conditions. Having said that, we have begun to see some insurance companies raising the bar on whether to pay for fusion surgery in general or asking more patients to get a second opinion, before agreeing to cover the procedure.
>
> \*\*\*
>
> …we had the category-three code put in place in January and that was a change in coding. We have actually put out a coding guide now, which has been blessed by everyone. And coding fusions is fairly complex and what we saw initially with the category-three code was right away a lot of coders in the practice went to the concern that like the Charité disc they are just not going to get paid.

22

JA-36

The reality is, as we've discussed in the past, this access code is one of several codes that they employ during a typical fusion. So I would say our coding issues have been grassfires, not forest fires, and so, this flare is up. A coder becomes concerned, because they see a category-three code. And we either work through the rep, or we work through the hotline, or now we've actually, as I have mentioned, brought on a couple of field related personnel, who had worked by the way at Saint Francis Medical, where they knew category-three code inside and out. Those people are then, if needed, deployed and we put these fires out.

I don't think we've had many instances, if any, where we just have surgeons stop doing this, but often times there is a concern when they see the category-three code. We need to work with them and once they understand the coding sequence, based on the particular operation that that surgeon does, we move through the process. So, that's why we proactively hired these folks. And now, the plan going forward is as we bring in new surgeon on by having field base, personnel to deal with this matter. We can actually have those personnel meet with the coders before the surgeon even treats patients with AxiaLIF, so that we don't even have the little flash fire to deal with.

65.     On May 6, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on Form 10-Q with the SEC, which was signed by Defendants Randall and Luetkemeyer and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications by Defendants Randall and Luetkemeyer, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

66.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

67.     On July 31, 2009, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2009.  For the quarter, the Company reported a net loss of $7 million, or $0.33 diluted LPS and revenue of $8 million, as compared to a net loss of $5 million, or $0.26 diluted LPS and revenue of $6 million for the same period a year ago.

68.    On August 6, 2009, the Company filed a quarterly report for the period ended June 30, 2009 on Form 10-Q with the SEC, which was signed by Defendants Randall and Luetkemeyer and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Randall and Luetkemeyer, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

69.    The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.


70.    On October 29, 2009, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2009.  For the quarter, the Company reported a net loss of $5.6 million, or $0.27 diluted LPS and revenue of $7 million, as compared to a net loss of $5 million, or $0.23 diluted LPS and revenue of $6 million for the same period a year ago.

71.    On November 6, 2009, the Company filed a quarterly report for the period ended September 30, 2009 on Form 10-Q with the SEC, which was signed by Defendants Randall and Luetkemeyer and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Randall and Luetkemeyer, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.  The 10-Q stated in relevant part:

> Revenue.  Revenue increased from $6.0 million in the three months ended September 30, 2008 to $6.9 million in the three months ended September 30,

24

2009. The $0.9 million increase in revenue from 2008 to 2009 was primarily attributable to an increase in the number of AxiaLIF products sold, which we believe resulted from continued market acceptance of our AxiaLIF and AxiaLIF 360° products, and the commercialization of our AxiaLIF 2L product in the United States, which had its full market release in the fourth quarter of 2008. Our revenues this quarter were impacted by continuing uncertainty in the marketplace surrounding reimbursement for our AxiaLIF procedure, which we are addressing with increased education and support resources for our current and prospective surgeon users. None of this increase was attributable to price increases.

72.    The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

73.    On February 23, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2009.  For the fourth quarter, the Company reported a net loss of $5.7 million, or ($0.28) diluted LPS and revenue of $6 million, as compared to a net loss of $4.5 million, or ($0.22) diluted LPS and revenue of $7.35 million for the same period a year ago.  For the year, the Company reported a net loss of $23 million or ($1.13) diluted LPS and revenue of $30 million, as compared to a net loss of $17 million, or ($0.84) diluted LPS and revenue of $25 million for the same period a year ago.

74.    On March 12, 2010, the Company filed an annual report for the period ended December 31, 2009 on Form 10-K with the SEC, which was signed by, among others, Defendants Randall, Luetkemeyer and Slattery, and reiterated the Company's previously announced annual financial results and financial position.  In addition, the Form 10-K contained signed certifications by Defendants Randall and Luetkemeyer, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

75.    The 10-K represented the following:

Our revenue is derived entirely from sales of our AxiaLIF products and related surgical instruments. We expect that sales of our AxiaLIF products will continue to account for a substantial portion of our revenues for the foreseeable future.

25

JA-39

***

Surgeons use the American Medical Association's Current Procedural Terminology, or CPT, system to bill payors for the AxiaLIF procedure. CPT codes describe the services and procedures provided for patients to third party payors so that physicians may be reimbursed. Effective January 1, 2009, the AMA implemented a Category III code which may describe the work involved in treating some AxiaLIF patients. Unlike Category I CPT codes, Category III codes do not have a set value which physicians use as a benchmark for setting their fee. Additionally, some payors view Category III codes as "investigational" or "experimental" and may not reimburse them. However, AxiaLIF adoption continues to grow and unlike many new or novel procedures, AxiaLIF is an access variation on the current standard of care (spinal fusion) and surgeons should code appropriately for the work they perform based on the unique clinical decision making, time, risk, and diagnosis of each patient.

76.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

77.     On May 4, 2010, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2010. For the quarter, the Company reported a net loss of $6 million, or $0.31 diluted LPS and revenue of $6.7 million, as compared to a net loss of $5 million, or $0.25 diluted LPS and revenue of $8.7 million for the same period a year ago.

78.     That same day, the Company held a conference call with analysts. On that call, Defendants Slattery and Reali stated in relevant part:

Defendant Slattery: Revenues in the first quarter of 2010 were $6.7 million, an increase of approximately $400,000 or 7% over the fourth quarter of 2009. Versus the prior year's first quarter revenues were down about $2 million or 23%. **The decrease from the prior year's Q1 was due to the impacts of the reimbursement environment, which began to cause a headwind in the second quarter of 2009.**
Defendant Reali: I can comment on what our strategy is. I think it is too early to comment on the success or not of that strategy, but I would think about our strategy in three pathways that we are pursuing, which were highlighted on the call today. First off, it is working with the payers to remove our experimental designation over time. And this has to be done on a payer by payer basis.

Secondly, it is working with the spine societies to gain endorsement and acceptance of our procedure in a broad manner. And thirdly, it is working with

26

JA-40

our physician customers getting further clinical data published and presented at key meetings such as the SAS meeting that was discussed last week.

First of all, it is still too early to project the success of our current strategy, as I mentioned. I think what we mean is by stabilization is just in our results itself. We are not seeing a decline quarter-over-quarter like we saw in the second half of 2009. What contributes to that? Certainly, we feel some of that is related to our three pronged approach on a reimbursement strategy, which is the current strategy that we are going forward with. And to your point, the endgame is a category one code.

***Now it is important to remember that the current code we have, which is a T code is not an experimental code. It is a tracking code. What we hope to do in the near term is work with payers to get that tracking code covered.*** Over time, as we evolve on this strategy and we penetrate the market, a decision will be made when we would apply for a category one code. But until we are successful in all parts of our strategy relative to payer acceptance and spine society endorsements and continued publications, we will not submit for a category one code.

79.    On May 10, 2010, the Company filed a quarterly report for the period ended March 31, 2010 on Form 10-Q with the SEC, which was signed by Defendants Randall and Slattery and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Randall and Slattery, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.  The 10-Q stated in relevant part:

Revenue. Revenue decreased from $8.7 million in the three months ended March 31, 2009 to $6.7 million in the three months ended March 31, 2010. The $2.0 million decrease in revenue from 2009 to 2010 was related to lower than expected case volume as a result of concerns and uncertainty in the marketplace surrounding physician reimbursement for our AxiaLIF procedure. We are addressing these issues with increased education and support resources for our current and prospective surgeon users. Domestically, sales of our AxiaLIF 2L product decreased from $2.3 million in the three months ended March 31, 2009 to $1.9 million in the three months ended March 31, 2010 and sales of our AxiaLIF 360° product decreased from $2.6 million in the three months ended March 31, 2009 to $1.4 million in the three months ended March 31, 2010. New products accounted for revenue of $132,000 in the first quarter of 2010. Average selling prices in the United States increased from approximately $10,600 in the three

27

JA-41

months ended March 31, 2009 to approximately $10,700 in the three months ended March 31, 2010. In the three months ended March 31, 2009 and 2010, we recorded 751 and 537 domestic AxiaLIF cases, respectively, including 261 AxiaLIF 360° cases and 168 AxiaLIF 2L cases in the first quarter of 2009, and 134 AxiaLIF 360° cases and 141 AxiaLIF 2L cases in the first quarter of 2010.

80.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

81.     On August 5, 2010, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2010.  For the quarter, the Company reported a net loss of $4 million, $0.18 diluted LPS and revenue of $7 million, as compared to a net loss of $7 million, or $0.33 diluted LPS and revenue of $8 million for the same period a year ago.

82.     On August 6, 2010, the Company filed a quarterly report for the period ended June 30, 2010 on Form 10-Q with the SEC, which was signed by Defendants Randall and Slattery, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Randall and Slattery, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.  The 10-Q stated in relevant part:

> *Revenue*   Revenue decreased from $7.9 million in the three months ended June 30, 2009 to $7.2 million in the three months ended June 30, 2010. The $0.7 million decrease in revenue from 2009 to 2010 was related to lower than expected case volume as a result of concerns and uncertainty in the marketplace surrounding physician reimbursement for our AxiaLIF procedure. Domestically, sales of our AxiaLIF 2L products decreased from $2.3 million in the three months ended June 30, 2009 to $2.2 million in the three months ended June 30, 2010 and sales of our AxiaLIF single level products decreased from $4.4 million in the three months ended June 30, 2009 to $3.6 million in the three months ended June 30, 2010. New products accounted for revenue of $0.4 million in the three months ended June 30, 2010. In the three months ended June 30, 2010, average revenue per AxiaLIF case continued to climb, helped by a price increase effective April 1, 2010, the limited market release of our AxiaLIF 2L+ product, and penetration into existing cases by our new products. In the three months ended June 30, 2009 and 2010, we recorded 671 and 541 domestic AxiaLIF cases,

28

respectively, including 175 AxiaLIF 2L cases in the three months ended June 30, 2009, and 148 AxiaLIF 2L cases in the three months ended June 30, 2010.

*** 

*Revenue*   Revenue decreased from $16.6 million in the six months ended June 30, 2009 to $14.0 million in the six months ended June 30, 2010. The $2.6 million decrease in revenue from 2009 to 2010 was related to lower than expected case volume as a result of concerns and uncertainty in the marketplace surrounding physician reimbursement for our AxiaLIF procedure. Domestically, sales of our AxiaLIF 2L products decreased from $4.6 million in the six months ended June 30, 2009 to $4.1 million in the six months ended June 30, 2010 and sales of our AxiaLIF single level products decreased from $9.5 million in the six months ended June 30, 2009 to $7.0 million in the six months ended June 30, 2010. New products accounted for revenue of $0.5 million in 2010. In the six months ended June 30, 2010, average revenue per AxiaLIF case continued to climb, helped by a price increase effective April 1, 2010, the limited market release of our AxiaLIF 2L+ product in January 2010, and penetration into existing cases by our new products. In the six months ended June 30, 2009 and 2010, we recorded 1,422 and 1,078 domestic AxiaLIF cases, respectively, including 343 AxiaLIF 2L cases in 2009 and 289 AxiaLIF 2L cases in 2010.

83.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

84.     On November 9, 2010, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2010.  For the quarter, the Company reported a net loss of $3.8 million, or ($0.18) diluted LPS and revenue of $6 million, as compared to a net loss of $5.6 million, or ($0.27) diluted LPS and revenue of $7 million for the same period a year ago.

85.     On November 10, 2010, the Company filed a quarterly report for the period ended September 30, 2010 on Form 10-Q with the SEC, which was signed by Defendants Randall and Slattery and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications by Defendants Randall and Slattery, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.  The 10-Q stated in relevant part:

29

*Revenue* Revenue decreased from $6.9 million in the three months ended September 30, 2009 to $6.3 million in the three months ended September 30, 2010. The $0.6 million decrease in revenue from 2009 to 2010 was related to lower case volume as a result of concerns and uncertainty in the marketplace surrounding physician reimbursement for our AxiaLIF procedure. Domestically, sales of our AxiaLIF single level products decreased from $4.1 million in the three months ended September 30, 2009 to $3.2 million in the three months ended September 30, 2010, and sales of our AxiaLIF 2L products increased from $1.8 million in the three months ended September 30, 2009 to $1.9 million in the three months ended September 30, 2010. New products accounted for revenue of $0.3 million in the three months ended September 30, 2010. In the three months ended September 30, 2010, average revenue per AxiaLIF case continued to increase, helped by a price increase effective April 1, 2010, the release of our AxiaLIF 2L+ product, and penetration into existing cases by our new products. In the three months ended September 30, 2009 and 2010, we recorded 606 and 490 domestic AxiaLIF cases, respectively, including 138 AxiaLIF 2L cases in the three months ended September 30, 2009, and 136 AxiaLIF 2L and 2L+ cases in the three months ended September 30, 2010.

***

*Revenue* Revenue decreased from $23.5 million in the nine months ended September 30, 2009 to $20.3 million in the nine months ended September 30, 2010. The $3.2 million decrease in revenue from 2009 to 2010 was related to lower case volume as a result of concerns and uncertainty in the marketplace surrounding physician reimbursement for our AxiaLIF procedure. Domestically, sales of our AxiaLIF single level products decreased from $13.1 million in the nine months ended September 30, 2009 to $10.2 million in the nine months ended September 30, 2010 and sales of our AxiaLIF 2L products decreased from $6.2 million in the nine months ended September 30, 2009 to $6.0 million in the nine months ended September 30, 2010. New products accounted for revenue of $0.8 million in the nine months ended September 30, 2010. In the nine months ended September 30, 2010, average revenue per AxiaLIF case continued to increase, helped by a price increase effective April 1, 2010, the full market release of our AxiaLIF 2L+ product, and penetration into existing cases by our new products. In the nine months ended September 30, 2009 and 2010, we recorded 2,028 and 1,568 domestic AxiaLIF cases, respectively, including 481 AxiaLIF 2L cases in 2009 and 425 AxiaLIF 2L and 2L+ cases in 2010.

86.    The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

87.    On February 22, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2010.  For the fourth quarter, the Company reported a net loss of $5.7 million, or $0.27 diluted LPS and revenue of

30

JA-44

$5.9 million, as compared to a net loss of $5.7 million, or $0.28 diluted LPS and revenue of $6.3 million for the same period a year ago. For the year, the Company reported a net loss of $19.5 million, or $0.94 diluted LPS and revenue of $26.2 million, as compared to a net loss of $23.2 million, or $1.13 diluted LPS and revenue of $30 million for the same period a year ago.

88.    On March 14, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC, which was signed by, among others, Defendants Reali, Slattery and Randall, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-K contained signed certifications by Defendants Reali and Slattery, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

89.    The 10-K represented the following:

"Our revenue is primarily derived from sales of our AxiaLIF products and related surgical instruments. We expect that sales of our AxiaLIF products will continue to account for a substantial portion of our revenues for the foreseeable future."

*** 

*Drive Reimbursement for Our Procedure.* We will continue to work with our surgeon customers to generate published, peer reviewed clinical literature that demonstrates our procedure's clinical efficacy and safety. We will also work to leverage this data along with our AxiaLIF surgeon advocates, with payors to secure positive coverage decisions for the reimbursement of the AxiaLIF procedure.

***

Surgeons use the American Medical Association's Current Procedural Terminology, or CPT, system to bill payors for the AxiaLIF procedures. CPT codes describe the services and procedures provided for patients to third party payors so that physicians may be reimbursed. Effective January 1, 2009, the AMA implemented a Category III code which may describe the work involved in treating some AxiaLIF patients. Unlike Category I CPT codes, Category III codes do not have a set value which physicians use as a benchmark for setting their fee. Additionally, *some payors view Category III codes as "investigational" or*

31

JA-45

*"experimental" and may not reimburse them.* However, unlike many new or novel procedures, AxiaLIF is an access variation on the current standard of care (interbody spinal fusion) and has been performed in over 10,000 U.S. procedures. In December 2010, Humana Inc. made a decision to cover the AxiaLIF procedures and reimburse physicians for use of the Category III Code. The reimbursement rates are consistent with reimbursement levels for performing other interbody fusion procedures. We intend to gain further positive reimbursement coverage decisions with other payors in the coming quarters by utilizing published clinical literature and leveraging the support of physicians that perform our procedures. Discussions are normally held with medical directors representing the payors to inform them that our approach to interbody fusion is not "investigational" or "experimental."

\*\*\*

To access the spine using our pre-sacral approach, the surgeon creates a small incision adjacent to the tailbone while the patient is lying on their stomach.

90.     The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

91.     On May 12, 2011, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2011. For the quarter, the Company reported a net loss of $5.7 million, or $0.27 diluted LPS and revenue of $5.1 million, as compared to a net loss of $6.4 million, or $0.31 diluted LPS and revenue of $6.7 million for the same period a year ago.

92.     On May 16, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Reali and Slattery and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications by Defendants Reali and Slattery, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The 10-Q stated in relevant part:

*Revenue.* Revenue decreased from $6.7 million in the three months ended March 31, 2010 to $5.1 million in the three months ended March 31, 2011. The $1.6 million decrease in revenue from 2010 to 2011 was primarily a result of a

32

JA-46

lower number of AxiaLIF cases performed in 2011, which was due primarily to physician reimbursement limitations and insurance denials for lumbar fusion surgery due to medical necessity. Domestically, sales of our AxiaLIF 1L products decreased from $3.5 million in the three months ended March 31, 2010 to $2.5 million in the three months ended March 31, 2011, and sales of our AxiaLIF 2L products decreased from $1.9 million in the three months ended March 31, 2010 to $1.5 million in the three months ended March 31, 2011. Sales of our pedicle screw system, which was introduced in January 2010, were $0.1 million for the three months ended March 31, 2010 and 2011 and sales of our Bi-Ostetic bone void filler, which we introduced in February 2010, increased from $17,000 in the three months ended March 31, 2010 to $0.2 million in the three months ended March 31, 2011. In the three months ended March 31, 2011, average revenue per AxiaLIF case continued to increase, helped by a price increase effective April 1, 2010, the release of our AxiaLIF 2L+ product in July 2010, and penetration into existing cases by our new products. In the three months ended March 31, 2010 and 2011, we recorded 537 and 369 domestic AxiaLIF cases, respectively, including 141 AxiaLIF 2L cases in the three months ended March 31, 2010, and 102 AxiaLIF 2L and 2L+ cases in the three months ended March 31, 2011.

93.    The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

94.    On August 9, 2011, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2011. For the quarter, the Company reported a net loss of $4.3 million, or $0.21 diluted LPS and revenue of $5.3 million, as compared to a net loss of $3.6 million, or $0.18 diluted LPS and revenue of $7.2 million for the same period a year ago.

95.    On August 11, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Reali and Slattery, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications by Defendants Reali and Slattery, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

96.    The foregoing statements were materially false and misleading for the reasons set forth in ¶ 62.

97.    On September 21, 2011, the Company announced that it had priced a public offering of 6.2 million shares of its common stock at a price of $3.25 per share. The gross proceeds to Trans1 from the sale of shares, before expenses and any over-allotment exercise were expected to be $20,150,000.

## THE TRUTH BEGINS TO EMERGE

98.    The Company's rampant reimbursement scheme inevitably drew regulatory scrutiny, sending Trans1's shares into a tailspin. On October 17, 2011, after the market closed, the Company filed a Form 8-K with the SEC, where it disclosed the following:

> On or about October 6, 2011, TranS1 Inc. (the "Company") received a subpoena issued by the Department of Health and Human Services, Office of Inspector General, under the authority of the federal healthcare fraud and false claims statutes. The subpoena seeks documents for the period January 1, 2008 through October 6, 2011. The Company is cooperating with the government's request and is in the process of responding to the subpoena. The Company is unable to predict what action, if any, might be taken in the future by the Department of Health and Human Services, Office of Inspector General or other governmental authorities as a result of the matters related to this subpoena or what impact, if any, the outcome of these matters might have on its consolidated financial position, results of operations, or cash flows. No claims have been made against the Company at this time.

99.    On October 18, 2011, McNicoll Lewis Vlak ("MLV") stated in an analyst report to clients that the subpoena "included 19 items ranging from patient names to serial lot traceability to reimbursement communications with physicians." Further, the report noted the following:

> Management mentioned in our conversation that they have 'let so many reps go in the last year and a half' (due to downsizing), which makes us think the subpoena could perhaps stem from allegations by a disgruntled former employee. Another

34

JA-48

speculation would be since about half of TranS1's revenues come from physicians still using the ALIF code (which provides reimbursement), rather than the designated T-code (which does not provide reimbursement), the issue could be due to reimbursement communications, although we think that the Company has been making strong efforts to educate physicians about correct coding. Note that ultimately the decision regarding which code to use lies in the hands of the physician.

100.    On this news, Trans1's securities plummeted $1.27 or 40.7%, to close at $1.85 on October 18, 2011.

### **Additional Scienter Allegations**

101.    The Individual Defendants, as directors and/or officers of Trans1 during the Class Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, these Defendants were in a position to, and did, control all of the Company's false and misleading statements and omissions, including the contents of SEC filings and press releases, as set forth herein.

102.    The Individual Defendants cannot credibly claim that they were unaware of the improper reimbursement scheme. As explained *infra*, AxiaLIF, the Company's key product, represented its primary source of revenue. Moreover, throughout the Class Period, Individual Defendants made numerous statements regarding the challenges incurred because of the Category III designation for AxiaLIF. Further, Amy Connors, the head of Trans1's reimbursement committee, made a number of presentations to management and the Board of Directors regarding reimbursement issues in light of the AMA's Category III designation. As such, it is inconceivable that the Company's executives were unaware of Trans1's pervasive scheme to evade AxiaLIF's Category III assignment. To the extent that they were unaware of this scheme, such a blatant disregard for the obvious bespeaks their recklessness.

103.    In addition, the Company employed less than 130 individuals rendering it highly unlikely that the Individual Defendants, the Company's key executives and decision makers, were unaware of the major activities transpiring within the Company.

104.    Additionally, Defendant Randall attended the Company's National Meeting in January 2009 held in Nevada, where Defendants publicly promoted using anterior coding for the AxiaLIF procedure, despite the implementation of the Category III code for AxiaLIF that same month.

105.    Further, during the Class Period, between May 26, 2010 and May 27, 2010, Defendant Randall disposed of a massive 100,000 shares of Company stock at inflated prices. He sold an additional 20,000 shares of stock at inflated prices on August 17, 2011. Notably, Randall did not sell any shares of Company stock either before or after the Class Period.  At the time of these sales, Randall was well aware of the Company's rampant reimbursement scheme.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

106.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Trans1 securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

107.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Trans1 securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Trans1 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

109.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Trans1;

- whether the Individual Defendants caused Trans1 to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Trans1 securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37

JA-51

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

112.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Trans1 securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Trans1 securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

113.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

38

JA-52

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

114.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

116.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Trans1 securities; and (iii) cause Plaintiff and other members of the Class to purchase Trans1 securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

117.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Trans1 securities.  Such reports, filings, releases and statements were

39

JA-53

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Trans1's finances and business prospects.

118.    By virtue of their positions at Trans1, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

119.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Trans1 securities from their personal portfolios.

120.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Trans1, the Individual Defendants had knowledge of the details of Trans1 internal affairs.

121.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Trans1.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Trans1's

40

businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Trans1 securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Trans1's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Trans1 securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

122.    During the Class Period, Trans1 securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Trans1 securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of Trans1 securities were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Trans1 securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

123.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Case 7:12-cv-00023-F   Document 29   Filed 07/11/12   Page 41 of 45

JA-55

124.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>**COUNT II**</u>

**(Violations of Section 20(a) of the**
<u>**Exchange Act Against The Individual Defendants)**</u>

125.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.    During the Class Period, the Individual Defendants participated in the operation and management of Trans1, and conducted and participated, directly and indirectly, in the conduct of Trans1's business affairs.  Because of their senior positions, they knew the adverse non-public information about Trans1's misstatement of income and expenses and false financial statements.

127.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Trans1's financial condition and results of operations, and to correct promptly any public statements issued by Trans1 which had become materially false or misleading.

128.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Trans1 disseminated in the marketplace during the Class Period concerning Trans1's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Trans1 to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Trans1

Case 7:12-cv-00023-F   Document 29   Filed 07/11/12   Page 42 of 45

JA-56

within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Trans1 securities.

129.   Each of the Individual Defendants, therefore, acted as a controlling person of Trans1.  By reason of their senior management positions and/or being directors of Trans1, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Trans1 to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Trans1 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

130.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Trans1.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

Case 7:12-cv-00023-F   Document 29   Filed 07/11/12   Page 43 of 45

JA-57

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: July 9, 2012

**POMERANTZ HAUDEK
 GROSSMAN & GROSS, LLP**

**By: /s/ Jeremy A. Lieberman**
Marc I. Gross
Jeremy A. Lieberman (admitted pro hac vice)
Tamar A. Weinrib
100 Park Avenue, 26th Floor
New York, New York 10017-5516
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

**POMERANTZ HAUDEK
 GROSSMAN & GROSS, LLP**
Patrick V. Dahlstrom
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**JACKSON & McGEE, LLP**
Sam McGee, NC State Bar No. 25343
Gary W. Jackson, NC State Bar No. 13976
225 E. Worthington Avenue, Suite 200
Charlotte, NC 28203
Telephone: (704) 377-6680
Facsimile: (704) 377-6690

**BRONSTEIN GEWIRTZ
 & GROSSMAN LLP**
Peretz Bronstein
60 E. 42nd Street, Suite 4600
New York, N.Y. 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296

*Attorneys for Lead Plaintiff*

44

JA-58

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 11, 2012, I electronically filed the foregoing ***Amended Class Action Complaint*** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record registered with the CM/ECF system.

SO CERTIFIED this 11th day of July, 2012.


/s/ Jeremy A. Lieberman
Jeremy A. Lieberman

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No.: 7:12-CV-00023-F**

JOEL CAPLIN, Individually and on Behalf of
All Other Persons Similarly Situated                    )
                                                         )
                                                         )
            Plaintiff,                                   )
                                                         )
      v.                                                 )  **AFFIDAVIT OF CHONTTÉ HOCUM IN**
                                                         )  **SUPPORT OF DEFENDANTS'**
TRANS1, INC., KENNETH REALI,                             )  **REQUEST FOR JUDICIAL NOTICE**
JOSEPH P. SLATTERY, RICHARD                              )
RANDALL, and MICHAEL                                     )
LUETKEMEYER,                                             )
                                                         )
            Defendants.                                  )
                                                         )
                                                         )

I, Chontté Hocum, being duly sworn according to law, upon my oath depose and say:

1.      I am a certified paralegal in the law firm of Stradling Yocca Carlson & Rauth. Attorneys at my firm has made a special appearance in this action pursuant to Local Civil Rule 83.1(e) and is counsel of record for Defendants TranS1, Inc., Kenneth Reali, Joseph P. Slattery, Richard Randall, and Michael Luetkemeyer (collectively, "Defendants").

2.      I make this affidavit in support of Defendants' Request for Judicial Notice. I have personal knowledge of the matters set forth herein and if called upon as a witness would testify thereto.

3.      Attached hereto as <u>Exhibit 1</u> is a true and correct copy of TranS1's Form 8-K filed with the Securities and Exchange Commission ("SEC") on February 25, 2009, excluding exhibits thereto that are not referenced in Plaintiff's Amended Class Action Complaint (the "Amended Complaint"), which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

4.      Attached hereto as <u>Exhibit 2</u> is a true and correct copy of TranS1's Form 10-K filed with the SEC on March 13, 2009, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

5.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on April 30, 2009, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

6.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of TranS1's Form 10-Q filed with the SEC on May 6, 2009, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

7.      Attached hereto as <u>Exhibit 5</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on August 3, 2009, excluding exhibits thereto that are not referenced in the

LITIOC/2052687v5/012226-0027

JA-61

Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

8.      Attached hereto as Exhibit 6 is a true and correct copy of TranS1's Form 10-Q filed with the SEC on August 6, 2009, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

9.      Attached hereto as Exhibit 7 is a true and correct copy of TranS1's Form 8-K filed with the SEC on November 3, 2009, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

10.     Attached hereto as Exhibit 8 is a true and correct copy of TranS1's Form 10-Q filed with the SEC on November 6, 2009, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

11.     Attached hereto as Exhibit 9 is a true and correct copy of TranS1's Form 8-K filed with the SEC on February 25, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

12.     Attached hereto as Exhibit 10 is a true and correct copy of TranS1's Form 10-K filed with the SEC on March 12, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

13.     Attached hereto as Exhibit 11 is a true and correct copy of TranS1's Form 8-K filed with the SEC on May 6, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

2

JA-62

14.     Attached hereto as <u>Exhibit 12</u> is a true and correct copy of TranS1's Form 10-Q filed with the SEC on May 10, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

15.     Attached hereto as <u>Exhibit 13</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on August 9, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

16.     Attached hereto as <u>Exhibit 14</u> is a true and correct copy of TranS1's Form 10-Q filed with the SEC on August 6, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

17.     Attached hereto as <u>Exhibit 15</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on November 15, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

18.     Attached hereto as <u>Exhibit 16</u> is a true and correct copy of TranS1's Form 10-Q filed with the SEC on November 10, 2010, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

19.     Attached hereto as <u>Exhibit 17</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on February 25, 2011, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

20.     Attached hereto as <u>Exhibit 18</u> is a true and correct copy of TranS1's Form 10-K filed with the SEC on March 14, 2011, excluding exhibits thereto that are not referenced in the

LITIOC/2052687v5/012226-0027

JA-63

Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

21.     Attached hereto as <u>Exhibit 19</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on May 17, 2011, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

22.     Attached hereto as <u>Exhibit 20</u> is a true and correct copy of TranS1's Form 10-Q filed with the SEC on May 16, 2011, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

23.     Attached hereto as <u>Exhibit 21</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on August 15, 2011, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

24.     Attached hereto as <u>Exhibit 22</u> is a true and correct copy of TranS1's Form 10-Q filed with the SEC on August 11, 2011, excluding exhibits thereto that are not referenced in the Amended Complaint, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

25.     Attached hereto as <u>Exhibit 23</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on October 17, 2011, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

26.     Attached hereto as <u>Exhibit 24</u> is a true and correct copy of TranS1's Form 8-K filed with the SEC on March 5, 2012, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

27.     Attached hereto as <u>Exhibit 25</u> is a true and correct copy of a Form 4 reported by Randall D. Richard and filed with the SEC on May 27, 2010, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

28.     Attached hereto as Exhibit 26 is a true and correct copy of a Form 4 reported by Randall D. Richard and filed with the SEC on August 18, 2011, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

29.     Attached hereto as Exhibit 27 is a true and correct copy of TranS1's Schedule 14A filed with the SEC on April 30, 2010, which upon my direction and under my supervision, I caused to be downloaded from the SEC's website.

30.     Attached hereto as Exhibit 28 is a true and correct copy of a chart of TranS1's closing stock prices from February 23, 2009 to July 11, 2012, which upon my direction and under my supervision, I caused to be downloaded from NASDAQ's website.

31.     Attached hereto as Exhibit 29 is a true and correct copy of a table of TranS1's closing stock prices for the last four (4) years, which upon my direction and under my supervision, I caused to be downloaded from NASDAQ's website.

FURTHER THE AFFIANT SAYETH NOT.

Chontté Hocum

SWORN TO AND SUBSCRIBED

Before me this ___ day of September, 2012

Notary Public

LENA HENRY
Commission # 1828134
Notary Public - California
Orange County
My Comm. Expires Dec 23, 2012

My Commission Expires: Dec 23, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2012, I electronically filed the foregoing Affidavit of Chontte Hocum with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Marc I. Gross
Jeremy A. Lieberman
Tamar A. Weinrib
POMERANTZ HAUDEK GROSSMAN & GROSS, LLP
100 Park Avenue, 26th Floor
New York, NY 10017

Patrick V. Dahlstrom
POMERANTZ HAUDEK GROSSMAN & GROSS, LLP
One North LaSalle Street, Suite 2225
Chicago, IL 60602

Sam McGee
Gary W. Jackson
JACKSON & MCGEE, LLP
225 E. Worthington Avenue, Suite 200
Charlotte, NC 28203

Peretz Bronstein
BRONSTEIN GEWIRTZ & GROSSMAN LLP
60 E. 42nd Street, Suite 4600
New York, NY 10165

*Attorneys for Lead Plaintiff*

ELLIS & WINTERS LLP

 /s/ Jonathan D. Sasser
Jonathan D. Sasser
N.C. State Bar No. 10028
Thomas H. Segars
N.C. State Bar No. 29433
P.O. Box 33550
Raleigh, NC 27636
Telephone:  (919) 865-7000
Facsimile:  (919) 865-7010
jonathan.sasser@elliswinters.com
tom.segars@elliswinters.com
*Attorneys for Defendants*

JA-66

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No.: 7:12-CV-00023-F**

| | |
|---|---|
| JOEL CAPLIN, Individually and on Behalf of<br>All Other Persons Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>TRANS1, INC., KENNETH REALI,<br>JOSEPH P. SLATTERY, RICHARD<br>RANDALL, and MICHAEL<br>LUETKEMEYER,<br><br>Defendants. | **INDEX OF EXHIBITS** |

| | |
|---|---|
| Ex. 1 | Form 8-K: February 23, 2009 Analyst Call |
| Ex. 2 | Form 10-K for Fiscal Year 2008 |
| Ex. 3 | Form 8-K: April 27, 2009 Press Release and Analyst Call |
| Ex. 4 | Form 10-Q for Q1 2009 |
| Ex. 5 | Form 8-K: July 30, 2009 Press Release |
| Ex. 6 | Form 10-Q for Q2 2009 |
| Ex. 7 | Form 8-K: October 29, 2009 Press Release |
| Ex. 8 | Form 10-Q for Q3 2009 |
| Ex. 9 | Form 8-K: February 23, 2010 Press Release |
| Ex. 10 | Form 10-K for Fiscal Year 2009 |
| Ex. 11 | Form 8-K: May 4, 2010 Press Release and Analyst Call |
| Ex. 12 | Form 10-Q for Q1 2010 |
| Ex. 13 | Form 8-K: August 5, 2010 Press Release |
| Ex. 14 | Form 10-Q for Q2 2010 |
| Ex. 15 | Form 8-K: November 9, 2010 Press Release |
| Ex. 16 | Form 10-Q for Q3 2010 |
| Ex. 17 | Form 8-K: February 22, 2011 Press Release |
| Ex. 18 | Form 10-K for Fiscal Year 2010 |

JA-67

| Ex. 19 | Form 8-K: May 12, 2011 Press Release |
| Ex. 20 | Form 10-Q for Q1 2011 |
| Ex. 21 | Form 8-K August 9, 2011 Press Release |
| Ex. 22 | Form 10-Q for Q2 2011 |
| Ex. 23 | Form 8-K: Oct. 17, 2011 Subpoena Announcement |
| Ex. 24 | Form 8-K: March 5, 2012 Press Release |
| Ex. 25 | Form 4 for Richard D. Randall Filed 5/27/2010 |
| Ex. 26 | Form 4 for Richard D. Randall Filed 8/18/2011 |
| Ex. 27 | Schedule 14A for TranS1's June 3, 2010 Annual Stockholder Meeting |
| Ex. 28 | NASDAQ Chart of TranS1 Closing Stock Prices from Starting Date of Class Period (February 23, 2009) to Date of Filing of Amended Complaint (July 11, 2012) |
| Ex. 29 | NASDAQ Table of TranS1 Closing Stock Prices for Last 4 Years |

# Exhibit 1

JA-69

8-K 1 g17833e8vk.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### The Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): February 23, 2009**

# TRANS1 INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-33744** | **33-0909022** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**411 Landmark Drive**
**Wilmington, NC 28412-6303**
(Address of principal executive offices)
(Zip Code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02 Results of Operations and Financial Condition.**

On February 23, 2009, TranS1 Inc. (the "Company") issued a press release to report its financial results for the quarter and year ended December 31, 2008. The release is furnished herewith as Exhibit 99.1 and incorporated herein by this reference.

Also on February 23, 2009, following the issuance of the press release referred to above, the Company conducted a conference call to discuss its financial results for the quarter and year ended December 31, 2008. A copy of the transcript of the conference call is furnished herewith as Exhibit 99.2 and incorporated herein by this reference.

The information in this Current Report on Form 8-K, including Exhibits 99.1 and 99.2, are being furnished pursuant to Item 2.02 and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section, nor shall they be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits.**

   **(d) Exhibits.**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press release, dated February 23, 2009. |
| 99.2 | Conference call transcript, dated February 23, 2009. |

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRANS1 INC.

February 25, 2009

By: /s/ Michael Luetkemeyer
       Michael Luetkemeyer
       Chief Financial Officer

**EXHIBIT INDEX**

*Exhibit Number*                                                           *Description*

99.1        Press release, dated February 23, 2009.

99.2        Conference call transcript, dated February 23, 2009.

EX-99.2 3 g17833exv99w2.htm EX-99.2

**Exhibit 99.2**

Operator: Good day, everyone, and welcome to the TranS1 Fourth Quarter and Full Year 2008 conference call. Today's conference is being recorded. At this time, for opening remarks and introductions, I'd like to turn the conference over to Mr. Mark Klausner. Please go ahead, sir.

Mark R. Klausner, Managing Partner, Westwicke Partners

Thanks, operator. Joining us on today's call are TranS1's President and CEO Rick Randall; and the company's Chief Financial Officer, Mike Luetkemeyer. If you do not have a copy of our press release, you can find it in the Investor Relations section of our website www.trans1.com.

Before we begin, I would like to remind you that this call is being webcast live and recorded. A web replay of the event will be available later today on our website and will be available for at least 30 days following the call. I would also like to caution listeners that certain information discussed by management during this conference call will include forward-looking statements covered under the Safe Harbor Provision of the Private Securities Litigation Reform Act of 1995. Actual results could differ materially from those stated or implied by our forward-looking statements due to risks and uncertainties associated with the company's business. The company undertakes no obligation to update information provided on this call. For a discussion of risks and uncertainties associated with TranS1's business, I encourage you to review the company's filings with the Securities and Exchange Commission, including its annual report on Form 10-K for the year ended December 31, 2007.

With that, it's my pleasure to turn the call over to TranS1's President and CEO, Rick Randall.

Rick Randall, President and Chief Executive Officer

Thanks, Mark. Good afternoon, and thank you for joining us today to discuss TranS1's fourth quarter and full year 2008 results. On today's call, I will discuss some of the key highlights of the quarter and Mike will provide you with the details of our financial results and our 2009 guidance. I then would like to share with you some additional perspective on the key operating trends in our business after which we will take your questions.

Worldwide, 768 TranS1 procedures were performed and we generated $7.4 million in revenue during the fourth quarter. Both of these numbers reflect significant increases and continued adoption from the prior quarter and comparable period a year ago. We made good progress operationally in the fourth quarter. Our direct sales force continued to mature. We ended the quarter with 53 direct reps in the field and these reps had on average approximately 10 months on the job. Apart from the continuing maturation of our sales force, our quarter was positively impacted by three primary factors. First on the product front, we continue to have good success with our two-level fusion product. Over 20% of our procedures in the quarter were two-level cases. We remain encouraged by the early adoption and clinical results. Second, we also experienced the benefit from our targeted surgeon education programs like the Association of Pre-Sacral Spine Surgeons meeting in October, which led to higher case volumes among our surgeon users who attended. Third, TranS1 and the AxiaLIF procedure were featured in the National news on ABC World News Tonight and in the Wall

Street Journal, which raised patient awareness of our procedure and brought our novel approach more into the main stream.

We trained 76 physicians in the United States during the quarter and have continued to make progress in developing effective training programs to convert spine surgeons to users of our products.

Additionally as of year-end, we have trained 156 of our existing surgeon users on the two-level procedure. We also continued to make progress in developing the supporting evidence to proactively work with commercial payers to prospectively cover our physician reimbursement. And we prepared to manage the transition from an unlisted code to a Category III tracking code.

Lastly, we continued clinical trials of our next generation PNR product in Europe, and our device has been successfully implanted in nine patients to date. I would now like to turn the call over to Mike to review our financial results. Mike?

Mike Luetkemeyer, Chief Financial Officer

Thanks, Rick, and good afternoon, everyone. I'm pleased to report that in fourth quarter of 2008, we generated revenue of $7.4 million. This compares favorably to our guidance of $6.1 million to $6.5 million and represents a 48% increase over the $5 million of revenue generated in the fourth quarter of 2007, as well as a sequential increase of 22% over the $6 million of revenue generated in the third quarter of 2008.

For the total year 2008, we generated revenue of $25.3 million. This represents an increase of 54% over the $16.5 million of revenue generated in 2007.

For the fourth quarter of 2008, we generated 97% of our revenue or $7.1 million in the United States. In the comparable period in 2007, we generated 92% or $4.5 million of our revenue in the United States.

For the total year 2008, we generated 92% of our revenue or $23.3 million in the United States, and in fiscal 2007 we also generated 92% or $15.1 million of our revenue in the United States.

The primary factors driving the significant increase in revenue in the United States were an increase in procedures performed, the introduction of our two-level procedure, and an increase in average selling prices.

During the fourth quarter of 2008, 651 procedures were performed in the United States utilizing TranS1 products. This represents a 41% increase over the 463 procedures performed in the fourth quarter of 2007, and a sequential increase of 96 procedures or 17% over the 555 procedures performed in the third quarter of 2008.

For the total year 2008, 2,280 procedures were performed in the United States utilizing TranS1 products. This represents an increase of 43% over the 1,591 procedures performed during 2007.

Our average selling price in the United States for the fourth quarter of 2008, excluding standalone sales of our percutaneous facet screw system was $10,600. This represents an increase of $1,300 over the comparable quarter of last year, and an increase of $800 over the third quarter of 2008.

For the total year 2008, our average selling price in the United States excluding standalone sales of our percutaneous facet screw system was $9,850. This represents an increase of about 6% over 2007. The increase in average selling price for both the quarter and the full year has primarily been driven by the introduction of our two-level procedure, and the continuing traction of our AxiaLIF 360 product.

For the fourth quarter of 2008, 225 of the 651 AxiaLIF procedures performed in the United States, or about 35%, were AxiaLIF 360 procedures and a 141 or about 22% were AxiaLIF two-level procedures.

For the total year 2008, 852 of the 2,280 AxiaLIF 360 procedures performed in the United States or about 37% were AxiaLIF 360 procedures and 229 or about 10% were AxiaLIF two-level procedures. As you may recall, we initially introduced the AxiaLIF two-level procedure in the United States in May of 2008 with a limited market release, followed by a full market release in October. For the fourth quarter of 2008, we generated revenue of $224,000 from the standalone sales of our percutaneous facet screw system, compared with $222,000 for the fourth quarter of 2007. For the total year 2008, we generated revenue of $868,000 from the standalone sales of our percutaneous facet screw system, compared with $359,000 for 2007. Gross margin was 84.7% in the fourth quarter of 2008. This represents an increase from 83.3% in the fourth quarter of 2007. Gross margin for the total year 2008 was 82.9%. This represents an increase from 81.5% for all of 2007. The increase in gross margin was primarily the result of increased efficiencies associated with our higher production in sales volumes and the introduction of our AxiaLIF two-level procedure. Fourth quarter gross margin also benefited from a decreased mix of lower margin sales outside the United States. Turning to expenses. Total operating expenses for the fourth quarter of 2008 were $11.1 million, an increase of $3.8 million from $7.3 million for the fourth quarter of 2007. The increase in operating expenses for the quarter were primarily the result of higher sales and marketing costs of $3.6 million due to the continued expansion of our direct sales force, increased commissions as a result of increased sales, and higher training and promotional expense.

Total operating expenses for the year 2008 were $40.6 million, an increase of $17.2 million from $23.4 million in 2007. The increase in operating expenses for the year were primarily the result of higher sales and marketing costs of $13.7 million due to the continued expansion of our direct sales force, increased commissions as a result of increased sales, and higher training and promotional expense. Additionally, general and administrative costs increased by $3.3 million, primarily due to the addition of personnel, increased professional fees and higher insurance and franchise taxes.

Other and interest income, which primarily consists of interest income, was $330,000 in the fourth quarter of 2008, this compares to $589,000 in the third quarter of 2008 and $916,000 in the fourth quarter of 2007. For all of 2008, other and interest income was $2.5 million, up from $1.4 million in 2007. The significant decrease in the fourth quarter other and interest income was primarily the result of rapidly falling interest rate and the conservative and very

liquid nature of our investment portfolio. The increase in other and interest income for the year-over-year comparison was due to the inclusion of a full year of interest income generated on the proceeds from our October 2007 IPO.

Our GAAP net loss for the fourth quarter was $4.5 million or $0.22 per share. And on a non-GAAP basis, adjusting for noncash stock compensation charges of $382,000 in the quarter, our net loss was $4.2 million or $0.20 per share. This compares to our previously issued guidance for the fourth quarter on a GAAP basis of a loss of $0.26 to $0.28 per share, and on a non-GAAP basis of a loss of $0.22 to $0.24 per share. Our GAAP net loss for the year 2008 was $17 million or $0.84 per share and on a non-GAAP basis, adjusting for noncash stock compensation of $3 million for the year, our net loss was $14 million or $0.69 per share. This compares to our previously issued guidance for the year on a GAAP basis of a loss of $0.87 to $0.89 per share, in a non-GAAP basis of a loss of $0.70 to $0.72 per share.

At the end of the year, we had $63.1 million in cash, cash equivalents and short-term investments and $14.2 million in investments with an initial maturity date greater than one year and no debt. Our operating cash burn for the fourth quarter, defined as cash used in operating activities and investment in fixed assets, was $6 million and our operating cash burn for the year 2008 was $16.9 million.

With regard to guidance for 2009, we anticipate revenue for the first quarter of 2008 to be in the range of $7.5 million to $7.8 million, and based on estimated average shares outstanding for the quarter of approximately 20.5 million, the GAAP loss per share to be in the range of $0.30 to $0.32, and the non-GAAP loss per share to be in a range of $0.25 to $0.27.

For the total year 2009, we anticipate revenue to be in the range of $33 million to $36 million and based on estimated average shares outstanding for the year of approximately 20.5 million, the GAAP loss per share to be in the range of $1.27 to $1.36 per share, and non-GAAP loss per share to be in the range of $1.03 to $1.12 per share.

Rick, back to you.

Rick Randall, President and Chief Executive Officer

Thanks, Mike. Before we open the all up for questions, I'd like to spend a few minutes providing some details on the key operating trends from the quarter. As we shared with you on the last call, our historical data demonstrates that sales productivity per rep increases along a pretty consistent curve. Specifically, we found that it takes about 12 months for a rep to get to about $0.5 million annual revenue run rate. Rep productivity tends to accelerate after 12 months and by their 20th month on the job, an average rep is at about $1 million annual revenue run rate.

As our direct sales force continued to mature in the quarter, we were pleased to note that they continued to perform in line with this expected maturity curve. We ended the quarter with 53 direct reps in the fields and these reps had on average approximately 10 months on the job.

As we progress through 2009, we intend to expand our direct sale force by 80 reps by the end of the calendar year. Some of these reps will moved into new territories, while others will be

placed in the territories where we have a successful rep, whose current geographic coverage is constrained by the amount of time they are spending in the OR covering cases.

This team approach will allow the new rep to learn from one of our most successful reps and will allow us to further penetrate those markets. In addition, we intend to add eight clinical support specialists, one in each region, to assist our direct reps with case coverage. We are hopeful that this measured expansion will allow us to continue to expand our footprint, further penetrate our more mature markets, and build a bench of experienced sales reps to mitigate any disruption from potential turnover.

On the product front, we completed the National launch of our two-level fusion product and have continued to see strong early adoption trends. In fact, over 20% of our procedures in the quarter were two-level procedures. As of year-end, we have trained 156 of our existing surgeon users on the use of the two-level product and remain encouraged by the early adoption and clinical results. We have seen positive follow through from our first Association of Pre-Sacral Spine Surgeons meetings or APSS held in Las Vegas in October.

This event created national attention and provided a support group for surgeons using new MIS technology, fostering opportunities for peer-to-peer interaction to share experiences and best practices. Subsequent to the event, we have observed a notable increase in the number of cases performed by our surgeon users who were in attendance. Based on the success of this initial event, we are planning to host 10 regional events over the course of 2009 that build on the success of the APSS to highlight our procedure to both existing and prospective surgeons. In addition, we intend to host the second annual national APSS in the fall. Along with events like APSS, we trained 76 new physicians in the United States during the quarter, and in calendar 2008 trained a total of 319 new surgeons on our products.

Additionally, as I mentioned earlier, as of year-end, we had trained 156 of our existing surgeons on the two-level procedure. By the end of the year, almost 50% of these surgeons had completed their first two-level case. We were also fortunate, towards the end of the year, to have TranS1 and the AxiaLIF procedure featured prominently in the national news media. In November, ABC World News Tonight ran a story that highlighted the experience of a patient in New Jersey, who had an AxiaLIF procedure on an outpatient basis, with a very successful outcome. For those of you that are interested, you can view this story on our website under the newsroom section.

Additionally, we were featured in a Wall Street Journal article in December that highlighted the benefits of our procedure. Both of these stories significantly raised patient awareness of our procedure, and subsequently we have seen increased traffic on our website, and our surgeons have reported an increased volume of enquiry about AxiaLIF. Also these feature stories brought our novel approach more into the mainstream in the eyes of both patients and surgeons.

Additionally, we understand that both the ABC news story and Wall Street Journal article have been used effectively by our surgeons to market the procedure to potential patients. On the reimbursement front, we remain diligent about helping our surgeons obtain appropriate reimbursement for our procedure. We have an 800 number and call-in resource center, up and running to assist surgeons with reimbursement issues that may arise.

As many of you know, a portion of our surgeon fee migrated from an unlisted code to a Category III CPT tracking code in January, 2009. While we remained focused on supporting our surgeons through this transition, we do not anticipate that this will create any significant additional headwind with regards to adoption.

We are also continuing to make progress in developing the supporting evidence to proactively work with commercial payers to prospectively cover our physician reimbursement. In fact at the AAOS meting in Las Vegas, this Wednesday, our procedure will be featured in a podium presentation that previews the clinical data from our patient registry that we hope to have published later this year.

Additionally, there are more articles in the pipeline that will further highlight TranS1's clinical effectiveness. These articles will be used to demonstrate to payers, that our procedure delivers positive patient outcome economically, and with fusion rates equivalent to those of the current standard of care.

Finally the Phase I single center feasibility study of our next generation PNR product in Europe continues to progress nicely. And our surgeon has implanted devices in nine patients to date.

We believe that we're on track to begin our broader study in Europe in 2009, and are beginning to recruit surgeons for this study and think about study design. I look forward to updating you on our progress as we move this product through trials.

Before I open the call up for questions, I'd like to share my impressions on some of the macro trends going on in our industry. First, as many of you know, NASS is implementing guidelines around transparency of payments being made by companies to surgeons. We fully support these efforts and look forward to the transparency these guidelines will create. As a company, we have never been aggressive in payments made to surgeons, and historically payments to surgeons have been solely for education, training or publication of clinical results. Further, we intend to fully adopt internal policies that are in compliance with the new AdvaMed guidelines, which become effective July 1 of this year. Secondly with regard to the economy, while I'm pleased to say that to date we have not seen any significant negative impact to our business as a result of the weak economy, we continue to carefully watch procedure volumes for signs that unemployment or economic hardship are beginning to cause patients to delay surgery.

I'd now like to open the call up for questions.

Operator: Thank you, sir. [Operator Instructions] We'll go first to Matt Miksic with Piper Jaffray.

Q — Matt Miksic

Hi. Good afternoon. Thanks for taking the question. Can you hear me okay?

A — Rick Randall

Yep.

Q — Matt Miksic

So one question just on your guidance heading into Q1. Some modest sequential improvement there from Q4, can you talk a little bit about any seasonality that factors into that or year-over-year comps or — and how we might think about maybe sequential improvements throughout the year, if you can give us an idea as to the pacing, and maybe — I know you don't want to give second quarter guidance, but some idea of where we might see an inflection point or anything you can help us with in how these quarters might play out?

A — Mike Luetkemeyer

Sure, Matt, this is Mike. Well, you remember last year, I mean, we had some difficulties last year, we had some turnover, we had to work through; we had the coding issue, we had to work through; and we had three quarters of flat numbers; six in the first quarter, six in the second quarter, six in the third quarter, and in the fourth quarter we had an obviously good quarter. And we saw some factors come together that we talked about in the script, that the maturation of the sales force, the positive media, some things came together for us.

And in December, it's hard to parse through the benefit that we got, but there is always some benefit at year-end from people meeting their deductible for insurance coverage. So the fourth quarter, generally, a really strong quarter for us and it was again this year. We normally see a bit of sequential growth in the first quarter and we are trying to be prudent in the number that we give you, because we remember very well what happened last year. But we are seeing the maturation of our sales force move along that curve that we've talked about over the last quarter, fairly consistently.

We were right on the curve in October, we were right on the curve in November, we were a bit above the curve in December, but again let's not get too far out in front of ourselves because there is some benefit in the fourth quarter from insurance having been — deductibles having been met. We're cautiously optimistic in the first quarter, we guided up sequentially. Usually, we have some sequential growth in the second quarter, and then as you remember last year and the year before, Q2 to Q3 can be flat because that Q3 is a tough quarter for our business, because of the summer people in Europe are on vacation and lot of our U.S. docs are on vacation and then in the fourth quarter we tend to have a really good quarter again.

So the way I look at it is, we're trying to be prudent, we're trying to be conservative, we're trying to give you numbers that we think pretty comfortably we can meet and we're showing sequential growth in the first quarter. I would hope we'll be able to show you some sequential growth in the second quarter, third quarter may not be up and onward because of the seasonality and then, hopefully, in the fourth quarter, if we stay on the curve and we're watching it very closely, we should have a good fourth quarter.

Operator: All right. We'll go next to Doug Schenkel with Cowen and Company.

Q — Doug Schenkel

Hey, good afternoon, guys.

A — Rick Randall

Hey, Doug.

A — Mike Luetkemeyer

Hi, Doug.

Q — Doug Schenkel

First, just a question on surgeon training. I think you guys trained about the same number of surgeons in Q4 and Q3, at least if I had my model updated correctly. So assuming that is correct, I just want to see if you could provide any commentary on — and basically how access to surgeons is progressing whether you're having the same levels of success in getting in front of surgeons to train them and then moving forward, can you help us think about the importance of number of surgeons trained as a metric versus increase in procedures per surgeon?

A — Rick Randall

Good question, Doug. I think we will continue to seek good access to new surgeons for training. I would also mention that our — the number of new surgeons trained was somewhat mitigated by the fact that we trained so many of our existing surgeons on the important two-level product. So that happened at somewhat at the expense of some new surgeon training. I expect to continue to see new surgeon training take place, especially as new reps mature and we're bringing more of these surgeons on board.

In general, I think it's safe to say that as this procedure gains maturation in the marketplace, more surgeons, the later adopters, are recognizing that this technique and technology has staying power and they didn't want to be first in their market but they don't want to be last, so they're now starting to move into the training fold as well. So I would expect during the course of the year we will continue to see growing metrics from a training standpoint and in addition there are a number of surgeons who we trained — could have trained years ago and for whatever reason did not adopt, a number of those surgeons are coming back into the fold and we're actually retraining them.

And I think, in general, our stick rate, our ability to train and then move those surgeons to treat that number is starting to grow. So I think this is a classic maturation of a disparate technology. We always said this is more revolutionary than evolutionary, and the acceptance is growing and the training number should move along with that.

Q — Doug Schenkel

Okay, thanks for answering that question. And then you talked about some of the momentum seen in your sales force coming out of Q4 in the context of — I think at least again highlighting that the average tenure within your sales force was about 10 months at the end of Q4, again pointing out that it seems like folks on the sales force really start to ramp once they have 12 months of experience. Is it right to assume that as the average tenure gets up to 12

months on average you're expecting the sales force to get a whole lot more productive and how does that reflect in your Q1 and full-year guidance?

A — Rick Randall

Well, yes, the answer is we would expect as what we have seen and as Mike mentioned, we continue to see that we're tracking to this productivity curve with the reps we've hired within the last year or so, that as they cross over that 12-month period, we expect to see an acceleration of the productivity. You basically double the business or the revenue run rate in those territories from the 12-month point to the 18 to 20-month point. And we expect that to continue.

We have used that metric in our assumption of guidance and maybe just provided the appropriate number of conservative seasoning to make sure that we can deliver a number that we can live with, but if the productivity curve remains intact and fortunately we haven't seen any significant turnover thus far this year, we're feeling pretty good about the stability of our sales force and just as important stability of our sales management team then we're looking forward to a lot of these reps moving from that 12 months to 20 months experience because the productivity increases.

A — Mike Luetkemeyer

Just to remind you though, Doug, we're adding — we're going from 53 at year-end to 80 at year-end this year. so we're going to be adding a lot of new faces and moving that average from 10 months to 20 months is going to take some time because of the dilution that we get just by adding that many new faces during the year. Now we're adding them in a smoother fashion than maybe we have in the past. In the past we tended to add salesmen in big boluses when we got funding and now that we are a well funded public company, we can be more smooth about those additions and hopefully we'll get away from that step function growth in top-line that we've experienced in the past, and have a smoother growth curve, that's what we're hoping.

Q — Doug Schenkel

No, it makes sense. You guys talked about the migration in reimbursement codes, sounds like there hasn't been much of an impact in Q1 thus far. When you started facing these challenges a few quarters ago, you were providing some metrics on a quarterly basis that would allow us to understand how much of a headwind this seemed to be on a quarterly basis. I don't think you provided that data on this call, I mean is it fair to assume at this point that you're doing a good enough job managing any potential challenges with reimbursement that you feel that that is not a significant headwind in getting broader adoption?

A — Mike Luetkemeyer

Doug, what we said in the script was that the conversion from unlisted to Category III, we didn't see giving us any significant additional headwind. I think the metric that we've provided in the past is that we feel, and it's hard to really quantify, but we feel that unlisted code gave us about a 5% kind of a headwind. And it's probably consistent again this year. We

JA-82

don't feel that moving from unlisted to Category III is going to provide any significant additional headwind.

Q — Doug Schenkel

Okay and last question. Some have speculated in other areas of spine and orthopedics that the group of patients that's going to most susceptible to the economic downturn in terms of deferring a procedure are relatively younger patients who are in the private pay community, those who are dependent on employer-based coverage. Would you agree with that, it sounds like you're not seeing anything significant in the way of economic related headwinds but, I mean, would you agree with that assessment and to the extent that you do, is it pretty much right to assume that the vast majority of your patients are in this group?

A — Rick Randall

Yes, Doug, I think I would agree with that assessment. And, yes, I would say that the majority of our patients are definitely young — if you mean younger, that's they're not on Medicare. The majority of our patients are private pay, and so they could be affected by that. However, as I've traveled around the country over the last quarter with an additional concern about economic impact, I think we are seeing some patients actually more concerned about having a procedure that takes them out of their job for a long period of time during a period of uncertainty.

I don't know if they feel if they are out of mind out of sight, they could be out of a job, but that is a concern. So, conversely, those patients if they could have an MIS procedure and get back to work, get treated quickly, respond and recover quickly, I think that's a benefit as opposed to more conventional surgery that could take them out of the job for half a year or so.

Q — Doug Schenkel

That's great, Rick. Thanks for that. That's helpful and thanks for taking all my questions.

A — Rick Randall

Thank you.

Operator: [Operator Instructions] We'll go next to Michael Matson with Wachovia.

Q — Michael Matson

Hi. I guess my first question would be for Mike, just on the guidance. Seems like your — if I heard you correctly, I think you guided to GAAP EPS or GAAP loss of $1.27 to $1.36. Is that correct?

A — Mike Luetkemeyer

I have to turn back to my script here for a minute, Mike, too many numbers in my head.

JA-83

Q — Michael Matson

That's fine.

A — Mike Luetkemeyer

But that sounds right.

Q — Michael Matson

Okay. So that's a pretty big...

A — Mike Luetkemeyer

1.27 to 1.36.

Q — Michael Matson

Yes. A pretty big increase from what we saw this year, is that really just due to the additional sales force hires that you are planning for 2009?

A — Mike Luetkemeyer

Well, it's certainly predominately driven by increasing cost in sales and marketing. We do have some cost increases built in for R&D, for instance, as we move further down the path with the PNR product. And we have some increases built in for G&A. But the predominant increase is sales and marketing and adding to the direct sales force, and the team approach that Rick Randall talked about where it's not just adding direct reps, but also the clinical support specialists to help cover cases.

Q — Michael Matson

Okay. And am I safe in assuming that your cash burn will be up proportionally as well, and can you give us some guidance on what that'll be during 2009?

A — Mike Luetkemeyer

Well, the cash burn was $6 million last quarter. I think it would be safe to assume it's not going to go down on a quarterly basis this year. So in that 24 to 25 range is probably safe.

Q — Michael Matson

Okay. And then, back to the economy, which seems to be everyone's focus these days, sort of a different twist on one of the prior questions. Is there a difference in the out-of-pocket payment that a patient would have to make for AxiaLIF versus the standard fusion? In other words, given that it's Category III, and it's a newer procedure, do you think patients — and I know it may vary by insurance plan, but do you think patients generally have to pay more to get an AxiaLIF versus a regular type of fusion?

---

A — Mike Luetkemeyer

No, Michael, I think we're relatively equivalent in that regard and the deductible is pretty much the deductible. I would add, I had dinner with a surgeon this past week and his comment to me was the only thing he's seen in the current economy is that he typically requests his patients to pay upfront when they book the surgery, to pay upfront a certain number of dollars for the procedure, the out-of-pocket portion. In case they walk and decide not to have the surgery, they don't show up to the OR that day, there's a down payment. He has seen more negotiation of that number as of late but to answer your first question, no there's really no difference with this procedure.

Q — Michael Matson

Okay. And then given the success that you seem to be having with the two-level procedure, I know that you've discussed some of the controversy around that and from the presentations at past conferences. Is there going to be any new clinical data being presented at any upcoming conferences or being published on the two-level, on fusion rates and so forth?

A — Rick Randall

No. To our knowledge there is no more data to be presented on the two-level, we haven't seen anything. We know what we're driving and we haven't seen anything outside of that. I just looked at the — as far out as the SAS meeting a couple of weeks ago and I see nothing there. And in that regard, our goal is, now that we've established the procedure and we feel pretty good about the product, we're looking to start a study and drive our own U.S. data with that technology.

Q — Michael Matson

Okay. Let's see and then just on the PNR, the timing of your more, I guess, call it pivotal trial, but the trial to actually get the product approved in Europe and then ultimately in the U.S, what's your latest thinking on the timing of that?

A — Rick Randall

Yes, we have one more patient to complete our, what we call, the Phase I feasibility trial, which is really a safety trial with an eye toward efficacy as well. I believe that patient is actually slated to be treated early in March in Holland. The plan is to go then into a Phase II trial where we'll expand to a few more centers and drive more patients in addition to those early 10 patients and try to learn more about the device from an efficacy standpoint and where the surgeons would like to utilize this technology, what the indications are. And then from that we will take that data and submit a CE mark in 2009 with the goal of having a CE mark in Europe to actually commercialize the product at the very end of the year or early 2010 depending on how the regulatory authorities in Europe respond.

And then the other piece is that, before we actually commercialize that product we will roll into a Phase III true efficacy study in Europe, before we commercialize with a number of sites and then concurrent with that in the United States this year take our Phase I and Phase II

data and approach the FDA and it starts with a pre-IDE meeting. Looking at that data and the test data that we have to see what we can do, what kind of a study we can propose, and when we can start that study in the United States. So that's really up to the FDA but the stated goal for us is to be able to have that pre-IDE meeting some time this year.

Q — Michael Matson

Okay. Thanks, guys. I appreciate it.

A — Rick Randall

Thank you.

Operator: We have a follow up from Matt Miksic with Piper Jaffray

Q — Matt Miksic

Hi. Thanks. Just one follow-up, Rick, to talk about, maybe just stepping back from some of the things you've — challenges you've had over the last year where we had reimbursement, you know, that was an issue that it seems like you've kind of — you are working through or have overcome at least in terms of something that's going to significantly slow your business as the sales — changes in the sales force.

I guess, going back even further there would be early adverse event concerns, is this thing safe and I think all of those things have kind have been recognized as sort of okay by most of the surgeons that I talked to. I don't think anyone is really — is concerned about the safety of the procedure any more, no one's concerned as to whether the two-level — doesn't seem from the fourth quarter numbers people are concerned as to whether two-level is a procedure that's sort of doable. So if you look forward, I guess, where are the friction points or the challenges or what do you see as sort of moving the numbers and making you sort of either having successful year this year or things that could trip you off?

A — Rick Randall

Boy, it's a great question Matt. I believe that it still remains all of those things. I mean there are markets where if you speak I think now, to the early adopters and that — those maybe the type of surgeons you spoke to, I think you would get the answers that you canvass that you got. I think though as you move along that adoption curve to more conservative surgeons who don't like to be out there alone with the new technology, our challenge still is in areas where we have not had significant adoption, where this technique is still relatively new; we do have pockets around the country, fortunately, they are getting smaller and fewer in numbers. But some of those — that same resistance exists there, but the more cases we do the better we are and the more experienced our reps become the better we are at handling those objections in moving forward.

So I think the answer is pretty much the same, as this business matures there is fewer showstoppers out there for us, but, obviously, competition lurks in the bushes and we still hear rumors from time-to-time that we have to deal with. But it's that general resistance that

in some areas this is a new technology and we have to fight through that and that's why taking these APSS meetings, we had one in New York last week, we had one this weekend in Utah, a very successful meeting. As we do that, that helps us break down some of those barriers and nothing beats breaking those barriers than surrounding the most conservative surgeons with users. And then they finally give up and come over to our side. But we just need to continue on and that's — and lessen that resistance and get to this tipping point, which I hope to see happen some time later this year or early next year.

Q — Matt Miksic

Great. Thanks very much.

Operator: And there are no further questions at this time. I'd like to turn things back over to Mr. Randall for any additional or closing comments.

Rick Randall, President and Chief Executive Officer

Let me close by thanking all of you for taking the time to join us on our call today. The continued maturation, which has led to an up tick in adoption and usage has been increasingly enthusiastic about out market opportunity. We sincerely appreciate your interest in TranS1 and look forward to updating you on our continued progress. Thanks again.

Operator: And that does conclude today's conference call. Again, thank you for your participation. You may disconnect at this time.

# Exhibit 2

JA-88

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549
# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2008**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period        to**

**Commission File Number 001-33744**

# TRANS1 INC.
*(Exact name of Registrant as specified in its charter)*

| **DELAWARE** | **33-0909022** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. employer identification no.)* |

**411 LANDMARK DRIVE, WILMINGTON, NC 28412-6303**
*(Address of principal executive office) (Zip code)*

**(910) 332-1700**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act**

| <u>Title of Each Class:</u> | <u>Name of Each Exchange on Which Registered:</u> |
|---|---|
| Common Stock, par value $0.0001 per share | The NASDAQ Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  YES ☐   NO ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  YES ☐   NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  YES ☑   NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☑ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
|---|---|---|---|

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  YES ☐   NO ☑

As of June 30, 2008, the last business day of our most recently completed second fiscal quarter, the aggregate market value of the voting stock held by non-affiliates was approximately $256.5 million, based on the number of shares held by non-affiliates of the registrant and based on the reported last sale price of common stock on June 30, 2008. This calculation does not reflect a determination that persons are affiliates

for any other purposes.

The number of shares of the registrant's common stock outstanding as of March 5, 2009 was 20,560,807 shares.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Definitive Proxy Statement to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this annual report, relating to the Registrant's annual meeting of stockholders, are incorporated by reference into Part III of this Form 10-K. With the exception of the portions of the Proxy Statement specifically incorporated herein by reference, the Proxy Statement is not deemed to be filed as part of this Form 10-K.

**TRANS1 INC.**
**FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2008**

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 36 |
| Item 2. | Properties | 36 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 36 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. | Selected Financial Data | 40 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 47 |
| Item 8. | Financial Statements and Supplementary Data | 47 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 47 |
| Item 9A. | Controls and Procedures | 48 |
| Item 9B. | Other Information | 48 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 48 |
| Item 11. | Executive Compensation | 48 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 49 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 49 |
| Item 14. | Principal Accountant Fees and Services | 49 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 49 |
| SIGNATURES | | 50 |
| Index to Financial Statements | | 51 |
| EX-10.7.1 | | |
| EX-23.1 | | |
| EX-31.1 | | |
| EX-31.2 | | |
| EX-32.1 | | |
| EX-32.2 | | |

2

Table of Contents

### Cautionary Note Regarding Forward-Looking Statements

In addition to historical financial information, this report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 that concern matters that involve risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements. All statements other than statements of historical fact contained in this report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should" or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Readers are urged to carefully review and consider the various disclosures made by us, which attempt to advise interested parties of the risks, uncertainties, and other factors that affect our business, operating results, financial condition and stock price, including without limitation the disclosures made under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors" in this report and in the financial statements and notes thereto included elsewhere in this report. Furthermore, such forward-looking statements speak only as of the date of this report. We expressly disclaim any intent or obligation to update any forward-looking statements after the date hereof to conform such statements to actual results or to changes in our opinions or expectations.

References in this report to "TranS1", "we", "our", "us", or the "Company" refer to TranS1 Inc.

3

Item 1. *Business*

**Overview**

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using this TranS1 pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the degenerative disc. We developed our TranS1 pre-sacral approach to allow spine surgeons to access and treat degenerative lumbar discs without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, short procedure times, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market two single-level fusion products, the AxiaLIF® and the AxiaLIF 360°™ and a two-level fusion product, the AxiaLIF 2L™.

Our AxiaLIF product received 510(k) clearance from the U.S. Food and Drug Administration, or FDA, in December 2004 and a CE mark in March 2005 and was commercially launched in the United States in January 2005. Our AxiaLIF 360° product received FDA 510(k) clearance in September 2005 and a CE mark in March 2006 and was commercially launched in the United States in July 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2005 and began commercialization in the European market in the fourth quarter of 2006. The Company received 510(k) clearance for the AxiaLIF 2L from the FDA and began marketing this product in the United States in the second quarter of 2008. As of December 31, 2008, over 5,500 fusion procedures have been performed globally using our AxiaLIF products. At December 31, 2008, we sold our AxiaLIF products through 53 direct sales personnel and 18 independent sales agents in the United States and 16 independent distributors internationally. For the year ended December 31, 2008, our revenues were $25.3 million and our net loss was $17.0 million.

Lower back pain affects over six million people annually in the United States and is a leading cause of healthcare expenditures globally. Our currently marketed products address the lower lumbar spine fusion market. We believe the introduction of minimally invasive spine procedures, such as ours, will attract more back pain patients, and attract them earlier, to a definitive surgical solution, thereby increasing the rate at which the market grows.

We also have two additional products under development that implement our pre-sacral approach: our Percutaneous Nucleus Replacement, or PNR, and Partial Disc Replacement, or PDR, devices. We expect these devices would be used earlier in the treatment of degenerative disc disease than a fusion, as they are designed to preserve motion in the lumbar spine while providing stabilization. We commenced a pilot clinical trial outside the United States for our PNR product in the second quarter of 2008 and we anticipate receiving a CE mark by the end of 2009. We expect to commercialize this product in Europe after the CE mark is received. We expect to file an investigational device exemption, or IDE, with the FDA in 2009 for our PNR implant in support of U.S. commercialization. We will design a clinical trial plan for the PDR implant subsequent to the initiation of a PNR pivotal trial.

**Spine Anatomy**

The human spine is the core of the human skeleton and provides important structural support while remaining flexible to allow movement. It consists of 33 separate interlocking bones called vertebrae that are connected by soft tissue and provide stability while facilitating motion. Vertebrae are paired into motion segments that move by means of two facet joints and one disc. The facet joints provide stability and enable the spine to bend and twist while the discs absorb pressures and shocks to the vertebrae. Nerves are contained in the spinal column and run through the foramen openings to the rest of the body.

The vertebrae are categorized into five regions: cervical, thoracic, lumbar, sacral and coccyx. The lumbar region, which is at the bottom of the spine and consists of five vertebrae, is capable of limited movement, and primarily functions as support for the body's weight. The sacrum consists of five fused vertebrae labeled S1 through S5 directly below the lumbar region and that provide attachment for the hipbones as well as protection to organs in the pelvic area. The coccyx, also known as the tailbone, is at the end of the spine.

4

Table of Contents

### Medical Conditions Affecting the Lower Lumbar Spine and Traditional Treatment Alternatives

Degenerative disc disease is a common medical condition affecting the lower lumbar spine and refers to the degeneration of the disc from aging and repetitive stresses resulting in a loss of flexibility, elasticity and shock-absorbing properties. As degenerative disc disease progresses, the space between the vertebrae narrows, which can pinch the nerves exiting the spine and result in back pain, leg pain, numbness and loss of motor function. This lower back pain can be overwhelming for patients as the resulting pain can have significant physical, psychological and financial implications.

Treatment alternatives for lower lumbar spine conditions range from non-operative conservative therapies to highly invasive surgical interventions. Conservative therapies are typically the initial treatments selected by patients and physicians and they include rest, bracing, physical therapy, chiropractics, electrical stimulation and drugs. When conservative therapies fail to provide adequate pain relief, surgical interventions, including fusion procedures, may be used to address the pain. If a patient's disc degeneration has not progressed to a stage requiring fusion, but has progressed beyond the stage where conservative therapies provide pain relief, physicians may use non-fusion surgical procedures. Non-fusion surgical procedures utilize implants that are designed to restore disc height and allow limited movement of the vertebrae similar to a healthy spine in order to avoid increased pressures on adjacent vertebrae. These procedures and implants include dynamic stabilization devices, artificial discs and prosthetic disc nucleuses.

Fusion procedures attempt to alleviate lower back pain by removing problematic disc material and permanently joining together two or more opposing vertebrae. This is done in a manner that restores the appropriate space between the vertebrae surrounding the degenerative disc and eliminates mobility of the affected vertebrae. By restoring disc height and eliminating motion, fusion attempts to prevent the pinching of the nerves exiting the spine and thereby reducing pain.

Traditional fusion procedures typically involve an incision in the skin, and cutting muscle or moving organs to gain access to the spine. The degenerated disc is then removed, referred to as a discectomy, and a rigid implant is inserted, such as a bone graft or cage, to stabilize the diseased vertebrae. This process is referred to as fixation. The bone graft or cage promotes the growth of bone between the vertebrae. Surgeons often also affix supplementary rods and screws along the spine to provide additional stabilization while the vertebrae fuse together during the six to eighteen months following surgery. The primary surgical fusion procedures performed in the lower lumbar region include: ALIF, PLIF, TLIF and XLIF.

*Anterior Lumbar Interbody Fusion, or ALIF.*  To perform an ALIF procedure, surgeons access the spine through an incision on the patient's abdomen which provides them with optimal access to the vertebral space for performing a discectomy and inserting bone grafts for fusion. Supporting soft tissue and nerves are manipulated or removed to accommodate the anterior access required by the ALIF procedure. Surgeons commonly perform ALIF procedures in conjunction with a general or vascular surgeon because critical vasculature and organs must be retracted to gain access to the spine. The assistance of a second surgeon can reduce the economics for the spine surgeon and increase the difficulty in scheduling the surgery. Complications associated with ALIF procedures include vascular damage to the vena cava and aorta.

*Posterior Lumbar Interbody Fusion, or PLIF.*  To perform a PLIF procedure, surgeons access the spine through an incision on the center of the patient's back. The surgeon then navigates through muscles and nerves to gain access to the spine. Once at the spine, the surgeon removes bone from the lamina to gain access to the affected disc space where a discectomy is performed and a bone graft is placed. When compared to ALIF procedures, PLIF procedures are generally considered easier to perform and can achieve better nerve root decompression in certain cases. However, the anatomy of the spine prevents surgeons from removing the entire degenerated disc and obtaining optimal access for insertion of an implant or bone graft. Complications associated with PLIF procedures include nerve damage, soft tissue damage and implant migration.

*Transforaminal Lumbar Interbody Fusion, or TLIF.*  TLIF procedures are performed in a similar manner to PLIF procedures except the surgeon accesses the spine through a small incision slightly to the left or right of the center of the patient's back. After reaching the spine, the surgeon removes a portion of the facet joint and navigates through the foramen which provides better visualization and disc removal capabilities than PLIF.

Table of Contents

Complications associated with TLIF procedures are similar to those found in PLIF procedures including nerve damage, soft tissue damage and implant migration.

*Extreme Lateral Interbody Fusion, or XLIF.* To perform an XLIF procedure, the surgeon accesses the spine from the patient's side through one or two small incisions. The XLIF procedure is not appropriate for fusions in the L5/S1 segment because the pelvis interferes with access. While the XLIF procedure damages less patient tissue than other fusion procedures, we believe that there is a significant physician learning curve.

*360° Lumbar Fusion Procedure.* Currently, the most common and structurally rigid lumbar fusion surgery is referred to as a 360° fusion and requires a second surgical procedure immediately following an ALIF, PLIF, TLIF or XLIF procedure. The additional procedure involves the permanent placement of screws and rods in the back to provide additional support while the vertebrae fuse together during the six to eighteen months following surgery.

## Limitations of Traditional Lower Lumbar Spine Procedures

While traditional and minimally invasive fusion procedures can be effective at treating lower back pain, common drawbacks of these procedures include:

- *Disruption to Soft Tissue and Support Structures.* Current lumbar fusion procedures require creating a pathway from the skin to the degenerative disc that is large enough to allow direct visualization and work by the surgeon. It is common to cut through healthy muscle or move critical organs, arteries, nerves and soft tissue, which can lead to bleeding, scarring, nerve damage and bowel disruption.

- *Significant Blood Loss.* As a result of undergoing current lumbar fusion procedures, patients typically experience significant blood loss of between 100 and 1,400 cc of blood. As a result, it is common for patients to use the hospital's blood supply or donate units of their own blood before a lumbar fusion procedure to replenish any significant blood loss.

- *Lengthy Operative Procedure Times.* We believe it is common for current lumbar fusion procedures to take between 90 minutes and 4 hours to complete. With some procedures a second surgeon may be required. Long procedure times increase the risks of complications and blood loss. Also, hospital and physician resources are consumed for lengthy periods of time, which can reduce productivity and increase costs.

- *Lengthy Patient Hospital Stays.* Patients remain in the hospital for an average of three days following a lumbar fusion procedure which consumes hospital and physician resources.

- *Significant Patient Recovery Time.* Patients require three to six months to recover and rehabilitate after undergoing a lumbar fusion procedure before resuming normal activities.

- *Unresolved Patient Pain.* Patients may continue to experience lower back pain after undergoing lumbar fusion procedures even though x-rays show successful fusion has been achieved through the growth of new bone. We believe this may be caused by muscle dissection, implant irritation and scar tissue that develops around the site of the surgery.

## Our Solution

We believe we have developed the least invasive approach for surgeons to perform fusion and motion preserving surgeries in the L4/L5/S1 region without the drawbacks associated with current lumbar fusion procedures. We refer to this unique proprietary approach as our pre-sacral approach. We have developed and are marketing three fusion products that are delivered using our pre-sacral approach: AxiaLIF, AxiaLIF 360 and AxiaLIF 2L. In addition, we are developing two motion preserving devices that are delivered using our pre-sacral approach: Percutaneous Nucleus Replacement, or PNR, and Partial Disc Replacement, or PDR.

To access the spine using our pre-sacral approach, the surgeon creates a 1.5 cm incision adjacent to the tailbone while the patient is lying on their stomach. The surgeon then navigates a blunt guidepin introducer a short distance along the sacrum using imaging technologies to a spine access point near the junction of the

6

Table of Contents

S1/S2 vertebral bodies. As the guidepin is advanced it moves soft tissue structures including the bowel to the side. From this access point, the guidepin is inserted through the bone into the disc of the lowest lumbar motion segment known as the L5/S1 disc. A cannula, or tube, is inserted over the guidepin to create a tissue-protecting working channel between the surgical access site and the L5/S1 disc where the entire fusion operation is then performed. This protected working channel provides access to the interior of the disc for removal of disc material with rotating cutters and brushes, introduction of bone graft material with special instrumentation and insertion of our AxiaLIF implant. The implant immediately provides fixation and restores disc height. The AxiaLIF 2L procedure uses the same approach to provide access for our procedure to both the L5/S1 and L4/L5 discs. The AxiaLIF 360° procedure supplements the AxiaLIF implant with fixation for the back of the spine. In our AxiaLIF 360° procedure, a second incision is made approximately eight inches above the first incision, and two facet screws are implanted. The 360° fusion is widely regarded as the most stable lumbar fusion procedure available.

We believe our pre-sacral approach and its associated products provide the following benefits for patients, providers and payors:

- *Least Invasive Approach Minimizes Complications.* Our AxiaLIF products are delivered using our unique pre-sacral approach, which we believe is the least invasive solution for delivering fusion and motion-preserving products to the L4/L5/S1 region. Procedures performed utilizing our pre-sacral approach have been documented to have favorable clinical safety profiles with complication rates of approximately 1%.

- *Ease of Use and Short Procedure Times.* Practicing surgeons have reported that they can perform AxiaLIF procedures utilizing our pre-sacral approach within 45 to 60 minutes after they have performed just two to three surgeries. We believe that these short procedure times can result in reduced patient recovery times, decreased costs for the hospitals and increased productivity for the surgeons. We also believe the ease of use of our pre-sacral approach enables reduced physician training as compared to alternative lower lumbar spine procedures.

- *Low Blood Loss.* We believe the least invasive nature of our pre-sacral approach results in the average patient losing approximately 25 to 125 cc of blood during an AxiaLIF, AxiaLIF 2L or AxiaLIF 360° procedure, which is much lower than current techniques and correlates to reduced pain and faster recoveries. Given the associated low blood loss, patients generally do not need to donate blood prior to undergoing procedures that utilize our pre-sacral approach.

- *Short Patient Hospital Stays.* Patients typically stay only one night in the hospital after receiving a procedure performed using our pre-sacral approach. In a small percentage of cases, patients are able to return home the same day.

- *Reduction in Patient Pain.* We believe our pre-sacral approach is effective at reducing lower back pain because surrounding soft tissue is not violated which prevents the creation of scar tissue, a leading cause of pain.

**Our Strategy**

Our goal is to become a global leader in the treatment of conditions affecting the L4/L5/S1 region of the lumbar spine utilizing our pre-sacral approach and associated instrumentation. To achieve this goal, we are pursuing the following strategies:

- *Establish our Pre-Sacral Approach as a Standard of Care for Lower Lumbar Spine Surgery.* We believe patients commonly avoid back surgery due to its invasive nature and other drawbacks associated with current surgical treatment options. We expend significant resources promoting our pre-sacral approach as the least invasive approach to lower back surgery and we believe the advantages of our technique will enable our AxiaLIF products to become a standard of care for the lower lumbar region of the spine.

Table of Contents

- *Expand our Sales and Marketing Infrastructure to Drive Surgeon Adoption.* We intend to continue expending significant resources targeting spine surgeons through our sales and marketing efforts in the United States and internationally in order to drive the adoption of our pre-sacral approach. We believe the ease of use, short procedure times, short hospital stays and reduction in patient pain will be compelling reasons for surgeon adoption of our technologies.

- *Broaden the Applications of Our Pre-Sacral Approach.* We believe that the applications for our pre-sacral approach can be expanded beyond AxiaLIF, AxiaLIF 2L and AxiaLIF 360° to include multi-level motion preservation technologies. We are currently conducting research and development activities with respect to these applications.

- *Opportunistically Pursue Acquisitions of Complementary Businesses and Technologies.* In addition to building our internal product development efforts, we intend to selectively license or acquire complementary products and technologies that we believe will enable us to leverage our growing distribution platform.

## Products

Our products include surgical instruments for creating a safe and reproducible access route to the L4/L5/S1 vertebrae, fusion implants, as well as supplemental stabilization products. We believe our AxiaLIF implants and instruments, combined with facet screws, provide surgeons with the tools necessary to perform a 360° lumbar fusion in the least invasive manner available. We sell these products to our customers in procedure kits that include all the instruments and implants needed to complete a lumbar fusion.

*AxiaLIF Lumbar Fusion Implants.* Our AxiaLIF implant is a threaded titanium rod, called our 3D Axial Rod, that comes in varying lengths to enable one-level L5/S1 fusions and two-level L4/L5/S1 fusions. As it is implanted, its proprietary thread design separates the vertebrae to restore disc height. The increased disc height relieves pressure on the nerve, while our 3D Axial Rod provides immediate rigid fixation.

*AxiaLIF 360° Implants.* Our proprietary AxiaLIF 360° implants consist of our 3D Axial Rod plus our titanium facet screws for supplemental posterior fixation. The two AxiaLIF 360° facet screws are implanted through a single 1.5 cm incision in the patient's back using our proprietary delivery system.

*TranS1 Access and Disc Preparation Instruments.* Our pre-sacral approach requires the use of a sterile set of surgical instruments that are used to create a safe and reproducible working channel and to prepare the disc and vertebrae for our implant. The instrumentation contained in the set includes stainless steel navigation tools and access cannulae to create the working channel, as well as nitinol cutters and brushes to cut and remove the degenerated disc material and prepare the disc space for our implant.

## Product Pipeline

We are focused on developing novel percutaneous implants that will utilize and leverage our pre-sacral approach to the lumbar spine. We currently have two products in development that are intended to be used as a surgical therapy earlier in the progression of degenerative disc disease than fusion, as they are designed to preserve motion in the lumbar spine while providing stabilization. Our motion preservation product development efforts include our PNR and PDR implants. Our modular product designs enable physicians to revise the implant to address disease progression. For example, our PNR implant is designed to be used for patients in the early stage of degenerative disc disease and to be capable of conversion to our PDR implant and ultimately our AxiaLIF fusion products if the patient's condition warrants. We believe these features may encourage more patients and physicians to elect surgical intervention, as well as encourage them to elect surgical intervention earlier in the progression of their disease.

*Percutaneous Nucleus Replacement.* Our proprietary PNR implant incorporates a soft polymer that facilitates normal range of motion and restores disc height to simulate the performance of a healthy disc. This design is intended for patients suffering from earlier stage disc degeneration prior to requiring disc replacement or fusion. By utilizing our pre-sacral approach, the PNR implant enables surgeons to replace the disc nucleus while preserving other native anatomy that provides stabilization, such as the annulus. We believe all other

8

JA-99

Table of Contents

nucleus replacement technologies currently in development require access to the nucleus through the annulus. We commenced a pilot clinical trial outside the United States in the second quarter of 2008 and we anticipate receiving a CE mark by the end of 2009. In the United States we anticipate filing an IDE in 2009 to begin the process of obtaining a premarket approval, or PMA.

*Partial Disc Replacement.* Our proprietary PDR implant is our PNR implant with the addition of a cobalt chrome rod incorporating a ball-and-socket design intended to provide additional stability while preserving normal range of motion. This design is intended for patients suffering from mid-stage disc degeneration, or PNR patients whose disease has progressed but does not yet require fusion. The PDR implantation procedure is identical to that of the PNR, with the addition of the insertion of the cobalt chrome rod. If the patient already has a PNR, converting to our PDR only requires the insertion of the cobalt chrome rod through the existing PNR implant. We will design a clinical trial plan for the PDR implant subsequent to the initiation of a PNR pivotal trial.

In the future, we believe our product offerings will be expanded to address additional clinical applications in the surgical treatment of conditions affecting the lower lumbar spine, such as neuro stimulation and biologics. Such applications would require FDA 510(k) clearance or PMA approval, most likely supported by safety and efficacy data from clinical trials.

## Sales and Marketing

Our sales and marketing effort primarily targets industry leaders and high volume spine surgeons. We also market our products at various industry conferences and through industry organized surgical training courses. In addition, we intend to develop and implement marketing programs targeted at potential patients, which we believe will accelerate the demand for our products.

In 2008, no customer accounted for 10% or more of revenues.

In the United States, we market and sell our products through a combination of direct sales representatives and independent sales agencies that have allocated representatives to solicit our products. At December 31, 2008, our U.S. sales and marketing team included our vice president of sales and marketing, 2 area managers, 8 regional sales managers, 1 director of training and professional development, 53 direct sales representatives, 2 case coverage specialists and 17 independent sales agents covering specific geographic regions. By the end of 2009, we expect to have increased the number of our direct sales representatives to 80 and case coverage specialists to 8. We select our sales representatives and independent sales agents based on their expertise in spine surgery medical device sales, reputation within the surgeon community and sales coverage. Our sales representatives receive a base salary and a percentage of the net sales that they generate. The independent sales agents are compensated based on a percentage of the net sales that they generate. We have agreements with our independent sales agents that provide them with an exclusive right to sell our products in their territories, which are generally terminable upon 90 days' written notice.

Outside of the United States, we primarily utilize third-party distributors, with support from our vice president of international sales and our U.S. sales and marketing staff, to support the commercialization of our products. Through December 31, 2008, the majority of our international sales have been in Europe. In December 2008, we hired 2 direct sales representatives in Germany, and in 2009 we expect to begin direct sales through our own sales representatives and agents in Germany and Switzerland. By the end of 2009, we expect to have 7 direct sales representatives in Germany.

We intend to continue to hire sales and marketing personnel as appropriate to enable us to support the commercialization of our products.

## Surgeon Training

We devote significant resources to training and educating surgeons on the specialized skills involved in the proper use of our instruments and implants. We believe that the most effective way to introduce and build market demand for our products is by training spine surgeons in the use of our products. We accomplish our training objectives primarily through cadaver and surrogate models and live case observations with surgeons

9

Table of Contents

experienced in our pre-sacral approach. After this training, surgeons are generally able to perform unsupervised surgeries using our pre-sacral approach. We supplement our training with online didactic tutorials. As of December 31, 2008, we had trained over 900 U.S. spine surgeons and 100 surgeons outside of the U.S. in the use of our single-level product. Of the U.S. surgeons trained on our pre-sacral approach, approximately 330 have performed a procedure in the 12 months ended December 31, 2008 using our pre-sacral approach. In addition, during 2008, we trained over 150 U.S. surgeons in the use of our AxiaLIF 2L product. We believe we have the necessary capacity to train a sufficient number of surgeons to meet our current goals.

### Third-Party Reimbursement

In the United States, healthcare providers generally rely on third-party payors, principally private insurers and governmental payors such as Medicare and Medicaid, to cover and reimburse all or part of the cost of a spine fusion surgery in which our medical device is used. Surgeons are reimbursed for performing the surgical procedure, while hospitals are reimbursed for the cost of the device, all patient care related to the fusion procedure and the overhead associated with maintaining the facility.

Most payors follow Medicare's Diagnosis-Related Group, or DRG, based payment system for reimbursing facilities. Under this model, hospitals are paid a set amount to cover the costs associated with a fusion patient, including the cost of the device used in the procedure. For 2008, Medicare expanded the group of available DRGs for spinal fusion to incorporate the higher costs associated with caring for fusion patients that may have major complications or comorbidities, or MCC. There are now several different DRGs for spinal fusion with varying reimbursement rates based on the severity of complications and comorbidities experienced by the patient. The most commonly associated DRGs for spinal fusion are 453/454/455 ("Combined Anterior/Posterior Spinal Fusion with MCC, with CC or without MCC/CC") and $459/460$ ("Spinal Fusion Except Cervical with or without MCC"). Private payors typically use Medicare DRGs as a benchmark when setting their own reimbursement rates for facilities.

Surgeons use the American Medical Association's Current Procedural Terminology, or CPT, system to bill payors for the AxiaLIF procedure. CPT codes describe the services and procedures provided for patients to third-party payors so that physicians may be reimbursed. Effective January 1, 2009, AxiaLIF has a dedicated Category III CPT code (0195T-arthrodesis, presacral interbody technique, including instrumentation). Unlike Category I CPT codes, Category III codes do not have a set value which physicians use to set their charge for a particular code. Additionally, some payors view Category III codes as "investigational" or "experimental" and may not reimburse them. However, AxiaLIF adoption continues to grow and unlike many new or novel procedures, AxiaLIF is an access variation on the current standard of care (spinal fusion). As the availability of peer-reviewed research continues to grow, we will diligently work with the private payor community to ensure continued patient access to the procedure. Furthermore, AxiaLIF is only one of up to 10 different CPT codes physicians may submit to capture the entirety of a spinal fusion procedure lessening the impact should payment for our code be initially denied.

We expect that sales volumes and prices of our products will depend in large part on the continued availability of reimbursement from such third-party payors. The above mentioned coding change only affects the CPT coding system. Hospital reimbursement is not impacted by this new code. Additionally, these third-party payors may deny reimbursement if they determine that a device used in a procedure was not used in accordance with cost-effective treatment methods, as determined by the third-party payor, or was used for an unapproved indication. Particularly in the United States, third-party payors continue to carefully review, and increasingly challenge, the prices charged for procedures and medical products.

Medicare coverage and reimbursement policies are developed by the Centers for Medicare and Medicaid Services, or CMS, the federal agency responsible for administering the Medicare program, and its contractors. CMS establishes Medicare coverage and reimbursement policies for medical products and procedures and such policies are periodically reviewed and updated. While private payors vary in their coverage and payment policies, the Medicare program is viewed as a benchmark. Medicare reimbursement rates for the same or similar procedures vary due to geographic location, nature of the facility in which the procedure is performed (i.e., teaching or community hospital) and other factors.

10

JA-101

Table of Contents

In addition, a large percentage of insured individuals receive their medical care through managed care programs, which monitor and often require pre-approval of the services that a member will receive. The percentage of individuals covered by managed care programs continues to grow in the United States.

Internationally, reimbursement and healthcare payment systems vary substantially from country to country and include single-payor, government-managed systems as well as systems in which private payors and government-managed systems exist side-by-side. Our ability to achieve market acceptance or significant sales volume in international markets we enter will be dependent in large part on the availability of reimbursement for procedures performed using our products under the healthcare payment systems in such markets. A small number of countries may require us to gather additional clinical data before recognizing coverage and reimbursement for our products. It is our intent to complete the requisite clinical studies and obtain coverage and reimbursement approval in countries where it makes economic sense to do so.

We believe that the overall escalating cost of medical products and services has led to, and will continue to lead to, increased pressures on the healthcare industry to reduce the costs of products and services. We cannot assure you that government or private third-party payors will cover and reimburse the procedures using our products in whole or in part in the future or that payment rates will be adequate. In addition, it is possible that future legislation, regulation, or reimbursement policies of third-party payors will adversely affect the demand for our procedures and products or our ability to sell them on a profitable basis. The unavailability or inadequacy of third-party payor coverage or reimbursement could have a material adverse effect on our business, operating results and financial condition.

**Competition**

The medical device industry is highly competitive, subject to rapid technological change and significantly affected by new product introductions and market activities of other participants. Our currently marketed products are, and any future products we commercialize will be, subject to intense competition. Our competitors include providers of conservative, non-operative therapies for lower lumbar spine conditions, as well as a number of major medical device companies that have developed or plan to develop products for minimally invasive spine surgery in each of our current and future product categories. We believe that the principal competitive factors in our markets include:

- improved outcomes for medical conditions affecting the lower lumbar spine;

- acceptance by spine surgeons;

- ease of use and reliability;

- product price and qualification for reimbursement;

- technical leadership and superiority;

- effective marketing and distribution; and

- speed to market.

We are aware of several companies that compete or are developing technologies in our current and future product areas. As a result, we expect competition to remain intense. We believe that our most significant competitors are Medtronic Sofamor Danek, Johnson & Johnson DePuy Spine, Stryker, NuVasive, Zimmer Spine, Synthes, Orthofix International, Globus Medical, Alphatec Spine and others, many of which have substantially greater sales and financial resources than we do. In addition, these companies may have more established distribution networks, entrenched relationships with physicians, and greater experience in launching, marketing, distributing and selling products.

Our ability to compete successfully will depend on our ability to develop proprietary products that reach the market in a timely manner, receive adequate reimbursement and are safer, less invasive and less expensive than alternatives available for the same purpose. Because of the size of the potential market, we anticipate that companies will dedicate significant resources to developing competing products.

11

JA-102

Table of Contents

### Research and Development

As of December 31, 2008, our research and development team was comprised of ten employees who have extensive experience in developing products to treat medical conditions affecting the lower lumbar spine. These employees work closely with our clinical advisors and spine surgeon customers to design and enhance our products and approach. Our R&D spending was $5.0 million, $4.8 million and $4.2 million for the years ending December 31, 2008, 2007 and 2006, respectively.

Since inception, we have devoted significant resources to develop and enhance our AxiaLIF product kits utilizing the pre-sacral approach. We expect our research and development expenditures to increase as we continue to devote significant resources to developing our PNR and PDR products and completing the clinical trials necessary to support submissions to gain regulatory approvals.

### Manufacturing and Supply

We rely on third parties to manufacture all of our products and their components, except for our nitinol nucleus cutter blades and nucleus cutter sheaths, which are manufactured by us at our facilities in Wilmington, North Carolina. Our outsourcing partners are manufacturers that meet FDA, International Organization for Standardization, or ISO, and other internal quality standards. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which we believe allows us to compete with larger-volume manufacturers of spine surgery products.

All of our products and components are assembled, packaged, labeled and sterilized at third-party facilities in the United States under our existing contracts requiring compliance with Good Manufacturing Processes, or GMPs. Following receipt of products or components from our third-party manufacturers, we inspect, warehouse and ship the products and components at our facilities in Wilmington. We reserve the exclusive right to inspect and assure conformance of each product and component to our specifications. In addition, FDA or other regulatory authorities may inspect our facilities and those of our suppliers to ensure compliance with quality system regulations.

The majority of our instruments and implants are produced by third-party manufacturers on precision, high-speed machine shop equipment. However, certain of our products, components, materials used to manufacture such products and components, and manufacturing operations are produced, performed or supplied by third-party specialty vendors due to their proprietary or non-conventional nature. For example, the blades for our nucleus cutter are made from a metal called nitinol, which is converted into strip form by three manufacturers in the United States known to us. We have sourced nitinol strip from two of these vendors. The nitinol strip is then further converted for us into cutter blanks by a scalpel blade specialty vendor. Other vendors are available to manufacture the cutter blanks, as we may deem desirable or necessary. We convert the cutter blanks into cutter blades at our facilities. Our tissue extractor product is produced for us by a supplier that specializes in wire forming and coiling specifically for the medical device industry. A limited number of similar vendors exist that could be used to produce the tissue extractor product, and we believe we could replace this supplier on reasonable terms without substantial delay, if necessary.

We are currently working with our third-party manufacturers to plan for our manufacturing requirements as we increase our commercialization efforts. In most cases, we have redundant manufacturing capability with multiple vendors and enjoy the significant capacity this arrangement provides to us. We may consider manufacturing certain products or product components internally, if and when demand or quality requirements make it appropriate to do so. We believe the manufacturing capacity available to us is sufficient to meet our demands into the foreseeable future.

### Patents and Proprietary Technology

We rely on a combination of patent, trademark, copyright, trade secret and other intellectual property laws, nondisclosure agreements and other measures to protect our intellectual property rights. We believe that in order to have a competitive advantage, we must develop and maintain the proprietary aspects of our

12

http://www.sec.gov/Archives/edgar/data/1230355/000095014409002207/g18069e10vk.htm    8/27/2012

JA-103

Table of Contents

technologies. We require our employees, consultants and advisors to execute confidentiality agreements in connection with their employment, consulting or advisory relationships with us. We also require our employees, consultants and advisors who we expect to work on our products to agree to disclose and assign to us all inventions conceived during the work day, using our property or which relate to our business. We cannot provide any assurance that employees and consultants will abide by the confidentiality or assignment terms of these agreements. Despite any measures taken to protect our intellectual property, unauthorized parties may attempt to copy aspects of our products or to obtain and use information that we regard as proprietary.

### Patents

As of December 31, 2008, we had 11 issued United States patents, 48 pending patent applications in the United States, 1 issued European patent and 97 foreign patent applications as counterparts of U.S. cases. The issued and pending patents cover, among other things:

- our method for performing trans-sacral procedures in the spine, including diagnostic or therapeutic procedures, and trans-sacral introduction of instrumentation or implants;

- apparatus for conducting these procedures including access, disc preparation and implantation including the current TranS1 instruments individually and in kit form; and

- implants for fusion and motion preservation in the spine.

Our issued patents begin to expire in 2021 assuming timely payment of all maintenance fees. We have multiple patents covering unique aspects and improvements for many of our methods and products. We do not believe that the expiration of any single patent is likely to significantly affect our business, operating results or prospects.

### Trademarks

We own two trademark registrations in the United States and six trademark registrations in the European Union. We also own nine pending trademark applications in the United States, one pending trademark applications in the European Union and six pending trademark applications in Canada.

## Government Regulation

Our products are medical devices subject to extensive regulation by the FDA and other U.S. federal and state regulatory bodies and comparable authorities in other countries. To ensure that medical products distributed domestically and internationally are safe and effective for their intended use, FDA and comparable authorities in other countries have imposed regulations that govern, among other things, the following activities that we or our partners perform and will continue to perform:

- product design and development;

- registration and listing;

- product testing (preclinical and clinical);

- product manufacturing;

- product labeling;

- product storage;

- premarket clearance or approval;

- advertising and promotion;

- product marketing, sales and distribution; and

- post-market surveillance, including reporting deaths or serious injuries related to products and certain product malfunctions.

13

JA-104

Table of Contents

### FDA's Premarket Clearance and Approval Requirements

Unless an exemption applies, each medical device we wish to commercially distribute in the United States will require either prior 510(k) clearance or prior premarket approval from the FDA. The FDA classifies medical devices into one of three classes. Devices deemed to pose lower risk are placed in either class I or II, which in many cases requires the manufacturer to submit to the FDA a premarket notification or 510(k) submission requesting permission for commercial distribution. This process is known as requesting 510(k) clearance. Some low risk devices are exempt from this requirement. Devices deemed by the FDA to pose the greatest risk, such as many life-sustaining, life-supporting or implantable devices, or devices deemed not substantially equivalent to a legally marketable device, are placed in class III, requiring a PMA. Our current commercial products are class II devices marketed under FDA 510(k) premarket clearance. Both premarket clearance and PMA applications are subject to the payment of user fees, paid at the time of submission for FDA review.

### 510(k) Clearance Pathway

To obtain 510(k) clearance, we must submit a premarket notification demonstrating that the proposed device is substantially equivalent to a legally marketable device not requiring a PMA. Although statutorily mandated to clear or deny a 510(k) premarket notification within 90 days of submission of the application, FDA's 510(k) clearance pathway usually takes from three to twelve months, based on requests for additional information by FDA, but it can take significantly longer. Additional information can include clinical data to make a determination regarding substantial equivalence.

After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a new or major change in its intended use, will require a new 510 (k) clearance or, depending on the modification, require a PMA. The FDA requires each manufacturer to determine whether the proposed change requires submission of a 510(k), or a PMA, but the FDA can review any such decision and can disagree with a manufacturer's determination. If the FDA disagrees with a manufacturer's determination, the FDA can require the manufacturer to cease marketing and/or recall the modified device until 510(k) clearance or a PMA is obtained. If the FDA requires us to seek 510(k) clearance or a PMA for any modifications to a previously cleared product, we may be required to cease marketing or recall the modified device until we obtain this clearance or approval. Also, in these circumstances, we may be subject to significant regulatory fines or penalties. We have made and plan to continue to make additional product enhancements to our AxiaLIF, AxiaLIF 2L and AxiaLIF 360° products that we believe do not require new 510(k) clearances.

### Premarket Approval Pathway

A PMA application must be submitted if the device is not exempt and cannot be cleared through the 510(k) process. The PMA application process is generally more costly and time consuming than the 510 (k) process. A PMA application must be supported by extensive data including, but not limited to, technical, preclinical, clinical trials, manufacturing and labeling to demonstrate to the FDA's satisfaction the safety and effectiveness of the device for its intended use.

After a PMA application is sufficiently complete, the FDA will accept the application and begin an in-depth review of the submitted information. By statute, the FDA has 180 days to review the "accepted application", although, generally, review of the application can take between one and three years, but it may take significantly longer. During this review period, the FDA may request additional information or clarification of information already provided. Also during the review period, an advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device. In addition, the FDA will conduct a preapproval inspection of the manufacturing facility to ensure compliance with quality system regulations. New PMA applications or PMA application supplements are required prior to marketing for product modifications that affect the safety and efficacy of the device. PMA supplements often require submission of the same type of information as a PMA application, except that the supplement is limited to information needed to support any changes from the

14

Table of Contents

device covered by the original PMA application, and may not require as extensive clinical data or the convening of an advisory panel. None of our products are currently approved under a PMA but devices in development may require it.

### Clinical Trials

Clinical trials are almost always required to support a PMA application and are sometimes required for a 510(k) premarket notification. In the U.S., these trials require submission of an application for an IDE. The IDE application must be supported by appropriate data, such as animal and laboratory testing results, showing that it is safe to test the device in humans and that the testing protocol is scientifically sound. The IDE application must be approved in advance by the FDA for a specified number of patients, unless the product is deemed a non-significant risk device and eligible for more abbreviated IDE requirements. Clinical trials for a significant risk device may begin once the IDE application is approved by the FDA and the appropriate institutional review boards at the clinical trial sites. Future clinical trials of our motion preservation designs will require that we obtain an IDE from the FDA prior to commencing clinical trials and that the trial be conducted under the oversight of an institutional review board at the clinical trial site. Our clinical trials must be conducted in accordance with FDA regulations and federal and state regulations concerning human subject protection, including informed consent and healthcare privacy and financial disclosure by clinical investigators. A clinical trial may be suspended by FDA or the investigational review board at any time for various reasons, including a belief that the risks to the study participants outweigh the benefits of participation in the study. Even if a study is completed, the results of our clinical testing may not demonstrate the safety and efficacy of the device, or may be equivocal or otherwise not be sufficient to obtain clearance or approval of one of our products. Similarly, in Europe the clinical study must be approved by the local ethics committee and in some cases, including studies of high-risk devices, by the Competent Authority in the applicable country.

### Pervasive and Continuing FDA Regulation

After a device is placed on the market, numerous FDA and other regulatory requirements continue to apply. These include:

- quality system regulation, which requires manufacturers, including third-party contract manufacturers, to follow stringent design, testing, control, documentation, and other quality assurance controls, during all aspects of the manufacturing process;

- establishment registration and listing;

- labeling regulations, and FDA prohibitions against the promotion of products for uncleared or unapproved "off-label" uses;

- medical device reporting obligations, which require that manufacturers submit reports to the FDA if information reasonably suggests their device (i) may have caused or contributed to a death or serious injury, or (ii) malfunctioned and the device or a similar company device would likely cause or contribute to a death or serious injury if the malfunction were to recur; and

- other post-market surveillance requirements, which apply when necessary to protect the public health or to provide additional safety and effectiveness data for the device.

We must register and list with FDA as medical device manufacturers and must obtain all necessary state permits or licenses to operate our business. As manufacturers, we are subject to announced and unannounced inspections by FDA to determine our compliance with quality system regulation and other regulations. We have not yet been inspected by the FDA. We believe that we are in substantial compliance with quality system regulation and other regulations.

15

JA-106

Table of Contents

Failure to comply with applicable regulatory requirements can result in enforcement action by the FDA, which may include, among other things, any of the following sanctions:

- warning letters, fines, injunctions, consent decrees and civil penalties;

- repair, replacement, refunds, recall or seizure of our products;

- operating restrictions, partial suspension or total shutdown of production;

- refusing our request for 510(k) clearance or premarket approval of new products, new intended uses or other modifications to existing products;

- withdrawing or suspending premarket approvals that are already granted; and

- criminal prosecution.

We are subject to announced and unannounced inspections by the FDA and these inspections may include the manufacturing facilities of our subcontractors.

### Fraud and Abuse

We may directly or indirectly be subject to various federal and state laws pertaining to healthcare fraud and abuse, including anti-kickback laws. In particular, the federal healthcare program anti-kickback statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing, arranging for or recommending a good or service, for which payment may be made in whole or part under federal healthcare programs, such as the Medicare and Medicaid programs. The anti-kickback statute is broad and prohibits many arrangements and practices that are lawful in businesses outside of the healthcare industry. In implementing the statute, the Office of Inspector General, or OIG, has issued a series of regulations, known as the "safe harbors," which began in July 1991. These safe harbors set forth provisions that, if all their applicable requirements are met, will assure healthcare providers and other parties that they will not be prosecuted under the anti-kickback statute. The failure of a transaction or arrangement to fit precisely within one or more safe harbors does not necessarily mean that it is illegal or that prosecution will be pursued. However, conduct and business arrangements that do not fully satisfy all requirements of an applicable safe harbor may result in increased scrutiny by government enforcement authorities such as the OIG. Penalties for violations of the federal anti-kickback statute include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

The federal False Claims Act prohibits persons from knowingly filing or causing to be filed a false claim to, or the knowing use of false statements to obtain payment from, the federal government. Suits filed under the False Claims Act, known as "qui tam" actions, can be brought by any individual on behalf of the government. These individuals, sometimes known as "relators" or, more commonly, as "whistleblowers", may share in any amounts paid by the entity to the government in fines or settlement. The number of filings of qui tam actions has increased significantly in recent years, causing more healthcare companies to have to defend a False Claim action. If an entity is determined to have violated the federal False Claims Act, it may be required to pay up to three times the actual damages sustained by the government, plus civil penalties of between $5,500 and $11,000 for each separate false claim. Various states have also enacted similar laws modeled after the federal False Claims Act which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor.

The Health Insurance Portability and Accountability Act of 1996, or HIPAA, created two new federal crimes: healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private payors. A violation of this statute is a felony and may result in fines, imprisonment or exclusion from government sponsored programs. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items, or services. A violation of this statute is a felony and may result in fines or imprisonment.

16

JA-107

Table of Contents

If any of our operations are found to have violated or be in violation of any of the laws described above and other applicable state and federal fraud and abuse laws, we may be subject to penalties, among them being civil and criminal penalties, damages, fines, exclusion from government healthcare programs, and the curtailment or restructuring of our operations.

### *International*

International sales of medical devices are subject to foreign government regulations, which vary substantially from country to country. The time required to obtain approval by a foreign country may be longer or shorter than that required for FDA clearance or approval, and the requirements may differ.

The European Union, which consists of 27 of the major countries in Europe, has adopted numerous directives and standards regulating the design, manufacture, clinical trials, labeling, and adverse event reporting for medical devices. Other countries, such as Switzerland, have voluntarily adopted laws and regulations that mirror those of the European Union with respect to medical devices. Devices that comply with the requirements of a relevant directive will be entitled to bear CE conformity marking and, accordingly, can be commercially distributed throughout the member states of the European Union, and other countries that comply with or mirror these directives. The method of assessing conformity varies depending on the type and class of the product, but normally involves a combination of self-assessment by the manufacturer and a third-party assessment by a "Notified Body," an independent and neutral institution appointed to conduct conformity assessments. This third-party assessment consists of audits of the manufacturer's quality system. An assessment by a Notified Body in one country within the European Union is required for each product in order for a manufacturer to commercially distribute the product throughout the European Union. Compliance with voluntary harmonizing standards ISO 9001 and ISO 13845 issued by the ISO establishes the presumption of conformity with the essential requirements for a CE mark. In August 2004, our quality system was certified by Intertek ETL-Semko, a Notified Body, under the European Union Medical Device Directive to be in compliance with ISO standards 9001:2000 and ISO 13485:2003.

### Employees

As of December 31, 2008, we had 122 employees, most of whom were full-time employees, with 82 employees in sales, marketing, customer service and training, 8 employees in manufacturing, 10 employees in research and development, 13 employees in general and administrative and 9 employees in clinical, regulatory and quality assurance. We believe that our future success will depend in part on our continued ability to attract, hire and retain qualified personnel. None of our employees are represented by a labor union, and we believe our employee relations are good.

### General Information

We were incorporated in Delaware in May 2000 under the name "aXiaMed, Inc." and changed our name to "TranS1 Inc." in February 2003. Our principal executive office is located at 411 Landmark Drive, Wilmington, North Carolina 28412-6303 and our telephone number is (910) 332-1700. Our website is located at *www.trans1.com*. The information on, or that can be accessed through, our website is not incorporated by reference into this report and should not be considered to be a part of this report.

We make our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to these reports available on our website, at *www.trans1.com*, free of charge as soon as practicable after filing with the U.S. Securities and Exchange Commission, or SEC.

All such reports are also available free of charge via EDGAR through the SEC website at www.sec.gov. In addition, the public may read and copy materials filed by us with the SEC at the SEC's public reference room located at 100 F St., NE, Washington, D.C., 20549. Information regarding operation of the SEC's public reference room can be obtained by calling the SEC at 1-800-SEC-0330.

17

Table of Contents

**Item 1A.**  *Risk Factors*

*Investing in our common stock involves a high degree of risk. You should carefully consider the following risk factors, as well as the other information contained in this report, before deciding whether to invest in shares of our common stock. If any of the following risks actually occur, our business, financial condition, operating results and prospects would suffer. In that case, the trading price of our common stock would likely decline and you might lose all or part of your investment in our common stock. The risks described below are not the only ones we face. Additional risks that we currently do not know about or that we currently believe to be immaterial may also impair our operations and business results.*

**Risks Related to Our Business**

**To be commercially successful, spine surgeons must accept that our products are a safe and effective alternative to existing surgical treatments of certain spine disorders.**

Our revenue is derived entirely from sales of our AxiaLIF products and related surgical instruments. We expect that sales of our AxiaLIF products will continue to account for a substantial portion of our revenues for the foreseeable future. We believe spine surgeons may not widely adopt our products unless they determine, based on experience, long-term clinical data and published peer reviewed journal articles, that our products provide a safe and effective alternative to conventional procedures used to treat certain spine disorders. Spine surgeons may be slow to adopt our technology for the following reasons, among others:

- lack of long-term clinical data supporting additional patient benefits;

- lack of experience with our products;

- lack of evidence supporting cost savings of our procedure over existing surgical alternatives;

- perceived liability risks generally associated with the use of new products and procedures;

- training time required to use a new product; and

- availability of adequate coverage and reimbursement for hospitals and surgeons.

If we are unable to effectively demonstrate to spine surgeons the benefits of our products as compared to existing surgical treatments of spine disorders and our products fail to achieve market acceptance, our future revenues will be adversely impacted. In addition, we believe recommendations and support of our products by influential spine surgeons are essential for market acceptance and adoption. If we do not receive support from these spine surgeons or have favorable long-term clinical data, spine surgeons may not use our products and our future revenues will be harmed and our stock price would likely decline.

**The efficacy of our products is not yet supported by long-term clinical data and may therefore prove to be less effective than initially thought.**

We obtained 510(k) clearance to manufacture, market and sell all of our currently U.S. marketed products from the FDA. The FDA's 510(k) clearance process is less costly and rigorous than the PMA process and requires less supporting clinical data. As a result, we currently lack the breadth of published long-term clinical data supporting the efficacy of our AxiaLIF and AxiaLIF 360° products and the benefits they offer that might have been generated in connection with the PMA process. In addition, we may determine from post-market experience that certain patient characteristics, such as age or preexisting medical conditions, could affect fusion rates, which could lead to misleading or contradictory data on the efficacy of our products. For these reasons, spine surgeons may be slow to adopt our products. Also, we may not be able to generate the comparative data that our competitors have or are generating and we may be subject to greater regulatory and product liability risks. Further, any long-term safety or efficacy data we generate may not be consistent with our existing data and may demonstrate less favorable safety or efficacy. These results could reduce demand for our products, significantly reduce our ability to achieve expected revenues and could prevent us from becoming profitable. Moreover, if future results and experience indicate that our products cause unexpected or

18

JA-109

Table of Contents

serious complications or other unforeseen negative effects, we could be subject to significant legal and regulatory liability and harm to our business reputation.

*The demand for our products and the prices which customers and patients are willing to pay for our products depend upon the ability of our customers to obtain adequate third-party coverage and reimbursement for their purchases of our products.*

Sales of our products depend in part on the availability of adequate coverage and reimbursement from governmental and private payors. In the United States, healthcare providers that purchase our products generally rely on third-party payors, principally Medicare, Medicaid and private health insurance plans, to pay for all or a portion of the costs and fees associated with the AxiaLIF procedure. While our currently marketed products are eligible for reimbursement in the United States, if surgical procedures utilizing our products are performed on an outpatient basis, it is possible that private payors may no longer provide reimbursement for our products without further supporting data on our procedure. Any delays in obtaining, or an inability to obtain, adequate coverage or reimbursement for procedures using our products could significantly affect the acceptance of our products and have a material adverse effect on our business. Additionally, third-party payors continue to review their coverage policies carefully for existing and new therapies and can, without notice, deny coverage for treatments that include the use of our products. Our business would be negatively impacted to the extent any such changes reduce reimbursement for our products.

With respect to coverage and reimbursement outside of the United States, reimbursement systems in international markets vary significantly by country, and by region within some countries, and reimbursement approvals must be obtained on a country-by-country basis and can take up to 18 months, or longer. Many international markets have government-managed healthcare systems that govern reimbursement for new devices and procedures. In most markets, there are private insurance systems as well as government-managed systems. Additionally, some foreign reimbursement systems provide for limited payments in a given period and therefore result in extended payment periods. Reimbursement in international markets may require us to undertake country-specific reimbursement activities, including additional clinical studies, which could be time consuming, expensive and may not yield acceptable reimbursement rates.

Furthermore, healthcare costs have risen significantly over the past decade. There have been and may continue to be proposals by legislators, regulators and third-party payors to contain these costs. These cost-control methods include prospective payment systems, capitated rates, group purchasing, redesign of benefits, requiring pre-authorizations or second opinions prior to major surgery, encouragement of healthier lifestyles and exploration of more cost-effective methods of delivering healthcare. Some healthcare providers in the United States have adopted or are considering a managed care system in which the providers contract to provide comprehensive healthcare for a fixed cost per person. Healthcare providers may also attempt to control costs by authorizing fewer elective surgical procedures or by requiring the use of the least expensive devices possible. These cost-control methods also potentially limit the amount which healthcare providers may be willing to pay for medical devices. In addition, in the United States, no uniform policy of coverage and reimbursement for medical technology exists among all these payors. Therefore, coverage of and reimbursement for medical technology can differ significantly from payor to payor. The continuing efforts of third-party payors, whether governmental or commercial, whether inside the United States or outside, to contain or reduce these costs, combined with closer scrutiny of such costs, could restrict our customers' ability to obtain adequate coverage and reimbursement from these third-party payors. The cost containment measures that healthcare providers are instituting both in the United States and internationally could harm our business by adversely affecting the demand for our products or the price at which we can sell our products.

*Our future growth depends on increasing physician awareness of our pre-sacral approach and our related products for appropriate treatment, intervention and referral.*

We target our sales and education efforts to spine surgeons. However, the initial point of contact for many patients may be primary care physicians who commonly treat patients experiencing lower lumbar spine pain. We believe that we must educate physicians to change their screening and referral practices. If we do not educate referring physicians about lower lumbar spine conditions in general, and the existence of the pre-sacral

JA-110


19

Table of Contents

approach and our related products in particular, they may not refer patients who are candidates for the procedures utilizing our pre-sacral approach to spine surgeons, and those patients may go untreated or receive conservative, non-operative therapies. If we are not successful in educating physicians about screening for lower lumbar spine conditions or about referral opportunities, our ability to increase our revenue may be impaired.

***We have incurred losses since inception and we expect to incur increasing losses for the foreseeable future. We may never achieve or sustain profitability.***

We were incorporated in May 2000 and began commercial sales of our products in early 2005. We have incurred net losses since our inception and through December 31, 2008, we had an accumulated deficit of $47.9 million. To date, we have financed our operations primarily through sales of our equity securities and have devoted substantially all of our resources to research and development of our products and the commercial launch of our AxiaLIF products. We expect our expenses to increase significantly in connection with our additional clinical trials and research and development activities, as well as to support the expansion of our sales and marketing efforts. As a result, we expect to continue to incur significant operating losses for the foreseeable future. These losses will continue to have an adverse effect on our stockholders' equity and we may never achieve or sustain profitability.

***We are in a highly competitive market segment, which is subject to rapid technological change. If our competitors are better able to develop and market products that are safer, more effective, less costly or otherwise more attractive than any products that we may develop, our ability to generate revenue will be reduced or eliminated.***

The market for treatment of spine disorders is highly competitive and subject to rapid and profound technological change. Our success depends, in part, upon our ability to maintain a competitive position in the development of technologies and products for use in the treatment of spine disorders. We face competition from both established and development stage companies. Many of the companies developing or marketing competing products are publicly traded or are divisions of publicly-traded companies, and these companies enjoy several competitive advantages, including:

- greater financial and human resources for product development, sales and marketing and patent litigation;

- significantly greater name recognition;

- established relationships with spine surgeons, customers and third-party payors;

- additional lines of products, and the ability to offer rebates or bundle products to offer greater discounts or incentives to gain a competitive advantage;

- established sales and marketing, and distribution networks; and

- greater experience in conducting research and development, manufacturing, clinical trials, preparing regulatory submissions and obtaining regulatory clearance or approval for products and marketing approved products.

Our competitors may develop and patent processes or products earlier than us, obtain regulatory clearance or approvals for competing products more rapidly than us, and develop more effective or less expensive products or technologies that render our technology or products obsolete or non-competitive. We also compete with our competitors in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient enrollment in clinical trials, as well as in acquiring technologies and technology licenses complementary to our products or advantageous to our business. If our competitors are more successful than us in these matters, our business may be harmed.

20

Table of Contents

***Our failure to continue building effective sales and marketing capabilities for our products could significantly impair our ability to increase sales of our products.***

We commercially launched our AxiaLIF single-level product in 2005, our AxiaLIF 360° product in 2006 and our AxiaLIF 2L product in 2008 and have limited experience marketing and selling our products. We utilize a hybrid model of independent sales agents and direct sales representatives for product sales in the United States and rely primarily on third-party distributors for international sales. As of December 31, 2008, we employed 53 direct sales representatives in the United States and 2 direct sales representatives in Germany and expect that we will need to increase that number significantly to continue to grow our business. We have limited experience managing a direct sales force, which can be an expensive and time consuming process. If we are unable to sufficiently increase the number of direct sales representatives and efficiently manage those individuals, our sales will suffer. We also rely on marketing arrangements with independent sales agents in the United States and independent distributors in Europe, in particular their sales and service expertise and relationships with the customers in the marketplace. We do not control, nor monitor the marketing practices of our independent sales agents or distributors and they may not be successful in implementing our marketing plans or complying with applicable laws regarding marketing practices. Independent distributors and sales agents may terminate their relationship with us, or devote insufficient sales efforts to our products. Our failure to maintain our existing relationships with our independent sales agents or distributors, or our failure to recruit and retain additional skilled independent sales distributors and sales agents or directly-employed sales professionals, could have an adverse effect on our operations.

***Our future success depends on our ability to develop, receive regulatory clearance or approval, and introduce new products or product enhancements that will be accepted by the market in a timely manner.***

It is important to our business that we continue to build a more complete product offering for treatment of spine disorders. As such, our success will depend in part on our ability to develop and introduce new products and enhancements to our existing products to keep pace with the rapidly changing spine market. However, we may not be able to successfully develop and obtain regulatory clearance or approval for product enhancements, or new products or our future products, or these products may not be accepted by spine surgeons or the payors who financially support many of the procedures performed with our products.

The success of any new product offering or enhancement to an existing product will depend on several factors, including our ability to:

- properly identify and anticipate spine surgeon and patient needs;

- develop and introduce new products or product enhancements in a timely manner;

- avoid infringing upon the intellectual property rights of third parties;

- demonstrate, if required, the safety and efficacy of new products with data from preclinical studies and clinical trials;

- obtain the necessary regulatory clearances or approvals for new products or product enhancements;

- be fully FDA-compliant with marketing of new devices or modified products;

- provide adequate training to potential users of our products;

- receive adequate coverage and reimbursement for procedures performed with our products; and

- develop an effective and FDA-compliant, dedicated marketing and distribution network.

If we do not develop new products or product enhancements in time to meet market demand or if there is insufficient demand for these products or enhancements, our results of operations will suffer.

21

Table of Contents

***If clinical trials of our current or future product candidates do not produce results necessary to support regulatory clearance or approval in the United States or elsewhere, we will be unable to commercialize these products.***

We have several product candidates in our development pipeline, including our PNR and PDR devices which we expect will require a PMA from the FDA. A PMA application must be supported by extensive information including, technical data, preclinical and clinical trial data, and manufacturing and labeling information to demonstrate to the FDA's satisfaction the safety and effectiveness of the device for its intended use. As a result, to receive regulatory approval for our products requiring PMA approval, we must conduct, at our own expense, adequate and well controlled clinical trials to demonstrate efficacy and safety in humans for their intended uses. Clinical testing is expensive, typically takes many years and has an uncertain outcome. The initiation and completion of any of these studies may be prevented, delayed or halted for numerous reasons, including, but not limited to, the following:

- the FDA, institutional review boards or other regulatory authorities do not approve a clinical study protocol, force us to modify a previously approved protocol, or place a clinical study on hold;

- patients do not enroll in, or enroll at the expected rate, or complete a clinical study;

- patients or investigators do not comply with study protocols;

- patients do not return for post-treatment follow-up at the expected rate;

- patients experience serious or unexpected adverse side effects for a variety of reasons that may or may not be related to our products such as the advanced stage of co-morbidities that may exist at the time of treatment, causing a clinical study to be put on hold;

- sites participating in an ongoing clinical study may withdraw, requiring us to engage new sites;

- difficulties or delays associated with bringing additional clinical sites on-line;

- third-party clinical investigators decline to participate in our clinical studies, do not perform the clinical studies on the anticipated schedule or consistent with the investigator agreement, clinical study protocol, good clinical practices, and other FDA and Institutional Review Board requirements;

- third-party organizations do not perform data collection and analysis in a timely or accurate manner;

- regulatory inspections of our clinical studies require us to undertake corrective action or suspend or terminate our clinical studies;

- changes in U.S. federal, state, or foreign governmental statutes, regulations or policies;

- interim results are inconclusive or unfavorable as to immediate and long-term safety or efficacy; or

- the study design is inadequate to demonstrate safety and efficacy.

Clinical failure can occur at any stage of the testing. Our clinical trials may produce negative or inconclusive results, and we may decide, or regulators may require us, to conduct additional clinical and/or non-clinical testing in addition to those we have planned. Our failure to adequately demonstrate the efficacy and safety of any of our devices would prevent receipt of regulatory clearance or approval and, ultimately, the commercialization of that device.

***Our international operations subject us to certain operating risks, which could adversely impact our net revenues, results of operations and financial condition.***

Sales of our products outside the United States represented 7.8% of our revenue in 2008. Through December 31, 2008, we have sold our products in the following countries outside of the United States: United Kingdom, Italy, Austria, Australia, Germany, Switzerland, Turkey, the Netherlands, Belgium, Israel, Denmark, Spain, Greece and Hong Kong. The sale and shipment of our products across international borders, as well as the purchase of components and products from international sources, subject us to extensive U.S. and foreign governmental trade, import and export, and custom regulations and laws. Compliance with these

Table of Contents

regulations is costly and exposes us to penalties for non-compliance. Other laws and regulations that can significantly impact us include various anti-bribery laws, including the U.S. Foreign Corrupt Practices Act and anti-boycott laws. Any failure to comply with applicable legal and regulatory obligations could impact us in a variety of ways that include, but are not limited to, significant criminal, civil and administrative penalties, including imprisonment of individuals, fines and penalties, denial of export privileges, seizure of shipments, restrictions on certain business activities, and exclusion or debarment from government contracting. Also, the failure to comply with applicable legal and regulatory obligations could result in the disruption of our shipping and sales activities.

In addition, many of the countries in which we sell our products are, to some degree, subject to political, economic or social instability. Our international operations expose us and our distributors to risks inherent in operating in foreign jurisdictions. These risks include:

- the imposition of additional U.S. and foreign governmental controls or regulations;

- the imposition of costly and lengthy new export licensing requirements;

- the imposition of U.S. or international sanctions against a country, company, person or entity with whom we do business that would restrict or prohibit continued business with the sanctioned country, company, person or entity;

- economic instability;

- a shortage of high-quality sales people and distributors;

- changes in third-party reimbursement policies that may require some of the patients who receive our products to directly absorb medical costs or that may necessitate the reduction of the selling prices of our products;

- changes in duties and tariffs, license obligations and other non-tariff barriers to trade;

- the imposition of new trade restrictions;

- the imposition of restrictions on the activities of foreign agents, representatives and distributors;

- scrutiny of foreign tax authorities which could result in significant fines, penalties and additional taxes being imposed on us;

- pricing pressure that we may experience internationally;

- laws and business practices favoring local companies;

- longer payment cycles;

- difficulties in maintaining consistency with our internal guidelines;

- difficulties in enforcing agreements and collecting receivables through certain foreign legal systems; and

- difficulties in enforcing or defending intellectual property rights.

Any of these factors may adversely impact our operations. Our international sales are predominately in Europe. In Europe, healthcare regulation and reimbursement for medical devices vary significantly from country to country. This changing environment could adversely affect our ability to sell our products in some European countries, which could negatively affect our results of operations.

***The use, misuse or off-label use of our products may harm our image in the marketplace or result in injuries that lead to product liability suits, which could be costly to our business or result in FDA sanctions if we are deemed to have engaged in such promotion.***

Our currently marketed products have been cleared by the FDA's 510(k) clearance process for use under specific circumstances for the treatment of certain lower lumbar spine conditions. We cannot, however, prevent

23

JA-116

Table of Contents

a physician from using our products or procedure outside of those indications cleared for use, known as off-label use. There may be increased risk of injury if physicians attempt to use our products off-label. We train our sales force not to promote our products for off-label uses. Furthermore, the use of our products for indications other than those indications for which our products have been cleared by the FDA may not effectively treat such conditions, which could harm our reputation in the marketplace among physicians and patients. Physicians may also misuse our products or use improper techniques if they are not adequately trained, potentially leading to injury and an increased risk of product liability. If our products are misused or used with improper technique, we may become subject to costly litigation by our customers or their patients. Product liability claims could divert management's attention from our core business, be expensive to defend and result in sizable damage awards against us that may not be covered by insurance. If we are deemed by FDA to have engaged in the promotion of any our products for off-label use, we could be subject to FDA prohibitions on the sale or marketing of our products or significant fines and penalties, and the imposition of these sanctions could also affect our reputation and position within the industry. Any of these events could harm our business and results of operations and cause our stock to decline.

***We purchase some of the key components of our products from single suppliers. The loss of these suppliers could prevent or delay shipments of our products or delay our clinical trials or otherwise adversely affect our business.***

Some of the key components of our products and related services are currently purchased from only single suppliers. We do not have long-term contracts with the third-party suppliers of our product components. If necessary or desirable, we could source our product components and related services from other suppliers. However, establishing additional or replacement suppliers for these components, and obtaining any additional regulatory clearances or approvals, if necessary, that may result from adding or replacing suppliers, will take a substantial amount of time and could result in increased costs and impair our ability to produce our products, which would adversely impact our business, operating results and prospects. In addition, some of our products, which we acquire from third parties, are highly technical and are required to meet exacting specifications, and any quality control problems that we experience with respect to the products supplied by third-party vendors could adversely and materially affect our reputation, our attempts to complete our clinical trials or commercialization of our products. We may also have difficulty obtaining similar components from other suppliers that are acceptable to the FDA or foreign regulatory authorities, and the failure of our suppliers to comply with strictly enforced regulatory requirements could expose us to regulatory action including, warning letters, product recalls, termination of distribution, product seizures or civil penalties, among others. Furthermore, since some of these suppliers may be located outside of the United States, we are subject to foreign export laws and U.S. import and customs statutes and regulations, which complicate and could delay shipments of components to us.

If we experience any delay or deficiency in the quality of products supplied to us by third-party suppliers, or if we have to switch to replacement suppliers, we may face additional regulatory delays and the manufacture and delivery of our products would be interrupted for an extended period of time, which would adversely affect our business, operating results and prospects. In addition, we may be required to obtain prior regulatory clearance or approval from the FDA or foreign regulatory authorities to use different suppliers or components. As a result, regulatory clearance or approval of our products may not be received on a timely basis, or at all, and our business, operating results and prospects would be harmed.

***We depend on our officers and other key employees, and if we are not able to retain and motivate them or recruit additional qualified personnel, our business will suffer.***

We are highly dependent on our officers and other key employees. Due to the specialized knowledge each of our officers and other key employees possesses with respect to the treatment of spine disorders and our operations, the loss of service of any of our officers and other key employees could delay or prevent the successful completion of our clinical trials, the growth of revenue from existing products and the commercialization of our new products. Each of our officers and key employees may terminate his or her employment without notice and without cause or good reason.

http://www.sec.gov/Archives/edgar/data/1230355/000095014409002207/g18069e10vk.htm        8/27/2012

JA-117

**Table of Contents**

*If we fail to properly manage our anticipated growth, our business could suffer.*

The rapid growth of our business has placed a significant strain on our managerial, operational and financial resources and systems. To execute our anticipated growth successfully, we must attract and retain qualified personnel and manage and train them effectively. We must also review our internal business processes and capabilities and internal controls to create the scalability that a growing business demands. We will be dependent on our personnel and third parties to accomplish this, as well as to effectively market our products to an increasing number of spine surgeons. We will also depend on our personnel to develop next generation technologies.

Further, our anticipated growth will place additional strain on our suppliers and manufacturers, resulting in increased need for us to carefully monitor quality assurance. Any failure by us to manage our growth effectively could have an adverse effect on our ability to achieve our development and commercialization goals.

We expect to rapidly expand our operations and grow our research and development, product development, clinical, regulatory, operations, sales and marketing and administrative functions. Our growth will require hiring a significant number of qualified clinical, scientific, regulatory, quality, commercial and administrative personnel. Recruiting, motivating and retaining such personnel will be critical to our success. There is intense competition from other companies and research and academic institutions for qualified personnel in the areas of our activities. In addition, our operations are located in a geographic region which historically does not have a large number of medical device companies and it may be difficult to convince qualified personnel to relocate to our area. If we fail to identify, attract, retain and motivate these highly skilled personnel, we may be unable to continue our development and commercialization activities.

*If we need additional funding, we may be unable to raise capital when needed, which would force us to delay, reduce, eliminate or abandon our commercialization efforts or product development programs.*

We may need to raise substantial additional capital to:

- expand the commercialization of our products;

- fund our operations and clinical trials;

- continue our research and development;

- defend, in litigation or otherwise, any claims that we infringe third-party patents or other intellectual property rights;

- address FDA or other governmental, legal/enforcement actions and remediate underlying problems

- commercialize our new products, if any such products receive regulatory clearance or approval for commercial sale; and

- acquire companies and in-license products or intellectual property.

We believe that our existing cash and cash equivalent balances and cash receipts generated from sales of our products, will be sufficient to meet our anticipated cash requirements for at least the next two years. However, our future funding requirements will depend on many factors, including:

- market acceptance of our products;

- the scope, rate of progress and cost of our clinical trials;

- the cost of our research and development activities;

- the cost of filing and prosecuting patent applications and defending and enforcing our patent and other intellectual property rights;

- the cost of defending, in litigation or otherwise, any claims that we infringe third-party patent or other intellectual property rights;

25

Table of Contents

- the cost and timing of additional regulatory clearances or approvals;

- the cost and timing of establishing additional sales, marketing and distribution capabilities;

- the effect of competing technological and market developments; and

- the extent to which we acquire or invest in businesses, products and technologies, although we currently have no commitments or agreements relating to any of these types of transactions.

If we raise additional funds by issuing equity securities, our stockholders may experience dilution. Debt financing, if available, may involve covenants restricting our operations or our ability to incur additional debt. Any debt financing or additional equity that we raise may contain terms that are not favorable to us or our stockholders. If we raise additional funds through collaboration and licensing arrangements with third parties, it may be necessary to relinquish some rights to our technologies or our products, or grant licenses on terms that are not favorable to us. As a result of the recent economic crisis, it has been difficult for companies, particularly small cap medical device companies, to obtain equity or debt financing. If we are unable to raise adequate funds, we may have to liquidate some or all of our assets, or delay, reduce the scope of or eliminate some or all of our development programs.

If we do not have, or are not able to obtain, sufficient funds, we may have to delay development or commercialization of our products or license to third parties the rights to commercialize products or technologies that we would otherwise seek to commercialize. We also may have to reduce marketing, customer support or other resources devoted to our products or cease operations. Any of these factors could harm our operating results.

***If we choose to acquire new businesses, products or technologies, we may experience difficulty in the identification or integration of any such acquisition, and our business may suffer.***

Our success depends on our ability to continually enhance and broaden our product offerings in response to changing customer demands, competitive pressures and technologies. Accordingly, we may in the future pursue the acquisition of complementary businesses, products or technologies instead of developing them ourselves. We do not know if we will be able to identify or complete any acquisitions, or whether we will be able to successfully integrate any acquired business, product or technology or retain key employees. Integrating any business, product or technology we acquire could be expensive and time consuming, and could disrupt our ongoing business and distract our management. If we are unable to integrate any acquired businesses, products or technologies effectively, our business will suffer. In addition, any amortization or charges resulting from acquisitions could harm our operating results.

***Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of some suppliers from certain of our markets, which could have an adverse effect on our business, financial condition or results of operations.***

Because healthcare costs have risen significantly over the past decade, numerous initiatives and reforms initiated by legislators, regulators and third-party payors to curb these costs have resulted in a consolidation trend in the healthcare industry to create new companies with greater market power, including hospitals. As the healthcare industry consolidates, competition to provide products and services to industry participants has become and will continue to become more intense. This in turn has resulted and will likely continue to result in greater pricing pressures and the exclusion of certain suppliers from important market segments as group purchasing organizations, independent delivery networks and large single accounts continue to use their market power to consolidate purchasing decisions for some of our customers. We expect that market demand, government regulation, third-party reimbursement policies and societal pressures will continue to change the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers, which may reduce competition, exert further downward pressure on the prices of our products and may adversely impact our business, financial condition or results of operations.

26

Table of Contents

***We face the risk of product liability or other claims and may not be able to obtain sufficient insurance coverage, if at all.***

Our business exposes us to the risk of product liability claims that is inherent in the testing, manufacturing and marketing of implantable medical devices. We may be subject to product liability claims if our products cause, or merely appear to have caused, an injury or death. Claims may be made by patients, consumers or healthcare providers. Although we have product liability and clinical trial liability insurance that we believe is appropriate for our current level of operations, this insurance is subject to deductibles and coverage limitations. Our current product liability insurance may not continue to be available to us on acceptable terms, if at all, and, if available, the coverages may not be adequate to protect us against any future product liability claims. If we are unable to obtain insurance at acceptable cost or on acceptable terms with adequate coverage or otherwise protect against potential product liability claims, we could be exposed to significant financial and other liabilities, which may harm our business. A product liability claim, product recall or other claim with respect to uninsured liabilities or for amounts in excess of insured liabilities could have a material adverse effect on our business, operating results and prospects.

We may be subject to claims against us even if the apparent injury is due to the actions of others. For example, we rely on the expertise of spine surgeons, nurses and other associated medical personnel to perform the medical procedure and related processes for our product. If these medical personnel are not properly trained or are negligent in their provision of care, the therapeutic effect of our products may be diminished or the patient may suffer critical injury, which may subject us to liability. In addition, an injury that is caused by the activities of our suppliers may be the basis for a claim against us.

In addition, medical malpractice carriers are withdrawing coverage in certain regions or substantially increasing premiums. In the event we become a defendant in a product liability suit in which the treating surgeon or hospital does not have adequate malpractice insurance, the likelihood of liability being imposed on us could increase.

These liabilities could prevent, delay or otherwise adversely interfere with our product commercialization efforts, and result in judgments, fines, damages and other financial liabilities which have adverse effects on our business, operating results and prospects. Defending a suit, regardless of merit, could be costly, could divert management's attention from our business and might result in adverse publicity, which could result in the withdrawal of, or inability to recruit, clinical trial patient participants or result in reduced acceptance of our products in the market. In addition to adversely impacting our business and prospects, such adverse publicity could materially adversely affect our stock price.

***If our independent contract manufacturers fail to timely deliver to us sufficient quantities of some of our products and components in a timely manner, our operations may be harmed.***

Our reliance on independent contract manufacturers to manufacture most of our products and components involves several risks, including:

• inadequate capacity of the manufacturer's facilities;

• financial difficulties experienced by manufacturers due to the current economic recession;

• interruptions in access to certain process technologies; and

• reduced control over product availability, quality, delivery schedules, manufacturing yields and costs.

Shortages of raw materials, production capacity or financial constraints, or delays by our contract manufacturers could negatively affect our ability to meet our production obligations and result in increased prices for affected parts. Any such reduction, constraint or delay may result in delays in shipments of our products or increases in the prices of components, either of which could have a material adverse effect on our business.

We do not have supply agreements with all of our current contract manufacturers and we often utilize purchase orders, which are subject to acceptance by the supplier. Failure to accept purchase orders could result

Table of Contents

in an inability to obtain adequate supply of our product or components in a timely manner or on commercially reasonable terms.

An unanticipated loss of any of our contract manufacturers could cause delays in our ability to deliver our products while we identify and qualify a replacement manufacturer, which delays could negatively impact our revenues.

The liquidity of our customers and suppliers may also be affected by the current economic and financial downturn. Our suppliers may experience credit or liquidity problems which could negatively affect sources of our products and components.

***We operate at a single location. Any disruption in this facility or any inability to ship a sufficient number of our products to meet demand could adversely affect our business and results of operations.***

We operate at a single location in Wilmington, North Carolina. Our facility may be affected by man-made or natural disasters, such as a hurricane. While we currently rely on third parties to manufacture, assemble, package, label and sterilize our products and components, we might also be forced to rely on third parties to inspect, warehouse or ship our products and components in the event our facilities were affected by a disaster. Our facility, if damaged or destroyed, could be difficult to replace and could require substantial lead-time to repair or replace. In the case of a device with a PMA approval, we might be required to obtain prior FDA, or notified body, approval of an alternate facility, which could delay or prevent our marketing of the affected product until this supplemental approval is obtained. Although we believe we possess adequate insurance for damage to our property and the disruption of our business from casualties, this insurance may not be sufficient to cover all of our potential losses and may not continue to be available to us on acceptable terms, or at all.

***Current challenges in the commercial and credit environment may adversely affect our business and financial condition.***

The global financial markets have recently experienced unprecedented levels of volatility. Our ability to generate cash flows from operations or enter into financing arrangements on acceptable terms could be adversely affected if there is a material decline in the demand for our products or in the solvency of our customers, deterioration in our key financial ratios or credit ratings, or other significantly unfavorable changes in conditions. While these conditions and the current economic downturn have not meaningfully impaired our ability to access credit markets or meaningfully adversely affected our operations to date, continuing volatility in the global financial markets could increase borrowing costs or affect our ability to access the capital markets. Current or worsening economic conditions may also adversely affect the business of our customers, including their ability to pay for our products and services, and the amount spent on healthcare generally. This could result in a decrease in the demand for our products and services, longer sales cycles, slower adoption of new technologies and increased price competition.

***Our future operating results are difficult to predict and may vary significantly from quarter to quarter, which may negatively impact our stock price in the future.***

We have only commercially distributed our products since 2005. Given this limited history, it is difficult to predict future revenues derived from sales of our products. Because of this and the uncertain effects of the following factors, our quarterly revenues and results of operations may fluctuate in the future due to, among others, the following reasons:

- market acceptance of our products;

- the conduct and results of clinical trials;

- the timing and expense of obtaining future regulatory approvals;

- fluctuations in our expenses associated with expanding our operations;

- the introduction of new products by our competitors;

28

- changes in our pricing policies or in the pricing policies of our competitors or suppliers; and
- changes in third-party payors' reimbursement policies.

Because of these and possibly other factors, it is possible that in some future period our operating results will not meet investor expectations or those of public market analysts.

Any unanticipated change in revenues or operating results is likely to cause our stock price to fluctuate since such changes reflect new information available to investors and analysts. New information may cause investors and analysts to re-evaluate our stock, which could cause a decline in the trading price of our stock.

## Risks Related to Regulatory Environment

*If we fail to maintain regulatory approvals and clearances, or are unable to obtain, or experience significant delays in obtaining, FDA clearances or approvals for our future products or product modifications, our ability to commercially distribute and market these products could suffer.*

Our products are subject to rigorous regulation by the FDA and numerous other federal, state and foreign governmental authorities. The process of obtaining regulatory clearances or approvals to market a medical device can be costly and time consuming, and we may not be able to obtain these clearances or approvals on a timely basis, if at all. In particular, the FDA permits commercial distribution of most new medical devices only after the device has received clearance under Section 510(k) of the Federal Food, Drug and Cosmetic Act, or is the subject of an approved PMA. The FDA will clear marketing of a non-exempt lower risk medical device through the 510(k) process if the manufacturer demonstrates that the new product is substantially equivalent to other legally marketed products not requiring PMA approval. High risk devices deemed to pose the greatest risk, such as life-sustaining, life-supporting, or implantable devices, or devices not deemed substantially equivalent to a legally marketed device, require a PMA. The PMA process is more costly, lengthy and uncertain than the 510(k) clearance process. A PMA application must be supported by extensive data, including, but not limited to, technical, preclinical, clinical trial, manufacturing and labeling data, to demonstrate to the FDA's satisfaction the safety and efficacy of the device for its intended use. Our currently commercialized products have been cleared through the 510(k) process. However, we expect to submit a PMA for each of our PNR and PDR devices currently under development.

Our failure to comply with U.S. federal, state and foreign governmental regulations could lead to the imposition of injunctions, suspensions or loss of regulatory clearance or approvals, product recalls, termination of distribution, product seizures or civil penalties, among other things. In the most extreme cases, criminal sanctions or closure of our manufacturing facility are possible.

Foreign governmental authorities that regulate the manufacture and sale of medical devices have become increasingly stringent and, to the extent we market and sell our products internationally, we may be subject to rigorous international regulation in the future. In these circumstances, we would rely significantly on our foreign independent distributors to comply with the varying regulations, and any failures on their part could result in restrictions on the sale of our products in foreign countries.

*Modifications to our marketed products may require new 510(k) clearances or PMA approvals, or may require us to cease marketing or recall the modified products until clearances or approvals are obtained.*

Any modification to our currently marketed 510(k)-cleared devices that could significantly affect its safety or efficacy, or that would constitute a change in its intended use, requires a new 510(k) clearance or, possibly, a PMA. The FDA requires every manufacturer to make this determination in the first instance, but the FDA may review the manufacturer's decision. The FDA may not agree with our decisions regarding whether new clearances or approvals are necessary. If the FDA requires us to seek 510(k) clearance or a PMA for any modification to a previously cleared product, we may be required to cease marketing and distributing, or to recall the modified product until we obtain such clearance or approval, and we may be subject to significant regulatory fines or penalties. Further, our products could be subject to recall if the FDA determines, for any reason, that our products are not safe or effective because they are in violation of the FDCA. Any recall or FDA requirement that we seek additional approvals or clearances could result in significant delays,

Appeal: 15-2579   Doc: 27-1   Filed: 04/14/2016   Pg: 131 of 471

JA-124

**Table of Contents**

fines, increased costs associated with modification of a product, loss of revenue and potential operating restrictions imposed by the FDA.

*Clinical trials necessary to support a PMA application will be expensive and will require the enrollment of large numbers of patients, and suitable patients may be difficult to identify and recruit. Delays or failures in our clinical trials will prevent us from commercializing any modified or new products and will adversely affect our business, operating results and prospects.*

Initiating and completing clinical trials necessary to support a PMA application for our PNR and PDR devices, and additional safety and efficacy data beyond that typically required for 510(k) clearances for possible future product candidates, will be time consuming and expensive and the outcomes uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product we advance into clinical trials may not have favorable results in later clinical trials.

Conducting successful clinical studies may require the enrollment of large numbers of patients, and suitable patients may be difficult to identify and recruit. Patient enrollment in clinical trials and completion of patient participation and follow-up depends on many factors, including the size of the patient population, the nature of the trial protocol, the attractiveness of, or the discomforts and risks associated with, the treatments received by enrolled subjects, the availability of appropriate clinical trial investigators, support staff, and proximity of patients to clinical sites. For example, patients may be discouraged from enrolling in our clinical trials if the trial protocol requires them to undergo extensive post-treatment procedures or follow-up to assess the safety and effectiveness of our products or if they determine that the treatments received under the trial protocols are not attractive or involve unacceptable risks or discomforts. Patients may also not participate in our clinical trials if they choose to participate in contemporaneous clinical trials of competitive products. In addition, patients participating in clinical trials may die before completion of the trial or suffer adverse medical events unrelated to investigational products.

Development of sufficient and appropriate clinical protocols and data to demonstrate safety and efficacy are required and we may not adequately develop such protocols to support clearance and approval. Further, the FDA may require us to submit data on a greater number of patients than we originally anticipated and/or for a longer follow-up period or change the data collection requirements or data analysis applicable to our clinical trials. Delays in patient enrollment or failure of patients to continue to participate in a clinical trial may cause an increase in costs and delays in the clearance or approval and attempted commercialization of our products or result in the failure of the clinical trial. In addition, despite considerable time and expense invested in our clinical trials, FDA may not consider our data adequate to demonstrate safety and efficacy. Such increased costs and delays or failures could adversely affect our business, operating results and prospects.

*If the third parties on which we rely to conduct our clinical trials and to assist us with pre-clinical development do not perform as contractually required or expected, we may not be able to obtain regulatory clearance or approval for or commercialize our products.*

We do not have the ability to independently conduct our pre-clinical and clinical trials for our products and we must rely on third parties, such as contract research organizations, medical institutions, clinical investigators and contract laboratories to conduct such trials. If these third parties do not successfully perform their contractual duties or regulatory obligations or meet expected deadlines, if these third parties need to be replaced, or if the quality or accuracy of the data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements or for other reasons, our pre-clinical development activities or clinical trials may be extended, delayed, suspended or terminated, and we may not be able to obtain regulatory clearance or approval for, or successfully commercialize, our products on a timely basis, if at all, and our business, operating results and prospects may be adversely affected. Furthermore, our third-party clinical trial investigators may be delayed in conducting our clinical trials for reasons outside of their control.

30

JA-125

Table of Contents

***Even if our products are approved by regulatory authorities, if we or our suppliers fail to comply with ongoing FDA or other foreign regulatory authority requirements, or if we experience unanticipated problems with our products, these products could be subject to restrictions or withdrawal from the market.***

Any product for which we obtain clearance or approval, and the manufacturing processes, reporting requirements, post-approval clinical data and labeling and promotional activities for such product, will be subject to continued regulatory review, oversight and periodic inspections by the FDA and other domestic and foreign regulatory bodies. In particular, we and our suppliers are required to comply with the Quality System Regulations, or QSR, and MDD regulations, which may include ISO standards, for the manufacture of our products and other regulations which cover the methods and documentation of the design, testing, production, control, quality assurance, labeling, packaging, storage and shipping of any product for which we obtain clearance or approval. Regulatory bodies enforce the QSR and ISO regulations through inspections. The failure by us or one of our suppliers to comply with applicable statutes and regulations administered by the FDA and other regulatory bodies, or the failure to timely and adequately respond to any adverse inspectional observations or product safety issues, could result in, among other things, any of the following enforcement actions:

- warning letters or untitled letters;

- fines and civil penalties;

- unanticipated expenditures to address or defend such actions;

- delays in clearing or approving, or refusal to clear or approve, our products;

- withdrawal or suspension of approval of our products or those of our third-party suppliers by the FDA or other regulatory bodies;

- product recall or seizure;

- orders for physician notification or device repair, replacement or refund;

- interruption of production;

- operating restrictions;

- injunctions; and

- criminal prosecution.

If any of these actions were to occur it would harm our reputation and cause our product sales to suffer and may prevent us from generating revenue. Furthermore, our key component suppliers may not currently be or may not continue to be in compliance with all applicable regulatory requirements which could result in our failure to produce our products on a timely basis and in the required quantities, if at all.

Even if regulatory clearance or approval of a product is granted, such clearance or approval may be subject to limitations on the intended uses for which the product may be marketed and reduce our potential to successfully commercialize the product and generate revenue from the product. If the FDA determines that our promotional materials, labeling, training or other marketing or educational activities constitute promotion of an unapproved use, it could request that we cease or modify our training educational, labeling or promotional materials or subject us to regulatory enforcement actions. It is also possible that other federal, state or foreign enforcement authorities might take action if they consider our training educational, labeling or other promotional materials to constitute promotion of an unapproved use, which could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement.

In addition, we may be required to conduct costly post-market testing and surveillance to monitor the safety or effectiveness of our products, and we must comply with medical device reporting requirements, including the reporting of adverse events and certain malfunctions related to our products. Later discovery of previously unknown problems with our products, including unanticipated adverse events or adverse events of unanticipated severity or frequency, manufacturing problems, or failure to comply with regulatory requirements

31

Table of Contents

such as the QSR or GMP, may result in changes to labeling, restrictions on such products or manufacturing processes, withdrawal of the products from the market, voluntary or mandatory recalls, a requirement to repair, replace or refund the cost of any medical device we manufacture or distribute, fines, suspension of regulatory approvals, product seizures, injunctions or the imposition of civil or criminal penalties which would adversely affect our business, operating results and prospects.

***We may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse and health information privacy and security laws, and could face substantial penalties if we are unable to fully comply with such laws.***

Although we do not provide healthcare services, submit claims for third-party reimbursement, or receive payments directly from Medicare, Medicaid, or other third-party payors for our products or the procedures in which our products are used, healthcare regulation by federal and state governments could significantly impact our business. Healthcare fraud and abuse and health information privacy and security laws potentially applicable to our operations include:

- the federal Anti-Kickback Law, which constrains our marketing practices and those of our independent sales agents and distributors, educational programs, pricing policies, and relationships with healthcare providers, by prohibiting, among other things, soliciting, receiving, offering or providing remuneration, intended to induce the purchase or recommendation of an item or service reimbursable under a federal healthcare program (such as the Medicare or Medicaid programs);

- federal false claims laws which prohibit, among other things, knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid, or other third-party payors that are false or fraudulent;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, and its implementing regulations, which created federal criminal laws that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters and which also imposes certain regulatory and contractual requirements regarding the privacy, security and transmission of individually identifiable health information; and

- state laws analogous to each of the above federal laws, such as anti-kickback and false claims laws that may apply to items or services reimbursed by any third-party payor, including commercial insurers, and state laws governing the privacy of certain health information, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.

If our past or present operations, or those of our independent sales agents and distributors, are found to be in violation of any of such laws or any other governmental regulations that may apply to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, exclusion from federal healthcare programs and/or the curtailment or restructuring of our operations. Similarly, if the healthcare providers or entities with whom we do business are found to be non-compliant with applicable laws, they may be subject to sanctions, which could also have a negative impact on us. Any penalties, damages, fines, curtailment or restructuring of our operations could adversely affect our ability to operate our business and our financial results. The risk of our being found in violation of these laws is increased by the fact that many of them have not been fully interpreted by the regulatory authorities or the courts, and their provisions are open to a variety of interpretations. Any action against us for violation of these laws, even if we successfully defend against them, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business.

### Risks Related to Our Intellectual Property

***Our ability to protect our intellectual property and proprietary technology through patents and other means is uncertain.***

Our success depends significantly on our ability to protect our proprietary rights to the procedures created with, and the technologies used in, our products. We rely on patent protection, as well as a combination of

32

Table of Contents

copyright, trade secret and trademark laws, and nondisclosure, confidentiality and other contractual restrictions to protect our proprietary technology. However, these legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep any competitive advantage. For example, our pending United States and foreign patent applications may not be approved, may not issue as patents in a form that will be advantageous to us, or may issue and be subsequently successfully challenged by others and invalidated. In addition, our pending patent applications include claims to material aspects of our products and procedures that are not currently protected by issued patents. Both the patent application process and the process of managing patent disputes can be time consuming and expensive. The patents we own may not be of sufficient scope or strength to provide us with any meaningful protection or commercial advantage, and competitors may be able to design around our patents or develop products which provide outcomes which are comparable to ours. Although we have taken steps to protect our intellectual property and proprietary technology, including entering into confidentiality agreements and intellectual property assignment agreements with our officers, employees, consultants and advisors, such agreements may not be enforceable or may not provide meaningful protection for our trade secrets or other proprietary information in the event of unauthorized use or disclosure or other breaches of such agreements. Furthermore, the laws of some foreign countries do not protect our intellectual property rights to the same extent as do the laws of the United States.

We rely on our trademarks, trade names, and brand names to distinguish our products from the products of our competitors, and have registered or applied to register many of these trademarks. However, our trademark applications may not be approved. Third parties may also oppose our trademark applications, or otherwise challenge our use of the trademarks. In the event that our trademarks are successfully challenged, we could be forced to rebrand our products, which could result in loss of brand recognition, and could require us to devote resources to advertising and marketing new brands. Further, our competitors may infringe our trademarks, or we may not have adequate resources to enforce our trademarks.

In the event a competitor infringes upon our patent or other intellectual property rights, enforcing those rights may be costly, difficult and time consuming. Even if successful, litigation to enforce our intellectual property rights or to defend our patents against challenge could be expensive and time consuming and could divert our management's attention. We may not have sufficient resources to enforce our intellectual property rights or to defend our patents or other intellectual property rights against a challenge.

***Any lawsuit, whether initiated by us to enforce our intellectual property rights or by a third party against us alleging infringement, may cause us to expend significant financial and other resources, and may divert our attention from our business and adversely affect our business, operating results and prospects.***

The medical device industry is characterized by the existence of a large number of patents and frequent litigation based on allegations of patent infringement. Patent litigation can involve complex factual and legal questions and its outcome is uncertain. Any claim relating to infringement of patents that is successfully asserted against us may require us to pay substantial damages. Even if we were to prevail, any litigation could be costly and time-consuming and would divert the attention of our management and key personnel from our business operations. Our success will also depend in part on our not infringing patents issued to others, including our competitors and potential competitors. If our products are found to infringe the patents of others, our development, manufacture and sale of such products could be severely restricted or prohibited. In addition, our competitors may independently develop similar technologies. Because of the importance of our patent portfolio and unpatented proprietary technology to our business, we may lose market share to our competitors if we fail to protect our patent rights.

As the number of entrants into our market increases, the possibility of a patent infringement claim against us grows. Our products and methods may be covered by patents held by our competitors. Some of our competitors have considerable resources available to them to engage in this type of litigation. We, on the other hand, are an early stage company with comparatively few resources available to us to engage in costly and protracted litigation. Because some patent applications are maintained in secrecy for a period of time after they are filed, there is a risk that we could adopt a technology without knowledge of a pending patent application, which technology would infringe a third-party patent once that patent is issued. In addition, our competitors may assert that future products we may market infringe their patents.

33

JA-130

Table of Contents

A patent infringement suit or other infringement or misappropriation claim brought against us or any of our strategic partners or licensees may force us or any of our strategic partners or licensees to stop or delay developing, manufacturing or selling potential products that are claimed to infringe a third party's intellectual property, unless that party grants us or any strategic partners or licensees rights to use its intellectual property. In such cases, we may be required to obtain licenses to patents or proprietary rights of others in order to continue to commercialize our products. However, we may not be able to obtain any licenses required under any patents or proprietary rights of third parties on acceptable terms, or at all. Even if our strategic partners or licensees or we were able to obtain rights to the third party's intellectual property, these rights may be non-exclusive, thereby giving our competitors access to the same intellectual property. Ultimately, we may be unable to commercialize some of our potential products or may have to cease some of our business operations as a result of patent infringement claims, which could severely harm our business.

In any infringement lawsuit, a third party could seek to enjoin, or prevent, us from commercializing our existing or future products, and/or may seek damages from us, and any such lawsuit would likely be expensive for us to defend against. A court may determine that patents held by third parties are valid and infringed by us and we may be required to:

- pay damages, including, but not limited to, treble damages and attorneys' fees, which may be substantial;

- cease the development, manufacture, use and sale of products that infringe the patent rights of others, through a court-imposed sanction called an injunction;

- expend significant resources to redesign our technology so that it does not infringe others' patent rights, or develop or acquire non-infringing intellectual property, which may not be possible;

- discontinue manufacturing or other processes incorporating infringing technology; or

- obtain licenses to the infringed intellectual property, which may not be available to us on acceptable terms, or at all.

Any development or acquisition of non-infringing products or technology or licenses could require the expenditure of substantial time and other resources and could have a material adverse effect on our business and financial results. If we are required to, but cannot, obtain a license to valid patent rights held by a third party, we would likely be prevented from commercializing the relevant product. We believe that it is unlikely that we would be able to obtain a license to any necessary patent rights controlled by companies against which we would, directly or indirectly, compete. If we need to redesign products to avoid third-party patents, we may suffer significant regulatory delays associated with conducting additional studies or submitting technical, manufacturing or other information related to the redesigned product and, ultimately, in obtaining regulatory approval.

**Risks Related to our Common Stock**

*A sale of a substantial number of shares of our common stock may cause the price of our common stock to decline.*

If our stockholders sell substantial amounts of our common stock in the public market, including shares issued upon the exercise of options, the market price of our common stock could decline. At December 31, 2008, we had 20,538,333 shares of common stock outstanding. All of these shares are freely tradable, without restriction, in the public market, of which 7,442,456 shares are held by directors, executive officers and other affiliates and are subject to volume limitations under Rule 144 under the Securities Act. In addition, the 2,247,733 shares of our common stock that are subject to outstanding options as of December 31, 2008 will be eligible for sale in the public market to the extent permitted by the provisions of the various vesting agreements and Rules 144 and 701 under the Securities Act. If these additional shares are sold, or it is perceived they will be sold, the trading price of our common stock could decline. These sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem reasonable or appropriate.

34

Table of Contents

***Our directors, officers and principal stockholders have significant voting power and may take actions that may not be in the best interests of our other stockholders.***

At December 31, 2008, our officers, directors and principal stockholders, each holding more than 5% of our common stock, collectively controlled approximately 70% of our outstanding common stock. As a result, these stockholders, if they act together, are able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. This concentration of ownership may not be in the best interests of our other stockholders.

***If securities or industry analysts do not publish research or reports about our business, if they change their recommendations regarding our stock adversely or if our operating results do not meet their expectations, our stock price and trading volume could decline.***

The trading market for our stock may be influenced by the research and reports that industry or securities analysts publish about us or our business. If one or more of these analysts cease coverage of us or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline. Moreover, if one or more of the analysts who cover us downgrade our stock or if our operating results do not meet their expectations, our stock price could decline.

***Trading in our stock over the last twelve months has been limited, so investors may not be able to sell as much stock as they want at prevailing prices.***

The average daily trading volume in our common stock for the year ended December 31, 2008 was approximately 100,000 shares. If limited trading in our stock continues, it may be difficult for investors to sell their shares in the public market at any given time at prevailing prices. Moreover, the market price for shares of our common stock may be made more volatile because of the relatively low volume of trading in our common stock. When trading volume is low, significant price movement can be caused by the trading in a relatively small number of shares. Volatility in our common stock could cause stockholders to incur substantial losses.

***Volatility in the stock price of other companies may contribute to volatility in our stock price.***

The Nasdaq Global Market, particularly in recent years, has experienced significant volatility with respect to medical technology, pharmaceutical, biotechnology and other life science company stocks. The volatility of medical technology, pharmaceutical, biotechnology and other life science company stocks often does not relate to the operating performance of the companies represented by the stock. Further, there has been particular volatility in the market price of securities of early stage life science companies. These broad market and industry factors may seriously harm the market price of our common stock, regardless of our operating performance. In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been instituted. A securities class action suit against us could result in substantial costs, potential liabilities and the diversion of management's attention and resources.

***Our amended and restated certificate of incorporation, amended and restated bylaws and Delaware law contain provisions that could discourage a takeover.***

Anti-takeover provisions of our amended and restated certificate of incorporation, amended and restated bylaws and Delaware law may have the effect of deterring or delaying attempts by our stockholders to remove or replace management, engage in proxy contests and effect changes in control. The provisions of our charter documents include:

- a classified board so that only one of the three classes of directors on our board of directors is elected each year;
- procedures for advance notification of stockholder director nominations and proposals;

35

Table of Contents

- the ability of our board of directors to amend our bylaws without stockholder approval;

- a supermajority stockholder vote requirement for amending certain provisions of our amended and restated certificate of incorporation and our amended and restated bylaws; and

- the ability of our board of directors to issue up to 5,000,000 shares of preferred stock without stockholder approval upon the terms and conditions and with the rights, privileges and preferences as our board of directors may determine.

In addition, as a Delaware corporation, we are subject to Delaware law, including Section 203 of the Delaware General Corporation Law, or DGCL. In general, Section 203 prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years following the date that the stockholder became an interested stockholder unless certain specific requirements are met as set forth in Section 203. These provisions, alone or together, could have the effect of deterring or delaying changes in incumbent management, proxy contests or changes in control.

### *We do not anticipate declaring any cash dividends on our common stock.*

We have never declared or paid cash dividends on our common stock and do not plan to pay any cash dividends in the near future. Our current policy is to retain all funds and any earnings for use in the operation and expansion of our business. If we do not pay dividends, our stock may be less valuable to you because a return on your investment will only occur if our stock price appreciates.

### Item 1B.  *Unresolved Staff Comments.*

None.

### Item 2.  *Properties.*

We lease approximately 30,000 square feet of space in a single-user building located in an industrial park in Wilmington, North Carolina. Of that amount, approximately 19,800 square feet are used for manufacturing and warehousing, approximately 8,400 square feet are used for office space and approximately 1,800 square feet are used for research and development activities. This lease expires in June 2010. We do not believe that our current facility will be sufficient to meet our needs through that time and are currently exploring alternatives that will meet our anticipated needs.

### Item 3.  *Legal Proceedings.*

We are not currently party to any material legal proceedings. We may be subject to various claims and legal actions arising in the ordinary course of business from time to time.

### Item 4.  *Submission of Matters to a Vote of Security Holders.*

No matter was submitted to a vote of our security holders during the quarter ended December 31, 2008.

36

Table of Contents

## PART II

**Item 5.**  *Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Price of Common Stock**

Our common stock is traded on the NASDAQ Global Market under the symbol "TSON." The following table sets forth the high and low sales prices of our common stock as quoted on the NASDAQ Global Market for the period beginning on October 17, 2007, the day we began trading, and ending on December 31, 2008. Prior to October 17, 2007, there was no identifiable public market for our common stock.

|  | Price Range | |
|---|---|---|
|  | High | Low |
| Fiscal 2008: |  |  |
| Fourth quarter | $ 9.54 | $ 5.82 |
| Third quarter | 14.25 | 7.45 |
| Second quarter | 15.74 | 9.93 |
| First quarter | 17.24 | 8.96 |
| Fiscal 2007: |  |  |
| Fourth Quarter (from October 17, 2007) | $26.48 | $15.83 |

The closing price for our common stock as reported by the NASDAQ Global market on March 5, 2009 was $5.79 per share.

As of March 5, 2009, we had approximately 48 stockholders of record based upon the records of our transfer agent, which does not include beneficial owners of our common stock whose shares are held in the names of various securities brokers, dealers and registered clearing agencies.

**Uses of Proceeds from Sale of Registered Securities**

On October 22, 2007, we completed our initial public offering of 6,325,000 shares of common stock (inclusive of 825,000 shares sold to the underwriters upon exercise of their over-allotment option) at the initial public offering price of $15.00 per share. We effected the offering through a Registration Statement on Form S-1 (Registration No. 333-144802), which was declared effective by the SEC on October 16, 2007, and through a Registration Statement on Form S-1 filed pursuant to Rule 462(b) under the Securities Act (Registration No. 333-146753), which became effective upon filing on October 17, 2007 pursuant to Rule 462(b) (collectively, the "Registration Statement"). The offering commenced on October 17, 2007 and terminated on October 22, 2007 after all of the 6,325,000 shares of common stock registered under the Registration Statement were sold. Our initial public offering resulted in aggregate proceeds to us of approximately $86.7 million, net of underwriting discounts and commissions of approximately $6.6 million and offering expenses of approximately $1.6 million. Lehman Brothers Inc. and Piper Jaffray & Co. acted as joint book-running managers for the offering with Cowen and Company, LLC and Wachovia Capital Markets, LLC acting as co-managers.

No offering expenses were paid directly or indirectly to any of our directors or officers (or their associates) or person owning ten percent or more of any class of our equity securities or to any other affiliates. All offering expenses were paid directly to others.

As of December 31, 2008, we had used approximately $40.8 million of the net proceeds for sales, marketing and general administrative activities and $6.0 million for research and development activities.

We intend to use the remaining net proceeds of our initial public offering to support the commercialization of our existing and future products and to support our research and development activities, clinical trials, regulatory approvals and for capital expenditures, working capital and other general corporate purposes. We have invested the net proceeds from our initial public offering in money market treasury funds, U.S. agency

JA-134

Table of Contents

backed debt instruments and high grade corporate bonds and commercial paper. There has been no material change in the planned use of proceeds from our initial public offering as described in the final prospectus filed with the SEC on October 17, 2007 pursuant to Rule 424(b) under the Act. As of the date of this report, we cannot specify with certainty all of the particular uses for the net proceeds received in connection with our initial public offering. The amounts and timing of our actual expenditures will depend on numerous factors, including the status of our product development efforts, sales and marketing activities, technological advances, amount of cash generated or used by our operations and competition. Accordingly, our management will have broad discretion in the application of the net proceeds and investors will be relying on the judgment of our management regarding the application of the proceeds of the offering.

## Dividend Policy

We have never declared or paid any cash dividends on our capital stock. We currently intend to retain future earnings, if any, for development of our business and do not anticipate that we will declare or pay cash dividends on our capital stock in the foreseeable future.

## Securities Authorized For Issuance Under Equity Compensation Plans

| Plan Category | (a) Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | (b) Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | (c) Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 2,247,733 | $ 7.12 | 1,070,172 |
| Equity compensation plans not approved by security holders | — | — | — |
| **Total** | 2,247,733 | $ 7.12 | 1,070,172 |

38

Table of Contents

**Stock Price Performance Graph**

The following graph compares the cumulative total stockholder return on our common stock from October 17, 2007 (the date our common stock began trading on the NASDAQ Global Market) through December 31, 2008 to that of the cumulative return over such period for (i) The NASDAQ Stock Market Composite Index, and (ii) NASDAQ Medical Equipment Index. Total stockholder return assumes $100.00 invested at the beginning of the period in our common stock and in each of the comparative indices. The graph further assumes that such amount was initially invested in our common stock at the closing market price on the first day of trading, and that any dividends have been reinvested. We have not paid any dividends on our common stock. The stock price performance on the following graph is not necessarily indicative of future stock price performance.



COMPARISON OF CUMULATIVE TOTAL RETURN

*The material in the above performance graph does not constitute soliciting material and should not be deemed filed or incorporated by reference into any other Company filing, whether under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made on, before or after the date of this report and irrespective of any general incorporation language in such filing, except to the extent we specifically incorporate this performance graph by reference therein.*

39

Table of Contents

### Item 6.  *Selected Financial Data.*

The selected financial data has been derived from our audited financial statements. You should read the following financial information together with the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the notes included elsewhere in this report.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| | (In thousands, except share data) | | | | |
| **Statements of Operations Data:** | | | | | |
| Revenue | $ 25,304 | $ 16,473 | $ 5,812 | $ 1,469 | $ — |
| Cost of revenue | 4,315 | 3,042 | 1,580 | 386 | — |
| Gross profit | 20,989 | 13,431 | 4,232 | 1,083 | — |
| **Operating expenses** | | | | | |
| Research and development | 5,020 | 4,785 | 4,246 | 2,444 | 1,758 |
| Sales and marketing | 29,375 | 15,706 | 9,288 | 2,635 | 746 |
| General and administrative | 6,177 | 2,901 | 1,166 | 1,293 | 1,117 |
| Total operating expenses | 40,572 | 23,392 | 14,700 | 6,372 | 3,621 |
| Operating loss | (19,583) | (9,961) | (10,468) | (5,289) | (3,621) |
| Interest income | 2,548 | 1,384 | 858 | 264 | 150 |
| Other income (expense) | — | — | 131 | (17) | — |
| Net loss | $ (17,035) | $ (8,577) | $ (9,479) | $ (5,042) | $ (3,471) |
| Net loss per common share — basic and diluted | $ (0.84) | $ (1.46) | $ (3.91) | $ (2.25) | $ (1.63) |
| Weighted average common shares outstanding — basic and diluted | 20,288,711 | 5,872,008 | 2,423,223 | 2,243,018 | 2,127,855 |

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| **Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and short-term investments | $ 77,266 | $ 93,921 | $ 14,962 | $ 25,994 | $ 6,708 |
| Working capital | 84,174 | 98,351 | 17,448 | 26,696 | 6,674 |
| Total assets | 90,491 | 102,856 | 20,004 | 28,013 | 7,139 |
| Preferred stock | — | — | 40,089 | 40,089 | 14,544 |
| Common stock | 2 | 2 | — | — | — |
| Additional paid in capital | 133,507 | 130,325 | 820 | 219 | 147 |
| Total stockholders' equity/(deficit) | 85,586 | 99,439 | (21,529) | (12,654) | (7,680) |

40

Table of Contents

**Item 7.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following discussion of our financial condition and results of operations should be read in conjunction with our financial statements and the related notes to our financial statements included in this report. The following discussion contains forward-looking statements. See "Cautionary Note Regarding Forward-Looking Statements" on page 1 of this report.

### Overview

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using this pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the degenerative disc. We developed our pre-sacral approach to allow spine surgeons to access and treat degenerative lumbar discs without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, short procedure times, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market in the United States and Europe two single-level fusion products, AxiaLIF and AxiaLIF 360°, and a two-level fusion product, the AxiaLIF 2L. All of our products are delivered using our pre-sacral approach.

From our incorporation in 2000 through 2004, we devoted substantially all of our resources to research and development and start-up activities, consisting primarily of product design and development, clinical trials, manufacturing, recruiting qualified personnel and raising capital. We received FDA 510(k) clearance for our AxiaLIF product in the fourth quarter of 2004, and commercially introduced our AxiaLIF product in the United States in the first quarter of 2005. We received FDA 510 (k) clearance for our AxiaLIF 360° product in the United States in the third quarter of 2005 and began commercialization in the United States in the third quarter of 2006. We received a CE mark to market AxiaLIF in the European market in the first quarter of 2005 and began commercialization in the first quarter of 2006. For AxiaLIF 360°, we received a CE mark in the first quarter of 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2006 and began commercialization in the European market in the fourth quarter of 2006. We received 510(k) clearance for the AxiaLIF 2L from the FDA and began marketing this product in the United States in the second quarter of 2008. We currently sell our products through a direct sales force, independent sales agents and international distributors.

We rely on third parties to manufacture most of our products and their components. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which allows us to compete with larger volume manufacturers of spine surgery products.

Since inception, we have been unprofitable. As of December 31, 2008, we had an accumulated deficit of $47.9 million.

We expect to continue to invest in creating a sales and marketing infrastructure for our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L products in order to gain wider acceptance for these products. We also expect to continue to invest in research and development and related clinical trials, and increase general and administrative expenses as we grow. As a result, we will need to generate significant revenue in order to achieve profitability.

### Financial Operations

*Revenue*

We generate revenue from the sales of our procedure kits and implants used in our AxiaLIF fusion procedure for the treatment of degenerative disc disease and instability. Our revenue is generated by our direct sales force, independent sales agents and independent distributors. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to

Table of Contents

the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. The other sales method is for sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine revenue recognition on a case by case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment of our products to our independent distributors. Although we intend to continue to expand our international sales and marketing efforts, we expect that a substantial amount of our revenues will be generated in the United States in future periods.

### Cost of Revenue

Cost of revenue consists primarily of material and overhead costs related to our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L instruments and implants. Cost of revenue also includes facilities-related costs, such as rent, utilities and depreciation.

### Research and Development

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within our product development, regulatory and clinical functions and the costs of clinical studies and product development projects. Research and development expenses also include legal expenses related to the development and protection of our intellectual property portfolio and facilities-related costs. In future periods, we expect research and development expenses to grow as we continue to invest in basic research, clinical trials, product development and in our intellectual property.

### Sales and Marketing

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to our direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities, and participation in medical conferences. In future periods, we expect sales and marketing expenses to increase as we expand our sales and marketing efforts.

### General and Administrative

General and administrative expenses consist of personnel costs, including stock-based compensation, related to the executive, finance, business development and information technology and human resource functions, as well as professional service fees, legal fees, accounting fees, insurance costs and general corporate expenses. We expect general and administrative expenses to increase as we grow our business and as we incur additional professional fees, increased insurance costs and other general corporate expenses related to operating as a public company.

### Interest Income

Interest income is primarily composed of interest earned on our cash, cash equivalents and available-for-sale securities.

## Results of Operations

### Comparison of the Years Ended December 31, 2008, 2007 and 2006

*Revenue.* Revenue increased to $25.3 million in 2008 from $16.5 million in 2007 and $5.8 million in 2006. The $8.8 million increase in revenue from 2007 to 2008 was primarily attributable to an increase in the number of products sold, which we believe resulted from the continued market acceptance of our AxiaLIF and AxiaLIF 360° products and the commercialization of our AxiaLIF 2L product in the United States, which

JA-140

42

began in the second quarter of 2008. None of this increase was attributable to price increases. Domestically, sales of our AxiaLIF 360° product, which began commercialization in the United States in the third quarter of 2006, increased to $8.5 million in 2008 from $6.8 million in 2007 and $530,000 in 2006. Sales of our AxiaLIF 2L product, which began commercialization in the United States in the second quarter of 2008 and which have a higher selling price than our other products, were $3.3 million in 2008. As a result, average selling prices in the United States increased to approximately $9,850 in 2008 from approximately $9,250 in 2007 and $8,200 in 2006. In 2008, 2007 and 2006, we recorded 2,280, 1,591 and 661 domestic AxiaLIF cases, respectively. This included 852, 677 and 53 AxiaLIF 360° cases in 2008, 2007 and 2006, respectively, and 229 AxiaLIF 2L cases in 2008. Additionally, in 2008 and 2007, we generated $868,000 and $359,000, respectively, in revenues from stand alone sales of our percutaneous facet screw system. Revenue generated outside the United States increased to $2.0 million in 2008 from $1.4 million in 2007 and $359,000 in 2006. In 2008 and 2007, initial stocking shipments to new distributors were $382,000 and $438,000, respectively. Our AxiaLIF 360° product began commercialization outside the United States in 2007 and our AxiaLIF 2L began commercialization in Europe in the fourth quarter of 2007, although we did not generate significant revenues from either the AxiaLIF 2L or the AxiaLIF 360° during 2007. In 2008, AxiaLIF 360 and AxiaLIF 2L revenues outside the U.S. were approximately $60,000 and $475,000, respectively. In 2008, 2007 and 2006, 92%, 92% and 94%, respectively, of our revenues were generated in the United States.

*Cost of Revenue.* Cost of revenue increased to $4.3 million in 2008 from $3.0 million in 2007 and $1.6 million in 2006. The $1.3 million increase from 2007 to 2008 and the $1.4 million increase from 2006 to 2007 were primarily the result of higher material and overhead costs associated with increased sales volumes of our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L products. As a percentage of revenue, cost of revenue was 17.1% in 2008, 18.5% in 2007 and 27.2% in 2006. The decrease in cost of revenue as a percentage of revenue was primarily attributable to increased efficiencies associated with higher production and sales volumes from 2006 to 2007 and to 2008.

*Research and Development.* Research and development expenses increased to $5.0 million in 2008 from $4.8 million in 2007 and $4.2 million in 2006. The $0.2 million increase in expense from 2007 to 2008 was primarily the result of increases in personnel related costs, including stock-based compensation expense, of $0.4 million, partially offset by reductions in project related research and development and clinical trial costs of $0.2 million. The $0.6 million increase in expense in 2007 compared to 2006 was primarily the result of increases in personnel related costs, including stock-based compensation expense of $0.6 million and increased cost of $0.5 million related to the enhancement of our intellectual property portfolio, partially offset by reductions in project related research and development and clinical trial costs of $0.4 million and occupancy costs of $0.1 million.

*Sales and Marketing.* Sales and marketing expenses increased to $29.4 million in 2008 from $15.7 million in 2007 and $9.3 million in 2006. The increase in expense from 2007 to 2008 of $13.7 million was primarily attributable to increased personnel related costs, including commissions and stock-based compensation expense, of $7.2 million, as we continued to build out our sales and marketing organization in order to continue to drive global market acceptance of our AxiaLIF products, increased travel costs of $2.7 million related to our expanded sales force, increased training costs of $1.7 million and increased tradeshow and promotional activities of $1.2 million. The increase in expenses from 2006 to 2007 of $6.4 million was primarily attributable to increased personnel related costs of $5.4 million, increased training costs of $0.4 million and increased tradeshow and promotional activities of $0.4 million.

*General and Administrative.* General and administrative expenses increased to $6.2 million in 2008 from $2.9 million in 2007 and $1.2 million in 2006. The increase in expenses from 2007 to 2008 of $3.3 million was primarily attributable to increased personnel related costs, including stock-based compensation expenses, of $1.0 million, increased professional fees of $1.5 million related to our operating as a public company, including accounting, legal and board of director expenses, increased directors and officers insurance expense of $0.3 million and higher franchise taxes of $0.2 million. The increase in expenses from 2006 to 2007 of $1.7 million was primarily attributable to increased personnel related costs, including stock-based compensation expenses, of $0.8 million, increased professional fees related to planning and preparation for our initial

43

Appeal: 15-2579    Doc: 27-1    Filed: 04/14/2016    Pg: 150 of 471

JA-143

Table of Contents

public offering of $0.5 million, increased occupancy cost of $0.3 million and increased directors and officers insurance expense of $0.1 million.

*Other and Interest Income (Expense).* Other and interest income increased to $2.5 million in 2008 from $1.4 million in 2007 and $1.0 million in 2006. The increases of $1.1 million in other and interest income from 2007 to 2008 and $0.4 million from 2006 to 2007 was primarily due to interest income on higher average cash and investment balances from the net proceeds to the Company of $86.7 million from our October 2007 IPO.

**Liquidity and Capital Resources**

*Sources of Liquidity*

Since our inception in 2000, we have incurred significant losses and, as of December 31, 2008, we had an accumulated deficit of $47.9 million. We have not yet achieved profitability, and anticipate that we will continue to incur losses in the near term. We expect that research and development, sales and marketing and general and administrative expenses will continue to grow and, as a result, we will need to generate significant revenues to achieve profitability. To date, our operations have been funded primarily with proceeds from the sale of preferred stock and, most recently, the net proceeds from our October 2007 initial public offering. Gross proceeds from our preferred stock sales totaled $40.5 million to date, and the net proceeds from our October 2007 initial public offering were approximately $86.7 million.

As of December 31, 2008, we did not have any outstanding debt financing arrangements, we had working capital of $84.2 million and our primary source of liquidity was $77.3 million in cash, cash equivalents and short-term investments. We currently invest our cash and cash equivalents primarily in money market treasury funds and high grade commercial paper. We currently place our short-term investments primarily in U.S. agency backed debt instruments and high grade corporate bonds, certificates of deposit and commercial paper.

*Cash,* cash equivalents and short-term investments decreased from $93.9 million at December 31, 2007 to $77.3 million at December 31, 2008. The decrease of $16.6 million was primarily the result of net cash used in operating activities of $15.7 million and purchases of property and equipment of $1.1 million.

*Cash,* cash equivalents and short-term investments increased from $15.0 million at December 31, 2006 to $93.9 million at December 31, 2007. The increase of $78.9 million was primarily the result of the net proceeds to the Company from our October 2007 initial public offering of approximately $86.7 million partially offset by cash used in operations of $7.3 million and purchases of property and equipment of $0.5 million.

*Cash Flows*

*Net Cash Used in Operating Activities.* Net cash used in operating activities was $15.7 million in 2008, $7.3 million in 2007 and $10.4 million in 2006. For each of these periods, net cash used in operating activities was attributable primarily to net losses after adjustment for non-cash items, such as depreciation and stock-based compensation expense, and increases in working capital requirements to support the introduction and increased market acceptance of our AxiaLIF products. The increases in working capital requirements for each of the periods were driven by the growth in inventories, and related payables, to support forecasted demand and the increases in accounts receivable resulting from increasing revenues exceeding cash inflow from customer collections and smaller changes in prepaid assets and accrued expenses due to the timing of activities in those accounts.

*Net Cash Used in Investing Activities.* Net cash used in investing activities was $7.1 million in 2008, $19.8 million in 2007 and $5.1 million in 2006. For each of these periods, this amount reflected purchases or sales and maturities of investments and purchases of property and equipment, primarily for research and development, information technology, manufacturing operations and capital improvements to our facilities.

*Net Cash Provided by Financing Activities.* Net cash provided by financing activities in 2008 was $0.2 million, representing proceeds from the issuance of shares of our common stock upon the exercise of stock options. Net cash provided by financing activities in 2007 was $86.8 million, which represented the net

44

**Table of Contents**

proceeds to the Company of our October 2007 initial public offering of 6,325,000 shares of our common stock, resulting in net proceeds to us, after deducting underwriting discounts, commissions and offering expenses, of approximately $86.7 million and $0.1 million in proceeds from the issuance of shares of our common stock upon the exercise of stock options. There was no significant net cash provided by financing activities in 2006.

### *Operating Capital and Capital Expenditure Requirements*

We believe that our existing cash and cash equivalents, together with cash received from sales of our products, will be sufficient to meet our cash needs for at least the next two years. We intend to spend substantial sums on sales and marketing initiatives to support the ongoing commercialization of our products and on research and development activities, including product development, regulatory and compliance, clinical studies in support of our currently marketed products and future product offerings, and the enhancement and protection of our intellectual property. We may need to obtain additional financing to pursue our business strategy, to respond to new competitive pressures or to take advantage of opportunities that may arise. The sale of additional equity or convertible debt securities could result in dilution to our stockholders. If additional funds are raised through the issuance of debt securities, these securities could have rights senior to those associated with our common stock and could contain covenants that would restrict our operations. Any additional financing may not be available in amounts or on terms acceptable to us, if at all. If we are unable to obtain this additional financing, we may be required to reduce the scope of our planned product development and marketing efforts.

### *Contractual Obligations*

The following table discloses information about our contractual obligations by the year in which payments are due as of December 31, 2008:

| | | Payments Due by Year | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less Than 1 Year** | **1-3 Years** | **4-5 Years** | **After 5 Years** |
| Operating leases(1) | $254 | $ 161 | $ 93 | $ — | $ — |

(1) We rent office space under an operating lease which expires in 2010.

### *Off-Balance Sheet Arrangements*

As of December 31, 2008, we did not have any outstanding debt or available debt financing arrangements or off-balance sheet liabilities.

### *Critical Accounting Policies and Estimates*

Our discussion and analysis of our financial condition and results of operations is based upon our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses, and disclosures of contingent assets and liabilities at the date of the financial statements. On an on-going basis, we evaluate our estimates, including those related to revenue recognition, accounts receivable, inventories, income taxes and stock-based compensation. We use authoritative pronouncements, historical experience and other assumptions as the basis for making estimates. Actual results could differ from those estimates under different assumptions or conditions.

We believe the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our financial statements.

*Revenue Recognition.* Revenue is recognized in accordance with Staff Accounting Bulletin, or SAB, No. 101 as amended by SAB No. 104, "Revenue Recognition". We recognize revenue based on the following criteria: (i) persuasive evidence that an arrangement exists with the customer; (ii) the delivery of the products

45

Table of Contents

and/or services has occurred (title has transferred); (iii) the selling price has been fixed for the products or services delivered; and (iv) the collection is reasonably assured. Revenue is generated from the sale of our implants and procedure kits, which consist of disposable instruments. We have two distinct sale methods. The first method is when procedure kits are sold directly to hospitals or surgical centers. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to our corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. The other sales method is for sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine revenue recognition on a case by case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment.

*Accounts Receivable and Allowances.* We monitor collections and payments from our customers and maintain an allowance for doubtful accounts based upon our historical experience and any specific customer collection issues that we have identified. While our credit losses have historically been within our expectations and the allowance established, we may not continue to experience the same credit loss rates that we have in the past. We make estimates on the collectability of customer accounts based primarily on analysis of historical trends and experience and changes in customers' financial condition. Management uses its best judgment, based on the best available facts and circumstances, and records a reserve against the amounts due to reduce the receivable to the amount that is expected to be collected.

These reserves are reevaluated and adjusted as additional information is received that impacts the amount reserved.

*Inventory.* We state our inventories at the lower of cost or market, computed on a standard cost basis, which approximates actual cost on a first-in, first-out basis and market being determined as the lower of replacement cost or net realizable value. Costs are monitored on an annual basis and updated as necessary to reflect changes in supplier costs and the rate of our overhead absorption is adjusted based on projections of our manufacturing department costs and production plan. Inventory reserves are established when conditions indicate that the selling price could be less than cost due to obsolescence, usage, or we deem we hold excessive levels of inventory based on market demand.

*Accounting for Income Taxes.* Significant management judgment is required in determining our provision for income taxes, our deferred tax assets and liabilities and any valuation allowance recorded against our net deferred tax assets. We have recorded a full valuation allowance on our net deferred tax assets as of December 31, 2008 due to uncertainties related to our ability to utilize our deferred tax assets in the foreseeable future.

*Stock-Based Compensation.* Effective January 1, 2006, we adopted SFAS 123(R) using the prospective transition method, which requires the measurement and recognition of compensation expense for all share-based payment awards granted, modified and settled to our employees and directors after January 1, 2006. The fair value of stock options was estimated using a Black-Scholes option pricing model. This model requires the input of subjective assumptions in implementing SFAS 123(R), including expected stock price volatility, expected life and estimated forfeitures of each award. The fair value of equity-based awards is amortized over the vesting period of the award, and we have elected to use the straight-line method of amortization. Due to the limited amount of historical data available to us, particularly with respect to stock-price volatility, employee exercise patterns and forfeitures, actual results could differ materially from our expectations.

46

Table of Contents

**Recent Accounting Pronouncements**

*New Accounting Standards*

In February 2008, the Financial Accounting Standards Board, or FASB, issued Staff Position No. FAS 157-2, which delayed the effective date of Statement of Financial Accounting Standards No. 157, "Fair Value Measurements", for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. We are currently evaluating the effect of the implementation of SFAS 157 on our non-financial assets and non-financial liabilities, but do not believe that it will have a material impact on our financial statements.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 (SFAS 159), "The Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115". SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value. The amendment to SFAS 115 applies to all entities with investments in available-for-sale or trading securities. The statement was effective for fiscal years beginning after November 15, 2007. We adopted SFAS 159 on January 1, 2008; however, no fair value elections were made for any of our assets or liabilities, other than those required by current accounting principles to be accounted for at fair value.

In May 2008, the FASB issued SFAS 162, "The Hierarchy of Generally Accepted Accounting Principles." SFAS 162 identifies the sources of accounting principles to be used in the preparation of financial statements. SFAS 162 is effective sixty days following the SEC's approval of the Public Company Accounting Oversight Board amendments to AU Section 411, "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles." The adoption of this statement did not have a material impact on our financial statements.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on us.

**Item 7A.  *Quantitative and Qualitative Disclosures About Market Risk***

Our exposure to interest rate risk at December 31, 2008 is related to our investment portfolio. We invest our excess cash primarily in money market funds, debt instruments of the U.S. government and its agencies and in high quality corporate bonds, certificates of deposit and commercial paper. Due to the short-term nature of these investments, we have assessed that there is no material exposure to interest rate risk arising from our investments. Thus, a hypothetical 100 basis point adverse move in interest rates along the entire interest rate yield curve would not materially affect the fair market value of our interest-sensitive financial investments. Declines in interest rates over time will, however, reduce our investment income, while increases in interest rates over time will increase our interest expense. Historically, and as of December 31, 2008, we have not used derivative instruments or engaged in hedging activities.

Although substantially all of our sales and purchases are denominated in U.S. dollars, future fluctuations in the value of the U.S. dollar may affect the competitiveness of our products outside the United States. We do not believe, however, that we currently have significant direct foreign currency exchange rate risk and have not hedged exposures denominated in foreign currencies.

**Item 8.  *Financial Statements and Supplementary Data.***

The financial statements and supplementary data required by this item are set forth under Item 15.

**Item 9.  *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.***

None.

Table of Contents

### Item 9A. *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of December 31, 2008. We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of December 31, 2008, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

**Internal Control Over Financial Reporting**

*Management's annual report on internal control over financial reporting.* Management's report on TranS1's internal control over financial reporting is included on page 52 hereof. The report of TranS1's independent registered public accounting firm related to their assessment of the effectiveness of internal control over financial reporting is included on page 53 hereof.

*Changes in Internal Control over Financial Reporting.* There has been no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. *Other Information.*

None.

## PART III

### Item 10. *Directors, Executive Officers and Corporate Governance.*

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2008, and delivered to stockholders in connection with our annual meeting of stockholders.

### Item 11. *Executive Compensation.*

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2008, and delivered to stockholders in connection with our annual meeting of stockholders.

The material incorporated herein by reference to the material under the caption "Compensation Committee Report" in the Proxy Statement shall be deemed furnished, and not filed, in this report and shall not be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, as a result of this furnishing, except to the extent that we specifically incorporate it by reference.

48

**Table of Contents**

**Item 12.** *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.*

With the exception of the information regarding securities authorized for issuance under our equity compensation plans, which is set forth in Item 5 of this report under the heading "Securities Authorized For Issuance under Equity Compensation Plans" and incorporated herein by reference, the information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2008, and delivered to stockholders in connection with our annual meeting of stockholders.

**Item 13.** *Certain Relationships and Related Transactions, and Director Independence.*

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2008, and delivered to stockholders in connection with our annual meeting of stockholders.

**Item 14.** *Principal Accountant Fees and Services.*

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2008, and delivered to stockholders in connection with our annual meeting of stockholders.

<div align="center">

**PART IV**

</div>

**Item 15.** *Exhibits, Financial Statement Schedules.*

(a) Financial Statements

(1) Index to Financial Statements

| | Page |
|---|---|
| Management Report on Internal Control Over Financial Reporting | 52 |
| Report of Independent Registered Public Accounting Firm | 53 |
| Balance Sheets | 54 |
| Statements of Operations | 55 |
| Statements of Stockholders' Equity (Deficit) | 56 |
| Statements of Cash Flows | 57 |
| Notes to Financial Statements | 58 |

(2) Financial Statement Schedule: Schedule II — Valuation Accounts    71

All other financial statement schedules have been omitted because they are not applicable, not required or the information required is shown in the financial statements or the notes thereto.

(3) Exhibits

The exhibits filed with this Annual Report on Form 10-K are listed in the Exhibit Index immediately following the financial statement schedules, which Exhibit Index is incorporated herein by reference.

<div align="center">

49

</div>

JA-150

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**TranS1 Inc.**

By: /s/  Richard Randall
_____
Richard Randall
President and Chief Executive Officer

Date: March 13, 2009

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Richard Randall and Michael Luetkemeyer, jointly and severally, his attorneys-in-fact, each with the power of substitution, for him in any and all capacities, to sign any amendments to this Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/  Richard Randall<br>Richard Randall | President and Chief Executive Officer<br>(Principal Executive Officer) | March 13, 2009 |
| /s/  Michael Luetkemeyer<br>Michael Luetkemeyer | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | March 13, 2009 |
| /s/  Michael Carusi<br>Michael Carusi | Director | March 13, 2009 |
| /s/  Mitchell Dann<br>Mitchell Dann | Director | March 13, 2009 |
| /s/  Paul LaViolette<br>Paul LaViolette | Director | March 13, 2009 |
| /s/  Jonathan Osgood<br>Jonathan Osgood | Director | March 13, 2009 |
| /s/  James Shapiro<br>James Shapiro | Director | March 13, 2009 |

/s/  Joseph Slattery                               Director                March 13,
Joseph Slattery                                                           2009

50

Table of Contents

**TranS1 Inc.**

**Index to Financial Statements**

| | Page |
|---|---|
| Management Report on Internal Control Over Financial Reporting | 52 |
| Report of Independent Registered Public Accounting Firm | 53 |
| Balance Sheets | 54 |
| Statements of Operations | 55 |
| Statements of Stockholders' Equity (Deficit) | 56 |
| Statements of Cash Flows | 57 |
| Notes to Financial Statements | 58 |

51

**Table of Contents**

### Management Report on Internal Control Over Financial Reporting

The management of TranS1 is responsible for establishing and maintaining adequate internal control over financial reporting. TranS1's internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

TranS1's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2008. In making this assessment, it used the criteria set forth in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on management's assessment, we concluded that, as of December 31, 2008, our internal control over financial reporting was effective based on those criteria.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2008 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

<div align="center">52</div>

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of TranS1 Inc.

In our opinion, the financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of TranS1 Inc. at December 31, 2008 and 2007, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2008 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management Report on Internal Control Over Financial Reporting. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our audits (which was an integrated audit in 2008). We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/  PricewaterhouseCoopers LLP

Raleigh, North Carolina
March 13, 2009

JA-155

Table of Contents

## TranS1 Inc.

## Balance Sheets

| | December 31, | |
| | 2008 | 2007 |
| --- | --- | --- |
| | (In thousands, except share amounts) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 42,051 | $ 64,676 |
| Short-term investments | 35,215 | 29,245 |
| Accounts receivable, net | 4,812 | 3,225 |
| Inventory | 6,369 | 4,025 |
| Prepaid expenses and other assets | 632 | 597 |
| Total current assets | 89,079 | 101,768 |
| Property and equipment, net | 1,412 | 1,088 |
| Total assets | $ 90,491 | $102,856 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,896 | $ 1,631 |
| Accrued expenses | 2,009 | 1,786 |
| Total current liabilities | 4,905 | 3,417 |
| Commitments (Note 5) | | |
| Stockholders' equity: | | |
| Common stock, $0.0001 par value; 75,000,000 shares authorized, 20,538,333 and 19,843,941 shares issued and outstanding at December 31, 2008 and 2007,respectively | 2 | 2 |
| Preferred stock, $0.0001 par value; 5,000,000 shares authorized, none issued and outstanding at December 31, 2008 and 2007 | — | — |
| Additional paid-in capital | 133,507 | 130,325 |
| Accumulated deficit | (47,923) | (30,888) |
| Total stockholders' equity | 85,586 | 99,439 |
| Total liabilities and stockholders' equity | $ 90,491 | $102,856 |

The accompanying notes are an integral part of these financial statements.

54

**Table of Contents**

<div align="center">

**TranS1 Inc.**

**Statements of Operations**

</div>

| | Year Ended December 31, | | |
| | 2008 | 2007 | 2006 |
| --- | --- | --- | --- |
| | (In thousands, except per share amounts) | | |
| Revenue | $ 25,304 | $16,473 | $ 5,812 |
| Cost of revenue | 4,315 | 3,042 | 1,580 |
| Gross profit | 20,989 | 13,431 | 4,232 |
| Operating expenses: | | | |
| Research and development | 5,020 | 4,785 | 4,246 |
| Sales and marketing | 29,375 | 15,706 | 9,288 |
| General and administrative | 6,177 | 2,901 | 1,166 |
| Total operating expenses | 40,572 | 23,392 | 14,700 |
| Operating loss | (19,583) | (9,961) | (10,468) |
| Interest income | 2,548 | 1,384 | 858 |
| Other income (expense), net | — | — | 131 |
| Net loss | $(17,035) | $(8,577) | $ (9,479) |
| Net loss per common share — basic and diluted | $ (0.84) | $ (1.46) | $ (3.91) |
| Weighted average common shares outstanding — basic and diluted | 20,289 | 5,872 | 2,423 |

The accompanying notes are an integral part of these financial statements.

<div align="center">55</div>

Table of Contents

TranS1 Inc.

Statements of Stockholders' Equity (Deficit)

| | Common Stock Number | Amount | Additional Paid-in Capital | Notes Receivable | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|
| | | | (In thousands, except share data) | | | |
| **Balance at December 31, 2005** | 2,411,773 $ | — $ | 219 $ | (41) $ | (12,832) $ | (12,654) |
| Issuance of common stock from exercised options | 23,711 | — | 2 | 3 | — | 5 |
| Stock-based compensation | — | — | 599 | — | — | 599 |
| Net loss | — | — | — | — | (9,479) | (9,479) |
| **Balance at December 31, 2006** | 2,435,484 | — | 820 | (38) | (22,311) | (21,529) |
| Issuance of common stock from exercised options | 290,292 | — | 123 | — | — | 123 |
| Issuance of common stock from initial public offering | 6,325,000 | 1 | 86,658 | — | — | 86,659 |
| Conversion of preferred stock to common stock | 10,793,165 | 1 | 40,088 | — | — | 40,089 |
| Stock-based compensation | — | — | 2,636 | — | — | 2,636 |
| Repayment of note receivable | — | — | — | 38 | — | 38 |
| Net loss | — | — | — | — | (8,577) | (8,577) |
| **Balance at December 31, 2007** | 19,843,941 | 2 | 130,325 | — | (30,888) | 99,439 |
| Issuance of common stock from exercised options | 694,392 | — | 203 | — | — | 203 |
| Stock-based compensation | — | — | 2,979 | — | — | 2,979 |
| Net loss | — | — | — | — | (17,035) | (17,035) |
| **Balance at December 31, 2008** | 20,538,333 $ | 2 $ | $133,507 $ | — $ | (47,923) $ | 85,586 |

The accompanying notes are an integral part of these financial statements.

56

JA-158

Table of Contents

TranS1 Inc.

Statements of Cash Flows

| | Year Ended December 31, | | |
| | 2008 | 2007 | 2006 |
| | (In thousands) | | |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net loss | $(17,035) | $ (8,577) | $ (9,479) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation | 804 | 540 | 237 |
| Stock-based compensation | 2,979 | 2,636 | 599 |
| Allowance for excess and obsolete inventory | 400 | 306 | 350 |
| Provision for bad debts | 101 | 95 | 64 |
| Changes in operating assets and liabilities: | | | |
| Increase in accounts receivable | (1,688) | (1,700) | (1,120) |
| Increase in inventory | (2,744) | (2,251) | (1,846) |
| Increase in prepaid expenses | (35) | (367) | (99) |
| Increase in accounts payable | 1,265 | 788 | 508 |
| Increase in accrued liabilities | 223 | 1,185 | 358 |
| Net cash used in operating activities | (15,730) | (7,345) | (10,428) |
| **Cash flows from investing activities:** | | | |
| Purchase of property and equipment | (1,128) | (516) | (609) |
| Purchases of investments | (55,761) | (30,687) | (13,925) |
| Sales of investments | 49,791 | 11,370 | 9,447 |
| Net cash used in investing activities | (7,098) | (19,833) | (5,087) |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of common stock | 203 | 86,820 | 5 |
| Net cash provided by financing activities | 203 | 86,820 | 5 |
| Net increase (decrease) in cash and cash equivalents | (22,625) | 59,642 | (15,510) |
| Cash and cash equivalents, beginning of period | 64,676 | 5,034 | 20,544 |
| Cash and cash equivalents, end of period | $ 42,051 | $ 64,676 | $ 5,034 |
| **Supplemental disclosure of noncash financing activities:** | | | |
| Conversion of preferred stock to common stock | $ — | $ 40,089 | $ — |

The accompanying notes are an integral part of these financial statements.

57

Table of Contents

<div align="center">

**TranS1 Inc.**

**Notes to Financial Statements**

</div>

### 1. Organization

TranS1 Inc., a Delaware corporation (the "Company"), was incorporated in May 2000 and is headquartered in Wilmington, North Carolina. The Company is a medical device company focused on designing, developing and marketing products that implement its minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine and operates in one business segment. The Company has developed and currently markets two single-level fusion products, the AxiaLIF® and the AxiaLIF 360°™ and a two-level fusion product, the AxiaLIF 2L™. All of the Company's products are delivered using its pre-sacral approach. The AxiaLIF product was commercially released in January 2005, the AxiaLIF 360° product was commercially released in July 2006 and the AxiaLIF 2L product was commercially released in Europe in the fourth quarter of 2006. The Company received 510(k) clearance for the AxiaLIF 2L from the FDA and began marketing this product in the United States in the second quarter of 2008. The Company generates revenue from the sale of implants and procedure kits. The Company sells its products directly to hospitals and surgical centers in the United States and to independent distributors outside the United States.

The Company is subject to a number of risks similar to other companies in the medical device industry. These risks include rapid technological change, uncertainty of market acceptance of our products, uncertainty of regulatory approval, competition from substitute products and larger companies, the need to obtain additional financing, compliance with government regulation, protection of proprietary technology, product liability, and the dependence on key individuals.

### 2. Summary of Significant Accounting Policies

*Basis of Presentation*

The Company has prepared the accompanying financial statements in conformity with accounting principles generally accepted in the United States of America. The Company's fiscal year ends on December 31. On October 5, 2007, the Company's Board of Directors approved an amendment to the Company's existing certificate of incorporation effecting a 0.9-for-1 reverse stock split. All share and per share information in the accompanying financial statements and notes to the financial statements has been retroactively restated to reflect the effect of the stock split.

On October 22, 2007, all of the outstanding preferred shares were converted into 10,793,165 common shares and the Company completed its initial public offering of 6,325,000 shares of common stock, at an offering price of $15.00 per share. The net proceeds of this offering, after deducting the underwriting discounts, commissions and offering expenses, were approximately $86.7 million.

*Use of Estimates*

The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. These principles require management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. The principal estimates relate specifically to accounts receivable reserves, inventory reserves, stock-based compensation, accrued expenses and income tax valuations.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents. Cash and cash equivalents include money market funds and commercial paper. Cash equivalents are carried at fair market value. Related unrealized gains and losses were insignificant as of December 31, 2008 and 2007.

<div align="center">58</div>

<div align="center">

JA-160

</div>

Table of Contents

TranS1 Inc.

Notes to Financial Statements — (Continued)

*Investments*

All marketable investments are classified as available-for-sale and therefore are carried at fair market value. Related unrealized gains and losses were insignificant as of December 31, 2008 and 2007. Realized gains and losses on the sale of all such investments are reported in earnings and computed using the specific identification cost method and were insignificant for the years ended December 31, 2008 and 2007. All of the Company's investments as of December 31, 2008 have maturities of one year or less. The following table presents the components of the Company's available-for-sale investments:

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In thousands) | |
| **Short-term investments:** | | |
| Commercial paper | $ 4,978 | $14,117 |
| Corporate debt securities | 18,972 | 8,695 |
| Certificate of deposit | 2,230 | — |
| Asset backed securities | — | 6,433 |
| U.S. government securities | 9,035 | — |
| Total short-term investments | $35,215 | $29,245 |

*Fair Value of Financial Instruments*

The carrying values of cash equivalents, short-term investments, accounts receivable, and accounts payable at December 31, 2008 and 2007 approximated their fair values due to the short-term nature of these items.

At December 31, 2008, the Company holds certain assets that are required to be measured at fair value on a recurring basis. These assets include available for sale securities classified as cash equivalents and short-term investments. Statement of Financial Accounting Standards No. 157 (SFAS 157), "Fair Value Measurements", requires the valuation of investments using a three tiered approach, which requires that fair value measurements be classified and disclosed in one of three tiers. These tiers are: Level 1, defined as quoted prices in active markets for identical assets or liabilities; Level 2, defined as valuations based on observable inputs other than those included in Level 1, such as quoted prices for similar assets and liabilities in active markets, or other inputs that are observable or can be corroborated by observable input data; and Level 3, defined as valuations based on unobservable inputs reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants.

At December 31, 2008, all available for sale securities are classified as Level 1 assets with a fair value of $76.8 million, which included money market funds of $41.6 million and short-term investments of $35.2 million. The Company has no Level 2 or Level 3 assets or liabilities at December 31, 2008.

*Accounts Receivable*

Accounts receivable are presented net of an allowance for uncollectible accounts. Estimates on the collectability of customer accounts are based primarily on analysis of historical trends and experience and changes in customers' financial condition. The following table presents the components of accounts receivable:

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In thousands) | |
| Gross accounts receivable | $5,005 | $3,335 |
| Allowance for uncollectible accounts | (193) | (110) |
| Total accounts receivable, net | $4,812 | $3,225 |

59

http://www.sec.gov/Archives/edgar/data/1230355/000095014409002207/g18069e10vk.htm    8/27/2012

JA-162

Table of Contents

**TranS1 Inc.**

**Notes to Financial Statements — (Continued)**

*Concentration of Credit Risk and Significant Customers*

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents.

The Company places cash deposits with a federally insured financial institution, in amounts which at times exceed the federally insured limit, which was $250,000 at December 31, 2008 and $100,000 at December 31, 2007. The total amount of deposits in excess of federally insured limits was $1,914,000 and $2,656,000 at December 31, 2008 and 2007, respectively.

In 2008 and 2007 no customer accounted for 10% or more of revenues. In 2006, one customer, Christ Hospital in Cincinnati, Ohio, accounted for 11% of revenues. As of December 31, 2008 and 2007, no single customer accounted for 10% or more of the accounts receivable balance.

*Inventories*

Inventories consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In thousands) | |
| Raw materials | $ 437 | $ 212 |
| Work-in-process | 3,334 | 2,189 |
| Finished goods | 2,598 | 1,624 |
| Total inventories | $6,369 | $4,025 |

Inventories are stated at the lower of cost or market, computed on a standard cost basis, which approximates actual cost on a first-in, first-out basis and market being determined as the lower of replacement cost or net realizable value. Inventory reserves are established when conditions indicate that the selling price could be less than cost due to obsolescence or the Company determines that it holds excessive levels of inventory based on market demand.

*Property and Equipment*

Property and equipment are recorded at cost and depreciated over their estimated useful lives using the straight-line method. Leasehold improvements are amortized over the shorter of the lease term or the estimated useful life of the related asset. Maintenance and repairs, which neither materially add to the value of the property nor appreciably prolong its life, are charged to expense as incurred. Upon retirement or sale, the cost of assets disposed of and the related accumulated depreciation and amortization are removed from the accounts and any resulting gain or loss is credited or charged to income.

The estimated useful lives are:

| Furniture and fixtures | 5-10 years |
|---|---|
| Equipment | 3-5 years |
| Other depreciable assets | 2-10 years |
| Leasehold improvements | Lesser of estimated useful life or lease term |

*Revenue Recognition*

Revenue is recognized in accordance with Staff Accounting Bulletin ("SAB") No. 101 as amended by SAB No. 104. The Company recognizes revenue based on the following criteria: (i) persuasive evidence that an arrangement exists with the customer; (ii) the delivery of the products and/or services has occurred (title

60

Table of Contents

**TranS1 Inc.**

**Notes to Financial Statements — (Continued)**

has transferred); (iii) the selling price has been fixed for the products or services delivered; and (iv) the collection is reasonably assured. Revenue is generated from the sale of implants and procedure kits, which consist of disposable instruments. The Company has two distinct sale methods. The first method is when procedure kits are sold directly to hospitals or surgical centers. The Company's sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. The Company recognizes revenue upon the confirmation that the procedure kit has been used in a surgical procedure. The other sales method is for sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. The Company determines revenue recognition on a case by case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment.

### Shipping and Handling Costs

Shipping and handling costs in the United States are expensed as incurred and are included in the cost of revenue. These costs are not reimbursed by the Company's customers. Shipping costs to distributors outside the United States are either paid directly by the distributor to the freight carrier or charged to the distributor and reimbursed to the Company.

### Sales and Marketing Expenses

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to the Company's direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities, and participation in medical conferences. All costs of advertising and promotional activities are expensed as incurred. Advertising expenses were $1.7 million, $0.7 million and $0.5 million for the years ending December 31, 2008, 2007 and 2006, respectively.

### Research and Development Expenses

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within the Company's product development, regulatory and clinical functions and the costs of clinical studies and product development projects. Research and development expenses also include legal expenses related to the development and protection of the Company's intellectual property portfolio and facilities-related costs. Research and development expenses are expensed as incurred.

### Patent Costs

Costs associated with the submission of a patent application are expensed as incurred given the uncertainty of the patents resulting in probable future economic benefits to the Company.

### Income Taxes

The Company accounts for income taxes using the liability method which requires the recognition of deferred tax assets or liabilities for the temporary differences between financial reporting and tax bases of the Company's assets and liabilities and for tax carryforwards at enacted statutory tax rates in effect for the years in which the differences are expected to reverse. The effect on deferred taxes of a change in tax rates is recognized in the period that includes the enactment date. In addition, valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized.

61

Table of Contents

## TranS1 Inc.

### Notes to Financial Statements — (Continued)

*Stock-Based Compensation*

The Company accounts for stock-based compensation under the fair value provisions of Statement of Financial Accounting Standards No. 123R (SFAS 123R), *Share-Based Payment*. SFAS 123R requires the recognition of compensation expense, using a fair-value-based method, for costs related to all share-based payments including stock options. SFAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model. The Company adopted SFAS 123R using the prospective transition method, which requires that for nonpublic entities that used the minimum value method for either pro forma or financial statements recognition purposes, SFAS 123R shall be applied to option grants or modifications to existing options after the required effective date. For options granted prior to the new SFAS 123R effective date and for which the requisite service period has not been performed as of January 1, 2006, the Company has continued to apply the intrinsic value provisions of Accounting Principles Board Opinion No. 25 (APB 25), *Accounting for Stock Issued to Employees*, on the remaining unvested awards. All options granted after January 1, 2006 are expensed on a straight-line basis over the vesting period.

The Company accounts for stock-based compensation arrangements with nonemployees in accordance with the Emerging Issues Task Force Abstract No. 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling Goods or Services*. The Company records the expense of such services based on the estimated fair value of the equity instrument using the Black-Scholes pricing model. The value of the equity instruments is charged to earnings over the term of the service agreement.

*Net Loss Per Common Share*

Basic net loss per common share ("Basic EPS") is computed by dividing net loss available to common stockholders by the weighted average number of common shares outstanding. Diluted net loss available to common stockholders per common share ("Diluted EPS") is computed by dividing net loss available to common stockholders by the weighted average number of common shares and dilutive potential common share equivalents then outstanding. The Company's potential dilutive common shares, which consist of shares issuable upon the exercise of stock options and conversion of convertible preferred stock, have not been included in the computation of diluted net loss per share for all periods as the result would be anti-dilutive.

The following table sets forth the potential shares of common stock that are not included in the calculation of diluted net loss per share as the result would be anti-dilutive as of the end of each period presented:

| | Year Ended December 31, | | |
| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Convertible preferred stock | — | — | 10,793,165 |
| Weighted average stock options outstanding | 1,915,687 | 1,928,495 | 1,213,938 |

*Segment and Geographic Reporting*

The Company applies SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information". SFAS No. 131 establishes standards for the reporting by business enterprises of information about operating segments, products and services, geographic areas, and major customers. The Company has determined that it did not have any separately reportable segments as of December 31, 2008, 2007 or 2006.

62

Table of Contents

**TranS1 Inc.**

**Notes to Financial Statements — (Continued)**

Revenue by geographic area was:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
|  | (In thousands) | | |
| United States | $23,322 | $15,085 | $5,453 |
| Europe | 1,854 | 1,183 | 359 |
| Other | 128 | 205 | — |
|  | $25,304 | $16,473 | $5,812 |

*Recently Issued Accounting Standards*

In February 2008, the Financial Accounting Standards Board ("FASB") issued Staff Position No. FAS 157-2, which delayed the effective date of Statement of Financial Accounting Standards No. 157, "Fair Value Measurements", for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. The Company is currently evaluating the effect of the implementation of SFAS 157 on its non-financial assets and non-financial liabilities, but does not believe that it will have a material impact on its financial statements.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 (SFAS 159), "The Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115". SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value. The amendment to SFAS 115 applies to all entities with investments in available-for-sale or trading securities. The statement was effective for fiscal years beginning after November 15, 2007. The Company adopted SFAS 159 on January 1, 2008; however, no fair value elections were made for any of the Company's assets or liabilities, other than those required by current accounting principles to be accounted for at fair value.

In May 2008, the FASB issued SFAS 162, "The Hierarchy of Generally Accepted Accounting Principles." SFAS 162 identifies the sources of accounting principles to be used in the preparation of financial statements. SFAS 162 is effective sixty days following the SEC's approval of the Public Company Accounting Oversight Board amendments to AU Section 411, "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles." The adoption of this statement did not have a material impact on its financial statements.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on the Company.

**3. Property and Equipment**

Property and equipment consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In thousands) | |
| Furniture and fixtures | $    186 | $    139 |
| Equipment | 2,061 | 1,136 |
| Computer software | 415 | 300 |
| Leasehold improvements | 380 | 330 |
| Tools | 73 | 73 |
| Construction in process | 14 | 23 |
|  | 3,129 | 2,001 |
| Less: accumulated depreciation and amortization | (1,717) | (913) |
|  | $ 1,412 | $1,088 |

63

Table of Contents

TranS1 Inc.

Notes to Financial Statements — (Continued)

Depreciation and amortization expense for the years ended December 31, 2008, 2007 and 2006 was $804,000, $540,000, and $237,000, respectively.

**4. Accrued Expenses**

Accrued expenses consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In thousands) | |
| Commissions | $1,178 | $ 561 |
| Bonus | 270 | 426 |
| Franchise taxes | 121 | — |
| Vacation | 163 | 95 |
| Legal and professional fees | 69 | 277 |
| Consulting | 66 | 59 |
| Travel & entertainment | 50 | 127 |
| Clinical | 20 | 94 |
| Other | 72 | 147 |
| Total accrued expenses | $2,009 | $1,786 |

**5. Lease Obligations**

The Company rents office space under the terms of an operating lease, which expires in 2010.

Future minimum lease payments under operating lease obligations at December 31, 2008 are as follows (in thousands):

**Year ending December 31,**
| | |
|---|---|
| 2009 | $161 |
| 2010 | 93 |
| 2011 | — |
| 2012 | — |
| 2013 and after | — |
| | $254 |

Rent expense related to operating leases for the years ended December 31, 2008, 2007 and 2006 was $157,000, $152,000 and $148,000, respectively.

**6. Stockholders' Equity**

At December 31, 2008 and 2007, the Company's Amended and Restated Certificate of Incorporation, which was adopted in connection with the Company's initial public offering, authorized up to 80,000,000 shares of capital stock, of which 75,000,000 shares were designated as common stock with a par value of $0.0001 and up to 5,000,000 shares were designated as preferred stock with a par value of $0.0001. At December 31, 2008 and 2007, there were 20,538,333 and 19,843,941 shares of common stock issued and outstanding, respectively, and there were no shares of preferred stock issued and outstanding.

In 2008, the Company issued 694,392 shares of common stock to employees and consultants for $203,000 upon the exercise of stock options. In 2007, the Company issued 290,292 shares of common stock to

64

TranS1 Inc.

Notes to Financial Statements — (Continued)

employees and consultants for $123,000 upon the exercise of stock options. In 2006, the Company issued 23,711 shares of the common stock to employees and consultants for $4,400 upon the exercise of stock options.

**7. Stock Incentive Plans and Stock-Based Compensation**

*2007 Employee Stock Purchase Plan*

The Company's board of directors adopted the 2007 Employee Stock Purchase Plan (the "ESPP") in July 2007. The ESPP became effective upon the completion of the Company's initial public offering. A total of 250,000 shares of common stock are available for sale. In addition, the ESPP provides for annual increases in the number of shares available for issuance under the ESPP on the first day of each fiscal year beginning in 2008, equal to the lesser of (i) 2.0% of the outstanding shares of common stock on the first day of such fiscal year or (ii) an amount determined by the administrator of the ESPP. The Company's Compensation Committee administers the ESPP.

Shares shall be offered pursuant to the ESPP in six-month periods commencing on the first trading day on or after June 1 and December 1 of each year, or on such other date as the administrator may determine.

Our ESPP permits participants to purchase common stock through payroll deductions of up to 10% of their eligible compensation, which includes a participant's base straight time gross earnings, certain commissions, overtime and shift premium, but exclusive of payments for incentive compensation, bonuses and other compensation. A participant may purchase a maximum of 2,500 shares during a six-month purchase period. Amounts deducted and accumulated by the participant are used to purchase shares of the Company's common stock at the end of each six-month purchase period. The purchase price of the shares will be 95% of the fair market value of Company common stock on the exercise date. Participants may end their participation at any time during an offering period, and will be paid their accrued payroll deductions that have not yet been used to purchase shares of common stock. Participation ends automatically upon termination of employment with the Company. Pursuant to SFAS No. 123R, the Company is not required to recognize compensation expense in connection with purchases under the ESPP.

During fiscal years ended December 31, 2008 and 2007, no shares were issued to participants under the ESPP.

*2000 and 2007 Stock Incentive Plans*

The Company established the TranS1 Inc. Stock Incentive Plan in 2000, (as amended, the "2000 Plan") and the 2007 Stock Incentive Plan (the "2007 Plan") in October 2007 (collectively, the "Plans"). Under the 2000 Plan and the 2007 Plan, the Company may grant options to employees, directors or service providers and contractors for a maximum of 3,159,108 and 1,400,000 shares, respectively, of the Company's common stock. Options granted under the Plans may be incentive stock options or non-qualified stock options. Non-qualified stock options may be granted to service providers and incentive stock options may be granted only to employees. The exercise periods may not exceed ten years for options. However, in the case of an incentive stock option granted to an optionee who, at the time of the option grant owns stock representing more than 10% of the outstanding shares, the term of the option shall be five years from the date of the grant. The exercise price of incentive stock options cannot be less than 100% of the fair market value per share of the Company's common stock on the grant date. The exercise price of a nonqualified option under the 2000 Plan and the 2007 Plan shall not be less than 85% and 100%, respectively, of the fair market value per share on the date the option is granted. If an optionee owns more than 10% of the outstanding shares, the exercise price cannot be less than 110% of the fair market value of the stock on the date of the grant. Options granted under the Plans generally vest over periods ranging from three to four years.

65

Table of Contents

### TranS1 Inc.

### Notes to Financial Statements — (Continued)

The following table summarizes the activity of the Company's 2000 Plan and 2007 Plan, including the number of shares under options ("Number") and the weighted average exercise price ("Price"):

|  | Number | Price |
|---|---|---|
| Outstanding as of December 31, 2007 | 2,320,281 | $ 3.22 |
| Options granted | 1,033,000 | 11.77 |
| Options exercised | (694,392) | 0.45 |
| Options forfeited | (411,156) | 8.07 |
| Outstanding as of December 31, 2008 | 2,247,733 | $ 7.12 |

The following table summarizes information about the Company's stock options at December 31, 2008:

| Range of Exercise Prices | Number Outstanding | Weighted Average Contractual Life (Years) | Weighted Average Exercise Price | Number of Options Exercisable |
|---|---|---|---|---|
| $0.11 - $0.28 | 258,494 | 4.9 | $ 0.25 | 253,583 |
| $1.11 - $2.38 | 456,907 | 7.9 | 1.23 | 301,980 |
| $5.56 - $7.78 | 479,707 | 8.4 | 5.73 | 175,645 |
| $12.22 | 817,625 | 9.3 | 11.11 | 49,851 |
| $19.66 | 235,000 | 9.1 | 15.10 | 67,500 |
|  | 2,247,733 | 8.3 | $ 7.12 | 848,559 |

The aggregate intrinsic value of outstanding stock options at December 31, 2008 was $5.2 million. At December 31, 2008, exercisable stock options had an aggregate intrinsic value of $3.8 million, a weighted average contractual life of 7.2 years and a weighted average exercise price of $2.39.

#### *Stock-Based Compensation for Non-employees*

During 2008, the Company issued options to purchase 35,000 shares of common stock with an average exercise price of $12.43 per share to consultants. These options vest over a range of 1 to 3 years and expire 10 years from the date of issuance. During 2007, the Company issued options to purchase 50,207 shares of common stock with an average exercise price of $7.52 per share to consultants. These options vest over a range of zero to three years and expire 10 years from the date of issuance. During 2006, the Company issued options to purchase 51,651 shares of common stock with an exercise price of $1.00 per share to consultants. These options vest over a range of zero to three years and expire 10 years from the date of issuance. The Company determined the estimated fair value of the options issued to the consultants using the Black-Scholes pricing model. The Company used the following assumptions in the Black-Scholes pricing model for 2008 grants: 54% volatility, 0% dividend yield, 1.54% risk-free rate and 6 year expected life. The Company used the following assumptions in the Black-Scholes pricing model for 2007 grants: 45% volatility, 0% dividend yield, 4.92% risk-free rate and 6 year expected life. The Company used the following assumptions in the Black-Scholes pricing model for 2006 grants: 45% volatility, 0% dividend yield, 4.58% risk-free rate and a 6 year expected legal life.

Stock-based compensation expense charged to operations on options granted to non-employees for years ended December 31, 2008, 2007 and 2006 was $118,000, $1.1 million and $77,000, respectively. As of December 31, 2008, there was $165,000 of total unrecognized compensation costs related to non-vested stock option awards which is expected to be recognized over a weighted-average period of 1.4 years.

**TranS1 Inc.**

**Notes to Financial Statements — (Continued)**

*Employee Stock-Based Compensation on or Subsequent to January 1, 2006*

Under SFAS 123R, compensation cost for employee stock-based awards is based on the estimated grant-date fair value and is recognized over the vesting period of the applicable award on a straight-line basis. For the period from January 1, 2006 to December 31, 2008, the Company issued employee stock-based awards in the form of stock options. The Company recorded stock-based compensation expense of $3.0 million, $1.5 million, and $522,000 for the years ended December 31, 2008, 2007 and 2006, respectively. The weighted average estimated fair value of the employee stock options granted for the years ended December 31, 2008, 2007 and 2006 was $11.77, $10.34 and $4.18 per share, respectively. The aggregate intrinsic value of stock options (the amount by which the market price of the stock on the date of exercise exceeded the exercise price of the option) exercised for the years ended December 31, 2008, 2007 and 2006 was $5.4 million, $3.8 million and $114,000, respectively.

The Company uses the Black-Scholes pricing model to determine the fair value of stock options. The determination of the fair value of stock-based payment awards on the date of grant is affected by our stock price as well as assumptions regarding a number of complex and subjective variables. These variables include our expected stock price volatility over the term of the awards, actual and projected employee stock option exercise behaviors, risk-free interest rates and expected dividends. Prior to the Company's initial public offering, the Board of Directors, with the assistance of management, performed contemporaneous fair value analyses to determine the fair value of the common stock at the time of the stock option grants. The estimated grant-date fair values of the employee stock options were calculated using the Black-Scholes valuation model, based on the following assumptions for the years ended December 31, 2008, 2007 and 2006:

*Expected Life.* The expected life of six years is based on the "simplified" method described in the SEC Staff Accounting Bulletin No. 110, which provides guidance regarding the application of SFAS 123R.

*Volatility.* Through October 17, 2007, the Company was a private entity with no historical data regarding the volatility of its common stock. Accordingly, the expected volatility used for 2007 and 2006 was based on volatility of similar entities, referred to as "guideline" companies. In 2008, the expected volatility was based on a weighted average of the actual volatility of the Company for the current year and the guideline companies for prior periods. In evaluating similarity, the Company considered factors such as industry, stage of life cycle and size. The Company utilized an expected volatility range of 45% to 54% for 2008 and 45% for 2007 and 2006.

*Risk-Free Interest Rate.* The risk-free rate is based on U.S. Treasury zero-coupon issues with remaining terms similar to the expected term on the options. The risk-free rates were:

| Option Grant Year | Risk-Free Rate Range |
|---|---|
| 2008 | 2.68% to 3.21% |
| 2007 | 4.58% to 4.92% |
| 2006 | 4.58% |

*Dividend Yield.* The Company has never declared or paid any cash dividends and does not plan to pay cash dividends in the foreseeable future, and, therefore, used an expected dividend yield of zero in the valuation model.

*Forfeitures.* SFAS 123R also requires the Company to estimate forfeitures at the time of grant, and revise those estimates in subsequent periods if actual forfeitures differ from those estimates. The Company uses historical data to estimate pre-vesting option forfeitures and record stock-based compensation expense only for those awards that are expected to vest. All stock-based payment awards are amortized on a straight-line basis over the requisite service periods of the awards, which are generally the vesting periods.

67

JA-175

Table of Contents

**TranS1 Inc.**

**Notes to Financial Statements — (Continued)**

As of December 31, 2008, there was $7.0 million of total unrecognized compensation costs related to non-vested employee stock option awards granted after January 1, 2006, which is expected to be recognized over a weighted-average period of 2.6 years.

**8.  Income Taxes**

No provision for federal or state income taxes has been recorded as the Company has incurred net operating losses since inception.

Significant components of the Company's deferred tax assets and liabilities consist of the following:

|  | 2008 | 2007 |
|---|---|---|
|  | (In thousands) | |
| **Deferred tax assets** | | |
| Domestic net operating loss carryforwards | $ 14,350 | $ 8,615 |
| Inventory | 200 | 177 |
| Fixed assets | 242 | 84 |
| Other | 485 | 80 |
| Research and development credit | 716 | 568 |
| Total deferred tax assets | 15,993 | 9,524 |
| Valuation allowance for deferred assets | (15,993) | (9,524) |
| Deferred tax assets | — | — |
| **Deferred tax liabilities** | | |
| Fixed assets | — | — |
| Total deferred tax liabilities | — | — |
| Net deferred tax assets (liabilities) | $ — | $ — |

The Company provided a full valuation allowance against its net deferred tax assets since realization of these benefits could not be reasonably assured. The increase in valuation allowance resulted primarily from the additional net operating loss carryforward generated.

As of December 31, 2008, the Company had federal and state net operating loss carryforwards of approximately $37.4 million and $26.8 million, respectively. These net operating loss carryforwards begin to expire in 2021 and 2016 for federal and state tax purposes, respectively. Additionally, as of December 31, 2008, the Company had research credit carryforwards of $1.0 million for federal tax purposes. These credit carryforwards begin to expire in 2021. The utilization of the federal net operating loss carryforwards may be subject to limitations under the rules regarding a change in stock ownership as determined by the Internal Revenue Code.

68

Table of Contents

TranS1 Inc.

Notes to Financial Statements — (Continued)

A reconciliation of differences between the U.S. federal income tax rate and the Company's effective tax rate for the years ended December 31 is as follows:

|  | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
|  | Amount | % of Net Loss | Amount | % of Net Loss | Amount | % of Net Loss |
|  | | | (In thousands) | | | |
| Tax at statutory rate | $(5,962) | 35.0% | $(3,002) | 35.0% | $(3,318) | 35.0% |
| State taxes | (447) | 2.6% | (394) | 4.6% | (213) | 2.2% |
| Non deductible items | 1,168 | (6.9)% | 998 | (11.6)% | 270 | (2.8)% |
| Other | (470) | 2.8% | 53 | (0.6)% | 421 | (4.3)% |
| R&D credits | (148) | 0.9% | (115) | 1.3% | (144) | 1.5% |
| Change in valuation allowance | 5,859 | (34.4)% | 2,460 | (28.7)% | 2,984 | (31.5)% |
| Total | $ — | 0.0% | $ — | 0.0% | $ — | 0.0% |

As of January 1, 2007, the Company adopted the provisions of FASB Interpretation No. 48 or FIN 48, "Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109", which clarifies the accounting for uncertainty in tax positions. As of that date, the Company had $1.2 million of unrecognized tax benefits related to the adoption of FIN 48. This would be recorded as a component of income tax expense once the valuation allowance is released. For the year ended December 31, 2008, the Company decreased its unrecognized tax benefits by $374,000. The change was recorded as a reduction to the respective deferred tax asset which was reflected as a decrease in the valuation allowance. As of December 31, 2008, the Company had $0.9 million of unrecognized tax benefits which, if recognized, would be recorded as a component of income tax expense. The Company's policy is to record estimated interest and penalties related to the underpayment of income taxes as a component of its income tax provision. As of January 1, 2007, December 31, 2007 and December 31, 2008, the Company had no accrued interest or tax penalties recorded. A reconciliation of the beginning and ending gross unrecognized tax benefits is as follows:

| | |
|---|---|
| Balance at January 1, 2007 | $1,205 |
| Gross increases related to current period tax positions | 56 |
| Balance at December 31, 2007 | 1,261 |
| Gross decreases related to current period tax positions | (374) |
| Balance at December 31, 2008 | $ 887 |

In many cases, uncertain tax positions are related to tax years that remain subject to examination by the relevant tax authorities. Given the losses accumulated to date, periods open for examination are 2001 to 2008 for the primary taxing jurisdictions of the United States and North Carolina. The Company currently does not expect a significant change in the FIN 48 liability in the next 12 months.

69

Table of Contents

**TranS1 Inc.**

**Notes to Financial Statements — (Continued)**

**9.  Quarterly Data (Unaudited)**

The following unaudited quarterly financial data, in the opinion of management, reflects all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of results for the periods presented (in thousands, except per share data):

| | Year Ended December 31, 2008 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total revenues | $ 5,978 | $ 5,951 | $ 6,021 | $ 7,354 |
| Gross profit | 4,940 | 4,814 | 5,010 | 6,225 |
| Total operating expenses | 8,319 | 10,801 | 10,363 | 11,089 |
| Net loss | $(2,439) | $(5,299) | $(4,764) | $(4,533) |
| Basic and diluted net loss per common share | $  (0.12) | $  (0.26) | $  (0.23) | $  (0.22) |

| | Year Ended December 31, 2007 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total revenues | $ 3,115 | $ 4,072 | $ 4,327 | $ 4,959 |
| Gross profit | 2,525 | 3,203 | 3,573 | 4,130 |
| Total operating expenses | 4,404 | 5,794 | 5,912 | 7,282 |
| Net loss | $(1,697) | $(2,430) | $(2,214) | $(2,236) |
| Basic and diluted net loss per common share | $  (0.69) | $  (0.98) | $  (0.87) | $  (0.14) |

70

JA-178

Table of Contents

TRANS1 INC.

SCHEDULE II

VALUATION AND QUALIFYING ACCOUNTS
FOR THE YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006

| | Balance at Beginning of Period | Additions(1) | Deductions(2) | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| Accounts Receivable Reserve: | | | | |
| Year ended December 31, 2008 | $   110 | $   101 | $    18 | $   193 |
| Year ended December 31, 2007 | 29 | 95 | 14 | 110 |
| Year ended December 31, 2006 | — | 64 | 35 | 29 |

| | Balance at Beginning of Period | Additions(3) | Deductions(4) | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| Inventory Reserve: | | | | |
| Year ended December 31, 2008 | $   295 | $   400 | $   298 | $   397 |
| Year ended December 31, 2007 | 57 | 306 | 68 | 295 |
| Year ended December 31, 2006 | 10 | 350 | 303 | 57 |

| | Balance at Beginning of Period | Additions | Deductions(5) | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| Valuation Allowance for Deferred Tax Assets: | | | | |
| Year ended December 31, 2008 | $  9,524 | $ 6,469 | $    — | $ 15,993 |
| Year ended December 31, 2007 | 8,121 | 2,460 | 1,057 | 9,524 |
| Year ended December 31, 2006 | 5,137 | 2,984 | — | 8,121 |

(1) Amount represents customer balances deemed uncollectible.

(2) Uncollectible accounts written-off.

(3) Amount represents excess and obsolete reserve recorded to cost of sales.

(4) Excess and obsolete inventory written-off against reserve.

(5) Adjustment for the adoption of FIN 48 on January 1, 2007.

71

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of TranS1 Inc. (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007). |
| 3.2 | Amended and Restated Bylaws of TranS1 Inc. (incorporated by reference to Exhibit 3.4 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007). |
| 4.1 | Specimen common stock certificate (incorporated by reference to Exhibit 4.1 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007). |
| 10.1 | Amended and Restated 2000 Stock Incentive Plan (incorporated by reference to Exhibit 10.1 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.2 | Form of Stock Option Agreement under Amended and Restated 2000 Stock Incentive Plan (incorporated by reference to Exhibit 10.2 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.3 | 2007 Stock Incentive Plan (incorporated by reference to Exhibit 10.3 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.4 | Form of Stock Option Agreement under 2007 Stock Incentive Plan (incorporated by reference to Exhibit 10.4 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.5 | 2007 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.5 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.6 | Lease, dated March 16, 2005, between TranS1 Inc. and Ellmore Enterprises (incorporated by reference to Exhibit 10.6 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007). |
| 10.7 | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.7 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007). |
| 10.7.1 | Schedule of Parties to Indemnification Agreement.** |
| 23.1 | Consent of Independent Registered Public Accounting Firm.** |
| 24.1 | Power of Attorney (included in the signature page). |
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934.** |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934.** |
| 32.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350.** |
| 32.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350.** |

* These exhibits are identified as management contracts or compensatory plans or arrangements of the Registrant pursuant to Item 15(a)(3) of Form 10-K.

** Filed herewith.

72

JA-180

EX-31.1 4 g18069exv31w1.htm EX-31.1

**EXHIBIT 31.1**

## CERTIFICATION

I, Richard Randall, certify that:

1. I have reviewed this annual report on Form 10-K of TranS1 Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Richard Randall

Richard Randall
President and Chief Executive Officer

Date: March 13, 2009

75

JA-181

EX-31.2 5 g18069exv31w2.htm EX-31.2

**EXHIBIT 31.2**

**CERTIFICATION**

I, Michael Luetkemeyer, certify that:

1. I have reviewed this annual report on Form 10-K of TranS1 Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/  Michael Luetkemeyer
Michael Luetkemeyer
Chief Financial Officer

Date: March 13, 2009

76

JA-182

# Exhibit 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): April 27, 2009

# TRANS1 INC.
(Exact name of registrant as specified in its charter)

| Delaware | 001-33744 | 33-0909022 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**411 Landmark Drive**
**Wilmington, NC 28412-6303**
(Address of principal executive offices)
(Zip Code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## **TABLE OF CONTENTS**

Item 2.02 Results of Operations and Financial Condition
Item 9.01 Financial Statements and Exhibits
Signatures
EXHIBIT INDEX
EX-99.1
EX-99.2

Table of Contents

**Item 2.02 Results of Operations and Financial Condition.**

On April 27, 2009, TranS1 Inc. (the "Company") issued a press release to report its financial results for the quarter ended March 31, 2009. The release is furnished herewith as Exhibit 99.1 and incorporated herein by this reference.

Also on April 27, 2009, following the issuance of the press release referred to above, the Company conducted a conference call to discuss its financial results for the quarter ended March 31, 2009. A copy of the transcript of the conference call is furnished herewith as Exhibit 99.2 and incorporated herein by this reference.

The information in this Current Report on Form 8-K, including Exhibits 99.1 and 99.2, are being furnished pursuant to Item 2.02 and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section, nor shall they be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits.**

  **(d) Exhibits.**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press release, dated April 27, 2009. |
| 99.2 | Conference call transcript, dated April 27, 2009. |

__Table of Contents__

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRANS1 INC.

April 30, 2009

By: /s/ Michael Luetkemeyer
    Michael Luetkemeyer
    Chief Financial Officer

**Table of Contents**

## EXHIBIT INDEX

*Exhibit Number*                                                          *Description*

99.1     Press release, dated April 27, 2009.

99.2     Conference call transcript, dated April 27, 2009.

EX-99.1 2 a52356exv99w1.htm EX-99.1

**Exhibit 99.1**

**TranS1 Inc. Reports Operating Results for the First Quarter of 2009**

*Highlights:*

*First quarter revenues increased 45% to $8.7 million*

*889 TranS1 procedures performed globally in the quarter*

*Gross margin was 82.2% for the quarter*

*GAAP loss per share was $0.25 for the quarter*

*Non-GAAP loss per share was $0.22 for the quarter*

WILMINGTON, NC — (PRIME NEWSWIRE)—April 27, 2009—TranS1 Inc. (NASDAQ:TSON), a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine, today announced its financial results for the first quarter ended March 31, 2009.

Revenues were $8.7 million in the first quarter of 2009, representing a 45% increase over revenues of $6.0 million in the first quarter of 2008. Gross margin was 82.2% in the first quarter, slightly below the first quarter of 2008.

Operating expenses were $12.5 million in the first quarter of 2009 compared to $8.3 million in the first quarter of 2008. The increase in operating expenses is primarily attributable to an increase in sales and marketing costs as a result of the continued expansion of the direct sales force, increased commissions as a result of increased sales and increased surgeon training costs.

Net loss was $5.2 million and $2.4 million for the quarters ended March 31, 2009 and 2008, respectively. GAAP net loss per common share was $0.25 in the first quarter of 2009 compared to a net loss per share of $0.12 in the first quarter of 2008.

For the quarter ended March 31, 2009, on a non-GAAP basis, adjusting for non-cash stock compensation expense, net loss was $0.22 per common share based upon 20,552,000 weighted average common shares outstanding. For the quarter ended March 31, 2008, on a non-GAAP basis, adjusting for non-cash stock compensation expense, net loss was $0.10 per common share based upon 19,930,000 weighted average common shares outstanding.

Cash, cash-equivalents and investments were $72.1 million as of March 31, 2009.

"I was pleased with our strong results in the first quarter," said Rick Randall, President and Chief Executive Officer of TranS1. "The continuing maturation of our direct sales force, combined with the impact of unique events like the regional Association of Pre-Sacral Spine Surgeon programs that we sponsor, positively impacted our selling efforts. Additionally, we continue to be pleased with the adoption and clinical results of our two-level procedure."

**Conference Call**

TranS1 will host a conference call today at 4:30 pm ET to discuss its first quarter financial results. To listen to the conference call on your telephone, please dial 877-723-9518 for domestic callers and 719-325-4837 for international callers approximately ten minutes prior to the start time. The call will be concurrently webcast. To access the live audio broadcast or the subsequent archived recording, visit the TranS1 website at www.trans1.com under the investor relations section.

**Non-GAAP Measures**

Management uses certain non-GAAP financial measures such as non-GAAP net loss and net loss per share, which exclude stock based compensation. This non-GAAP presentation is given in part to enhance the understanding of the company's historical financial performance and comparability between periods. The company believes that the non-GAAP presentation to exclude stock-based compensation is relevant and useful information that will be widely used by investors and analysts. Accordingly, the company is disclosing this information to permit additional analysis of the company's performance. These non-GAAP measures are not in accordance with, or an alternative for, GAAP, and may be different from non-GAAP measures used by other companies. Investors should consider these non-GAAP measures in addition to, and not as a substitute for, financial performance measures in accordance with GAAP. A reconciliation of the GAAP financial measures to the comparable non-GAAP financial measure is included below.

**About TranS1 Inc.**

TranS1 is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. TranS1 currently markets two single-level fusion products, the AxiaLIF® and the AxiaLIF 360°™, and a two-level fusion product, the AxiaLIF 2L™, in the US and Europe. TranS1 was founded in May 2000 and is headquartered in Wilmington, North Carolina. For more information, visit www.trans1.com.

**Forward-Looking Statements**

This press release includes forward-looking statements, the accuracy of which is necessarily subject to risks and uncertainties. These risks and uncertainties include, among other things, risks associated with the adoption of a new technology by spine surgeons, product development efforts, regulatory requirements, maintenance and prosecution of adequate intellectual property protection and other economic and competitive factors. These forward looking statements are based on the company's expectations as of the date of this press release and the company undertakes no obligation to update information provided in this press release. For a discussion of risks and uncertainties associated with TranS1's business, please review the company's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2008.

CONTACT:
Investors:
TranS1 Inc.
Michael Luetkemeyer, 910-332-1700
Chief Financial Officer

or

Westwicke Partners
Mark Klausner, 443-213-0501
mark.klausner@westwicke.com

Source: TranS1 Inc.

TranS1 Inc.
Statements of Operations
(in thousands, except per share amounts)
(Unaudited)

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2009 | 2008 |
| Revenue | $ 8,678 | $ 5,978 |
| Cost of revenue | 1,542 | 1,038 |
| Gross profit | 7,136 | 4,940 |
| | | |
| Operating expenses: | | |
| Research and development | 1,605 | 1,215 |
| Sales and marketing | 9,150 | 5,697 |
| General and administrative | 1,762 | 1,407 |
| Total operating expenses | 12,517 | 8,319 |
| Operating loss | (5,381) | (3,379) |
| Interest income | 217 | 940 |
| Net loss | $ (5,164) | $ (2,439) |
| | | |
| Net loss per common share — basic and diluted | $ (0.25) | $ (0.12) |
| | | |
| Weighted average common shares outstanding — basic and diluted | 20,552 | 19,930 |

Stock-based compensation is included in operating expenses in the following categories:

| | 2009 | 2008 |
| --- | ---: | ---: |
| Cost of revenue | $ 18 | $ 14 |
| Research and development | 44 | 91 |
| Sales and marketing | 388 | 275 |
| General and administrative | 193 | 143 |
| | $ 643 | $ 523 |

Reconciliation of Quarterly Results
(in thousands, except per share amounts)
(Unaudited)

| | 2009 | 2008 |
|---|---|---|
| GAAP net loss | $ (5,164) | $ (2,439) |
| Stock based compensation | 643 | 523 |
| Non-GAAP net loss | $ (4,521) | $ (1,916) |
| Shares used in computing GAAP and non-GAAP loss per share | 20,552 | 19,930 |
| Non-GAAP loss per share | $   (0.22) | $   (0.10) |

TranS1 Inc.
Balance Sheets
(in thousands)
(Unaudited)

| | March 31, 2009 | Dec. 31, 2008 |
|---|---|---|
| **Assets** | | |
| | | |
| Current assets: | | |
| Cash and cash equivalents | $ 52,786 | $ 42,051 |
| Short-term investments | 19,269 | 35,215 |
| Accounts receivable, net | 5,447 | 4,812 |
| Inventory | 6,525 | 6,369 |
| Prepaid expenses and other assets | 602 | 632 |
| Total current assets | 84,629 | 89,079 |
| Property and equipment, net | 1,460 | 1,412 |
| Total assets | $ 86,089 | $ 90,491 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| | | |
| Current liabilities: | | |
| Accounts payable | $ 2,944 | $ 2,896 |
| Accrued expenses | 2,059 | 2,009 |
| Total current liabilities | 5,003 | 4,905 |
| | | |
| Stockholders' equity | | |
| | | |
| Common stock | 2 | 2 |
| Additional paid-in capital | 134,171 | 133,507 |
| Accumulated deficit | $ (53,087) | $ (47,923) |
| Total stockholders' equity | 81,086 | 85,586 |
| | | |
| Total liabilities and stockholders' equity | $ 86,089 | $ 90,491 |

TranS1 Inc.
Statements of Cash Flows
(in thousands)
(Unaudited)

| | Three Months Ended March 31, | |
| | 2009 | 2008 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $ (5,164) | $ (2,439) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 229 | 170 |
| Stock-based compensation | 643 | 523 |
| Allowance for excess and obsolete inventory | 35 | (1) |
| Provision for bad debts | 24 | 18 |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in accounts receivable | (659) | (317) |
| (Increase) decrease in inventory | (191) | 377 |
| (Increase) decrease in prepaid expenses | 30 | (31) |
| Increase (decrease) in accounts payable | 48 | 115 |
| Increase (decrease) in accrued expenses | 50 | (387) |
| Net cash used in operating activities | (4,955) | (1,972) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (277) | (420) |
| Purchases of investments | (2,973) | (33,150) |
| Sales and maturities of short-term investments | 18,919 | 9,825 |
| | | |
| Net cash provided by (used in) investing activities | 15,669 | (23,745) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock | 21 | 44 |
| | | |
| Net cash provided by (used in) financing activities | 21 | 44 |
| | | |
| Net increase (decrease) in cash and cash equivalents | 10,735 | (25,673) |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 |
| Cash and cash equivalents, end of period | $52,786 | $ 39,003 |

EX-99.2 3 a52356exv99w2.htm EX-99.2

**Exhibit 99.2**

TRANS1 INC (TSON)
Q1 2009 Earnings Call
04:30 PM April 27, 2009 ET

Operator: Good day and welcome to the TranS1, Inc. First Quarter 2009 conference call. Today's conference is being recorded. At this time, I'd like to turn the conference over to Mr. Mark Klausner, Investor Relations. Please go ahead, sir.

Mark R. Klausner, Managing Partner, Westwicke Partners

Thanks, operator. Joining us on today's call are TranS1's President and CEO Rick Randall and the company's Chief Financial Officer, Mike Luetkemeyer. If you do not have a copy of our press release, you can find it in the Investor Relations section of our website www.trans1.com.

Before we begin, I would like to remind you that this call is being webcast live and recorded. A replay of the event will be available later today on our website and will be available for at least 30 days following the call. I would also like to caution listeners that certain information discussed by management during this conference call will include forward-looking statements covered under the Safe Harbor Provision of the Private Securities Litigation Reform Act of 1995. Actual results could differ materially from those stated or implied by our forward-looking statements due to risks and uncertainties associated with the company's business. The company undertakes no obligation to update information provided on this call. For a discussion of risks and uncertainties associated with TranS1's business, I encourage you to review the company's filings with the Securities and Exchange Commission, including its annual report on Form 10-K for the year ended December 31, 2008.

With that, it's my pleasure to turn the call over to TranS1's President and CEO, Rick Randall.

Rick Randall, President and Chief Executive Officer

Thanks Mark. Good afternoon and thank you for joining us today to discuss TranS1's first quarter 2009 results. On today's call, I will discuss some of the key highlights of the quarter and Mike will provide you with the details of our financial results and our updated 2009 guidance. I then would like to share with you some additional perspective on the key operating trends in our business after which we will take your questions.

Worldwide, 889 TranS1 procedures were performed and we generated $8.7 million in revenue during the first quarter. Both of these numbers reflect significant increases in continued adoption from the prior quarter and comparable period a year ago. We also made good progress operationally in the first quarter. Our direct sales force continued to mature. We ended the quarter with 65 direct reps in the field and these reps had on average approximately 10 months on the job.

On the international front, we converted Germany to a direct sales effort in the quarter with the hiring of two direct reps and one sales manager. We continue to have good success with our two-level fusion product. 22% of our procedures in the quarter were two-level cases. We remain encouraged by the early adoption, clinical results and surgeon interest.

We continued investment in our targeted surgeon education programs, hosting three regional Association of Pre-Sacral Spine Surgeon's events in the quarter. We trained 82 physicians in the United States during the quarter and have continued to make progress in developing effective training programs to convert spine surgeon's to users of our products.

Additionally, as of quarter end we had trained a total of 205 of our existing surgeon users on the two-level procedure. We also continued to be visible at major medical meetings like the recent AANS/CNS and the upcoming SAS.

Additionally, we continue to make progress in developing the supporting clinical evidence to proactively work with commercial payors to prospectively cover our physician reimbursement. And lastly, we continued clinical trials of our next generation PNR product in Europe. And our device has been successfully implanted in 10 patient's to-date.

I would now like to turn the call over to Mike to review our financial results.

Mike Luetkemeyer, Chief Financial Officer

Thanks Rick and good afternoon everyone. I am pleased to report that in the first quarter of 2009 we generated revenue of $8.7 million. This compares favorably to our guidance of $7.5 million to $7.8 million and represents a 45% increase over the $6.0 million of revenue generated in the first quarter of 2008, as well as the sequential increase of 18% over the $7.4 million of revenue generated in the fourth quarter of 2008.

For the first quarter of 2009, we generated 95% of our revenue or $8.2 million in the United States. In the comparable period in 2008, we generated 87% or $5.2 million of our revenue in the United States. Primary factors driving the significant increase in revenue in the United States over the comparable quarter of 2008 were an increase in procedures performed and the introduction of our two-level procedure, which also drove an increase in average selling prices.

The sequential increase in revenue in the United States was driven by an increase in procedures performed. During the first quarter of 2009, 751 procedures were performed in the United States utilizing TranS1 products. This represents a 41% increase over the 533 procedures performed in the first quarter of 2008 and a sequential increase of 100 procedures or 15% over the 651 procedures performed in the fourth quarter of 2008.

Our average selling price in the United States for the first quarter of 2009, excluding standalone sales of our percutaneous facet screw system was $10,600. This represents an increase of $1,300 over the comparable quarter of last year and is consistent with the fourth quarter of 2008.

The increase in average selling price from the first quarter of 2008 was primarily driven by the continuing traction of our AxiaLIF 360 product and the introduction of our two-level procedure. For the first quarter of 2009, 261 of the 751 AxiaLIF procedures performed in the United States, or about 35% were AxiaLIF 360 procedures and 168 or about 22% were AxiaLIF two-level procedures.

As you may recall, we initially introduced the AxiaLIF two-level procedure in the United States in May of 2008 with a limited market release followed by a full market release in the fourth quarter of 2008.

For the first quarter of 2009, we generated revenue of $297,000 from the standalone sales of our percutaneous facet screw system compared with $266,000 in the first quarter of 2008. Gross margin was 82.2% in the first quarter of 2009, this compares to 82.6% in the first quarter of 2008.

Turning to expenses, total operating expenses for the first quarter of 2009 were $12.5 million, an increase of $4.2 million from $8.3 million for the first quarter of 2008. The increase in operating expenses for the quarter were primarily the result of higher sales and marketing cost of $3.5 million, due to the continued expansion of our direct sales force, increased commissions as a result of increased sales, and higher training and promotional expense. Other and interest income, which primarily consists of interest income, was $217,000 in the first quarter of 2009. This compares to $940,000 in the first quarter of 2008. The significant decrease in the first quarter other and interest income was primarily the result of rapidly falling interest rates and a conservative and very liquid nature of our investment portfolio.

Our GAAP net loss for the first quarter of 2009 was $5.2 million or $0.25 per share, and on a non-GAAP basis, adjusting for non-cash stock compensation charges of $643,000 in the quarter, our net loss was $4.5 million or $0.22 per share. This compares to our previously issued guidance for the first quarter on a GAAP basis of a loss of $0.30 to $0.32 per share, and on a non-GAAP basis of a loss of $0.25 to $0.27 per share.

At the end of the first quarter of 2009, we had $72.1 million in cash, cash equivalents and short-term investments with no debt. Our operating cash burn for the first quarter, defined as cash used in operating activities and investment in fixed assets, was $5.2 million.

With regard to guidance, we anticipate revenue for the second quarter of 2009 to be in the range of $8.7 million to $9.0 million, based on estimated average shares outstanding for the quarter of approximately 20.6 million, the

GAAP loss per share to be in the range of $0.33 to $0.35, and the non-GAAP loss per share to be in a range of $0.28 to $0.30.

For the total year 2009, we are narrowing our revenue guidance and now expect revenue to be in the range of $34.0 million to $36.0 million and based on estimated average shares outstanding for the year of approximately 20.6 million, the GAAP loss per share to be in the range of $1.29 to $1.35 per share, and non-GAAP loss per share to be in the range of $1.08 to $1.14 per share.

Rick, back to you.

Rick Randall, President and Chief Executive Officer

Thanks Mike. Before we open the call up for questions, I'd like to spend a few minutes providing some details on the key operating trends from the quarter. As we shared with you on our last two calls, our historical data demonstrates that sales productivity per rep increases along a pretty consistent curve, and it takes a new rep approximately 18 to 20 months to achieve a $1.0 million revenue run-rate.

As our direct sales force has matured, they have continued to perform in line with this expected maturity curve. We added 12 new reps in the quarter and ended the quarter with 65 direct reps in the field. These reps had, on average, approximately 10 months on the job. As we progress through 2009, we continue to expect to expand our direct sales force to 80 reps by the end of the calendar year.

In addition, we intend to add six clinical support specialists to assist our direct reps with case coverage. As we've discussed before, some of the new reps we are hiring will move into territories – well in the new territories, while others will be placed into territories to support a fully productive rep.

We have begun applying this team approach successfully in a few markets, like Los Angeles, where we had one of our most productive reps, whose ability to sell new accounts was constrained by both the size of his geographic territory and the amount of time he was spending in the OR, covering cases.

We have added two new reps in this market, to work with him to help manage the diverse geography of the LA market, and to assist with case coverage. This has allowed our experienced rep to spend more time selling new accounts and our new reps have benefited from learning how to convert surgeons to our procedure from a very experienced mentor.

We are hopeful that this measured expansion will allow us to continue to expand our footprint, further penetrate our more mature and geographically diverse markets, as well as, build a bench of experienced sales reps to mitigate any disruption from potential turnover.

On the international sales front, while we still primarily sell through distributors we are in the process of converting to a direct model in Germany, one of the most important device markets in Europe. We currently have two direct reps and a sales manager in the market.

Turning to surgeon training and education, I am pleased to report that we hosted the first three regional association of Pre-Sacral Spine Surgeon events in the first quarter in New York, Utah and Florida, and recently completed our fourth and fifth APSS events in Illinois and North Carolina.

Additionally, we will host our first international APSS in London this week in conjunction with the SAS meeting. The turn out for these events has been strong and we are encouraged by the follow through we are seeing in the market. we intend to host the second annual national APSS in the fall. Along with events like APSS, we trained 82 new physicians in the United States during the quarter on our products. We also trained an incremental 49 of our existing surgeons on the two-level procedure, bringing the total trained to 205.

As of the end of the quarter, more than 50% of the surgeons who had been trained on the two-level procedure had already completed their first case. As we see increased application of our two-level procedure in the market, we

continue to benefit from our surgeon sharing their best practices in terms of patient selection, preoperative planning and technique.

On the reimbursement front, we remain diligent about helping our surgeons obtain appropriate reimbursement for our procedure. We have an 800 number and call-in resource center, up and running to assist surgeons with reimbursement issues that may arise.

We have also added two additional reimbursement specialists in the field to work with our surgeon customers and their billing specialist, to help them determine the appropriate coding for the fusion procedures they are performing. As our strong case volume this quarter would suggest, we have not seen a drop off in procedure volumes as a result of the current weak economic conditions. Having said that, we have begun to see some insurance companies raising the bar on whether to pay for fusion surgery in general or asking more patients to get a second opinion, before agreeing to cover the procedure.

As a result, we have seen some insurance-related postponements and delays. We do not believe that this is a cause for any significant concern and are convinced that our procedure with its minimally invasive approach, low complication rating, quick recovery time remains an attractive option for both patients and payors. We are continuing to see the AxiaLIF procedure discussed at major medical meetings. At the AANS/CNS meeting in Phoenix in March, we were featured in two instructional learning workshops and in nine posters. Additionally, at the SAS meeting in London this week, our procedure will be featured in two oral presentations and four posters.

Separately, our procedure was discussed in a peer-reviewed article published in the Internet Journal of Neurosurgery, which concluded that AxiaLIF in conjunction with pedicle screw placement was a feasible and safe minimally invasive technique for L5-S1 fusion and is associated with good clinical outcomes. This article along with future articles will be used as we work with commercial payors to prospectively cover our physician reimbursement.

Finally, the Phase 1 single-center feasibility study of our next generation PNR product in Europe continues to progress nicely and our surgeon investigator has implanted devices in 10 patients' to-date, which completes the enrollment in this phase of the study. Based on the preliminary results from this trial we are expanding this trial to two new centers and plan to treat 20 additional patients. This would lead to a pivotal study in Europe, which is targeted to begin in late 2009. We continue to expect that we will receive CE Mark for the PNR in 2010. I look forward to updating you on our progress as we move this product through trials.

Before I open the call up for questions, I'd like to share my anecdotal perspective on surgeon adoption. It is beginning to feel to me that the fresh threshold for adoption is reducing overtime, as the procedure becomes more accepted by mainstream surgeons. We are finally beginning to see a broader group of surgeons incorporate our procedure in their practices and change their practice patterns.

As an example, at one of our recent APSS meetings, one of our surgeons discussed how his success with our procedure has led him to change his treatment protocol for patients with low back pain. Rather than performing multiple surgeries like discectomies in an attempt to relieve acute pain in the near term, he shared that he is now utilizing AxiaLIF more as a frontline therapy not only to treat back pain but also to arrest the disease cascade.

He further shared that he believes that in this way he is getting better results and providing his patients with a better long-term quality of life. In follow-up discussions, other experienced AxiaLIF surgeons in the audience echoed his sentiment. I am optimistic that sentiment like this is not only a harbinger of increasing adoption, but also a market expansion as our procedure is used as a definitive treatment for patients with earlier stage disease.

I'd now like to open the call for questions.

Operator: And we'll take our first question from Doug Schenkel with Cowen and Company.

Q – Doug Schenkel

Hi, good afternoon and thanks for taking my question.

A – Mark Klausner

Hi Doug.

Q – Doug Schenkel

Hi, if my math is correct, I believe about 20 to maybe 25% of trained surgeons in the U.S. are now trained on the two-level procedure. So first off, I just want to make sure that's right. And the, and moving beyond that, I think last quarter, you talked about how a lot of training efforts have been targeted at getting existing TranS1 surgeons trained on the two-level and that this to some degree has come at the expense of training new surgeons from a bandwidth standpoint.

I was just wondering, beyond giving us an update on the percentage of surgeons trained on the two-level, if you could provide an update on the dynamic of focusing more on training two-level surgeons versus new surgeons and whether this is having an impact, and in terms of I guess what you call backlog and demand for first time training.

A – Mike Luetkemeyer

Hi, Doug, it's Mike. If you look at the number of physicians that we have trained in the U.S. since commercialization; that's now a little over a 1,000, it's about through the end of last quarter about a 1,038 and we had trained 205 of those surgeons on the two-level product. Now probably more importantly than how many we've trained to-date is "what's the current active surgeon base?" And that's – we ended the quarter at 365 surgeons in the U.S. that were in the current active surgeon base and frankly that 205 is a subset of the 365. And as Rick said, more than half of the ones that we've trained – the surgeons that we've trained on the two-level have already performed their first case.

And no, I don't think that training existing users on the two-level is constricting our ability in any significant way to train new surgeons. So I think we have the bandwidth and the capacity to do both.

A – Rick Randall

Yes Doug, I would further add that I believe as our sales force does mature and gains more experience then the sales management team obviously directs these folks to our best practices, that I believe we are getting more efficient in training the right surgeons. It's not good enough just to train someone and put that notch on your gun stock.

What's most important is we want to move these surgeons to treatment. And so I think our group in general again as they gain more experience are better targeting surgeons. I think the quality as I alluded to in the presentation, the quality of the surgeons that we are starting to find interested in this product they are no longer as much tire kickers as people intent on actually bringing this operation into their practice. So I would look forward to seeing a higher hit rate so to speak on surgeons and a higher quality of surgeon that we train.

Q – Doug Schenkel

Okay that's helpful. And then maybe segueing to the reps you're hiring to get a better hit rate and training. You reaffirmed your goal of getting the 80 reps by year end. Looks like that's tracking, at least the plan if not maybe ahead of plan. In terms of beyond this year is 80 kind of the right number to be thinking about in terms of what you need to hit your long-term plans or at least your next two to three year plans or would you assume some ramp beyond the 80 this year?

A – Mike Luetkemeyer

Doug as we speak we are starting to look very closely and at the map and our growing business and we are plotting out the future growth. We've not yet finalized that but I think we'll have a solid plan for next year probably by the end of this coming quarter.

Having said that and having participated in those meetings. I don't think 80 is the final number, but I don't think you're going to see a constant acceleration or ramp as you've seen it in the past. There is basically two things that our sales person has to do. They have to obviously sell a surgeon, train a surgeon and then secondly, they have to in the culture of spine surgery attend every one of those spine surgeries where the product is used. As you and I have discussed in the past that's expected.

Now having said that, as we grow the business if there is a geographic constrain or we look at a territory and realize that our rep as we alluded to in LA is being constrained both by geography and also by cases. It would be prudent to

JA-199

add more team members in the form of a clinical sales specialist to further penetrate that market. However, we have other markets and I'll point to Ohio, where I think, our geographic distribution of our CSM Group is actually fairly well established and doesn't need to change. On the other hand, a couple of those reps are now starting to push up against that number where we start to see their available time to sell, pinched a little bit.

So they are the proper investment and the plan going forward is to add head count in kind of a clinical specialist form, people that are used to cover cases and that's so much your higher priced sales people.

So I think, overtime, what you're going to see is we will continue to add in those geographic areas where there is an opportunity more clinical sales people and then you'll also see a lower cost case coverage type person added in other territories where that's the major constraint that we have.

Q – Doug Schenkel

Okay. And one last question and then I'll get back in the queue. Clearly your results in the quarter came in ahead of your guidance. If I was going to pick on anything, it looks like, your gross margin was down year-over-year, and as well as sequentially, and your R&D ticked up a decent amount in dollar term sequentially. Can you just give us some color on Q1 spend and how to think about COGS and R&D spend moving forward?

A – Mike Luetkemeyer

Doug, this is Mike. Our long-term gross margin rate, I think, has settled in at about 82 to 83%. I think that for the foreseeable future that is a gross margin that we can sustain. In any given quarter, there are going to be small movements around that center. In this quarter, we happen to have a couple of onetime charges that depressed the gross margin below the midpoint of that 82 to 83. Next quarter we may have a couple of onetime benefits that move it slightly above. But I'm pretty confident that we're going to be able to maintain a gross margin in the range of 82 to 83% as we move through the year.

R&D really didn't tick up all that much; I think it was up about 300,000 quarter-over-quarter, when you look year-over-year and most of that was legal expenses associated with either developing or enhancing our intellectual property portfolio, and maybe 100,000 of it – about 200 was that and about 100,000 of it was R&D projects, about 125,000.

Q – Doug Schenkel

Okay. Great. Thanks again and good quarter.

A – Rick Randall

Thanks Doug.

Operator: We'll take our next question from Matt Miksic with Piper Jaffray.

Q – Matt Miksic

Hi. Can you hear me, okay?

A – Rick Randall

Yes, Matt.

Q – Matt Miksic

Hi. Thanks for taking the question. So I guess, it looked like you saw again a little bit of sequential improvement here and Rick over the last couple of quarters, you've pulled together some metrics on how to measure the business and when reps will be able to deliver, what levels of revenue. Can you – is it too early to think that you need to tweak those a little bit or what you're seeing – is what we're seeing here just is maybe the benefit of these meetings that are layered on top of the model that you already had in place?

A – Rick Randall

That's a good question. I do believe it is a little too early to tweak those metrics a little bit. I'm just pleased that measurements we put in place are holding. However, I do believe, as we learn from some of the things we're doing

JA-200

in the field like this team model, I think what we're seeing very early on is where we've employed that model, we have tweaked those metrics in those areas.

Again, you're adding new people and teaming them up with a very experienced person in a market where, obviously, there is business. That gives you a lot more momentum than if we pick a geography where we just don't have anyone and we pop a new person in and they are kind of again isolated out there, which is sometimes unavoidable, and so, the more of our – as we expand and we do more of this team building type expansion model, hopefully the metrics will come in line, but I am not going to make that claim until it's measurable and more per basis.

A – Mike Luetkemeyer

Yes. Matt the early results are good. I think it's a little too early to say that we have shifted the productivity curve, certainly that's the goal through some of the programs that Rick talked about, and we will come back to you guys when the data supports telling you we've been able to shift the curve. But it's too soon to declare a victory.

Q – Matt Miksic

Okay. Yes, I think that's wise. And then the other question I had was around just the interest getting from surgeons, a fair amount of interest, obviously for any MIS type procedure that has faster recovery times and lower blood loss and all the things that maybe some of the other approaches would argue that they provide as well. Is there any other – is there any change in what's driving docs interest here in the procedure? Specifically I am wondering, with everything that's going on with the economics behind a lot of these procedures and the cost that might be taken out by an MIS procedure, is that starting to come up at all or are we still – is it still too early for that to be actually something that makes docs interested in one procedure over another?

A – Rick Randall

Matt, it is coming up, but again it's not yet a mainstream topic or point of discussion. Two weekends ago, I was at the North Carolina APSS meeting and one of the or actually two of the surgeon speakers, who both by the way are well over 100 procedures, AxiaLIF procedures under their belt, commented on how in this economy they are actually seeing more patients find their way to the operating room – their operating room, because patients do not want to and do not feel – many patients do not feel they can afford to take three months off at their job at the current time. So, once they've established themselves, especially established themselves in the referral community they view this as a benefit.

The other comment one of them made is, his practice is now almost exclusively moved to workers' comp, same kind of issue. The case workers are trying to get these people back to work and in this economy, that's even more important than ever before and probably in this economy, more people are motivated to get fixed and get back to work. So, when you match it up with a case worker, who knows they had other patients who have responded so quickly to an operation and gotten back to their jobs so quickly, and now you have a more motivated workers' comp patient load, those surgeons who are established in the market with this operation, where you've been able to establish that kind of a feedback loop are starting to see the benefit.

But again, we were at on a global basis is, we're still pretty early in that, but that's a nice story to have told in front of 30 other surgeons who aren't quite looking at it that way.

Q – Matt Miksic

Alright. And then finally just on the sales force, you've gone – again it's a situation where you've gone through a significant it seems like a significant change in the last 12, 18 months in terms of the types of reps. I'm wondering, are you – what's the interest level, I guess what kind of candidates are you seeing? I would imagine six months ago or eight months ago you may not have been seeing as many or the types of candidates you are seeing now. Can you talk at all about that?

A – Rick Randall

Yes. Two weeks ago we had a sizable sales training group here in Wilmington. And our Director of Professional Education Larry Foster who really put our whole sales training program together almost three years ago. And has been very closely involved with training and working with every representative that we basically hired, I'd say in the last two and a half years.

He has commented to me actually over the span of the last two training classes how impressed he is with the quality of people that we are now attracting to this company. I think, that's to be expected. It's a function of the technology is becoming more accepted, we're growing. The revenues are growing, and good salespeople want great technologies. In concurrent with that, there is a few technologies that are kind of hitting the wall due to capital equipment demands or whatever the effects of the current economy, and they kind of like the fact that we don't have those constraints and we are seeing nice growth.

So I do think in general we're pleased with the people we have and I think the quality continues of experience that we've been able to attract continues to move in the right direction.

Q – Matt Miksic

Okay. And that's helpful. Thank you, Rick.

A – Rick Randall

Thank you.

Operator: We'll go next to Vincent Ricci with Wachovia.

Hi, guys. Some good questions on the sales approach, and I'd just like to piggyback a little bit on that. You know, your SG&A has kind of popped up heavier – your sales at this point, and you have explained to us in pretty detailed fashion. How you're expanding the force, but can you talk to us how you get that force profitable, and how do you get some good leverage out of that both from your present portfolio and things you may have to add to get more revenue out of each rep?

A – Mike Luetkemeyer

Well, this is Mike. We are – we did reiterate on this call that we plan to take the rep force to 80 by year-end and somebody else mentioned earlier that it looks like we're either at or ahead of that plan. And we are running a little bit ahead of plan. Hopefully, we can get to 80 reps sooner rather than later this year. This, as Rick alluded earlier, will be the last year of wholesale adds in the sales force. Going forward, we hope to get and intend to get some pretty significant leverage out of the existing sales force and the incremental adds that we put in markets opportunistically along with the less expensive clinical support specialists to support the growing case volume.

This should be the year that the cash burn is the highest for the company. I've said before, and I think, I said on the last call that we expect this year to burn in the range of $25.0 to $26.0 million in cash, and then it should start to come down in 2010 as we get the leverage out of the existing trained sales force and slow down on the adds. And we, Rick and I, look each other in the eye from time to time and say our goal is still to become breakeven and turn the corner on profitability and cash flow from operations at about a $100.0 million run-rate. And we still firmly have the goal to be able to do that with the cash that we have on hand, we have no intention of going back to the market for incremental funding to get to that breakeven level.

A – Rick Randall

Vince, I think further, to further add to that, the meetings we've been having in modeling out 2010 and beyond, we've actually called those meetings the road to profitability. It started in March it had to be, like the road to whatever. March madness season, right. So the road to the final four, we had the road to profitability. It's very important to us to do that. And we feel especially with this more and more direct model that we have in our sales distribution channel that we can spend the appropriate dollars on the appropriate activity.

And it's simply to me, it goes back to, case coverage should not cost us, what it cost us to sell new surgeons. And as we develop out this infrastructure on the sales side, you'll start to see it blossom into kind of a multifunctional group. And we're all looking at a higher return on that investment overtime.

And then obviously, the last thing is we're constantly looking for new technologies, new things that we can add into the existing procedures that we service. We know that when a surgeon passes by 50 or 60 cases, they really start to open up their clinical indications and we see their numbers grow. That's more revenue for the same amount of time spent with that surgeon. Now as we add more products like we did with the two-level, and hopefully, other products that we can bring on board, we will get more of a – or a higher ASP that will help leverage that investment as well.

So, that's the direction we're heading and it's a people and product proposition that will allow us to really gain leverage of this investment where we continue to make.

Okay, I really appreciate that. And can you just remind us with the present product portfolio that you have approved in the US, how may cases per month a rep has to do, to be breakeven or profitable?

A – Mike Luetkemeyer

Well, we have talked about it in terms of when a rep gets to $0.5 million annualized run rate in revenue and when they get to $1.0 million annualized run rate in revenue. And remember we've said that at 12 months the average rep on the productivity curve is doing about four cases a month and that equates to about $0.5 million revenue run rate and then it takes about 18 to 20 months to get that rep up to the eight cases per month, which is about $1.0 million annualized run rate in revenue. We really haven't talked about what that does in terms of breakeven. But, you can do the math if we – when we get to a $100.0 million run rate we fully intend to be at breakeven.

Okay, great. Can we also just talk a little bit about your surgeon base? What is kind of the split from neurosurgeons versus orthopedics? And when you guys are approaching these different surgeon bases and do the discussions differ in their concerns or are they similar, can you just describe that to us for a little bit?

A – Rick Randall

Yes. The split is just about 50/50. I think there is a little bit of a – I think we have a little more business with the neurosurgery community in general. And it's very interesting, because I think to generalize the neurosurgeon adopts this technology a little bit more readily than the orthopedic surgeon. I think neurosurgeons have more of a historical background and through their cranial work on minimally invasive techniques and tend not to do the ALIF as much. They tend to go in through the back. So for those reasons they've adopted this a little more readily than the orthopedic surgeon, that's the pro.

The con is that as we gain adoption what the – what surgeons eventually learn is that when they put in our implant and they distract that disk space that both the back pain and the leg pain, that's caused by the compression of the nerves as that disk is collapsed and forced pressure, bone pressure around the nerves, that that leg pain is alleviated, typically alleviated as well just by the placement of the implant. Neurosurgeons are taught that the way you decompress a nerve, is you go open, you open the back and open up the frame and you basically do a decompression.

So if a patient had both leg and back pain, a neurosurgeon would be more inclined to do a more open operation, because they need to do that decompression. Whereas an orthopedic surgeon having done typically many ALIFs they understand that when you do that indirect decompression, that often times the leg pain goes away and frankly they don't like in general, messing around in the back near the nerves.

So what I just told you is that, neurosurgeons tend to be early adopters for us, but to expand their indications to the full complement of types of patients who truly benefit from this operation, patients with both leg and back pain, they typically take a little bit longer, more cases to work them there.

Orthopedic surgeons are typically a little more difficult to get into the game, but once we get them there we can expand those indications in general, more rapidly.

Okay, great. And lastly you touched upon some insurance push back in this environment, I was hoping you could expand upon that a little bit for us? And further we're seeing in the device community, a lot more request for clinical effectiveness data, cost effectiveness data. Just curious your guys take is on that and any efforts you might have underway to better make your case with payors as you go through this entire reimbursement process?

A – Rick Randall

Sure. Every time a case is scheduled, we're aware of it and every time a case is canceled or postponed, we're aware of it. And we ask our representatives to find out why and that's entered into our data base. So, on a daily basis, you can kind of look at that ledger and see what's going on and over the years, we've been doing this from day one.

JA-203

You kind of develop a sense as to why typically cases may be canceled or postponed. And the insurance wasn't high up there as a reason why, and I would say over the last year, we've seen it become more and more of a reason, I would say in the last couple of quarters, we've seen that patients have been denied because they didn't get a second opinion or they didn't have instability along with their back pain, things that we typically did not see a year or two years ago. So there clearly in our view seems to be a higher threshold for some of these insurance companies. I think in general, they're forcing the patients to do a little more work to make it a little more clear cut as to why that surgery ought to be authorized. And I just think we're seeing a little bit more of that than we have in the past.

A – Mike Luetkemeyer

And it's not specific to our procedure. It's more general to having a fusion surgery approved, needing to get a second opinion to support the need for fusion. Not specific to our procedure, but more general to the fusion procedure.

A – Rick Randall

Now, specific to our procedure, obviously, as you know Vince, we had the category-three code put in place in January and that was a change in coding. We've actually put out a coding guide now, which has been blessed by everyone. And coding fusions is fairly complex and what we saw initially with the category-three code was right away a lot of coders in the practice went to the concern that like the Charité disc they are just not going to get paid.

And the reality is, as we've discussed in the past this access code is one of several codes that they employ during a typical fusion. So we have had – I would say our coding issues have been grassfires not forest fires, and so, this flares up. A coder becomes concerned, because they see a category-three code. And we either work through the rep or we work through the hotline, or now we've actually, as I mentioned, brought on a couple of field related personnel, who had worked by the way at St. Francis where they knew category-three code inside and out Saint Francis Medical. Those people are then, if needed, deployed and we put these fires out.

I don't think we've had many instances, if any, where we just have surgeon stop doing this, but often times there is a concern when they see the category-three code, we need to work with them and once they understand the coding sequence, based on the particular operation that that surgeon does, we move through the process. So, that's why we proactively hired these folks. And now, the plan going forward is as we bring in new surgeon on by having field base, personnel to deal with this matter. We can actually have those personnel meet with the coders before the surgeon even treats patients with AxiaLIF, so that we don't even have the little flash fire to deal with.

Okay, great. Thanks for taking my questions.

A – Rick Randall

Thank you.

Operator: And that does conclude our question-and-answer session. At this time, I'd like to turn everything back over to you Mr. Randall for any additional or closing remarks.

Rick Randall, President and Chief Executive Officer

Thank you. Let me close by thanking all of you for taking the time to join us on our call today. The continued maturation of our sales force, which has led to an uptick and adoption in usage has me increasingly enthusiastic about our market opportunity. We sincerely appreciate your interest in TranS1 and look forward to updating you on our continued progress.

Operator: That does conclude today's conference. Thank you for your participation.

# Exhibit 4

Case 7:12-cv-00023-F   Document 33-5   Filed 09/07/12   Page 1 of 22

Table of Contents

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 10-Q

☑  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2009

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period _____ to _____

Commission File Number 001-33744

# TRANS1 INC.

(Exact name of Registrant as specified in its charter)

| **DELAWARE** | **33-0909022** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |

**411 LANDMARK DRIVE, WILMINGTON, NC 28412-6303**
(Address of principal executive office) (Zip code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐   Accelerated filer ☑     Non-accelerated filer ☐       Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The number of shares of the registrant's common stock outstanding as of May 4, 2009 was 20,561,608 shares.

TRANS1 INC.
FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2009
TABLE OF CONTENTS

## PART I. FINANCIAL INFORMATION

**Item 1. Financial Statements** (unaudited)
    Statements of Operations     1
    Balance Sheets     2
    Statements of Cash Flows     3
    Notes to Financial Statements     4
**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**     8
**Item 3. Quantitative and Qualitative Disclosures About Market Risk**     14
**Item 4. Controls and Procedures**     14

## PART II. OTHER INFORMATION

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**     15
**Item 6. Exhibits**     15

**SIGNATURES**     16

**EXHIBIT INDEX**     17
    **Exhibit 31.1**
    **Exhibit 31.2**
    **Exhibit 32.1**
    **Exhibit 32.2**
    EX-31.1
    EX-31.2
    EX-32.1
    EX-32.2

Table of Contents

**PART I. FINANCIAL INFORMATION**
**Item 1. Financial Statements.**

### TranS1 Inc.
### Statements of Operations
### (in thousands, except per share amounts)
### (Unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| Revenue | $ 8,678 | $ 5,978 |
| Cost of revenue | 1,542 | 1,038 |
| Gross profit | 7,136 | 4,940 |
| | | |
| Operating expenses: | | |
| Research and development | 1,605 | 1,215 |
| Sales and marketing | 9,150 | 5,697 |
| General and administrative | 1,762 | 1,407 |
| | | |
| Total operating expenses | 12,517 | 8,319 |
| | | |
| Operating loss | (5,381) | (3,379) |
| | | |
| Interest income | 217 | 940 |
| | | |
| Net loss | $ (5,164) | $ (2,439) |
| | | |
| Net loss per common share — basic and diluted | $ (0.25) | $ (0.12) |
| | | |
| Weighted average common shares outstanding — basic and diluted | 20,552 | 19,930 |

The accompanying notes are an integral part of these financial statements.

1

Table of Contents

**TranS1 Inc.**
**Balance Sheets**
**(in thousands)**
**(Unaudited)**

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 52,786 | $ 42,051 |
| Short-term investments | 19,269 | 35,215 |
| Accounts receivable, net | 5,447 | 4,812 |
| Inventory | 6,525 | 6,369 |
| Prepaid expenses and other assets | 602 | 632 |
| Total current assets | 84,629 | 89,079 |
| Property and equipment, net | 1,460 | 1,412 |
| Total assets | $ 86,089 | $ 90,491 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,944 | $ 2,896 |
| Accrued expenses | 2,059 | 2,009 |
| Total current liabilities | 5,003 | 4,905 |
| Stockholders' equity | | |
| Common stock | 2 | 2 |
| Additional paid-in capital | 134,171 | 133,507 |
| Accumulated deficit | (53,087) | (47,923) |
| Total stockholders' equity | 81,086 | 85,586 |
| Total liabilities and stockholders' equity | $ 86,089 | $ 90,491 |

The accompanying notes are an integral part of these financial statements.

2

JA-209

Table of Contents

TranS1 Inc.
Statements of Cash Flows
(in thousands)
(Unaudited)

| | Three Months Ended March 31, | |
| | 2009 | 2008 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | $ (5,164) | $ (2,439) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 229 | 170 |
| Stock-based compensation | 643 | 523 |
| Allowance for excess and obsolete inventory | 35 | (1) |
| Provision for bad debts | 24 | 18 |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in accounts receivable | (659) | (317) |
| (Increase) decrease in inventory | (191) | 377 |
| (Increase) decrease in prepaid expenses | 30 | (31) |
| Increase (decrease) in accounts payable | 48 | 115 |
| Increase (decrease) in accrued expenses | 50 | (387) |
| Net cash used in operating activities | (4,955) | (1,972) |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (277) | (420) |
| Purchases of investments | (2,973) | (33,150) |
| Sales and maturities of investments | 18,919 | 9,825 |
| Net cash provided by (used in) investing activities | 15,669 | (23,745) |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 21 | 44 |
| Net cash provided by financing activities | 21 | 44 |
| Net increase (decrease) in cash and cash equivalents | 10,735 | (25,673) |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 |
| Cash and cash equivalents, end of period | $ 52,786 | $ 39,003 |

The accompanying notes are an integral part of these financial statements.

3

Table of Contents

**TranS1 Inc.**
Notes to Financial Statements
(Unaudited)

#### 1. Description of Business

TranS1 Inc., a Delaware corporation (the "Company"), was incorporated in May 2000 and is headquartered in Wilmington, North Carolina. The Company is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. The Company operates in one business segment. The Company has developed and currently markets two single-level fusion products, AxiaLIF® and AxiaLIF 360°™, and a two-level fusion product, the AxiaLIF 2L™. All of the Company's products are delivered using its pre-sacral approach. The AxiaLIF product was commercially released in January 2005 and the AxiaLIF 360° product was commercially released in July 2006. The AxiaLIF 2L™ product was commercially released in Europe in the fourth quarter of 2006 and in the United States in the second quarter of 2008. The Company generates revenue from the sale of implants and procedure kits. The Company sells its products directly to hospitals and surgical centers in the United States and certain European countries, and to independent distributors elsewhere.

The Company owns two trademark registrations in the United States and four trademark registrations in the European Union. The Company also owns nine pending trademark applications in the United States, three pending trademark applications in the European Union and six pending trademark applications in Canada.

The Company is subject to a number of risks similar to other companies in the medical device industry. These risks include, without limitation, rapid technological change, uncertainty of market acceptance of our products, uncertainty of regulatory clearance or approval, competition from substitute products and larger companies, the need to obtain additional financing, compliance with government regulation, protection of proprietary technology, product liability, and the dependence on key individuals.

#### 2. Basis of presentation

The Company has prepared the accompanying financial statements in conformity with accounting principles generally accepted in the United States of America for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). The financial statements are unaudited and reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of the Company's management, necessary for a fair statement of the Company's financial position, results of operations and cash flows. These principles require management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The principal estimates relate specifically to accounts receivable reserves, inventory reserves, stock-based compensation, accrued expenses and income tax valuations. Actual results could differ from those estimates. Operating results for the interim periods presented are not necessarily indicative of the results that may be expected for the

4

JA-211

Table of Contents

full year. The year end balance sheet data was derived from audited financial statements, but does not include all disclosures required by accounting principles generally accepted in the United States.

**Impact of Recently Issued Accounting Standards**

In February 2008, the Financial Accounting Standards Board, or FASB, issued Staff Position No. FAS 157-2, which delayed the effective date of Statement of Financial Accounting Standards No. 157, "Fair Value Measurements", for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. The Company adopted SFAS 157 for its non-financial assets and non-financial liabilities on January 1, 2009, and it did not have a material impact on the Company's financial statements.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on the Company.

**3. Income taxes**

No provision for federal or state income taxes has been recorded as the Company has incurred net operating losses since inception.

**4. Loss per share**

Basic net loss per common share ("Basic EPS") is computed by dividing the net loss by the weighted average number of common shares outstanding. Diluted net loss per common share ("Diluted EPS") is computed by dividing the net loss by the weighted average number of common shares and potential dilutive common share equivalents then outstanding. The Company's potential dilutive common shares, which consist of shares issuable upon the exercise of stock options, have not been included in the computation of diluted net loss per share for all periods as the result would be anti-dilutive.

The following table sets forth the potential shares of common stock that are not included in the calculation of diluted net loss per share as the result would be anti-dilutive as of the end of each period presented:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2009 | 2008 |
| Weighted average stock options outstanding | 2,264,005 | 2,357,387 |

**5. Cash, Cash Equivalents and Investments**

The Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents. Cash and cash equivalents include money market funds and commercial paper. Short-term investments consist of corporate notes, certificates of deposit and U.S. government securities.

5

**Table of Contents**

At March 31, 2009, the Company holds certain assets that are required to be measured at fair value on a recurring basis. These assets include available for sale securities classified as cash equivalents and short-term investments. SFAS 157 requires the valuation of investments using a three tiered approach, which requires that fair value measurements be classified and disclosed in one of three tiers. These tiers are: Level 1, defined as quoted prices in active markets for identical assets or liabilities; Level 2, defined as valuations based on observable inputs other than those included in Level 1, such as quoted prices for similar assets and liabilities in active markets, or other inputs that are observable or can be corroborated by observable input data; and Level 3, defined as valuations based on unobservable inputs reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants.

At March 31, 2009, all available for sale securities are classified as Level 1 assets with a fair value of $71.7 million, which included money market funds of $52.5 million and short-term investments of $19.3 million. At December 31, 2008, all available for sale securities were classified as Level 1 assets with a fair value of $76.8 million, which included money market funds of $41.6 million and short-term investments of $35.2 million. The Company had no Level 2 or Level 3 assets or liabilities at March 31, 2009 or December 31, 2008.

### 6. Accounts receivable, net

The following table presents the components of accounts receivable:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | (In thousands) | |
| Gross accounts receivable | $ 5,632 | $ 5,005 |
| Allowance for uncollectible accounts | (185) | (193) |
| Total accounts receivable, net | $ 5,447 | $ 4,812 |

### 7. Inventories

The following table presents the components of inventories:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | (In thousands) | |
| Finished goods | $ 3,151 | $ 2,598 |
| Work-in-process | 2,934 | 3,334 |
| Raw materials | 440 | 437 |
| Total inventories | $ 6,525 | $ 6,369 |

### 8. Accrued Expenses

The following table presents the components of accrued expenses:

6

Table of Contents

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | (In thousands) | |
| Commissions | $ 1,063 | $ 1,178 |
| Bonus | 268 | 270 |
| Vacation | 259 | 163 |
| Legal and professional fees | 239 | 69 |
| Other | 230 | 329 |
| Total accrued expenses | $ 2,059 | $ 2,009 |

7

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read in conjunction with our financial statements and the related notes to our financial statements included in this report. In addition to historical financial information, this report contains forward-looking statements that have been made pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 and concern matters that involve risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements. All statements other than statements of historical fact contained in this report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should" or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Readers are urged to carefully review and consider the various disclosures made by us, which attempt to advise interested parties of the risks, uncertainties, and other factors that affect our business, operating results, financial condition and stock price, including without limitation the disclosures made under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report and in the financial statements and notes thereto included elsewhere in this report, as well as the disclosures made under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Risk Factors", "Financial Statements" and "Notes to Financial Statements" included in our Annual Report on Form 10-K for the year ended December 31, 2008. Furthermore, such forward-looking statements speak only as of the date of this report. We expressly disclaim any intent or obligation to update any forward-looking statements after the date hereof to conform such statements to actual results or to changes in our opinions or expectations. References in this report to "TranS1", "we", "our", "us", or the "Company" refer to TranS1 Inc.*

**Overview**

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using this pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the degenerative disc. We developed our pre-sacral approach to allow spine surgeons to access and treat degenerative lumbar discs without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, short procedure times, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market in the United States and Europe two single-level fusion products, AxiaLIF and AxiaLIF 360°, and a two-level fusion product, the AxiaLIF 2L. All of our products are delivered using our pre-sacral approach.

8

**Table of Contents**

From our incorporation in 2000 through 2004, we devoted substantially all of our resources to research and development and start-up activities, consisting primarily of product design and development, clinical trials, manufacturing, recruiting qualified personnel and raising capital. We received 510(k) clearance from the U.S. Food and Drug Administration, or FDA, for our AxiaLIF product in the fourth quarter of 2004, and commercially introduced our AxiaLIF product in the United States in the first quarter of 2005. We received FDA 510(k) clearance for our AxiaLIF 360° product in the United States in the third quarter of 2005 and began commercialization in the United States in the third quarter of 2006. We received a CE mark to market AxiaLIF in the European market in the first quarter of 2005 and began commercialization in the first quarter of 2006. For AxiaLIF 360°, we received a CE mark in the first quarter of 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2006 and began commercialization in the European market in the fourth quarter of 2006. We received FDA 510(k) clearance for our AxiaLIF 2L product and began marketing this product in the United States in the second quarter of 2008. We currently sell our products through a direct sales force, independent sales agents and international distributors.

We rely on third parties to manufacture most of our products and their components. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which allows us to compete with larger volume manufacturers of spine surgery products.

Since inception, we have been unprofitable. As of March 31, 2009, we had an accumulated deficit of $53.1 million.

We expect to continue to invest in creating a sales and marketing infrastructure for our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L products in order to gain wider acceptance for these products. We also expect to continue to invest in research and development and related clinical trials, and increase general and administrative expenses as we grow. As a result, we will need to generate significant revenue in order to achieve profitability.

### Financial Operations

### Revenue

We generate revenue from the sales of our procedure kits and implants used in our AxiaLIF fusion procedure for the treatment of degenerative disc disease and instability. Our revenue is generated by our direct sales force, independent sales agents and independent distributors. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. We also generate revenue through sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine revenue recognition on a case-by-case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment of

9

Table of Contents

our products to our independent distributors. Although we intend to continue to expand our international sales and marketing efforts, we expect that a substantial amount of our revenues will be generated in the United States in future periods.

**Cost of Revenue**

Cost of revenue consists primarily of material and overhead costs related to our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L instruments and implants. Cost of revenue also includes facilities-related costs, such as rent, utilities and depreciation.

**Research and Development**

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within our product development, regulatory and clinical functions and the costs of clinical studies and product development projects. Research and development expenses also include legal expenses related to the development and protection of our intellectual property portfolio and facilities-related costs. In future periods, we expect research and development expenses to grow as we continue to invest in basic research, clinical trials, product development and in our intellectual property.

**Sales and Marketing**

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to our direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities, and participation in medical conferences. In future periods, we expect sales and marketing expenses to increase as we expand our sales and marketing efforts.

**General and Administrative**

General and administrative expenses consist of personnel costs, including stock-based compensation, related to the executive, finance, business development, information technology and human resource functions, as well as professional service fees, legal fees, accounting fees, insurance costs and general corporate expenses. We expect general and administrative expenses to increase as we grow our business and as we incur additional professional fees, increased insurance costs and other general corporate expenses related to operating as a public company.

**Interest Income**

Interest income is primarily composed of interest earned on our cash, cash equivalents and available-for-sale securities.

**Results of Operations**

**Comparison of the Three Months Ended March 31, 2008 and 2009**

10

Table of Contents

Revenue. Revenue increased from $6.0 million in the three months ended March 31, 2008 to $8.7 million in the three months ended March 31, 2009. The $2.7 million increase in revenue from 2008 to 2009 was primarily attributable to an increase in the number of AxiaLIF products sold, which we believe resulted from continued market acceptance of our AxiaLIF and AxiaLIF 360° products, and the commercialization of our AxiaLIF 2L product in the United States, which began in the second quarter of 2008. None of this increase was attributable to price increases. Domestically, sales of our AxiaLIF 360° product increased from $2.2 million in the three months ended March 31, 2008 to $2.6 million in the three months ended March 31, 2009 and sales of our AxiaLIF 2L product, which began commercialization in the United States in the second quarter of 2008, were $2.3 million in the three months ended March 31, 2009. As a result of the launch of the AxiaLIF 2L, which has a higher selling price than our other products, average selling prices in the United States increased from approximately $9,300 in the three months ended March 31, 2008 to approximately $10,600 in the three months ended March 31, 2009. In the three months ended March 31, 2008 and 2009, we recorded 533 and 751 domestic AxiaLIF cases, respectively, including 213 AxiaLIF 360° cases in the first quarter of 2008, and 261 AxiaLIF 360° cases and 168 AxiaLIF 2L cases in the first quarter of 2009. Additionally, during the three months ended March 31, 2008 and 2009, we generated $266,000 and $297,000, respectively, in revenues from stand alone sales of our percutaneous facet screw system. Revenue generated outside the United States decreased from $753,000 in the three months ended March 31, 2008 to $452,000 in the three months ended March 31, 2009. In the first quarter of 2008 and 2009, initial stocking shipments to new distributors outside the United States were $309,000 and $97,000, respectively. In the three months ended March 31, 2008 and 2009, 87% and 95%, respectively, of our revenues were generated in the United States.

Cost of Revenue. Cost of revenue increased from $1.0 million in the three months ended March 31, 2008 to $1.5 million in the three months ended March 31, 2009. The $0.5 million increase in cost of revenue resulted primarily from higher material and overhead costs associated with increased sales volume for our products.

Research and Development. Research and development expenses increased from $1.2 million in the three months ended March 31, 2008 to $1.6 million in the three months ended March 31, 2009. The $390,000 increase in expense in 2009 compared to 2008 was primarily the result of increased research and development and clinical project-related spending of $192,000 and increased legal fess related to maintaining our intellectual property of $184,000.

Sales and Marketing. Sales and marketing expenses increased from $5.7 million in the three months ended March 31, 2008 to $9.2 million in the three months ended March 31, 2009. The increase in expenses from 2008 to 2009 of $3.5 million was primarily the result of increased personnel related costs, including commissions and stock-based compensation expense, of $1.9 million, as we continued to build out our sales and marketing organization in order to continue to drive global market acceptance of our AxiaLIF products, increased travel and entertainment expenses of $0.4 million related to the larger sales force, increased training expenses of $0.5 million and increased tradeshow and promotional expenses of $0.5 million.

General and Administrative. General and administrative expenses increased from $1.4 million in the three months ended March 31, 2008 to $1.8 million in the three months ended March 31, 2009. The

11

Table of Contents

increase in expenses from 2008 to 2009 of $0.4 million was primarily due to increased personnel related costs, including stock-based compensation expense, of $0.3 million.

Interest Income. Interest income decreased from $940,000 in the three months ended March 31, 2008 to $217,000 in the three months ended March 31, 2009. The decrease of $723,000 in interest income from 2008 to 2009 was primarily due to significantly lower interest rates and our lower average cash and investment balances.

## Liquidity and Capital Resources

### Sources of Liquidity

Since our inception in 2000, we have incurred significant losses and, as of March 31, 2009, we had an accumulated deficit of $53.1 million. We have not yet achieved profitability, and anticipate that we will continue to incur losses in the near term. As we continue to develop new products, drive global market acceptance of our current AxiaLIF products and expand our sales and marketing efforts, we expect that research and development, sales and marketing and general and administrative expenses will continue to increase. As a result, we will need to generate significant revenues to achieve profitability. To date, our operations have been funded primarily with proceeds from the sale of preferred stock and the net proceeds from our October 2007 initial public offering. Gross proceeds from our preferred stock sales totaled $40.5 million to date, and the net proceeds from our initial public offering were approximately $86.7 million.

As of March 31, 2009, we did not have any outstanding debt financing arrangements, we had working capital of $80.0 million and our primary source of liquidity was $72.1 million in cash, cash equivalents and short-term investments. We currently invest our cash and cash equivalents primarily in money market treasury funds and high grade commercial paper. We currently place our short-term investments primarily in U.S. agency backed debt instruments, high grade corporate bonds and certificates of deposit.

Cash, cash equivalents and short-term investments decreased from $77.3 million at December 31, 2008 to $72.1 million at March 31, 2009. The decrease of $5.2 million was primarily the result of net cash used in operating activities of $5.0 million and purchases of property and equipment of $277,000.

### Cash Flows

Net Cash Used in Operating Activities. Net cash used in operating activities was $5.0 million in the three months ended March 31, 2009. This amount was attributable primarily to the net loss after adjustment for non-cash items, such as depreciation and stock-based compensation expense, increases in accounts receivable resulting from the growth in revenue and inventory as we prepare for continued growth, partially offset by small changes in prepaid assets, accounts payable and accrued expense due to the timing of activity in those accounts.

Net Cash Provided by Investing Activities. Net cash provided by investing activities was $15.7 million in the three months ended March 31, 2009. This amount reflected purchases or sales and maturities of

12

Table of Contents

short-term investments of $15.9 million, offset by purchases of property and equipment of $277,000, primarily for research and development and information technology needs.

Net Cash Provided by Financing Activities. Net cash provided by financing activities in the three months ended March 31, 2009 was $21,000, which represented proceeds from the issuance of shares of our common stock upon the exercise of stock options.

**Operating Capital and Capital Expenditure Requirements**

We believe that our existing cash, cash equivalents and short-term investments, together with cash received from sales of our products, will be sufficient to meet our cash needs for at least the next two years. We intend to spend substantial sums on sales and marketing initiatives to support the ongoing commercialization of our products and on research and development activities, including product development, regulatory and compliance, clinical studies in support of our currently marketed products and future product offerings, and the enhancement and protection of our intellectual property. We may need to obtain additional financing to pursue our business strategy, to respond to new competitive pressures or to take advantage of opportunities that may arise. The sale of additional equity or convertible debt securities could result in dilution to our stockholders. If additional funds are raised through the issuance of debt securities, these securities could have rights senior to those associated with our common stock and could contain covenants that would restrict our operations. Any additional financing may not be available in amounts or on terms acceptable to us, if at all. If we are unable to obtain this additional financing, we may be required to reduce the scope of our planned product development and marketing efforts.

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations is based upon our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses, and disclosures of contingent assets and liabilities at the date of the financial statements. On an on-going basis, we evaluate our estimates, including those related to revenue recognition, accounts receivable, inventories, accrued expenses, income taxes and stock-based compensation. We use authoritative pronouncements, historical experience and other assumptions as the basis for making estimates. Actual results could differ from those estimates under different assumptions or conditions.

For a description of our critical accounting policies and estimates, please refer to the "Critical Accounting Policies and Estimates" section of the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section contained in our Annual Report on Form 10-K for the year ended December 31, 2008. There have been no material changes in any of our accounting policies since December 31, 2008.

**New Accounting Standards**

In February 2008, the Financial Accounting Standards Board issued Staff Position No. FAS 157-2, which delayed the effective date of Statement of Financial Accounting Standards No. 157, "Fair Value

13

Table of Contents

Measurements", for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. We adopted SFAS 157 for our non-financial assets and non-financial liabilities on January 1, 2009 and it did not have a material impact on our financial statements.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on us.

## Item 3. Quantitative and Qualitative Disclosures About Market Risk

Our exposure to interest rate risk at March 31, 2009 is related to our investment portfolio. We invest our excess cash primarily in money market funds, debt instruments of the U.S. government and its agencies and in high quality corporate bonds, certificates of deposit and commercial paper. Due to the short-term nature of these investments, we have assessed that there is no material exposure to interest rate risk arising from our investments. Thus, a hypothetical 100 basis point adverse move in interest rates along the entire interest rate yield curve would not materially affect the fair market value of our interest-sensitive financial investments. Declines in interest rates over time will, however, reduce our investment income, while increases in interest rates over time will increase our interest expense. Historically, and as of March 31, 2009, we have not used derivative instruments or engaged in hedging activities.

Although substantially all of our sales and purchases are denominated in U.S. dollars, future fluctuations in the value of the U.S. dollar may affect the competitiveness of our products outside the United States. We do not believe, however, that we currently have significant direct foreign currency exchange rate risk and have not hedged exposures denominated in foreign currencies.

## Item 4. Controls and Procedures.

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of March 31, 2009. We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of March 31, 2009, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective and operating at the reasonable assurance level.

### Changes in Internal Control over Financial Reporting

14

Table of Contents

There has been no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

### Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

#### (b) Uses of Proceeds from Sale of Registered Securities

On October 22, 2007, we completed our initial public offering of 6,325,000 shares of common stock at the offering price of $15.00 per share. We effected the offering through a Registration Statement on Form S-1 (Registration No. 333-144802), which was declared effective by the SEC on October 16, 2007, and through a Registration Statement on Form S-1 filed pursuant to Rule 462(b) under the Securities Act (Registration No. 333-146753), which became effective upon filing on October 17, 2007 pursuant to Rule 462(b). The offering resulted in aggregate proceeds to us of approximately $86.7 million, net of underwriting discounts and commissions.

As of March 31, 2009, we had used approximately $51.7 million of the net proceeds for sales, marketing and general administrative activities and $7.6 million for research and development activities.

We intend to use the remaining net proceeds of our initial public offering to support the commercialization of our existing and future products and to support our research and development activities, clinical trials, regulatory clearances or approvals and for capital expenditures, working capital and other general corporate purposes. We have invested the net proceeds from our initial public offering in money-market funds and short-term investment-grade interest-bearing securities. There has been no material change in the planned use of proceeds from our initial public offering as described in the final prospectus filed with the SEC on October 17, 2007 pursuant to Rule 424(b) under the Securities Act. As of the date of this report, we cannot specify with certainty all of the particular uses for the net proceeds received in connection with our initial public offering. The amounts and timing of our actual expenditures will depend on numerous factors, including the status of our product development efforts, sales and marketing activities, technological advances, amount of cash generated or used by our operations and competition. Accordingly, our management will have broad discretion in the application of the net proceeds and investors will be relying on the judgment of our management regarding the application of the proceeds of the offering.

### Item 6. Exhibits

A list of the exhibits required to be filed as part of this report is set forth in the "Exhibit Index," which immediately precedes such exhibits, and is incorporated herein by reference.

15

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**TranS1 Inc.**

Date: May 6, 2009

By: /s/ Richard Randall
    Richard Randall
    President and Chief Executive Officer

Date: May 6, 2009

By: /s/ Michael Luetkemeyer
    Michael Luetkemeyer
    Chief Financial Officer

16

**Table of Contents**

**TranS1 Inc.**
**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 32.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |
| 32.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |

17

EX-31.1 2 g18974exv31w1.htm EX-31.1

**EXHIBIT 31.1**

### Certification

I, Richard Randall, certify that:

1. I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 6, 2009

/s/ Richard Randall
Richard Randall
President and Chief Executive Officer

EX-31.2 3 g18974exv31w2.htm EX-31.2

EXHIBIT 31.2

### Certification

I, Michael Luetkemeyer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 6, 2009

/s/ Michael Luetkemeyer
Michael Luetkemeyer
Chief Financial Officer

# Exhibit 5

Case 7:12-cv-00023-F   Document 33-6   Filed 09/07/12   Page 1 of 11

8-K 1 g20000e8vk.htm FORM 8-K

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of**
**The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): July 30, 2009

# TRANS1 INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-33744** | **33-0909022** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**411 Landmark Drive**
**Wilmington, NC 28412-6303**
(Address of principal executive offices)
(Zip Code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02  Results of Operations and Financial Condition.**

On July 30, 2009, TranS1 Inc. (the "Company") issued a press release to report its financial results for the quarter ended June 30, 2009. The release is furnished herewith as Exhibit 99.1 and incorporated herein by this reference.

Also on July 30, 2009, following the issuance of the press release referred to above, the Company conducted a conference call to discuss its financial results for the quarter ended June 30, 2009. A copy of the transcript of the conference call is furnished herewith as Exhibit 99.2 and incorporated herein by this reference.

The information in this Current Report on Form 8-K, including Exhibits 99.1 and 99.2, are being furnished pursuant to Item 2.02 and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section, nor shall they be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01  Financial Statements and Exhibits.**

   **(d) Exhibits**

| *Exhibit Number* | *Description* |
|---|---|
| 99.1 | Press release, dated July 30, 2009. |
| 99.2 | Conference call transcript, dated July 30, 2009. |

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRANS1 INC.

August 3, 2009

By: /s/ Michael Luetkemeyer
Michael Luetkemeyer
Chief Financial Officer

**EXHIBIT INDEX**

*Exhibit Number*          *Description*

99.1          Press release, dated July 30, 2009.

99.2          Conference call transcript, dated July 30, 2009.

EX-99.1 2 g20000exv99w1.htm EX-99.1

**Exhibit 99.1**

**TranS1 Inc. Reports Operating Results for the Second Quarter of 2009**

*Highlights:*

*Second quarter revenues increased 33% to $7.9 million*

*796 TranS1 procedures performed globally in the quarter*

*Gross margin was 80.9% for the quarter*

*GAAP loss per share was $0.33 for the quarter*

*Non-GAAP loss per share was $0.28 for the quarter*

WILMINGTON, NC — (GLOBE NEWSWIRE)—July 30, 2009—TranS1 Inc. (NASDAQ:TSON), a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine, today announced its financial results for the second quarter ended June 30, 2009.

Revenues were $7.9 million in the second quarter of 2009, representing a 33% increase over revenues of $6.0 million in the second quarter of 2008. Gross margin was 80.9% in the second quarter of 2009, which was consistent with the second quarter of 2008.

Operating expenses were $13.3 million in the second quarter of 2009 compared to $10.8 million in the second quarter of 2008. The increase in operating expenses is primarily attributable to an increase in sales and marketing costs as a result of the continued expansion of the direct sales force, increased commissions as a result of increased sales and increased spending for research and development.

Net loss was $6.8 million and $5.3 million for the quarters ended June 30, 2009 and 2008, respectively. GAAP net loss per common share was $0.33 in the second quarter of 2009 compared to a net loss per share of $0.26 in the second quarter of 2008.

For the quarters ended June 30, 2009 and 2008, on a non-GAAP basis adjusting for non-cash stock compensation expense, net loss per common share was $0.28 and $0.20, respectively.

Cash, cash-equivalents and investments were $66.5 million as of June 30, 2009.

"Our results this quarter were impacted by increased concerns and confusion in the marketplace surrounding reimbursement for our AxiaLIF procedure, which we are addressing with increased education and support resources for our current and prospective surgeon users," said Rick Randall, President and CEO of TranS1. "We

JA-232

remain confident in our products, clinical benefits and prospects for future growth as the market for minimally invasive spine surgery continues to expand."

**Conference Call**

TranS1 will host a conference call today at 4:30 pm ET to discuss its second quarter financial results. To listen to the conference call on your telephone, please dial 888-228-5279 for domestic callers and 913-312-1520 for international callers approximately ten minutes prior to the start time. The call will be concurrently webcast. To access the live audio broadcast or the subsequent archived recording, visit the TranS1 website at www.trans1.com under the investor relations section.

**Non-GAAP Measures**

Management uses certain non-GAAP financial measures such as non-GAAP net loss and net loss per share, which exclude stock based compensation. This non-GAAP presentation is given in part to enhance the understanding of the company's historical financial performance and comparability between periods. The company believes that the non-GAAP presentation to exclude stock-based compensation is relevant and useful information that will be widely used by investors and analysts. Accordingly, the company is disclosing this information to permit additional analysis of the company's performance. These non-GAAP measures are not in accordance with, or an alternative for, GAAP, and may be different from non-GAAP measures used by other companies. Investors should consider these non-GAAP measures in addition to, and not as a substitute for, financial performance measures in accordance with GAAP. A reconciliation of the GAAP financial measures to the comparable non-GAAP financial measure is included below.

**About TranS1 Inc.**

TranS1 is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. TranS1 currently markets two single-level fusion products, the AxiaLIF® and the AxiaLIF 360°™, and a two-level fusion product, the AxiaLIF 2L™, in the US and Europe. TranS1 was founded in May 2000 and is headquartered in Wilmington, North Carolina. For more information, visit www.trans1.com.

**Forward-Looking Statements**

This press release includes forward-looking statements, the accuracy of which is necessarily subject to risks and uncertainties. These risks and uncertainties include, among other things, risks associated with the adoption of a new technology by spine surgeons, product development efforts, regulatory requirements, maintenance and prosecution of adequate intellectual property protection and other economic and competitive factors. These forward looking statements are based on the company's expectations as of the date of this press release and the company undertakes no obligation

to update information provided in this press release. For a discussion of risks and uncertainties associated with TranS1's business, please review the company's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2008.

TranS1 Inc.
Statements of Operations
(in thousands, except per share amounts)
(Unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Revenue | $ 7,938 | $ 5,951 | $ 16,616 | $11,929 |
| Cost of revenue | 1,515 | 1,137 | 3,057 | 2,175 |
| Gross profit | 6,423 | 4,814 | 13,559 | 9,754 |
| Operating expenses: | | | | |
| Research and development | 2,359 | 1,211 | 3,685 | 2,331 |
| Sales and marketing | 8,943 | 7,200 | 18,093 | 12,898 |
| General and administrative | 1,991 | 2,390 | 4,031 | 3,891 |
| Total operating expenses | 13,293 | 10,801 | 25,809 | 19,120 |
| Operating loss | (6,870) | (5,987) | (12,250) | (9,366) |
| Interest income | 111 | 688 | 328 | 1,628 |
| Net loss | $(6,759) | $(5,299) | $(11,922) | $(7,738) |
| Net loss per common share | | | | |
| - basic and diluted | $ (0.33) | $ (0.26) | $ (0.58) | $ (0.39) |
| Weighted average common shares outstanding - basic and diluted | 20,590 | 20,212 | 20,571 | 20,071 |
| Stock-based compensation is included in operating expenses in the following categories: | | | | |
| Cost of revenue | $ 18 | $ 13 | $ 37 | $ 27 |
| Research and development | 57 | 204 | 101 | 295 |
| Sales and marketing | 387 | 600 | 775 | 874 |
| General and administrative | 481 | 515 | 674 | 658 |
| | $ 943 | $ 1,332 | $ 1,587 | $ 1,854 |

Reconciliation of Quarterly Results
(in thousands, except per share amounts)
(Unaudited)

|  | 2009 | 2008 |
|---|---|---|
| GAAP net loss | $(6,759) | $(5,299) |
| Stock based compensation | 943 | 1,332 |
| Non-GAAP net loss | $(5,816) | $(3,967) |
| Shares used in computing GAAP and non-GAAP loss per share | 20,590 | 20,212 |
| Non-GAAP loss per share | $ (0.28) | $ (0.20) |

Reconciliation of Year-To-Date Results
(in thousands, except per share amounts)
(Unaudited)

|  | 2009 | 2008 |
|---|---|---|
| GAAP net loss | $(11,922) | $(7,738) |
| Stock based compensation | 1,587 | 1,854 |
| Non-GAAP net loss | $(10,335) | $(5,884) |
| Shares used in computing GAAP and non-GAAP loss per share | 20,571 | 20,071 |
| Non-GAAP loss per share | $ (0.50) | $ (0.29) |

TranS1 Inc.
Balance Sheets
(in thousands)
(Unaudited)

|  | June 30, 2009 | Dec. 31, 2008 |
|---|---|---|
| Assets |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ 29,207 | $ 42,051 |
| Short-term investments | 37,275 | 35,215 |
| Accounts receivable, net | 4,707 | 4,812 |
| Inventory | 7,346 | 6,369 |
| Prepaid expenses and other assets | 547 | 632 |
| Total current assets | 79,082 | 89,079 |
| Property and equipment, net | 1,374 | 1,412 |
| Total assets | $ 80,456 | $ 90,491 |
| Liabilities and Stockholders' Equity |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ 3,099 | $ 2,896 |
| Accrued expenses | 2,021 | 2,009 |
| Total current liabilities | 5,120 | 4,905 |
| Stockholders' equity |  |  |
| Common stock | 2 | 2 |
| Additional paid-in capital | 135,175 | 133,507 |
| Accumulated other comprehensive income | 4 | — |
| Accumulated deficit | (59,845) | (47,923) |
| Total stockholders' equity | 75,336 | 85,586 |
| Total liabilities and stockholders' equity | $ 80,456 | $ 90,491 |

TranS1 Inc.
Statements of Cash Flows
(in thousands)
(Unaudited)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| Cash flows from operating activities: | | |
| Net loss | $(11,922) | $ (7,738) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 448 | 369 |
| Stock-based compensation | 1,587 | 1,854 |
| Allowance for excess and obsolete inventory | 383 | 34 |
| Provision for bad debts | 45 | 66 |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in accounts receivable | 60 | (615) |
| (Increase) decrease in inventory | (1,360) | 27 |
| (Increase) decrease in prepaid expenses | 85 | 235 |
| Increase (decrease) in accounts payable | 203 | 386 |
| Increase (decrease) in accrued expenses | 12 | (251) |
| Net cash used in operating activities | (10,459) | (5,633) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (410) | (618) |
| Purchases of investments | (33,922) | (41,288) |
| Sales and maturities of short-term investments | 31,862 | 34,791 |
| Net cash provided by (used in) investing activities | (2,470) | (7,115) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock | 85 | 121 |
| Net cash provided by (used in) financing activities | 85 | 121 |
| Net increase (decrease) in cash and cash equivalents | (12,844) | (12,627) |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 |
| Cash and cash equivalents, end of period | $ 29,207 | $ 52,049 |

# Exhibit 6

JA-238

Table of Contents

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2009

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period _____ to _____

Commission File Number 001-33744

# TRANS1 INC.

(Exact name of Registrant as specified in its charter)

| **DELAWARE** | **33-0909022** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |

**411 LANDMARK DRIVE, WILMINGTON, NC 28412-6303**

(Address of principal executive office)    (Zip code)

**(910) 332-1700**

(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☑    Non-accelerated filer ☐    Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The number of shares of the registrant's common stock outstanding as of August 3, 2009 was 20,631,144 shares.

TRANS1 INC.
FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2009
TABLE OF CONTENTS

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements** (unaudited)
    Statements of Operations ........................................... 1
    Balance Sheets ........................................... 2
    Statements of Cash Flows ........................................... 3
    Notes to Financial Statements ........................................... 4
**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations** ........ 8
**Item 3. Quantitative and Qualitative Disclosures About Market Risk** ........ 15
**Item 4. Controls and Procedures** ........ 16

**PART II. OTHER INFORMATION**
**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds** ........ 16
**Item 4. Submission of Matters to a Vote of Security Holders** ........ 17
**Item 6. Exhibits** ........ 17

**SIGNATURES** ........ 18

**EXHIBIT INDEX** ........ 19
    **Exhibit 31.1**
    **Exhibit 31.2**
    **Exhibit 32.1**
    **Exhibit 32.2**
EX-31.1
EX-31.2
EX-32.1
EX-32.2

JA-240

**Table of Contents**

**PART I. FINANCIAL INFORMATION**
Item 1.  Financial Statements.

**TranS1 Inc.**
**Statements of Operations**
**(in thousands, except per share amounts)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Revenue | $ 7,938 | $ 5,951 | $16,616 | $11,929 |
| Cost of revenue | 1,515 | 1,137 | 3,057 | 2,175 |
| Gross profit | 6,423 | 4,814 | 13,559 | 9,754 |
| | | | | |
| Operating expenses: | | | | |
| Research and development | 2,359 | 1,211 | 3,685 | 2,331 |
| Sales and marketing | 8,943 | 7,200 | 18,093 | 12,898 |
| General and administrative | 1,991 | 2,390 | 4,031 | 3,891 |
| | | | | |
| Total operating expenses | 13,293 | 10,801 | 25,809 | 19,120 |
| Operating loss | (6,870) | (5,987) | (12,250) | (9,366) |
| Interest income | 111 | 688 | 328 | 1,628 |
| Net loss | $ (6,759) | $ (5,299) | $(11,922) | $ (7,738) |
| | | | | |
| Net loss per common share — basic and diluted | $   (0.33) | $   (0.26) | $   (0.58) | $   (0.39) |
| | | | | |
| Weighted average common shares outstanding — basic and diluted | 20,590 | 20,212 | 20,571 | 20,071 |

The accompanying notes are an integral part of these financial statements.

1

**Table of Contents**

<div align="center">

TranS1 Inc.
**Balance Sheets**
**(in thousands)**
**(Unaudited)**

</div>

|  | June 30, 2009 | December 31, 2008 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 29,207 | $ 42,051 |
| Short-term investments | 37,275 | 35,215 |
| Accounts receivable, net | 4,707 | 4,812 |
| Inventory | 7,346 | 6,369 |
| Prepaid expenses and other assets | 547 | 632 |
| Total current assets | 79,082 | 89,079 |
| Property and equipment, net | 1,374 | 1,412 |
| Total assets | $ 80,456 | $ 90,491 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,099 | $ 2,896 |
| Accrued expenses | 2,021 | 2,009 |
| Total current liabilities | 5,120 | 4,905 |
| Stockholders' equity | | |
| Common stock | 2 | 2 |
| Additional paid-in capital | 135,175 | 133,507 |
| Accumulated other comprehensive income | 4 | — |
| Accumulated deficit | (59,845) | (47,923) |
| Total stockholders' equity | 75,336 | 85,586 |
| Total liabilities and stockholders' equity | $ 80,456 | $ 90,491 |

<div align="center">

The accompanying notes are an integral part of these financial statements.

2

</div>

Table of Contents

**TranS1 Inc.**
**Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

| | Six Months Ended June 30, | |
| | 2009 | 2008 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | $(11,922) | $ (7,738) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 448 | 369 |
| Stock-based compensation | 1,587 | 1,854 |
| Allowance for excess and obsolete inventory | 383 | 34 |
| Provision for bad debts | 45 | 66 |
| Changes in operating assets and liabilities | | |
| (Increase) decrease in accounts receivable | 60 | (615) |
| (Increase) decrease in inventory | (1,360) | 27 |
| (Increase) decrease in prepaid expenses | 85 | 235 |
| Increase (decrease) in accounts payable | 203 | 386 |
| Increase (decrease) in accrued expenses | 12 | (251) |
| Net cash used in operating activities | (10,459) | (5,633) |
| | | |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (410) | (618) |
| Purchases of investments | (33,922) | (41,288) |
| Sales and maturities of investments | 31,862 | 34,791 |
| Net cash used in investing activities | (2,470) | (7,115) |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 85 | 121 |
| Net cash provided by financing activities | 85 | 121 |
| Net decrease in cash and cash equivalents | (12,844) | (12,627) |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 |
| Cash and cash equivalents, end of period | $ 29,207 | $ 52,049 |

The accompanying notes are an integral part of these financial statements.

3

JA-243

Table of Contents

**TranS1 Inc.**
Notes to Financial Statements
(Unaudited)

**1. Description of Business**

TranS1 Inc., a Delaware corporation (the "Company"), was incorporated in May 2000 and is headquartered in Wilmington, North Carolina. The Company is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. The Company operates in one business segment. The Company has developed and currently markets two single-level fusion products, AxiaLIF® and AxiaLIF 360°™, and a two-level fusion product, the AxiaLIF 2L™. All of the Company's products are delivered using its pre-sacral approach. The AxiaLIF product was commercially released in January 2005 and the AxiaLIF 360° product was commercially released in July 2006. The AxiaLIF 2L™ product was commercially released in Europe in the fourth quarter of 2006 and in the United States in the second quarter of 2008. The Company generates revenue from the sale of implants and procedure kits. The Company sells its products directly to hospitals and surgical centers in the United States and certain European countries, and to independent distributors elsewhere.

The Company owns three trademark registrations in the United States and six trademark registrations in the European Union. The Company also owns nine pending trademark applications in the United States, one pending trademark applications in the European Union and six pending trademark applications in Canada.

The Company is subject to a number of risks similar to other companies in the medical device industry. These risks include, without limitation, rapid technological change, uncertainty of market acceptance of our products, uncertainty of regulatory clearance or approval, uncertainty of reimbursement from third-party payors, competition from substitute products and larger companies, the need to obtain additional financing, compliance with government regulation, protection of proprietary technology, product liability, and the dependence on key individuals.

**2. Basis of presentation**

The Company has prepared the accompanying financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). The financial statements are unaudited and reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of the Company's management, necessary for a fair statement of the Company's financial position, results of operations and cash flows. These principles require management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The principal estimates relate specifically to accounts receivable reserves, inventory reserves, stock-based compensation, accrued expenses and income tax valuations. Actual results could differ from those estimates. Operating results

4

Table of Contents

for the interim periods presented are not necessarily indicative of the results that may be expected for the full year. The year end balance sheet data was derived from audited financial statements, but does not include all disclosures required by accounting principles generally accepted in the United States.

In the second quarter of 2009, the Company revised the classification of patent-related legal costs from research and development expense to general and administrative expense as such costs typically would be excluded from research and development costs as defined by Statement of Financial Accounting Standards No. 2, "Accounting for Research and Development Costs". Amounts related to prior periods are not considered material to the financial statements taken as a whole, but were revised for purposes of comparability. Such amounts for the three and six month periods ended June 30, 2008 were $351,000 and $446,000, respectively. The revision did not affect previously reported total operating expenses, net loss, loss per share, assets, liabilities, stockholders' equity or cash flows.

**Impact of Recently Issued Accounting Standards**

In February 2008, the Financial Accounting Standards Board ("FASB") issued Staff Position No. FAS 157-2, which delayed the effective date of Statement of Financial Accounting Standards ("SFAS") No. 157, "Fair Value Measurements", for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. The Company adopted SFAS No. 157 for its non-financial assets and non-financial liabilities on January 1, 2009, and it did not have a material impact on the Company's financial statements.

In May 2009, the FASB issued SFAS No. 165, "Subsequent Events," which establishes general standards of accounting for and disclosures of events that occur after the balance sheet date but before the financial statements are issued or are available to be issued. SFAS No. 165 provides guidance on the period after the balance sheet date during which management of a reporting entity should evaluate events or transactions that may occur for potential recognition or disclosure in the financial statements, the circumstances under which an entity should recognize events or transactions occurring after the balance sheet date in its financial statements and the disclosures that an entity should make about events or transactions that occurred after the balance sheet date. The Company adopted SFAS No. 165 during the second quarter of 2009, and its application did not have a material impact on the Company's financial statements. The Company has performed this evaluation through August 6, 2009, the date the financial statements were issued.

In June 2009, the FASB issued SFAS No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles". SFAS No. 168 establishes the FASB Accounting Standards Codification (the "Codification") as the single source of authoritative nongovernmental U.S. GAAP. The Codification is effective for interim and annual periods ending after September 15, 2009. The adoption of this standard did not have a material impact on the Company's financial statements.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on the Company.

5

JA-245

Table of Contents

## 3. Income taxes

No provision for federal or state income taxes has been recorded as the Company has incurred net operating losses since inception.

## 4. Loss per share

Basic net loss per common share ("Basic EPS") is computed by dividing the net loss by the weighted average number of common shares outstanding. Diluted net loss per common share ("Diluted EPS") is computed by dividing the net loss by the weighted average number of common shares and potential dilutive common share equivalents then outstanding. The Company's potential dilutive common shares, which consist of shares issuable upon the exercise of stock options, have not been included in the computation of diluted net loss per share for all periods as the result would be anti-dilutive.

The following table sets forth the potential shares of common stock that are not included in the calculation of diluted net loss per share as the result would be anti-dilutive as of the end of each period presented:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Weighted average stock options outstanding | 2,350,270 | 2,316,641 | 2,247,111 | 2,094,691 |

## 5. Cash, Cash Equivalents and Investments

The Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents. Cash and cash equivalents include money market funds. Short-term investments consist of corporate notes and U.S. government securities.

At June 30, 2009, the Company holds certain assets that are required to be measured at fair value on a recurring basis. These assets include available for sale securities classified as cash equivalents and short-term investments. SFAS 157 requires the valuation of investments using a three tiered approach, which requires that fair value measurements be classified and disclosed in one of three tiers. These tiers are: Level 1, defined as quoted prices in active markets for identical assets or liabilities; Level 2, defined as valuations based on observable inputs other than those included in Level 1, such as quoted prices for similar assets and liabilities in active markets, or other inputs that are observable or can be corroborated by observable input data; and Level 3, defined as valuations based on unobservable inputs reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants.

At June 30, 2009, all available for sale securities are classified as Level 1 assets with a fair value of $66.1 million, which included money market funds of $28.8 million and short-term investments of $37.3 million. At December 31, 2008, all available for sale securities were classified as Level 1 assets with a fair value of $76.8 million, which included money market funds of $41.6 million and short-term investments of $35.2 million. The Company had no Level 2 or Level 3 assets or liabilities at June 30, 2009 or December 31, 2008.

6

JA-246

**Table of Contents**

### 6. Accounts receivable, net

The following table presents the components of accounts receivable:

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| | (In thousands) | |
| Gross accounts receivable | $4,914 | $ 5,005 |
| Allowance for uncollectible accounts | (207) | (193) |
| Total accounts receivable, net | $4,707 | $ 4,812 |

### 7. Inventories

The following table presents the components of inventories:

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| | (In thousands) | |
| Finished goods | $4,181 | $ 2,598 |
| Work-in-process | 2,700 | 3,334 |
| Raw materials | 465 | 437 |
| Total inventories | $7,346 | $ 6,369 |

### 8. Accrued Expenses

The following table presents the components of accrued expenses:

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| | (In thousands) | |
| Commissions | $ 800 | $ 1,178 |
| Bonus | 526 | 270 |
| Vacation | 323 | 163 |
| Legal and professional fees | 134 | 69 |
| Other | 238 | 329 |
| Total accrued expenses | $2,021 | $ 2,009 |

7

JA-247

Table of Contents

**Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read in conjunction with our financial statements and the related notes to our financial statements included in this report. In addition to historical financial information, this report contains forward-looking statements that have been made pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 and concern matters that involve risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements. All statements other than statements of historical fact contained in this report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should" or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Readers are urged to carefully review and consider the various disclosures made by us, which attempt to advise interested parties of the risks, uncertainties, and other factors that affect our business, operating results, financial condition and stock price, including without limitation the disclosures made under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report and in the financial statements and notes thereto included elsewhere in this report, as well as the disclosures made under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Risk Factors", "Financial Statements" and "Notes to Financial Statements" included in our Annual Report on Form 10-K for the year ended December 31, 2008. Furthermore, such forward-looking statements speak only as of the date of this report. We expressly disclaim any intent or obligation to update any forward-looking statements after the date hereof to conform such statements to actual results or to changes in our opinions or expectations. References in this report to "TranS1", "we", "our", "us", or the "Company" refer to TranS1 Inc.*

**Overview**

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using this pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the degenerative disc. We developed our pre-sacral approach to allow spine surgeons to access and treat degenerative lumbar discs without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, short procedure times, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market in the United States and Europe two single-level fusion products, AxiaLIF and AxiaLIF 360°, and a two-level fusion product, the AxiaLIF 2L. All of our products are delivered using our pre-sacral approach.

8

Table of Contents

From our incorporation in 2000 through 2004, we devoted substantially all of our resources to research and development and start-up activities, consisting primarily of product design and development, clinical trials, manufacturing, recruiting qualified personnel and raising capital. We received 510(k) clearance from the U.S. Food and Drug Administration, or FDA, for our AxiaLIF product in the fourth quarter of 2004, and commercially introduced our AxiaLIF product in the United States in the first quarter of 2005. We received FDA 510(k) clearance for our AxiaLIF 360° product in the United States in the third quarter of 2005 and began commercialization in the United States in the third quarter of 2006. We received a CE mark to market AxiaLIF in the European market in the first quarter of 2005 and began commercialization in the first quarter of 2006. For AxiaLIF 360°, we received a CE mark in the first quarter of 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2006 and began commercialization in the European market in the fourth quarter of 2006. We received FDA 510(k) clearance for our AxiaLIF 2L product and began marketing this product in the United States in the second quarter of 2008. We currently sell our products through a direct sales force, independent sales agents and international distributors.

We rely on third parties to manufacture most of our products and their components. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which allows us to compete with larger volume manufacturers of spine surgery products.

Since inception, we have been unprofitable. As of June 30, 2009, we had an accumulated deficit of $59.8 million.

We expect to continue to invest in creating a sales and marketing infrastructure for our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L products in order to gain wider acceptance for these products. We also expect to continue to invest in research and development and related clinical trials, and increase general and administrative expenses as we grow. As a result, we will need to generate significant revenue in order to achieve profitability.

### Financial Operations

#### Revenue

We generate revenue from the sales of our procedure kits and implants used in our AxiaLIF fusion procedure for the treatment of degenerative disc disease and instability. Our revenue is generated by our direct sales force, independent sales agents and independent distributors. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. We also generate revenue through sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine revenue recognition on a case-by-case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment of

9

JA-249

Table of Contents

our products to our independent distributors. Although we intend to continue to expand our international sales and marketing efforts, we expect that a substantial amount of our revenues will be generated in the United States in future periods.

**Cost of Revenue**

Cost of revenue consists primarily of material and overhead costs related to our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L instruments and implants. Cost of revenue also includes facilities-related costs, such as rent, utilities and depreciation.

**Research and Development**

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within our product development, regulatory and clinical functions and the costs of clinical studies and product development projects. Research and development expenses also include facilities-related costs. In future periods, we expect research and development expenses to grow as we continue to invest in basic research, clinical trials, product development and in our intellectual property.

**Sales and Marketing**

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to our direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities, and participation in medical conferences. In future periods, we expect sales and marketing expenses to increase as we expand our sales and marketing efforts.

**General and Administrative**

General and administrative expenses consist of personnel costs, including stock-based compensation, related to the executive, finance, business development, information technology and human resource functions, as well as professional service fees, legal fees, accounting fees, insurance costs and general corporate expenses. We expect general and administrative expenses to increase as we grow our business and as we incur additional professional fees, increased insurance costs and other general corporate expenses related to operating as a public company.

**Interest Income**

Interest income is primarily composed of interest earned on our cash, cash equivalents and available-for-sale securities.

**Results of Operations**

**Comparison of the Three Months Ended June 30, 2008 and 2009**

Revenue. Revenue increased from $6.0 million in the three months ended June 30, 2008 to $7.9 million in the three months ended June 30, 2009. The $1.9 million increase in revenue from 2009 to 2008 was

10

**Table of Contents**

primarily attributable to an increase in the number of AxiaLIF products sold, which we believe resulted from continued market acceptance of our AxiaLIF and AxiaLIF 360° products, and the commercialization of our AxiaLIF 2L product in the United States, which had its limited market release in May 2008. None of this increase was attributable to price increases. Domestically, sales of our AxiaLIF 2L product, increased from $356,000 in the three months ended June 30, 2008 to $2.3 million in the three months ended June 30, 2009 and sales of our AxiaLIF 360° product decreased from $2.2 million in the three months ended June 30, 2008 to $2.0 million in the three months ended June 30, 2009. As a result of the launch of the AxiaLIF 2L, which has a higher selling price than our other products, average selling prices in the United States increased from approximately $9,500 in the three months ended June 30, 2008 to approximately $10,700 in the three months ended June 30, 2009. In the three months ended June 30, 2008 and 2009, we recorded 541 and 671 domestic AxiaLIF cases, respectively, including 213 AxiaLIF 360° cases and 24 AxiaLIF 2L cases in the second quarter of 2008, and 199 AxiaLIF 360° cases and 175 AxiaLIF 2L cases in the second quarter of 2009. Additionally, during the three months ended June 30, 2008 and 2009, we generated $175,000 and $211,000, respectively, in revenues from stand alone sales of our percutaneous facet screw system. Revenue generated outside the United States decreased from $649,000 in the three months ended June 30, 2008 to $565,000 in the three months ended June 30, 2009. In the second quarter of 2008, initial stocking shipments to new distributors outside the United States were $73,000. There were no initial stocking shipments to our international distributors in the second quarter of 2009. In the three months ended June 30, 2008 and 2009, 89% and 93%, respectively, of our revenues were generated in the United States.

Cost of Revenue. Cost of revenue increased from $1.1 million in the three months ended June 30, 2008 to $1.5 million in the three months ended June 30, 2009. The $378,000 increase in cost of revenue resulted primarily from higher material and overhead costs associated with increased sales volume for our products. As a percentage of revenue, cost of revenue remained consistent at 19% in the three months ended June 30, 2008 and 2009.

Research and Development. Research and development expenses increased from $1.2 million in the three months ended June 30, 2008 to $2.4 million in the three months ended June 30, 2009. The $1.2 million increase in expense in 2009 compared to 2008 was primarily the result of an expenditure of $1.0 million to acquire the rights to develop a technology for future use, along with increased research and development and clinical project-related spending of $316,000, partially offset by a decrease in stock compensation expense of $147,000.

Sales and Marketing. Sales and marketing expenses increased from $7.2 million in the three months ended June 30, 2008 to $8.9 million in the three months ended June 30, 2009. The increase in expenses from 2008 to 2009 of $1.7 million was primarily the result of increased personnel related costs, including commissions, of $1.3 million, as we continued to build out our sales and marketing organization in order to continue to drive global market acceptance of our AxiaLIF products and increased tradeshow and promotional expenses of $0.2 million.

General and Administrative. General and administrative expenses decreased from $2.4 million in the three months ended June 30, 2008 to $2.0 million in the three months ended June 30, 2009. The decrease in expenses from 2008 to 2009 of $0.4 million was primarily due to decreased professional fees of $0.3 million.

11

JA-251

Table of Contents

Interest Income. Interest income decreased from $688,000 in the three months ended June 30, 2008 to $111,000 in the three months ended June 30, 2009. The decrease of $577,000 in interest income from 2008 to 2009 was primarily due to significantly lower interest rates and our lower average cash and investment balances.

## Comparison of the Six Months Ended June 30, 2008 and 2009

Revenue. Revenue increased from $11.9 million in the six months ended June 30, 2008 to $16.6 million in the six months ended June 30, 2009. The $4.7 million increase in revenue from 2008 to 2009 was primarily attributable to an increase in the number of AxiaLIF products sold. None of this increase was attributable to price increases. Sales of our AxiaLIF 360° product increased from $4.3 million in the six months ended June 30, 2008 to $4.7 million in the six months ended June 30, 2009. Sales of our AxiaLIF 2L product, which began commercialization in the United States in the second quarter of 2008, increased from $356,000 in the six months ended June 30, 2008 to $4.6 million in the six months ended June 30, 2009. As a result of the launch of the AxiaLIF 2L, which has a higher selling price than our other products, average selling prices in the United States increased from approximately $9,400 in the six months ended June 30, 2008 to approximately $10,600 in the six months ended June 30, 2009. In the six months ended June 30, 2008 and 2009 we recorded 1,074 and 1,422 domestic AxiaLIF cases, respectively, including 426 AxiaLIF 360° cases and 24 AxiaLIF 2L cases in 2008, and 460 AxiaLIF 360° cases and 343 AxiaLIF 2L cases in 2009. Additionally, during the six months ended June 30, 2008 and 2009 we generated $440,000 and $508,000, respectively, in revenues from stand alone sales of our percutaneous facet screw system. Revenue generated outside the United States decreased from $1.4 million in the six months ended June 30, 2008 to $1.0 million in the six months ended June 30, 2009. $295,000 of this decrease was attributable to initial stocking shipments to new distributors in 2008. In the six months ended June 30, 2008 and 2009, 88% and 94%, respectively, of our revenues were generated in the United States.

Cost of Revenue. Cost of revenue increased from $2.2 million in the six months ended June 30, 2008 to $3.1 million in the six months ended June 30, 2009. The $0.9 million increase in cost of revenue resulted primarily from higher material and overhead costs associated with increased sales volume for our AxiaLIF products. As a percentage of revenue, cost of revenue remained consistent at 18% in the six months ended June 30, 2008 and 2009.

Research and Development. Research and development expenses increased from $2.3 million in the six months ended June 30, 2008 to $3.7 million in the six months ended June 30, 2009. The $1.4 million increase in expense in 2009 compared to 2008 was primarily the result of an expenditure of $1.0 million to acquire the rights to develop a technology for future use, along with increases in project related research and development and clinical trial costs of $256,000.

Sales and Marketing. Sales and marketing expenses increased from $12.9 million in the six months ended June 30, 2008 to $18.1 million in the six months ended June 30, 2009. The increase in expenses from 2008 to 2009 of $5.2 million was primarily the result of increased personnel related costs, including commissions, of $3.2 million, increased travel and entertainment expenses of $0.5 million related to the larger sales force, increased training of $0.5 million and increased tradeshow and promotional expenses of $0.7 million.

12

**Table of Contents**

General and Administrative. General and administrative expenses increased from $3.9 million in the six months ended June 30, 2008 to $4.0 million in the six months ended June 30, 2009. The increase in expenses from 2008 to 2009 of $0.1 million was primarily due to increased personnel related costs, including stock-based compensation expense, of $415,000, partially offset by a decrease in professional fees of $212,000.

Interest Income. Interest income decreased from $1.6 million in the six months ended June 30, 2008 to $328,000 in the six months ended June 30, 2009. The decrease of $1.3 million in interest income from 2008 to 2009 was primarily due to significantly lower interest rates and our lower average cash and investment balances.

**Liquidity and Capital Resources**

**Sources of Liquidity**

Since our inception in 2000, we have incurred significant losses and, as of June 30, 2009, we had an accumulated deficit of $59.8 million. We have not yet achieved profitability, and anticipate that we will continue to incur losses in the near term. As we continue to develop new products, drive global market acceptance of our current AxiaLIF products and expand our sales and marketing efforts, we expect that research and development, sales and marketing and general and administrative expenses will continue to increase. As a result, we will need to generate significant revenues to achieve profitability. To date, our operations have been funded primarily with proceeds from the sale of preferred stock and the net proceeds from our October 2007 initial public offering. Gross proceeds from our preferred stock sales totaled $40.5 million to date, and the net proceeds from our initial public offering were approximately $86.7 million.

As of June 30, 2009, we did not have any outstanding debt financing arrangements, we had working capital of $74.0 million and our primary source of liquidity was $66.5 million in cash, cash equivalents and short-term investments. We currently invest our cash and cash equivalents primarily in money market treasury funds. We currently place our short-term investments primarily in U.S. agency backed debt instruments and high grade corporate bonds.

Cash, cash equivalents and short-term investments decreased from $77.3 million at December 31, 2008 to $66.5 million at June 30, 2009. The decrease of $10.8 million was primarily the result of net cash used in operating activities of $10.5 million and purchases of property and equipment of $410,000.

**Cash Flows**

Net Cash Used in Operating Activities. Net cash used in operating activities was $10.5 million in the six months ended June 30, 2009. This amount was attributable primarily to the net loss after adjustment for non-cash items, such as depreciation and stock-based compensation expense, and an increase in inventory as we prepare for continued growth, partially offset by small changes in accounts receivable, prepaid assets, accounts payable and accrued expense due to the timing of activity in those accounts.

Net Cash Used in Investing Activities. Net cash used in investing activities was $2.5 million in the six months ended June 30, 2009. This amount reflected net purchases or sales and maturities of short-term

13

JA-253

Table of Contents

investments of $2.1 million and purchases of property and equipment of $410,000, primarily for research and development, surgical instrument kits and information technology needs.

Net Cash Provided by Financing Activities. Net cash provided by financing activities in the six months ended June 30, 2009 was $85,000, which primarily represented proceeds from the issuance of shares of our common stock upon the exercise of stock options.

**Operating Capital and Capital Expenditure Requirements**

We believe that our existing cash, cash equivalents and short-term investments, together with cash received from sales of our products, will be sufficient to meet our cash needs for at least the next two years. We intend to spend substantial sums on sales and marketing initiatives to support the ongoing commercialization of our products and on research and development activities, including product development, regulatory and compliance, clinical studies in support of our currently marketed products and future product offerings, and the enhancement and protection of our intellectual property. We may need to obtain additional financing to pursue our business strategy, to respond to new competitive pressures or to take advantage of opportunities that may arise. The sale of additional equity or convertible debt securities could result in dilution to our stockholders. If additional funds are raised through the issuance of debt securities, these securities could have rights senior to those associated with our common stock and could contain covenants that would restrict our operations. Any additional financing may not be available in amounts or on terms acceptable to us, if at all. If we are unable to obtain this additional financing, we may be required to reduce the scope of our planned product development and marketing efforts.

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations is based upon our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses, and disclosures of contingent assets and liabilities at the date of the financial statements. On an on-going basis, we evaluate our estimates, including those related to revenue recognition, accounts receivable, inventories, accrued expenses, income taxes and stock-based compensation. We use authoritative pronouncements, historical experience and other assumptions as the basis for making estimates. Actual results could differ from those estimates under different assumptions or conditions.

For a description of our critical accounting policies and estimates, please refer to the "Critical Accounting Policies and Estimates" section of the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section contained in our Annual Report on Form 10-K for the year ended December 31, 2008. There have been no material changes in any of our accounting policies since December 31, 2008.

**New Accounting Standards**

In February 2008, the Financial Accounting Standards Board, or FASB, issued Staff Position No. FAS 157-2, which delayed the effective date of Statement of Financial Accounting Standards, or

14

Table of Contents

SFAS, No. 157, "Fair Value Measurements", for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. We adopted SFAS No. 157 for our non-financial assets and non-financial liabilities on January 1, 2009 and it did not have a material impact on our financial statements.

In May 2009, the FASB issued SFAS No. 165, "Subsequent Events,", which establishes general standards of accounting for and disclosure of events that occur after the balance sheet date but before the financial statements are issued or are available to be issued. SFAS No. 165 provides guidance on the period after the balance sheet date during which management of a reporting entity should evaluate events or transactions that may occur for potential recognition or disclosure in the financial statements, the circumstances under which an entity should recognize events or transactions occurring after the balance sheet date in its financial statements and the disclosures that an entity should make about events or transactions that occurred after the balance sheet date. We adopted SFAS No. 165 during the second quarter of 2009, and its application did not have a material impact on our financial statements. We performed this evaluation through August 6, 2009, the date the financial statements were issued.

In June 2009, the FASB issued SFAS No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles". SFAS No. 168 establishes the FASB Accounting Standards Codification, or the Codification, as the single source of authoritative nongovernmental U.S. GAAP. The Codification is effective for interim and annual periods ending after September 15, 2009. The adoption of this standard did not have a material impact on our financial statements.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on us.

### Item 3.   Quantitative and Qualitative Disclosures About Market Risk

Our exposure to interest rate risk at June 30, 2009 is related to our investment portfolio. We invest our excess cash primarily in money market funds, debt instruments of the U.S. government and its agencies and in high quality corporate bonds. Due to the short-term nature of these investments, we have assessed that there is no material exposure to interest rate risk arising from our investments. Thus, a hypothetical 100 basis point adverse move in interest rates along the entire interest rate yield curve would not materially affect the fair market value of our interest-sensitive financial investments. Declines in interest rates over time will, however, reduce our investment income. Historically, and as of June 30, 2009, we have not used derivative instruments or engaged in hedging activities.

Although substantially all of our sales and purchases are denominated in U.S. dollars, future fluctuations in the value of the U.S. dollar may affect the competitiveness of our products outside the United States. We do not believe, however, that we currently have significant direct foreign currency exchange rate risk and have not hedged exposures denominated in foreign currencies.

15

JA-255

Table of Contents

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of June 30, 2009. We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of June 30, 2009, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective and operating at the reasonable assurance level.

**Changes in Internal Control over Financial Reporting**

There has been no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

**(b) Uses of Proceeds from Sale of Registered Securities**

On October 22, 2007, we completed our initial public offering of 6,325,000 shares of common stock at the offering price of $15.00 per share. We effected the offering through a Registration Statement on Form S-1 (Registration No. 333-144802), which was declared effective by the SEC on October 16, 2007, and through a Registration Statement on Form S-1 filed pursuant to Rule 462(b) under the Securities Act (Registration No. 333-146753), which became effective upon filing on October 17, 2007 pursuant to Rule 462(b). The offering resulted in aggregate proceeds to us of approximately $86.7 million, net of underwriting discounts and commissions.

As of June 30, 2009, we had used approximately $64.0 million of the net proceeds for sales, marketing and general administrative activities and $8.7 million for research and development activities.

We intend to use the remaining net proceeds of our initial public offering to support the commercialization of our existing and future products and to support our research and development

16

JA-256

**Table of Contents**

activities, clinical trials, regulatory clearances or approvals and for capital expenditures, working capital and other general corporate purposes. We have invested the net proceeds from our initial public offering in money-market funds and short-term investment-grade interest-bearing securities. There has been no material change in the planned use of proceeds from our initial public offering as described in the final prospectus filed with the SEC on October 17, 2007 pursuant to Rule 424(b) under the Securities Act. As of the date of this report, we cannot specify with certainty all of the particular uses for the net proceeds received in connection with our initial public offering. The amounts and timing of our actual expenditures will depend on numerous factors, including the status of our product development efforts, sales and marketing activities, technological advances, amount of cash generated or used by our operations and competition. Accordingly, our management will have broad discretion in the application of the net proceeds and investors will be relying on the judgment of our management regarding the application of the proceeds of the offering.

### Item 4.  Submission of Matters to a Vote of Security Holders

We held an annual meeting on June 3, 2009 at our corporate headquarters in Wilmington, North Carolina. The first item of business was the election of two class II directors. The nominees elected were Michael Carusi and Jonathan Osgood. Both nominees were elected by a majority of votes present at the meeting as follows:

| Name | Votes For | Votes Withheld |
|------|-----------|----------------|
| Michael Carusi | 17,188,315 | 150,448 |
| Jonathan Osgood | 17,304,345 | 34,458 |

Directors Richard Randall, Mitchell Dann, James Shapiro, Joseph Slattery and Paul LaViolette continued in office after the meeting.

The appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm for the year ending December 31, 2009 was ratified with 17,321,156 in favor and 17,647 abstentions.

An amendment to our 2007 Stock Incentive Plan to increase the number of shares reserved for issuance from 1,400,000 to 2,000,000 was ratified with 13,056,492 in favor, 1,716,865 against and 10,050 abstentions.

### Item 6.  Exhibits

A list of the exhibits required to be filed as part of this report is set forth in the "Exhibit Index," which immediately precedes such exhibits, and is incorporated herein by reference.

17

Case 7:12-cv-00023-F  Document 33-7  Filed 09/07/12  Page 20 of 24

JA-257

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**TranS1 Inc.**

Date: August 6, 2009

By: /s/ Richard Randall
Richard Randall
President and Chief Executive Officer

Date: August 6, 2009

By: /s/ Michael Luetkemeyer
Michael Luetkemeyer
Chief Financial Officer

18

Table of Contents

TranS1 Inc.
Exhibit Index

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 32.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |
| 32.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |

19

JA-259

EX-31.1 2 g20062exv31w1.htm EX-31.1

**EXHIBIT 31.1**

### Certification

I, Richard Randall, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 6, 2009

/s/ Richard Randall
_____
Richard Randall
President and Chief Executive Officer

EX-31.2 3 g20062exv31w2.htm EX-31.2

<div align="right">**EXHIBIT 31.2**</div>

<div align="center">**Certification**</div>

I, Michael Luetkemeyer, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during        the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control        over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: August 6, 2009

/s/ Michael Luetkemeyer
_____
Michael Luetkemeyer
Chief Financial Officer

# Exhibit 7

Case 7:12-cv-00023-F   Document 33-8   Filed 09/07/12   Page 1 of 12

8-K 1 g21033e8vk.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### The Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): October 29, 2009**

# TRANS1 INC.
### (Exact name of registrant as specified in its charter)

| **Delaware** | **001-33744** | **33-0909022** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**411 Landmark Drive**
**Wilmington, NC 28412-6303**
(Address of principal executive offices)
(Zip Code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02 Results of Operations and Financial Condition.**

On October 29, 2009, TranS1 Inc. (the "Company") issued a press release to report its financial results for the third fiscal quarter ended September 30, 2009. The release is furnished herewith as Exhibit 99.1 and incorporated herein by this reference.

Also on October 29, 2009, following the issuance of the press release referred to above, the Company conducted a conference call to discuss its financial results for the third fiscal quarter ended September 30, 2009. A copy of the transcript of the conference call is furnished herewith as Exhibit 99.2 and incorporated herein by this reference.

The information in this Current Report on Form 8-K, including Exhibits 99.1 and 99.2, are being furnished pursuant to Item 2.02 and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section, nor shall they be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits.**

   **(d) Exhibits.**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press release, dated October 29, 2009. |
| 99.2 | Conference call transcript, dated October 29, 2009. |

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRANS1 INC.

November 3, 2009                    By:  /s/ Michael Luetkemeyer
                                        Michael Luetkemeyer
                                        Chief Financial Officer

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press release, dated October 29, 2009. |
| 99.2 | Conference call transcript, dated October 29, 2009. |

EX-99.1 2 g21033exv99w1.htm EX-99.1

**Exhibit 99.1**

**TranS1 Inc. Reports Operating Results for the Third Quarter of 2009**

*Highlights:*

*Third quarter revenues increased 15% to $6.9 million*

*729 TranS1 procedures performed globally in the quarter*

*Gross margin was 80.2% for the quarter*

*GAAP loss per share was $0.27 for the quarter*

*Non-GAAP loss per share was $0.24 for the quarter*

WILMINGTON, NC — (GLOBE NEWSWIRE)—October 29, 2009—TranS1 Inc. (NASDAQ:TSON), a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine, today announced its financial results for the third quarter ended September 30, 2009.

Revenues were $6.9 million in the third quarter of 2009, representing a 15% increase over revenues of $6.0 million in the third quarter of 2008. Gross margin was 80.2% in the third quarter of 2009 as compared to 83.2% in the third quarter of 2008. Gross margin in the third quarter included a non-recurring charge of approximately $125,000 related to inventory obsolescence. Excluding this charge, gross margin would have been 82.0%.

Operating expenses were $11.2 million in the third quarter of 2009 compared to $10.4 million in the third quarter of 2008. The increase in operating expenses is primarily attributable to an increase in sales and marketing costs as a result of the continued expansion of the direct sales force, increased commissions as a result of increased sales and increased spending for research and development.

Net loss was $5.6 million and $4.8 million for the quarters ended September 30, 2009 and 2008, respectively. GAAP net loss per common share was $0.27 in the third quarter of 2009 compared to a net loss per share of $0.23 in the third quarter of 2008.

For the quarters ended September 30, 2009 and 2008, on a non-GAAP basis adjusting for non-cash stock compensation expense, net loss per common share was $0.24 and $0.20, respectively.

Cash, cash-equivalents and investments were $61.3 million as of September 30, 2009.

"Our results this quarter were impacted by continuing uncertainty in the marketplace surrounding reimbursement for our AxiaLIF procedure, which we are addressing with increased education and support resources for our current and prospective surgeon users," said Rick Randall, President and CEO of TranS1. "We remain confident in our products, clinical benefits and prospects for future growth as the market for minimally invasive spine surgery continues to expand."

**Conference Call**

TranS1 will host a conference call today at 5:30 pm ET to discuss its third quarter financial results. To listen to the conference call on your telephone, please dial 888-298-3490 for domestic callers and 719-325-2174 for international callers approximately ten minutes prior to the start time. The call will be concurrently webcast. To access the live audio broadcast or the subsequent archived recording, visit the TranS1 website at www.trans1.com under the investor relations section.

**Non-GAAP Measures**

Management uses certain non-GAAP financial measures such as non-GAAP net loss and net loss per share, which exclude stock based compensation. This non-GAAP presentation is given in part to enhance the understanding of the company's historical financial performance and comparability between periods. The company believes that the non-GAAP presentation to exclude stock-based compensation is relevant and useful information that will be widely used by investors and analysts. Accordingly, the company is disclosing this information to permit additional analysis of the company's performance. These non-GAAP measures are not in accordance with, or an alternative for, GAAP, and may be different from non-GAAP measures used by other companies. Investors should consider these non-GAAP measures in addition to, and not as a substitute for, financial performance measures in accordance with GAAP. A reconciliation of the GAAP financial measures to the comparable non-GAAP financial measure is included below.

**About TranS1 Inc.**

TranS1 is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. TranS1 currently markets two single-level fusion products, the AxiaLIF® and the AxiaLIF 360™, and a two-level fusion product, the AxiaLIF 2L™, in the US and Europe. TranS1 was founded in May 2000 and is headquartered in Wilmington, North Carolina. For more information, visit www.trans1.com.

**Forward-Looking Statements**

This press release includes forward-looking statements, the accuracy of which is necessarily subject to risks and uncertainties. These risks and uncertainties include, among other things, risks associated with the adoption of a new technology by spine

surgeons, product development efforts, regulatory requirements, maintenance and prosecution of adequate intellectual property protection and other economic and competitive factors. These forward looking statements are based on the company's expectations as of the date of this press release and the company undertakes no obligation to update information provided in this press release. For a discussion of risks and uncertainties associated with TranS1's business, please review the company's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2008.

**CONTACT:**
Investors:
TranS1 Inc.
Michael Luetkemeyer, 910-332-1700
Chief Financial Officer

or

Westwicke Partners
Mark Klausner, 443-213-0501
mark.klausner@westwicke.com

Source: TranS1 Inc.

**TranS1 Inc.**
**Statements of Operations**
**(in thousands, except per share amounts)**
**(Unaudited)**

| | Three Months Ended Sept. 30, | | Nine Months Ended Sept. 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Revenue | $ 6,912 | $ 6,021 | $ 23,528 | $ 17,950 |
| Cost of revenue | 1,366 | 1,011 | 4,423 | 3,186 |
| Gross profit | 5,546 | 5,010 | 19,105 | 14,764 |
| | | | | |
| Operating expenses: | | | | |
| Research and development | 1,362 | 910 | 5,047 | 3,241 |
| Sales and marketing | 8,126 | 7,782 | 26,219 | 20,680 |
| General and administrative | 1,683 | 1,671 | 5,714 | 5,563 |
| | | | | |
| Total operating expenses | 11,171 | 10,363 | 36,980 | 29,484 |
| | | | | |
| Operating loss | (5,625) | (5,353) | (17,875) | (14,720) |
| | | | | |
| Interest income | 54 | 589 | 382 | 2,218 |
| | | | | |
| Net loss | $ (5,571) | $ (4,764) | $(17,493) | $(12,502) |
| | | | | |
| Net loss per common share - basic and diluted | $ (0.27) | $ (0.23) | $ (0.85) | $ (0.62) |
| | | | | |
| Weighted average common shares outstanding - basic and diluted | 20,630 | 20,474 | 20,591 | 20,206 |
| | | | | |
| Stock-based compensation is included in operating expenses in the following categories: | | | | |
| Cost of revenue | $ 19 | $ 18 | $ 56 | $ 45 |
| Research and development | 40 | 99 | 141 | 394 |
| Sales and marketing | 368 | 445 | 1,143 | 1,319 |
| General and administrative | 186 | 181 | 860 | 839 |
| | $ 613 | $ 743 | $ 2,200 | $ 2,597 |

Reconciliation of Quarterly Results
(in thousands, except per share amounts)
(Unaudited)

| | 2009 | 2008 |
|---|---|---|
| GAAP net loss | $ (5,571) | $ (4,764) |
| Stock based compensation | 613 | 743 |
| Non-GAAP net loss | $ (4,958) | $ (4,021) |
| | | |
| Shares used in computing GAAP and non-GAAP loss per share | 20,630 | 20,474 |
| | | |
| Non-GAAP loss per share | $  (0.24) | $  (0.20) |

Reconciliation of Year-To-Date Results
(in thousands, except per share amounts)
(Unaudited)

| | 2009 | 2008 |
|---|---|---|
| GAAP net loss | $(17,493) | $(12,502) |
| Stock based compensation | 2,200 | 2,597 |
| Non-GAAP net loss | $(15,293) | $ (9,905) |
| | | |
| Shares used in computing GAAP and non-GAAP loss per share | 20,591 | 20,206 |
| | | |
| Non-GAAP loss per share | $  (0.74) | $  (0.49) |

**TranS1 Inc.**
**Balance Sheets**
**(in thousands)**
**(Unaudited)**

| | September 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 30,298 | $ | 42,051 |
| Short-term investments | | 30,969 | | 35,215 |
| Accounts receivable, net | | 4,168 | | 4,812 |
| Inventory | | 7,671 | | 6,369 |
| Prepaid expenses and other assets | | 433 | | 632 |
| Total current assets | | 73,539 | | 89,079 |
| Property and equipment, net | | 1,281 | | 1,412 |
| Total assets | $ | 74,820 | $ | 90,491 |
| | | | | |
| **Liabilities and Stockholders' Equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ | 2,655 | $ | 2,896 |
| Accrued expenses | | 1,780 | | 2,009 |
| Total current liabilities | | 4,435 | | 4,905 |
| | | | | |
| Stockholders' equity | | | |
| Common stock | | 2 | | 2 |
| Additional paid-in capital | | 135,796 | | 133,507 |
| Accumulated other comprehensive income | | 3 | | — |
| Accumulated deficit | | (65,416) | | (47,923) |
| Total stockholders' equity | | 70,385 | | 85,586 |
| | | | | |
| Total liabilities and stockholders' equity | $ | 74,820 | $ | 90,491 |

**TranS1 Inc.**
**Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

| | Nine Months Ended Sept. 30, | |
| | 2009 | 2008 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | $(17,493) | $(12,502) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
|     Depreciation | 684 | 583 |
|     Stock-based compensation | 2,200 | 2,597 |
|     Allowance for excess and obsolete inventory | 541 | 376 |
|     Provision for bad debts | 63 | 84 |
|     Changes in operating assets and liabilities: | | |
|         (Increase) decrease in accounts receivable | 581 | (611) |
|         (Increase) decrease in inventory | (1,843) | (1,804) |
|         (Increase) decrease in prepaid expenses | 199 | 196 |
|         Increase (decrease) in accounts payable | (241) | 772 |
|         Increase (decrease) in accrued expenses | (229) | 413 |
| Net cash used in operating activities | (15,538) | (9,896) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (553) | (1,003) |
| Purchases of investments | (39,911) | (50,826) |
| Sales and maturities of short-term investments | 44,157 | 39,791 |
| Net cash provided by (used in) investing activities | 3,693 | (12,038) |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 92 | 188 |
| Net cash provided by (used in) financing activities | 92 | 188 |
| Net increase (decrease) in cash and cash equivalents | (11,753) | (21,746) |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 |
| Cash and cash equivalents, end of period | $ 30,298 | $ 42,930 |

JA-273

# Exhibit 8

JA-274

Table of Contents

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 10-Q

☑     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

     **For the quarterly period ended September 30, 2009**

<div align="center">or</div>

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

     **For the transition period _____ to _____**

**Commission File Number 001-33744**

# TRANS1 INC.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **33-0909022** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |

**411 LANDMARK DRIVE, WILMINGTON, NC 28412-6303**
(Address of principal executive office)    (Zip code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.:

Large accelerated filer ☐   Accelerated filer ☑      Non-accelerated filer ☐      Smaller reporting company ☐
<div align="center">(Do not check if a smaller reporting company)</div>

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐   No ☑

The number of shares of the registrant's common stock outstanding as of November 2, 2009 was 20,635,084 shares.

TRANS1 INC.
FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2009
TABLE OF CONTENTS

**PART I.  FINANCIAL INFORMATION**

| | |
|---|---|
| **Item 1.** **Financial Statements** (unaudited) | |
| Statements of Operations | 1 |
| Balance Sheets | 2 |
| Statements of Cash Flows | 3 |
| Notes to Financial Statements | 4 |
| **Item 2.** **Management's Discussion and Analysis of Financial Condition and Results of Operations** | 8 |
| **Item 3.** **Quantitative and Qualitative Disclosures About Market Risk** | 15 |
| **Item 4.** **Controls and Procedures** | 16 |

**PART II.  OTHER INFORMATION**

| | |
|---|---|
| **Item 2.** **Unregistered Sales of Equity Securities and Use of Proceeds** | 16 |
| **Item 6.** **Exhibits** | 17 |
| **SIGNATURES** | 18 |
| **EXHIBIT INDEX** | 19 |
| EX-31.1 | |
| EX-31.2 | |
| EX-32.1 | |
| EX-32.2 | |

Table of Contents

**PART I. FINANCIAL INFORMATION**

Item 1.  Financial Statements.

<div align="center">

**TranS1 Inc.**
**Statements of Operations**
**(in thousands, except per share amounts)**
**(Unaudited)**

</div>

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Revenue | $  6,912 | $  6,021 | $ 23,528 | $ 17,950 |
| Cost of revenue | 1,366 | 1,011 | 4,423 | 3,186 |
| Gross profit | 5,546 | 5,010 | 19,105 | 14,764 |
| Operating expenses: | | | | |
| Research and development | 1,362 | 910 | 5,047 | 3,241 |
| Sales and marketing | 8,126 | 7,782 | 26,219 | 20,680 |
| General and administrative | 1,683 | 1,671 | 5,714 | 5,563 |
| Total operating expenses | 11,171 | 10,363 | 36,980 | 29,484 |
| Operating loss | (5,625) | (5,353) | (17,875) | (14,720) |
| Interest income | 54 | 589 | 382 | 2,218 |
| Net loss | $  (5,571) | $  (4,764) | $(17,493) | $(12,502) |
| Net loss per common share — basic and diluted | $    (0.27) | $    (0.23) | $   (0.85) | $    (0.62) |
| Weighted average common shares outstanding — basic and diluted | 20,630 | 20,474 | 20,591 | 20,206 |

<div align="center">

The accompanying notes are an integral part of these financial statements.

1

</div>

<div align="center">

JA-277

</div>

Table of Contents

TranS1 Inc.
Balance Sheets
(in thousands)
(Unaudited)

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 30,298 | $ 42,051 |
| Short-term investments | 30,969 | 35,215 |
| Accounts receivable, net | 4,168 | 4,812 |
| Inventory | 7,671 | 6,369 |
| Prepaid expenses and other assets | 433 | 632 |
| Total current assets | 73,539 | 89,079 |
| Property and equipment, net | 1,281 | 1,412 |
| Total assets | $ 74,820 | $ 90,491 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,655 | $ 2,896 |
| Accrued expenses | 1,780 | 2,009 |
| Total current liabilities | 4,435 | 4,905 |
| | | |
| Stockholders' equity: | | |
| Common stock | 2 | 2 |
| Additional paid-in capital | 135,796 | 133,507 |
| Accumulated other comprehensive income | 3 | — |
| Accumulated deficit | (65,416) | (47,923) |
| Total stockholders' equity | 70,385 | 85,586 |
| Total liabilities and stockholders' equity | $ 74,820 | $ 90,491 |

The accompanying notes are an integral part of these financial statements.

2

Table of Contents

**TranS1 Inc.**
**Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

| | Nine Months Ended September 30, 2009 | 2008 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | $ (17,493) | $ (12,502) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 684 | 583 |
| Stock-based compensation | 2,200 | 2,598 |
| Allowance for excess and obsolete inventory | 541 | 376 |
| Provision for bad debts | 63 | 84 |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in accounts receivable | 581 | (611) |
| (Increase) decrease in inventory | (1,843) | (1,804) |
| (Increase) decrease in prepaid expenses | 199 | 196 |
| Increase (decrease) in accounts payable | (241) | 772 |
| Increase (decrease) in accrued expenses | (229) | 412 |
| Net cash used in operating activities | (15,538) | (9,896) |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (553) | (1,003) |
| Purchases of investments | (39,911) | (50,826) |
| Sales and maturities of investments | 44,157 | 39,791 |
| Net cash provided by (used in) investing activities | 3,693 | (12,038) |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 92 | 188 |
| Net cash provided by financing activities | 92 | 188 |
| Net decrease in cash and cash equivalents | (11,753) | (21,746) |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 |
| Cash and cash equivalents, end of period | $ 30,298 | $ 42,930 |

The accompanying notes are an integral part of these financial statements.

Table of Contents

**TranS1 Inc.**
Notes to Financial Statements
(Unaudited)

**1. Description of Business**

TranS1 Inc., a Delaware corporation (the "Company"), was incorporated in May 2000 and is headquartered in Wilmington, North Carolina. The Company is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. The Company operates in one business segment. The Company has developed and currently markets two single-level fusion products, AxiaLIF® and AxiaLIF 360°™, and a two-level fusion product, the AxiaLIF 2L™. All of the Company's products are delivered using its pre-sacral approach. The AxiaLIF product was commercially released in January 2005 and the AxiaLIF 360° product was commercially released in July 2006. The AxiaLIF 2L™ product was commercially released in Europe in the fourth quarter of 2006 and in the United States in the second quarter of 2008. The Company generates revenue from the sale of implants and procedure kits. The Company sells its products directly to hospitals and surgical centers in the United States and certain European countries, and to independent distributors elsewhere.

The Company owns four trademark registrations in the United States and seven trademark registrations in the European Union. The Company also owns ten pending trademark applications in the United States and six pending trademark applications in Canada.

The Company is subject to a number of risks similar to other companies in the medical device industry. These risks include, without limitation, rapid technological change, uncertainty of market acceptance of our products, uncertainty of regulatory clearance or approval, uncertainty of reimbursement from third-party payors, competition from substitute products and larger companies, the need to obtain additional financing, compliance with government regulation, protection of proprietary technology, product liability, and the dependence on key individuals.

**2. Basis of presentation**

The Company has prepared the accompanying financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). The financial statements are unaudited and reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of the Company's management, necessary for a fair statement of the Company's financial position, results of operations and cash flows. These principles require management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The principal estimates relate specifically to accounts receivable reserves, inventory reserves, stock-based compensation, accrued expenses and income tax valuations. Actual results could differ from those estimates. Operating results for the interim periods presented are not necessarily indicative of the results that may be expected for the

4

JA-280

Table of Contents

full year. The year end balance sheet data was derived from audited financial statements, but does not include all disclosures required by accounting principles generally accepted in the United States.

In the second quarter of 2009, the Company revised the classification of patent-related legal costs from research and development expense to general and administrative expense as such costs typically would be excluded from research and development costs as defined by Accounting Standards Codification 730 (formerly Statement of Financial Accounting Standards No. 2, "Accounting for Research and Development Costs"). Amounts related to prior periods are not considered material to the financial statements taken as a whole, but were revised for purposes of comparability. Such amounts for the three and nine month periods ended September 30, 2008 were $253,000 and $699,000, respectively. The revision did not affect previously reported total operating expenses, net loss, loss per share, assets, liabilities, stockholders' equity or cash flows.

**Impact of Recently Issued Accounting Standards**

In June 2009, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Codification ("ASC") 105 (formerly SFAS 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles"). ASC 105 became the source of authoritative U.S. GAAP recognized by the FASB to be applied by nongovernment entities. It also modifies the GAAP hierarchy to include only two levels of GAAP; authoritative and non-authoritative. ASC 105 is effective for financial statements issued for interim and annual periods ending after September 15, 2009. The Company adopted ASC 105 during the third quarter of 2009. The adoption of this standard did not have a material impact on the Company's financial statements.

In February 2008, the FASB issued ASC 820 (formerly Staff Position No. FAS 157-2, "Fair Value Measurements"), which delayed the effective date of ASC 820 for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. The Company adopted ASC 820 for its non-financial assets and non-financial liabilities on January 1, 2009, and it did not have a material impact on the Company's financial statements.

In May 2009, the FASB issued ASC 855 (formerly SFAS No. 165, "Subsequent Events"), which establishes general standards of accounting for and disclosures of events that occur after the balance sheet date but before the financial statements are issued or are available to be issued. ASC 855 provides guidance on the period after the balance sheet date during which management of a reporting entity should evaluate events or transactions that may occur for potential recognition or disclosure in the financial statements, the circumstances under which an entity should recognize events or transactions occurring after the balance sheet date in its financial statements and the disclosures that an entity should make about events or transactions that occurred after the balance sheet date. The Company adopted ASC 855 during the second quarter of 2009, and its application did not have a material impact on the Company's financial statements. The Company has performed this evaluation through November 6, 2009, the date the financial statements were issued.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on the Company.

**3. Income taxes**

No provision for federal or state income taxes has been recorded as the Company has incurred net operating losses since inception.

5

**Table of Contents**

### 4. Loss per share

Basic net loss per common share ("Basic EPS") is computed by dividing the net loss by the weighted average number of common shares outstanding. Diluted net loss per common share ("Diluted EPS") is computed by dividing the net loss by the weighted average number of common shares and potential dilutive common share equivalents then outstanding. The Company's potential dilutive common shares, which consist of shares issuable upon the exercise of stock options, have not been included in the computation of diluted net loss per share for all periods as the result would be anti-dilutive.

The following table sets forth the potential shares of common stock that are not included in the calculation of diluted net loss per share as the result would be anti-dilutive as of the end of each period presented:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2009 | 2008 | 2009 | 2008 |
| Weighted average stock options outstanding | 2,441,139 | 2,300,906 | 2,274,259 | 1,982,502 |

### 5. Cash, Cash Equivalents and Investments

The Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents. Cash and cash equivalents include money market funds. Short-term investments consist of U.S. government securities.

At September 30, 2009, the Company holds certain assets that are required to be measured at fair value on a recurring basis. These assets include available for sale securities classified as cash equivalents and short-term investments. ASC 820 requires that fair value measurements be classified and disclosed in one of three tiers. These tiers are: Level 1, defined as quoted prices in active markets for identical assets or liabilities; Level 2, defined as valuations based on observable inputs other than those included in Level 1, such as quoted prices for similar assets and liabilities in active markets, or other inputs that are observable or can be corroborated by observable input data; and Level 3, defined as valuations based on unobservable inputs reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants.

At September 30, 2009, all available for sale securities are classified as Level 1 assets with a fair value of $61.6 million, which included money market funds of $30.6 million and short-term investments of $31.0 million. At December 31, 2008, all available for sale securities were classified as Level 1 assets with a fair value of $76.8 million, which included money market funds of $41.6 million and short-term investments of $35.2 million. The Company had no Level 2 or Level 3 assets or liabilities at September 30, 2009 or December 31, 2008.

### 6. Accounts receivable, net

6

JA-282

Table of Contents

The following table presents the components of accounts receivable:

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
|  | (In thousands) | |
| Gross accounts receivable | $ 4,350 | $ 5,005 |
| Allowance for uncollectible accounts | (182) | (193) |
| Total accounts receivable, net | $ 4,168 | $ 4,812 |

## 7. Inventories

The following table presents the components of inventories:

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
|  | (In thousands) | |
| Finished goods | $ 3,503 | $ 2,598 |
| Work-in-process | 3,852 | 3,334 |
| Raw materials | 316 | 437 |
| Total inventories | $ 7,671 | $ 6,369 |

## 8. Accrued Expenses

The following table presents the components of accrued expenses:

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
|  | (In thousands) | |
| Commissions | $ 731 | $ 1,178 |
| Vacation | 349 | 163 |
| Bonus | 307 | 270 |
| Legal and professional fees | 101 | 69 |
| Other | 292 | 329 |
| Total accrued expenses | $ 1,780 | $ 2,009 |

7

http://www.sec.gov/Archives/edgar/data/1230535/000095012509039170/g21114e10vq.htm    6/21/2012

JA-283

Table of Contents

## 9. Comprehensive Loss

The following table presents the components of other comprehensive loss:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| Net loss | $(5,571) | $(4,764) | $(17,493) | $(12,502) |
| Other comprehensive income ( loss): |  |  |  |  |
| Translation adjustments | (1) | — | 3 | — |
| Total comprehensive loss | $(5,572) | $(4,674) | $(17,490) | $(12,502) |

**Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read in conjunction with our financial statements and the related notes to our financial statements included in this report. In addition to historical financial information, this report contains forward-looking statements that have been made pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 and concern matters that involve risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements. All statements other than statements of historical fact contained in this report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should" or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Readers are urged to carefully review and consider the various disclosures made by us, which attempt to advise interested parties of the risks, uncertainties, and other factors that affect our business, operating results, financial condition and stock price, including without limitation the disclosures made under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report and in the financial statements and notes thereto included elsewhere in this report, as well as the disclosures made under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Risk Factors", "Financial Statements" and "Notes to Financial Statements" included in our Annual Report on Form 10-K for the year ended December 31, 2008. Furthermore, such forward-looking statements speak only as of the date of this report. We expressly disclaim any intent or obligation to update any forward-looking statements after the date hereof to conform such statements to actual results or to changes in our opinions or expectations. References in this report to "TransS1", "we", "our", "us", or the "Company" refer to TransS1 Inc.*

8

Table of Contents

## Overview

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using this pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the degenerative disc. We developed our pre-sacral approach to allow spine surgeons to access and treat degenerative lumbar discs without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, short procedure times, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market in the United States and Europe two single-level fusion products, AxiaLIF and AxiaLIF 360°, and a two-level fusion product, the AxiaLIF 2L. All of our products are delivered using our pre-sacral approach.

From our incorporation in 2000 through 2004, we devoted substantially all of our resources to research and development and start-up activities, consisting primarily of product design and development, clinical trials, manufacturing, recruiting qualified personnel and raising capital. We received 510(k) clearance from the U.S. Food and Drug Administration, or FDA, for our AxiaLIF product in the fourth quarter of 2004, and commercially introduced our AxiaLIF product in the United States in the first quarter of 2005. We received FDA 510(k) clearance for our AxiaLIF 360° product in the United States in the third quarter of 2005 and began commercialization in the United States in the third quarter of 2006. We received a CE mark to market AxiaLIF in the European market in the first quarter of 2005 and began commercialization in the first quarter of 2006. For AxiaLIF 360°, we received a CE mark in the first quarter of 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2006 and began commercialization in the European market in the fourth quarter of 2006. We received FDA 510(k) clearance for our AxiaLIF 2L product and began marketing this product in the United States in the second quarter of 2008. We currently sell our products through a direct sales force, independent sales agents and international distributors.

We rely on third parties to manufacture most of our products and their components. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which allows us to compete with larger volume manufacturers of spine surgery products.

Since inception, we have been unprofitable. As of September 30, 2009, we had an accumulated deficit of $65.4 million.

We expect to continue to invest in creating a sales and marketing infrastructure for our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L products in order to gain wider acceptance for these products. We also expect to continue to invest in research and development and related clinical trials, and increase general and administrative expenses as we grow. As a result, we will need to generate significant revenue in order to achieve profitability.

## Financial Operations

9

**Table of Contents**

**Revenue**

We generate revenue from the sales of our procedure kits and implants used in our AxiaLIF fusion procedure for the treatment of degenerative disc disease and instability. Our revenue is generated by our direct sales force, independent sales agents and independent distributors. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. We also generate revenue through sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine revenue recognition on a case-by-case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment of our products to our independent distributors. Although we intend to continue to expand our international sales and marketing efforts, we expect that a substantial amount of our revenues will be generated in the United States in future periods.

**Cost of Revenue**

Cost of revenue consists primarily of material and overhead costs related to our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L instruments and implants. Cost of revenue also includes facilities-related costs, such as rent, utilities and depreciation.

**Research and Development**

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within our product development, regulatory and clinical functions and the costs of clinical studies and product development projects. Research and development expenses also include facilities-related costs. In future periods, we expect research and development expenses to grow as we continue to invest in basic research, clinical trials, product development and in our intellectual property.

**Sales and Marketing**

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to our direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities and participation in medical conferences. In future periods, we expect sales and marketing expenses to increase as we expand our sales and marketing efforts.

**General and Administrative**

General and administrative expenses consist of personnel costs, including stock-based compensation, related to the executive, finance, business development, information technology and human resource functions, as well as professional service fees, legal fees, accounting fees, insurance costs and general corporate expenses. We expect general and administrative expenses to increase as we grow our business and as we incur additional professional fees, increased insurance costs and other general corporate expenses related to operating as a public company.

**Interest Income**

Interest income is primarily composed of interest earned on our cash, cash equivalents and available-for-sale securities.

Table of Contents

**Results of Operations**

**Comparison of the Three Months Ended September 30, 2008 and 2009**

Revenue. Revenue increased from $6.0 million in the three months ended September 30, 2008 to $6.9 million in the three months ended September 30, 2009. The $0.9 million increase in revenue from 2008 to 2009 was primarily attributable to an increase in the number of AxiaLIF products sold, which we believe resulted from continued market acceptance of our AxiaLIF and AxiaLIF 360° products, and the commercialization of our AxiaLIF 2L product in the United States, which had its full market release in the fourth quarter of 2008. Our revenues this quarter were impacted by continuing uncertainty in the marketplace surrounding reimbursement for our AxiaLIF procedure, which we are addressing with increased education and support resources for our current and prospective surgeon users. None of this increase was attributable to price increases. Domestically, sales of our AxiaLIF 2L product increased from $0.9 million in the three months ended September 30, 2008 to $1.8 million in the three months ended September 30, 2009 and sales of our AxiaLIF 360° product decreased from $2.0 million in the three months ended September 30, 2008 to $1.7 million in the three months ended September 30, 2009. As a result of the launch of the AxiaLIF 2L, which has a higher selling price than our other products, average selling prices in the United States increased from approximately $9,800 in the three months ended September 30, 2008 to approximately $10,400 in the three months ended September 30, 2009. In the three months ended September 30, 2008 and 2009, we recorded 555 and 606 domestic AxiaLIF cases, respectively, including 201 AxiaLIF 360° cases and 64 AxiaLIF 2L cases in the third quarter of 2008, and 169 AxiaLIF 360° cases and 138 AxiaLIF 2L cases in the third quarter of 2009. Additionally, during the three months ended September 30, 2008 and 2009, we generated $203,000 and $191,000, respectively, in revenues from stand alone sales of our percutaneous facet screw system. Revenue generated outside the United States increased from $354,000 in the three months ended September 30, 2008 to $402,000 in the three months ended September 30, 2009. There were no initial stocking shipments to new distributors outside the United States in the third quarter of 2008, compared to $35,000 in the third quarter of 2009. In the three months ended September 30, 2008 and 2009, 94% of our revenues were generated within the United States.

Cost of Revenue. Cost of revenue increased from $1.0 million in the three months ended September 30, 2008 to $1.4 million in the three months ended September 30, 2009. The $354,000 increase in cost of revenue resulted primarily from higher material and overhead costs associated with increased sales volume for our products. As a percentage of revenue, cost of revenue increased from 16.8% in the three months ended September 30, 2008 to 19.8% in the three months ended September 30, 2009. The increase in cost of revenue as a percent of revenue from 2008 to 2009 was primarily attributable to an inventory obsolescence reserve of $125,000 for discontinued product, which was recorded in the third quarter of 2009.

Research and Development. Research and development expenses increased from $910,000 in the three months ended September 30, 2008 to $1.4 million in the three months ended September 30, 2009. The $0.5 million increase in expense in 2009 compared to 2008 was primarily the result of an increase in project-related spending.

11

http://www.sec.gov/Archives/edgar/data/1230335/000095012309059170/g21114ef0vq.htm        6/21/2012

Table of Contents

Sales and Marketing. Sales and marketing expenses increased from $7.8 million in the three months ended September 30, 2008 to $8.1 million in the three months ended September 30, 2009. The increase in expenses from 2008 to 2009 of $0.3 million was primarily the result of increased personnel related costs, including commissions, as we continued to build out our sales and marketing organization in order to continue to drive global market acceptance of our AxiaLIF products.

General and Administrative. General and administrative expenses remained consistent at $1.7 million for the three months ended September 30, 2008 and 2009.

Interest Income. Interest income decreased from $589,000 in the three months ended September 30, 2008 to $54,000 in the three months ended September 30, 2009. The decrease of $535,000 in interest income from 2008 to 2009 was primarily due to significantly lower interest rates and our lower average cash and investment balances.

**Comparison of the Nine Months Ended September 30, 2008 and 2009**

Revenue. Revenue increased from $18.0 million in the nine months ended September 30, 2008 to $23.5 million in the nine months ended September 30, 2009. The $5.5 million increase in revenue from 2008 to 2009 was primarily attributable to an increase in the number of AxiaLIF products sold. None of this increase was attributable to price increases. Sales of our AxiaLIF 360° product remained consistent at $6.4 million in the nine months ended September 30, 2008 and 2009. Sales of our AxiaLIF 2L product, which had its full market release in the fourth quarter of 2008, increased from $1.3 million in the nine months ended September 30, 2008 to $6.5 million in the nine months ended September 30, 2009. As a result of the launch of the AxiaLIF 2L, which has a higher selling price than our other products, average selling prices in the United States increased from approximately $9,500 in the nine months ended September 30, 2008 to approximately $10,600 in the nine months ended September 30, 2009. In the nine months ended September 30, 2008 and 2009, we recorded 1,629 and 2,028 domestic AxiaLIF cases, respectively, including 627 AxiaLIF 360° cases and 88 AxiaLIF 2L cases in 2008, and 629 AxiaLIF 360° cases and 481 AxiaLIF 2L cases in 2009. Additionally, during the nine months ended September 30, 2008 and 2009 we generated $644,000 and $699,000, respectively, in revenues from stand alone sales of our percutaneous facet screw system. Revenue generated outside the United States decreased from $1.8 million in the nine months ended September 30, 2008 to $1.4 million in the nine months ended September 30, 2009. $260,000 of this decrease was attributable to initial stocking shipments to new distributors in 2008. In the nine months ended September 30, 2008 and 2009, 90% and 94%, respectively, of our revenues were generated in the United States.

Cost of Revenue. Cost of revenue increased from $3.2 million in the nine months ended September 30, 2008 to $4.4 million in the nine months ended September 30, 2009. The $1.2 million increase in cost of revenue resulted primarily from higher material and overhead costs associated with increased sales volume for our AxiaLIF products. As a percentage of revenue, cost of revenue increased from 17.7% in the nine months ended September 30, 2008 to 18.8% in the nine months ended September 30, 2009. The increase in cost of revenue as a percent of revenue from 2008 to 2009 was primarily attributable to reserves for obsolete and excess inventory recorded in 2009.

Research and Development. Research and development expenses increased from $3.2 million in the nine months ended September 30, 2008 to $5.0 million in the nine months ended September 30, 2009. The $1.8 million increase in expense in 2009 compared to 2008 was primarily the result of an

12

JA-288

**Table of Contents**

expenditure of $1.0 million to acquire the rights to develop a technology for future use, along with increases in project related research and development and clinical trial costs of $0.8 million.

Sales and Marketing. Sales and marketing expenses increased from $20.7 million in the nine months ended September 30, 2008 to $26.2 million in the nine months ended September 30, 2009. The increase in expenses from 2008 to 2009 of $5.5 million was primarily the result of increased personnel related costs, including commissions, of $3.7 million, increased travel and entertainment expenses of $0.3 million related to the larger sales force, increased surgeon consulting expenses of $0.7 million and increased tradeshow and promotional expenses of $0.6 million.

General and Administrative. General and administrative expenses increased from $5.6 million in the nine months ended September 30, 2008 to $5.7 million in the nine months ended September 30, 2009. The increase in expenses from 2008 to 2009 of $0.1 million was primarily due to increased personnel related costs, including stock-based compensation expense, of $0.3 million, partially offset by a decrease in consulting fees of $0.1 million.

Interest Income. Interest income decreased from $2.2 million in the nine months ended September 30, 2008 to $0.4 million in the nine months ended September 30, 2009. The decrease of $1.8 million in interest income from 2008 to 2009 was primarily due to significantly lower interest rates and our lower average cash and investment balances.

**Liquidity and Capital Resources**

**Sources of Liquidity**

Since our inception in 2000, we have incurred significant losses and, as of September 30, 2009, we had an accumulated deficit of $65.4 million. We have not yet achieved profitability, and anticipate that we will continue to incur losses in the near term. As we continue to develop new products, drive global market acceptance of our current AxiaLIF products and expand our sales and marketing efforts, we expect that research and development, sales and marketing and general and administrative expenses will continue to increase. As a result, we will need to generate significant revenues to achieve profitability. To date, our operations have been funded primarily with proceeds from the sale of preferred stock and the net proceeds from our October 2007 initial public offering. Gross proceeds from our preferred stock sales totaled $40.5 million to date, and the net proceeds from our initial public offering were approximately $86.7 million.

As of September 30, 2009, we did not have any outstanding debt financing arrangements, we had working capital of $69.1 million and our primary source of liquidity was $61.3 million in cash, cash equivalents and short-term investments. We currently invest our cash and cash equivalents in money market treasury funds and our short-term investments in U.S. agency backed debt instruments.

Cash, cash equivalents and short-term investments decreased from $77.3 million at December 31, 2008 to $61.3 million at September 30, 2009. The decrease of $16.0 million was primarily the result of net cash used in operating activities of $15.5 million and purchases of property and equipment of $553,000.

13

JA-289

Table of Contents

## Cash Flows

Net Cash Used in Operating Activities. Net cash used in operating activities was $15.5 million in the nine months ended September 30, 2009. This amount was attributable primarily to the net loss after adjustment for non-cash items, such as depreciation, stock-based compensation expense and inventory and receivable reserves, and an increase in inventory as we prepare for continued growth, partially offset by small changes in accounts receivable, prepaid assets, accounts payable and accrued expense due to the timing of activity in those accounts.

Net Cash Used in Investing Activities. Net cash provided by investing activities was $3.7 million in the nine months ended September 30, 2009. This amount reflected net purchases or sales and maturities of short-term investments of $4.2 million, offset by purchases of property and equipment of $553,000, primarily for research and development, surgical instrument kits and information technology needs.

Net Cash Provided by Financing Activities. Net cash provided by financing activities in the nine months ended September 30, 2009 was $92,000 which primarily represented proceeds from the issuance of shares of our common stock upon the exercise of stock options.

### Operating Capital and Capital Expenditure Requirements

We believe that our existing cash, cash equivalents and short-term investments, together with cash received from sales of our products, will be sufficient to meet our cash needs for at least the next two years. We intend to spend substantial sums on sales and marketing initiatives to support the ongoing commercialization of our products and on research and development activities, including product development, regulatory and compliance, clinical studies in support of our currently marketed products and future product offerings, and the enhancement and protection of our intellectual property. We may need to obtain additional financing to pursue our business strategy, to respond to new competitive pressures or to take advantage of opportunities that may arise. The sale of additional equity or convertible debt securities could result in dilution to our stockholders. If additional funds are raised through the issuance of debt securities, these securities could have rights senior to those associated with our common stock and could contain covenants that would restrict our operations. Any additional financing may not be available in amounts or on terms acceptable to us, if at all. If we are unable to obtain this additional financing, we may be required to reduce the scope of our planned product development and marketing efforts.

### Critical Accounting Policies and Estimates

Our discussion and analysis of our financial condition and results of operations is based upon our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses, and disclosures of contingent assets and liabilities at the date of the financial statements. On an on-going basis, we evaluate our estimates, including those related to revenue recognition, accounts receivable, inventories, accrued expenses, income taxes and stock-based compensation. We use authoritative pronouncements, historical experience and other assumptions as the basis for making estimates. Actual results could differ from those estimates under different assumptions or conditions.

For a description of our critical accounting policies and estimates, please refer to the "Critical Accounting Policies and Estimates" section of the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section contained in our Annual Report on Form 10-K for the year ended December 31, 2008. There have been no material changes in any of our accounting policies since December 31, 2008.

14

Table of Contents

**New Accounting Standards**

In June 2009, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Codification ("ASC") 105 (formerly SFAS 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles"). ASC 105 became the source of authoritative U.S. GAAP recognized by the FASB to be applied by nongovernment entities. It also modifies the GAAP hierarchy to include only two levels of GAAP; authoritative and non-authoritative. ASC 105 is effective for financial statements issued for interim and annual periods ending after September 15, 2009. We adopted ASC 105 during the third quarter of 2009. The adoption of this standard did not have a material impact on our financial statements.

In February 2008, the FASB issued ASC 820 (formerly Staff Position No. FAS 157-2, "Fair Value Measurements"), which delayed the effective date of ASC 820 for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. We adopted ASC 820 for our non-financial assets and non-financial liabilities on January 1, 2009, and it did not have a material impact on our financial statements.

In May 2009, the FASB issued ASC 855 (formerly SFAS No. 165, "Subsequent Events"), which establishes general standards of accounting for and disclosures of events that occur after the balance sheet date but before the financial statements are issued or are available to be issued. ASC 855 provides guidance on the period after the balance sheet date during which management of a reporting entity should evaluate events or transactions that may occur for potential recognition or disclosure in the financial statements, the circumstances under which an entity should recognize events or transactions occurring after the balance sheet date in its financial statements and the disclosures that an entity should make about events or transactions that occurred after the balance sheet date. We adopted ASC 855 during the second quarter of 2009, and its application did not have a material impact on our financial statements. We performed this evaluation through November 6, 2009, the date the financial statements were issued.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on us.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

Our exposure to interest rate risk at September 30, 2009 is related to our investment portfolio. We invest our excess cash primarily in money market funds and in debt instruments of the U.S. government and its agencies. Due to the short-term nature of these investments, we have assessed that there is no material exposure to interest rate risk arising from our investments. Thus, a hypothetical 100 basis point adverse move in interest rates along the entire interest rate yield curve would not materially affect the fair market value of our interest-sensitive financial investments. Declines in interest rates over time will, however, reduce our investment income. Historically, and as of September 30, 2009, we have not used derivative instruments or engaged in hedging activities.

Although substantially all of our sales and purchases are denominated in U.S. dollars, future fluctuations in the value of the U.S. dollar may affect the competitiveness of our products outside the United States. We do not believe, however, that we currently have significant direct foreign currency exchange rate risk and have not hedged exposures denominated in foreign currencies.

15

**Table of Contents**

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of September 30, 2009. We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of September 30, 2009, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective and operating at the reasonable assurance level.

**Changes in Internal Control over Financial Reporting**

There has been no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

**(b) Uses of Proceeds from Sale of Registered Securities**

On October 22, 2007, we completed our initial public offering of 6,325,000 shares of common stock at the offering price of $15.00 per share. We effected the offering through a Registration Statement on Form S-1 (Registration No. 333-144802), which was declared effective by the SEC on October 16, 2007, and through a Registration Statement on Form S-1 filed pursuant to Rule 462(b) under the Securities Act (Registration No. 333-146753), which became effective upon filing on October 17, 2007 pursuant to Rule 462(b). The offering resulted in aggregate proceeds to us of approximately $86.7 million, net of underwriting discounts and commissions.

As of September 30, 2009, we had used approximately $73.8 million of the net proceeds for sales, marketing and general administrative activities and $10.0 million for research and development activities.

16

Table of Contents

We intend to use the remaining net proceeds of our initial public offering to support the commercialization of our existing and future products and to support our research and development activities, clinical trials, regulatory clearances or approvals and for capital expenditures, working capital and other general corporate purposes. We have invested the net proceeds from our initial public offering in money-market funds and short-term investment-grade interest-bearing securities. There has been no material change in the planned use of proceeds from our initial public offering as described in the final prospectus filed with the SEC on October 17, 2007 pursuant to Rule 424(b) under the Securities Act. As of the date of this report, we cannot specify with certainty all of the particular uses for the net proceeds received in connection with our initial public offering. The amounts and timing of our actual expenditures will depend on numerous factors, including the status of our product development efforts, sales and marketing activities, technological advances, amount of cash generated or used by our operations and competition. Accordingly, our management will have broad discretion in the application of the net proceeds and investors will be relying on the judgment of our management regarding the application of the proceeds of the offering.

**Item 6. Exhibits**

A list of the exhibits required to be filed as part of this report is set forth in the "Exhibit Index," which immediately precedes such exhibits, and is incorporated herein by reference.

17

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**TranS1 Inc.**

Date: November 6, 2009                         By:  /s/ Richard Randall
                                                   Richard Randall
                                                   President and Chief Executive Officer


Date: November 6, 2009                         By:  /s/ Michael Luetkemeyer
                                                   Michael Luetkemeyer
                                                   Chief Financial Officer

18

JA-294

Table of Contents

**TranS1 Inc.**
**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 32.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |
| 32.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |

19

EX-31.1 2 g21114exv31w1.htm EX-31.1

**EXHIBIT 31.1**

<div align="center">

**Certification**

</div>

I, Richard Randall, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 6, 2009

/s/ Richard Randall
———————————————————
Richard Randall
President and Chief Executive Officer

<div align="center">20</div>

JA-296

EX-31.2 3 g21114exv31w2.htm EX-31.2

**EXHIBIT 31.2**

**Certification**

I, Michael Luetkemeyer, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: November 6, 2009

/s/ Michael Luetkemeyer
_____
Michael Luetkemeyer
Chief Financial Officer

21

JA-297

# Exhibit 9

8-K 1 g22269e8vk.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of
The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): February 23, 2010

# TRANS1 INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-33744** | **33-0909022** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**411 Landmark Drive
Wilmington, NC 28412-6303**
(Address of principal executive offices)
(Zip Code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02  Results of Operations and Financial Condition.**

On February 23, 2010, TranS1 Inc. (the "Company") issued a press release to report its financial results for the quarter ended December 31, 2009. The release is furnished herewith as Exhibit 99.1 and incorporated herein by this reference.

Also on February 23, 2010, following the issuance of the press release referred to above, the Company conducted a conference call to discuss its financial results for the quarter ended December 31, 2009. A copy of the transcript of the conference call is furnished herewith as Exhibit 99.2 and incorporated herein by this reference.

The information in this Current Report on Form 8-K, including Exhibits 99.1 and 99.2, are being furnished pursuant to Item 2.02 and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section, nor shall they be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such a filing.

**Item 5.02  Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

Also on February 23, 2010, the Company issued a press release announcing the resignation of Michael Luetkemeyer from his position as Chief Financial Officer of the Company, effective as of March 31, 2010. Mr. Luetkemeyer is resigning to pursue other opportunities and not as a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

In connection with Mr. Luetkemeyer's resignation, the Company and Mr. Luetkemeyer entered into a Separation Agreement on February 23, 2010, pursuant to which Mr. Luetkemeyer will serve as a consultant to the Company from April 1, 2010 through December 31, 2010, unless terminated earlier in accordance with the terms of the Separation Agreement. Mr. Luetkemeyer will continue to receive his current monthly salary through December 31, 2010. In addition, the Company will pay the premiums to continue Mr. Luetkemeyer's current coverage under the Company's group health plans until the end of the consulting period.

The above summary does not purport to be complete and is qualified in its entirety by reference to the Separation Agreement, which is attached as Exhibit 10.1 to this Current Report and incorporated herein by this reference. A copy of the press release announcing Mr. Luetkemeyer's resignation is also filed herewith as Exhibit 99.3 and incorporated herein by this reference.

**Item 9.01  Financial Statements and Exhibits.**

**(d) Exhibits.**

| Exhibit Number | Description |
|---|---|
| 10.1 | Separation Agreement, dated February 23, 2010, between TranS1 Inc. and Michael Luetkemeyer. |
| 99.1 | Press release, dated February 23, 2010. |
| 99.2 | Conference call transcript, dated February 23, 2010. |
| 99.3 | Press release, dated February 23, 2010. |

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRANS1 INC.

February 25, 2010                     By:  /s/ Kenneth Reali
                                          Kenneth Reali
                                          President and Chief Operating Officer

JA-301

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Separation Agreement, dated February 23, 2010, between TranS1 Inc. and Michael Luetkemeyer. |
| 99.1 | Press release, dated February 23, 2010. |
| 99.2 | Conference call transcript, dated February 23, 2010. |
| 99.3 | Press release, dated February 23, 2010. |

EX-99.1 3 g22269exv99w1.htm EX-99.1

**Exhibit 99.1**

**TranS1 Inc. Reports Operating Results for the Fourth Quarter of 2009**

*Highlights:*

*Fourth quarter revenues were $6.3 million*

*674 TranS1 procedures performed globally in the quarter*

*Gross margin was 79.9% for the quarter*

*GAAP loss per share was $0.28 for the quarter*

*Non-GAAP loss per share was $0.25 for the quarter*

WILMINGTON, NC — (GLOBE NEWSWIRE)—February 23, 2010—TranS1 Inc. (NASDAQ:TSON), a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine, today announced its financial results for the fourth quarter ended December 31 2009.

Revenues were $6.3 million in the fourth quarter of 2009, representing a 15% decrease over revenues of $7.4 million in the fourth quarter of 2008. Gross margin was 79.9% in the fourth quarter of 2009 as compared to 84.6% in the fourth quarter of 2008.

Operating expenses were $10.7 million in the fourth quarter of 2009 compared to $11.1 million in the fourth quarter of 2008. The decrease in operating expenses is primarily attributable to a decrease in sales and marketing costs as a result of the decreased commissions due to lower sales, partially offset by increased spending for research and development.

Net loss was $5.7 million and $4.5 million for the quarters ended December 31 2009 and 2008, respectively. GAAP net loss per common share was $0.28 in the fourth quarter of 2009 compared to a net loss per share of $0.22 in the fourth quarter of 2008.

For the quarters ended December 31 2009 and 2008, on a non-GAAP basis adjusting for non-cash stock compensation expense, net loss per common share was $0.25 and $0.20, respectively.

Cash, cash-equivalents and investments were $55.3 million as of December 31 2009.

"Our results this quarter, and for much of 2009, were impacted by concerns in the marketplace surrounding reimbursement for our AxiaLIF procedure. We are using the experience we gained in 2009 to better educate and support our current and prospective surgeon users as they navigate the current reimbursement landscape," said Rick Randall,

CEO of TranS1. "We are approaching 2010 with a leaner, more experienced sales force armed with a broader product offering to expand our clinical indications within the lumbar spine".

**Conference Call**

TranS1 will host a conference call today at 4:30 pm ET to discuss its fourth quarter financial results. To listen to the conference call on your telephone, please dial (877) 881-2183 for domestic callers and (970) 315-0453 for international callers approximately ten minutes prior to the start time. The call will be concurrently webcast. To access the live audio broadcast or the archived recording, use the following link at http://ir.trans1.com/events.cfm.

**Non-GAAP Measures**

Management uses certain non-GAAP financial measures such as non-GAAP net loss and net loss per share, which exclude stock based compensation. This non-GAAP presentation is given in part to enhance the understanding of the company's historical financial performance and comparability between periods. The company believes that the non-GAAP presentation to exclude stock-based compensation is relevant and useful information that will be widely used by investors and analysts. Accordingly, the company is disclosing this information to permit additional analysis of the company's performance. These non-GAAP measures are not in accordance with, or an alternative for, GAAP, and may be different from non-GAAP measures used by other companies. Investors should consider these non-GAAP measures in addition to, and not as a substitute for, financial performance measures in accordance with GAAP. A reconciliation of the GAAP financial measures to the comparable non-GAAP financial measure is included below.

**About TranS1 Inc.**

TranS1 is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. TranS1 currently markets the AxiaLIF family of products for single and multilevel lumbar fusion and the Vectre and Avatar posterior fixation systems for lumbar fixation supplemental to AxiaLIF fusion. TranS1 was founded in May 2000 and is headquartered in Wilmington, North Carolina. For more information, visit www.trans1.com.

**Forward-Looking Statements**

This press release includes forward-looking statements, the accuracy of which is necessarily subject to risks and uncertainties. These risks and uncertainties include, among other things, risks associated with the adoption of a new technology by spine surgeons, product development efforts, regulatory requirements, maintenance and prosecution of adequate intellectual property protection and other economic and competitive factors. These forward looking statements are based on the company's expectations as of the date of this press release and the company undertakes no obligation

to update information provided in this press release. For a discussion of risks and uncertainties associated with TranS1's business, please review the company's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2008.

**CONTACT:**
Investors:
TranS1 Inc.
Michael Luetkemeyer, 910-332-1700
Chief Financial Officer

or

Westwicke Partners
Mark Klausner, 443-213-0501
mark.klausner@westwicke.com

Source: TranS1 Inc.

**TranS1 Inc.**
**Statements of Operations**
**(in thousands, except per share amounts)**
**(Unaudited)**

|  | Three Months Ended Dec. 31, | | Twelve Months Ended Dec. 31, | |
|  | 2009 | 2008 | 2009 | 2008 |
|---|---|---|---|---|
| Revenue | $ 6,279 | $ 7,354 | $ 29,807 | $ 25,304 |
| Cost of revenue | 1,264 | 1,129 | 5,687 | 4,315 |
| Gross profit | 5,015 | 6,225 | 24,120 | 20,989 |
| Operating expenses: |  |  |  |  |
| Research and development | 1,392 | 839 | 6,439 | 4,081 |
| Sales and marketing | 7,878 | 8,696 | 34,098 | 29,375 |
| General and administrative | 1,471 | 1,554 | 7,184 | 7,116 |
| Total operating expenses | 10,741 | 11,089 | 47,721 | 40,572 |
| Operating loss | (5,726) | (4,864) | (23,601) | (19,583) |
| Interest income | 23 | 331 | 405 | 2,548 |
| Net loss | $ (5,703) | $ (4,533) | $(23,196) | $(17,035) |
| Net loss per common share — basic and diluted | $ (0.28) | $ (0.22) | $ (1.13) | $ (0.84) |
| Weighted average common shares outstanding — basic and diluted | 20,641 | 20,534 | 20,604 | 20,289 |
| Stock-based compensation is included in operating expenses in the following categories: |  |  |  |  |
| Cost of revenue | $ 19 | $ 21 | $ 74 | $ 66 |
| Research and development | 45 | 18 | 186 | 412 |
| Sales and marketing | 338 | 154 | 1,481 | 1,474 |
| General and administrative | 198 | 189 | 1,058 | 1,027 |
|  | $ 600 | $ 382 | $ 2,799 | $ 2,979 |

Reconciliation of Quarterly Results
(in thousands, except per share amounts)
(Unaudited)

|  | 2009 | 2008 |
|---|---|---|
| GAAP net loss | $ (5,703) | $ (4,533) |
| Stock based compensation | 600 | 382 |
| Non-GAAP net loss | $ (5,103) | $ (4,151) |
| Shares used in computing GAAP and non-GAAP loss per share | 20,641 | 20,534 |
| Non-GAAP loss per share | $   (0.25) | $   (0.20) |

Reconciliation of Year-To-Date Results
(in thousands, except per share amounts)
(Unaudited)

|  | 2009 | 2008 |
|---|---|---|
| GAAP net loss | $(23,196) | $(17,035) |
| Stock based compensation | 2,799 | 2,979 |
| Non-GAAP net loss | $(20,397) | $(14,056) |
| Shares used in computing GAAP and non-GAAP loss per share | 20,604 | 20,289 |
| Non-GAAP loss per share | $   (0.99) | $   (0.69) |

**TranS1 Inc.**
**Balance Sheets**
**(in thousands)**
**(Unaudited)**

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 29,298 | $ 42,051 |
| Short-term investments | 25,953 | 35,215 |
| Accounts receivable, net | 3,926 | 4,812 |
| Inventory | 7,325 | 6,369 |
| Prepaid expenses and other assets | 676 | 632 |
| Total current assets | 67,178 | 89,079 |
| Property and equipment, net | 1,813 | 1,412 |
| Total assets | $ 68,991 | $ 90,491 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,442 | $ 2,896 |
| Accrued expenses | 1,269 | 2,009 |
| Total current liabilities | 3,711 | 4,905 |
| | | |
| Stockholders' equity | | |
| Common stock | 2 | 2 |
| Additional paid-in capital | 136,402 | 133,507 |
| Accumulated other comprehensive income | (5) | — |
| Accumulated deficit | (71,119) | (47,923) |
| Total stockholders' equity | 65,280 | 85,586 |
| Total liabilities and stockholders' equity | $ 68,991 | $ 90,491 |

**TranS1 Inc.**
**Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

| | Twelve Months Ended Dec. 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| **Cash flows from operating activities:** | | |
| Net loss | $(23,196) | $(17,035) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 909 | 804 |
| Stock-based compensation | 2,799 | 2,979 |
| Allowance for excess and obsolete inventory | 505 | 400 |
| Provision for bad debts | 80 | 101 |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in accounts receivable | 806 | (1,688) |
| (Increase) decrease in inventory | (1,461) | (2,744) |
| (Increase) decrease in prepaid expenses | (44) | (35) |
| Increase (decrease) in accounts payable | (454) | 1,265 |
| Increase (decrease) in accrued expenses | (740) | 223 |
| Net cash used in operating activities | (20,796) | (15,730) |
| | | |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (1,310) | (1,128) |
| Purchases of investments | (50,872) | (55,761) |
| Sales and maturities of short-term investments | 60,134 | 49,791 |
| Net cash provided by (used in) investing activities | 7,952 | (7,098) |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 91 | 203 |
| Net cash provided by (used in) financing activities | 91 | 203 |
| Net decrease in cash and cash equivalents | (12,753) | (22,625) |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 |
| Cash and cash equivalents, end of period | $ 29,298 | $ 42,051 |

JA-309

# Exhibit 10

JA-310

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549
# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2009

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period         to

Commission File Number 001-33744

# TRANS1 INC.
*(Exact name of Registrant as specified in its charter)*

**DELAWARE**                                                    **33-0909022**
*(State or other jurisdiction of*                               *(I.R.S. employer*
*incorporation or organization)*                               *identification no.)*

**301 GOVERNMENT CENTER DRIVE, WILMINGTON, NC 28403**
*(Address of principal executive office) (Zip code)*

**(910) 332-1700**
*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act

| <u>Title of Each Class:</u> | <u>Name of Each Exchange on Which Registered:</u> |
|---|---|
| Common Stock, par value $0.0001 per share | The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  YES ☐   NO ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  YES ☐   NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  YES ☑   NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulations S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  YES ☐   NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☑    Non-accelerated filer ☐    Smaller Reporting
                                                   (Do not check if a smaller reporting    company ☐
                                                   company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange

JA-311

Act).  YES ☐  NO ☒

As of June 30, 2009, the last business day of our most recently completed second fiscal quarter, the aggregate market value of the voting stock held by non-affiliates was approximately $107.6 million, based on the number of shares held by non-affiliates of the registrant and based on the reported last sale price of common stock on June 30, 2009. This calculation does not reflect a determination that persons are affiliates for any other purposes.

The number of shares of the registrant's common stock outstanding as of March 8, 2010 was 20,656,293 shares.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Definitive Proxy Statement to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this annual report, relating to the Registrant's annual meeting of stockholders, are incorporated by reference into Part III of this Form 10-K. With the exception of the portions of the Proxy Statement specifically incorporated herein by reference, the Proxy Statement is not deemed to be filed as part of this Form 10-K.

**TRANS1 INC.**
**FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2009**

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 17 |
| Item 1B. | Unresolved Staff Comments | 36 |
| Item 2. | Properties | 36 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 36 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. | Selected Financial Data | 40 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 47 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 48 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 48 |
| Item 9A. | Controls and Procedures | 48 |
| Item 9B. | Other Information | 48 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 48 |
| Item 11. | Executive Compensation | 48 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 49 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 49 |
| Item 14. | Principal Accountant Fees and Services | 49 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 49 |
| SIGNATURES | | 50 |
| Index to Consolidated Financial Statements | | 51 |
| EX-10.7.1 | | |
| EX-23.1 | | |
| EX-31.1 | | |
| EX-31.2 | | |
| EX-32.1 | | |
| EX-32.2 | | |

2

JA-313

Table of Contents

**Cautionary Note Regarding Forward-Looking Statements**

In addition to historical financial information, this report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 that concern matters that involve risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements. All statements other than statements of historical fact contained in this report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should" or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Readers are urged to carefully review and consider the various disclosures made by us, which attempt to advise interested parties of the risks, uncertainties, and other factors that affect our business, operating results, financial condition and stock price, including without limitation the disclosures made under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors" in this report and in the consolidated financial statements and notes thereto included elsewhere in this report. Furthermore, such forward-looking statements speak only as of the date of this report. We expressly disclaim any intent or obligation to update any forward-looking statements after the date hereof to conform such statements to actual results or to changes in our opinions or expectations.

References in this report to "TranS1", "we", "our", "us", or the "Company" refer to TranS1 Inc.

3

Table of Contents

Item 1.  *Business*

**Overview**

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using this TranS1 pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the intervertebral space. We developed our TranS1 pre-sacral approach to allow spine surgeons to access and treat intervertebral spaces without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market two single-level fusion products, the AxiaLIF® and the AxiaLIF 360°™ and a two-level fusion product, the AxiaLIF 2L™, which include the Vectre and Avatar™ posterior fixation systems for lumbar fixation supplemental to AxiaLIF fusion.

Our AxiaLIF product received 510(k) clearance from the U.S. Food and Drug Administration, or FDA, in December 2004 and a CE mark in March 2005 and was commercially launched in the United States in January 2005. Our AxiaLIF 360° product received FDA 510(k) clearance in September 2005 and a CE mark in March 2006 and was commercially launched in the United States in July 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2005 and began commercialization in the European market in the fourth quarter of 2006. We received 510(k) clearance for our AxiaLIF 2L from the FDA and began marketing this product in the United States in April 2008. In November 2009, we commenced the limited market release of our next generation Vectre facet screw system. Our AxiaLIF 2L+ product received FDA 510(k) clearance, and we began marketing the product, in January 2010. In January 2010, we entered into a partnership agreement with Life Spine, Inc. to distribute Avatar, a minimally invasive pedicle screw system. As of December 31, 2009, over 8,600 fusion procedures have been performed globally using our AxiaLIF products. At December 31, 2009, we sold our AxiaLIF products through 55 direct sales personnel and 19 independent sales agents in the United States and 4 direct sales personnel and 14 independent distributors internationally. For the year ended December 31, 2009, our revenues were $29.8 million and our net loss was $23.2 million.

Lower back pain affects over six million people annually in the United States and is a leading cause of healthcare expenditures globally. Our currently marketed products address the lower lumbar spine fusion market. We believe the introduction of minimally invasive spine procedures, such as ours, will attract more back pain patients, and attract them earlier, to a definitive surgical solution, thereby increasing the rate at which the market grows.

**Spine Anatomy**

The human spine is the core of the human skeleton and provides important structural support while remaining flexible to allow movement. It consists of 33 separate interlocking bones called vertebrae that are connected by soft tissue and provide stability while facilitating motion. Vertebrae are paired into motion segments that move by means of two facet joints and one disc. The facet joints provide stability and enable the spine to bend and twist while the discs absorb pressures and shocks to the vertebrae. Nerves are contained in the spinal column and run through the foramen openings to the rest of the body.

The vertebrae are categorized into five regions: cervical, thoracic, lumbar, sacral and coccyx. The lumbar region, which is at the bottom of the spine and consists of five vertebrae, is capable of limited movement, and primarily functions as support for the body's weight. The sacrum consists of five fused vertebrae labeled S1 through S5 directly below the lumbar region and that provide attachment for the hipbones as well as protection to organs in the pelvic area. The coccyx, also known as the tailbone, is at the end of the spine.

4

JA-315

**Table of Contents**

### Medical Conditions Affecting the Lower Lumbar Spine and Traditional Treatment Alternatives

Degenerative disc disease is a common medical condition affecting the lower lumbar spine and refers to the degeneration of the disc from aging and repetitive stresses resulting in a loss of flexibility, elasticity and shock-absorbing properties. As degenerative disc disease progresses, the space between the vertebrae narrows, which can pinch the nerves exiting the spine and result in back pain, leg pain, numbness and loss of motor function. This lower back pain can be overwhelming for patients as the resulting pain can have significant physical, psychological and financial implications.

Treatment alternatives for lower lumbar spine conditions range from non-operative conservative therapies to highly invasive surgical interventions. Conservative therapies are typically the initial treatments selected by patients and physicians and they include rest, bracing, physical therapy, chiropractics, electrical stimulation and drugs. When conservative therapies fail to provide adequate pain relief, surgical interventions, including fusion procedures, may be used to address the pain. If a patient's disc degeneration has not progressed to a stage requiring fusion, but has progressed beyond the stage where conservative therapies provide pain relief, physicians may use non-fusion surgical procedures. Non-fusion surgical procedures utilize implants that are designed to restore disc height and allow limited movement of the vertebrae similar to a healthy spine in order to avoid increased pressures on adjacent vertebrae. These procedures and implants include dynamic stabilization devices, artificial discs and prosthetic disc nucleuses.

Fusion procedures attempt to alleviate lower back pain by removing problematic disc material and permanently joining together two or more opposing vertebrae. This is done in a manner that restores the appropriate space between the vertebrae surrounding the degenerative disc and eliminates mobility of the affected vertebrae. By restoring disc height and eliminating motion, fusion attempts to prevent the pinching of the nerves exiting the spine and thereby reducing pain.

Traditional fusion procedures typically involve an incision in the skin, and cutting muscle or moving organs to gain access to the spine. The degenerated disc is then removed, referred to as a discectomy, and a rigid implant is inserted, such as a bone graft or cage, to stabilize the diseased vertebrae. This process is referred to as fixation. The bone graft or cage promotes the growth of bone between the vertebrae. Surgeons often also affix supplementary rods and screws along the spine to provide additional stabilization while the vertebrae fuse together during the six to eighteen months following surgery. The primary surgical fusion procedures performed in the lower lumbar region include: ALIF, PLIF, TLIF and XLIF.

*Anterior Lumbar Interbody Fusion, or ALIF.*  To perform an ALIF procedure, surgeons access the spine through an incision on the patient's abdomen which provides them with optimal access to the vertebral space for performing a discectomy and inserting bone grafts for fusion. Supporting soft tissue and nerves are manipulated or removed to accommodate the anterior access required by the ALIF procedure. Surgeons commonly perform ALIF procedures in conjunction with a general or vascular surgeon because critical vasculature and organs must be retracted to gain access to the spine. The assistance of a second surgeon can reduce the economics for the spine surgeon and increase the difficulty in scheduling the surgery. Complications associated with ALIF procedures include vascular damage to the vena cava and aorta.

*Posterior Lumbar Interbody Fusion, or PLIF.*  To perform a PLIF procedure, surgeons access the spine through an incision on the center of the patient's back. The surgeon then navigates through muscles and nerves to gain access to the spine. Once at the spine, the surgeon removes bone from the lamina to gain access to the affected disc space where a discectomy is performed and a bone graft is placed. When compared to ALIF procedures, PLIF procedures are generally considered easier to perform and can achieve better nerve root decompression in certain cases. However, the anatomy of the spine prevents surgeons from removing the entire degenerated disc and obtaining optimal access for insertion of an implant or bone graft. Complications associated with PLIF procedures include nerve damage, soft tissue damage and implant migration.

*Transforaminal Lumbar Interbody Fusion, or TLIF.*  TLIF procedures are performed in a similar manner to PLIF procedures, except the surgeon accesses the spine through a small incision slightly to the left or right of the center of the patient's back. After reaching the spine, the surgeon removes a portion of the facet joint and navigates through the foramen which provides better visualization and disc removal capabilities than PLIF.

5

JA-317

Table of Contents

Complications associated with TLIF procedures are similar to those found in PLIF procedures including nerve damage, soft tissue damage and implant migration.

*Extreme Lateral Interbody Fusion, or XLIF.*  To perform an XLIF procedure, the surgeon accesses the spine from the patient's side through one or two small incisions. The XLIF procedure is not appropriate for fusions in the L5/S1 segment because the pelvis interferes with access. While the XLIF procedure damages less patient tissue than other fusion procedures, we believe that there is a significant physician learning curve.

*360° Lumbar Fusion Procedure.*  Currently, the most common and structurally rigid lumbar fusion surgery is referred to as a 360° fusion and requires a second surgical procedure immediately following an ALIF, PLIF, TLIF or XLIF procedure. The additional procedure involves the permanent placement of screws and rods in the back to provide additional support while the vertebrae fuse together during the six to eighteen months following surgery.

## Limitations of Traditional Lower Lumbar Spine Procedures

While traditional and minimally invasive fusion procedures can be effective at treating lower back pain, common drawbacks of these procedures include:

- *Disruption to Soft Tissue and Support Structures.*  Current lumbar fusion procedures require creating a pathway from the skin to the degenerative disc that is large enough to allow direct visualization and work by the surgeon. It is common to cut through healthy muscle or move critical organs, arteries, nerves and soft tissue, which can lead to bleeding, scarring, nerve damage and bowel disruption.

- *Significant Blood Loss.*  As a result of undergoing current lumbar fusion procedures, patients typically experience significant blood loss of between 100 and 1,400 cc of blood. As a result, it is common for patients to use the hospital's blood supply or donate units of their own blood before a lumbar fusion procedure to replenish any significant blood loss.

- *Lengthy Operative Procedure Times.*  We believe it is common for current lumbar fusion procedures to take between 90 minutes and 4 hours to complete. With some procedures a second surgeon may be required. Long procedure times increase the risks of complications and blood loss. Also, hospital and physician resources are consumed for lengthy periods of time, which can reduce productivity and increase costs.

- *Lengthy Patient Hospital Stays.*  Patients remain in the hospital for an average of three days following a lumbar fusion procedure which consumes hospital and physician resources.

- *Significant Patient Recovery Time.*  Patients require three to six months to recover and rehabilitate after undergoing a lumbar fusion procedure before resuming normal activities.

- *Unresolved Patient Pain.*  Patients may continue to experience lower back pain after undergoing lumbar fusion procedures even though x-rays show successful fusion has been achieved through the growth of new bone. We believe this may be caused by muscle dissection, implant irritation and scar tissue that develops around the site of the surgery.

## Our Solution

We believe we have developed the least invasive approach for surgeons to perform fusion and motion preserving surgeries in the L4/L5/S1 region without the drawbacks associated with current lumbar fusion procedures. We refer to this unique proprietary approach as our pre-sacral approach. We have developed and are marketing three fusion products that are delivered using our pre-sacral approach: AxiaLIF, AxiaLIF 360 and AxiaLIF 2L.

To access the spine using our pre-sacral approach, the surgeon creates a 1.5 cm incision adjacent to the tailbone while the patient is lying on their stomach. The surgeon then navigates a blunt dissecting tool a short distance along the sacrum using imaging technologies to a spine access point near the junction of the S1/S2 vertebral bodies. As the dissecting tool is advanced it moves soft tissue structures, including the bowel, to the

JA-318

6

Table of Contents

side. From this access point, a guide pin is inserted through the bone into the disc of the lowest lumbar motion segment known as the L5/S1 disc. A tubular dissector is inserted over the guide pin to create a tissue-protecting working channel between the surgical access site and the L5/S1 disc where the entire fusion operation is then performed. This protected working channel provides access to the interior of the disc for removal of disc material with rotating cutters and brushes, introduction of bone graft material with special instrumentation and insertion of our AxiaLIF implant. The implant immediately provides fixation and restores disc height. The AxiaLIF 2L procedure uses the same approach to provide access for our procedure to both the L5/S1 and L4/L5 discs. The AxiaLIF 360° procedure supplements the AxiaLIF implant with fixation for the back of the spine. In our AxiaLIF 360° procedure, a second incision is made approximately eight inches above the first incision, and two facet screws are implanted.

We believe our pre-sacral approach and its associated products provide the following benefits for patients, providers and payors:

- *Least Invasive Approach Minimizes Complications.* Our AxiaLIF products are delivered using our unique pre-sacral approach, which we believe is the least invasive solution for delivering fusion and motion-preserving products to the L4/L5/S1 region. Procedures performed utilizing our pre-sacral approach have been documented to have favorable clinical safety profiles with complication rates of approximately 1%.

- *Spinal Stability.* We believe our approach is the only spinal fusion that does not violate or cut through any muscles or ligaments that control the stability of the spine.

- *Short Learning Curve.* We believe that the ease of use of our pre-sacral approach enables reduced physician training as compared to alternative lower lumbar spine procedures.

- *Low Blood Loss.* We believe the least invasive nature of our pre-sacral approach results in the average patient losing approximately 25 to 125 cc of blood during an AxiaLIF, AxiaLIF 2L or AxiaLIF 360° procedure, which is much lower than current techniques and correlates to reduced pain and faster recoveries. Given the associated low blood loss, patients generally do not need to donate blood prior to undergoing procedures that utilize our pre-sacral approach.

- *Short Patient Hospital Stays.* Patients typically stay only one night in the hospital after receiving a procedure performed using our pre-sacral approach. In a small percentage of cases, patients are able to return home the same day.

- *Reduction in Patient Pain.* We believe our pre-sacral approach is effective at reducing lower back pain because surrounding soft tissue is not violated which prevents the creation of scar tissue, a leading cause of pain.

**Our Strategy**

Our goal is to become a global leader in the treatment of conditions affecting the L4/L5/S1 region of the lumbar spine utilizing our pre-sacral approach and associated instrumentation. To achieve this goal, we are pursuing the following strategies:

- *Establish our Pre-Sacral Approach as a Standard of Care for Lower Lumbar Spine Surgery.* We believe patients commonly avoid back surgery due to its invasive nature and other drawbacks associated with current surgical treatment options. We expend significant resources promoting our pre-sacral approach as the least invasive approach to lower back surgery and we believe the advantages of our technique will enable our AxiaLIF products to become a standard of care for the lower lumbar region of the spine.

- *Focus our Sales and Marketing Infrastructure to Drive Surgeon Adoption.* We intend to continue expending significant resources targeting spine surgeons through our sales and marketing efforts in the United States and internationally in order to drive the adoption of our pre-sacral approach. We believe the ease of use, short hospital stays and reduction in patient pain will be compelling reasons for surgeon adoption of our technologies.

7

JA-320

Table of Contents

- *Opportunistically Pursue Acquisitions of Complementary Businesses and Technologies.* In addition to building our internal product development efforts, we intend to selectively license or acquire complementary products and technologies that we believe will enable us to leverage our growing distribution platform.

## Products

Our products include surgical instruments for creating a safe and reproducible access route to the L4/L5/S1 vertebrae, fusion implants, as well as supplemental stabilization products. We believe our AxiaLIF implants and instruments, combined with facet screws, provide surgeons with the tools necessary to perform a 360° lumbar fusion in the least invasive manner available. We sell these products to our customers in procedure kits that include all the instruments and implants needed to complete a lumbar fusion.

*AxiaLIF Lumbar Fusion Implants.* Our AxiaLIF implant is a threaded titanium rod, called our 3D Axial Rod, that comes in varying lengths to enable one-level L5/S1 fusions and two-level L4/L5/S1 fusions. As it is implanted, its proprietary thread design separates the vertebrae to restore disc height. The increased disc height relieves pressure on the nerve, while our 3D Axial Rod provides immediate rigid fixation.

*AxiaLIF 360° Implants.* Our proprietary AxiaLIF 360° implants consist of our 3D Axial Rod plus our titanium facet screws for supplemental posterior fixation. The two AxiaLIF 360° facet screws are implanted through a single 1.5 cm incision in the patient's back using our proprietary delivery system.

*TranS1 Access and Disc Preparation Instruments.* Our pre-sacral approach requires the use of a sterile set of surgical instruments that are used to create a safe and reproducible working channel and to prepare the disc and vertebrae for our implant. The instrumentation contained in the set includes stainless steel navigation tools and tubular dissectors to create the working channel, as well as nitinol cutters and brushes to cut and remove the degenerated disc material and prepare the disc space for our implant and the bone graft material.

*AVATAR Pedicle Screw System.* In January 2010, we entered into a partnership agreement with Life Spine, Inc. to distribute Avatar, a minimally invasive pedicle screw system. Avatar can be used with our implants to provide supplemental posterior fixation. Avatar offers cannulated pedicle screws inserted over a guidewire to reduce muscle and tissue trauma. Extended tabs integrated to the screws combined with a variety of rod insertion mechanisms provide secure implantation of the rod while minimizing tissue dissection. In-situ reduction, compression, and distraction are achieved simply and effectively with intuitive instrumentation.

## Product Pipeline

We have re-prioritized our product development efforts and are pursuing products that enhance our existing product line and those that that have a shorter pathway to regulatory clearance and commercialization. Due to an uncertain regulatory pathway, we have decided to put our Percutaneous Nucleus Replacement, or PNR, project on hold in the U.S., which also impacts our Partial Disc Replacement project, which was an enhancement of the PNR.

In the future, we believe our product offerings will be expanded to address additional clinical applications in the surgical treatment of conditions affecting the lower lumbar spine. Such applications would require FDA 510(k) clearance or PMA approval, most likely supported by safety and efficacy data from clinical trials. We also have an active program aimed at developing tools that will lower complications for our procedures.

## Sales and Marketing

Our sales and marketing effort primarily targets industry leaders and high volume spine surgeons. We also market our products at various industry conferences and through industry organized surgical training courses. In addition, we intend to develop and implement marketing programs targeted at potential patients, which we believe will accelerate the demand for our products.

In 2009, no customer accounted for 10% or more of revenues.

JA-321

8

Table of Contents

In the United States, we market and sell our products through a combination of direct sales representatives and independent sales agents that have allocated representatives to solicit our products. At December 31, 2009, our U.S. sales team included territory managers, direct sales representatives, case coverage specialists and independent sales agents covering specific geographic regions. We select our sales representatives and independent sales agents based on their expertise in spine surgery medical device sales, reputation within the surgeon community and sales coverage. Our sales representatives receive a base salary and a percentage of the net sales that they generate. In January 2010, as part of our on-going effort to best address current market opportunities, we reduced our direct sales representatives from 55 to 45. We have taken our most successful reps and given them more territory to grow while ensuring that all territories are appropriately covered. Our overriding goal is to make each of our sales reps profitable as quickly as possible. The sales management structure remains unchanged. The independent sales agents are compensated based on a percentage of the net sales that they generate. We have agreements with our independent sales agents that provide them with an exclusive right to sell our products in their territories, which are generally terminable upon 90 days' written notice.

Outside of the United States, we utilize third-party distributors and our own direct sales representatives and agents, with support from our vice president of international sales and our U.S. and international sales and marketing staff, to support the commercialization of our products. Through December 31, 2009, the majority of our international sales have been in Europe. In 2008, we hired direct sales representatives in Germany, and in 2009 we began direct sales through our own sales representatives and agents in Germany, Switzerland, Netherlands and Belgium. In 2009, 69% of our international revenues were through third-party distributors and 31% were through our direct sales efforts.

We intend to continue to hire sales and marketing personnel as appropriate to enable us to support the commercialization of our products.

## Surgeon Training

We devote significant resources to training and educating surgeons on the specialized skills involved in the proper use of our instruments and implants. We believe that the most effective way to introduce and build market demand for our products is by training spine surgeons in the use of our products. We accomplish our training objectives primarily through cadaver and surrogate models and live case observations with surgeons experienced in our pre-sacral approach. We supplement this training with online didactic tutorials. After this training, surgeons are generally able to perform unsupervised surgeries using our pre-sacral approach. As of December 31, 2009, we had trained over 1,150 U.S. spine surgeons and 200 surgeons outside of the U.S. in the use of our single-level product. Of the U.S. surgeons trained on our pre-sacral approach, approximately 380 have performed a procedure in the 12 months ended December 31, 2009 using our pre-sacral approach. In addition, we have trained over 250 U.S. surgeons in the use of our AxiaLIF 2L product. We believe we have the necessary capacity to train a sufficient number of surgeons to meet our current goals.

## Third-Party Reimbursement

In the United States, healthcare providers generally rely on third-party payors, principally private insurers and governmental payors such as Medicare and Medicaid, to cover and reimburse all or part of the cost of a spine fusion surgery in which our medical device is used. Surgeons are reimbursed for performing the surgical procedure, while hospitals are reimbursed for the cost of the device, all patient care related to the fusion procedure and the overhead associated with maintaining the facility.

Most payors follow Medicare's Diagnosis-Related Group, or DRG, based payment system for reimbursing facilities. Under this model, hospitals are paid a set amount to cover the costs associated with a fusion patient, including the cost of the device used in the procedure. The most commonly associated DRGs for spinal fusion are 453/454/455 ("Combined Anterior/Posterior Spinal Fusion with major complications and comorbidities (MCC), with complications and comorbidities (CC) or without MCC/CC") and 459/460 ("Spinal Fusion Except Cervical with or without MCC"). Private payors typically use Medicare DRGs as a benchmark when setting their own reimbursement rates for facilities.

JA-323

9

JA-324

Table of Contents

Surgeons use the American Medical Association's Current Procedural Terminology, or CPT, system to bill payors for the AxiaLIF procedure. CPT codes describe the services and procedures provided for patients to third-party payors so that physicians may be reimbursed. Effective January 1, 2009, the AMA implemented a Category III code which may describe the work involved in treating some AxiaLIF patients. Unlike Category I CPT codes, Category III codes do not have a set value which physicians use as a benchmark for setting their fee. Additionally, some payors view Category III codes as "investigational" or "experimental" and may not reimburse them. However, AxiaLIF adoption continues to grow and unlike many new or novel procedures, AxiaLIF is an access variation on the current standard of care (spinal fusion) and surgeons should code appropriately for the work they perform based on the unique clinical decision making, time, risk, and diagnosis of each patient.

As the breadth and depth of peer-reviewed clinical research regarding AxiaLIF continues to grow, we will continue to diligently work to ensure that patients have continued access to AxiaLIF should their doctors determine this is best clinical solution for their condition.

Internationally, reimbursement and healthcare payment systems vary substantially from country to country and include single-payor, government-managed systems as well as systems in which private payors and government-managed systems exist side-by-side. Our ability to achieve market acceptance or significant sales volume in international markets we enter will be dependent in large part on the availability of reimbursement for procedures performed using our products under the healthcare payment systems in such markets. A small number of countries may require us to gather additional clinical data before recognizing coverage and reimbursement for our products. It is our intent to complete the requisite clinical studies and obtain coverage and reimbursement approval in countries where it makes economic and strategic sense to do so.

We believe that the overall escalating cost of medical products and services has led to, and will continue to lead to, increased pressures on the healthcare industry to reduce the costs of products and services. We cannot assure you that government or private third-party payors will cover and reimburse the procedures using our products in whole or in part in the future or that payment rates will be adequate. In addition, it is possible that future legislation, regulation, or reimbursement policies of third-party payors will adversely affect the demand for our procedures and products or our ability to sell them on a profitable basis. The unavailability or inadequacy of third-party payor coverage or reimbursement could have a material adverse effect on our business, operating results and financial condition.

**Competition**

The medical device industry is highly competitive, subject to rapid technological change and significantly affected by new product introductions and market activities of other participants. Our currently marketed products are, and any future products we commercialize will be, subject to intense competition. Our competitors include providers of conservative, non-operative therapies for lower lumbar spine conditions, as well as a number of major medical device companies that have developed or plan to develop products for minimally invasive spine surgery in each of our current and future product categories. We believe that the principal competitive factors in our markets include:

- improved outcomes for medical conditions affecting the lower lumbar spine;

- acceptance by spine surgeons;

- ease of use and reliability;

- product price and qualification for reimbursement;

- technical leadership and superiority;

- effective marketing and distribution; and

- speed to market.

We are aware of several companies that compete or are developing technologies in our current and future product areas. As a result, we expect competition to remain intense. We believe that our most significant

10

**Table of Contents**

competitors are Medtronic Sofamor Danek, Johnson & Johnson DePuy Spine, Stryker Spine, NuVasive, Zimmer Spine, Synthes, Orthofix International, Globus Medical, Alphatec Spine and others, many of which have substantially greater sales and financial resources than we do. In addition, these companies may have more established distribution networks, entrenched relationships with physicians, and greater experience in launching, marketing, distributing and selling products.

Our ability to compete successfully will depend on our ability to develop proprietary products that reach the market in a timely manner, receive adequate reimbursement and are safer, less invasive and less expensive than alternatives available for the same purpose. Because of the size of the potential market, we anticipate that companies will dedicate significant resources to developing competing products.

### Research and Development

As of December 31, 2009, our research and development team was comprised of 11 employees who have extensive experience in developing products to treat medical conditions affecting the lower lumbar spine. These employees work closely with our clinical advisors and spine surgeon customers to design and enhance our products and approach. Our R&D spending was $6.4 million, $4.1 million and $3.9 million for the years ending December 31, 2009, 2008 and 2007, respectively. Since inception, we have devoted significant resources to develop and enhance our AxiaLIF product kits utilizing the pre-sacral approach.

### Manufacturing and Supply

We rely on third parties to manufacture all of our products and their components, except for our nitinol nucleus cutter blades and nucleus cutter sheaths, which we manufacture at our facilities in Wilmington, North Carolina. Our outsourcing partners are manufacturers that meet FDA, International Organization for Standardization, or ISO, and other internal quality standards. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which we believe allows us to compete with larger-volume manufacturers of spine surgery products.

All of our products and components are assembled, packaged, labeled and sterilized at third-party facilities in the United States under our existing contracts requiring compliance with Good Manufacturing Processes, or GMPs. Following receipt of products or components from our third-party manufacturers, we inspect, warehouse and ship the products and components at our facilities in Wilmington or at a third-party distribution facility in Memphis, Tennessee. We reserve the exclusive right to inspect and assure conformance of each product and component to our specifications. In addition, FDA or other regulatory authorities may inspect our facilities and those of our suppliers to ensure compliance with quality system regulations.

The majority of our instruments and implants are produced by third-party manufacturers on precision, high-speed machine shop equipment. However, certain of our products, components, materials used to manufacture such products and components, and manufacturing operations are produced, performed or supplied by third-party specialty vendors due to their proprietary or non-conventional nature. For example, the blades for our nucleus cutter are made from a metal called nitinol, which is converted into strip form by three manufacturers in the United States known to us. We have sourced nitinol strip from two of these vendors. The nitinol strip is then further converted for us into cutter blanks by a scalpel blade specialty vendor. Other vendors are available to manufacture the cutter blanks, as we may deem desirable or necessary. We convert the cutter blanks into cutter blades at our facilities. Our tissue extractor product is produced for us by a supplier that specializes in wire forming and coiling specifically for the medical device industry. A limited number of similar vendors exist that could be used to produce the tissue extractor product, and we believe we could replace this supplier on reasonable terms without substantial delay, if necessary.

We are currently working with our third-party manufacturers to plan for our manufacturing requirements as we increase our commercialization efforts. In most cases, we have redundant manufacturing capability with multiple vendors and enjoy the significant capacity this arrangement provides to us. We may consider manufacturing certain products or product components internally, if and when demand or quality requirements

JA-327

11

Table of Contents

make it appropriate to do so. We believe the manufacturing capacity available to us is sufficient to meet our demands into the foreseeable future.

**Patents and Proprietary Technology**

We rely on a combination of patent, trademark, copyright, trade secret and other intellectual property laws, nondisclosure agreements and other measures to protect our intellectual property rights. We believe that in order to have a competitive advantage, we must develop and maintain the proprietary aspects of our technologies. We require our employees, consultants and advisors to execute confidentiality agreements in connection with their employment, consulting or advisory relationships with us. We also require our employees, consultants and advisors who we expect to work on our products to agree to disclose and assign to us all inventions conceived during the work day, using our property or which relate to our business. We cannot provide any assurance that employees and consultants will abide by the confidentiality or assignment terms of these agreements. Despite any measures taken to protect our intellectual property, unauthorized parties may attempt to copy aspects of our products or to obtain and use information that we regard as proprietary.

*Patents*

As of December 31, 2009, we had 22 issued United States patents, 46 pending patent applications in the United States, 2 issued European patents and 96 foreign patent applications as counterparts of U.S. cases. The issued and pending patents cover, among other things:

- our method for performing trans-sacral procedures in the spine, including diagnostic or therapeutic procedures, and trans-sacral introduction of instrumentation or implants;

- apparatus for conducting these procedures including access, disc preparation and implantation including the current TranS1 instruments individually and in kit form; and

- implants for fusion and motion preservation in the spine.

Our issued patents begin to expire in 2021 assuming timely payment of all maintenance fees. We have multiple patents covering unique aspects and improvements for many of our methods and products. We do not believe that the expiration of any single patent is likely to significantly affect our business, operating results or prospects.

*Trademarks*

We own four trademark registrations in the United States and seven trademark registrations in the European Union. We also own eight pending trademark applications in the United States, two pending trademark applications in the European Union and eight pending trademark applications in Canada.

**Government Regulation**

Our products are medical devices subject to extensive regulation by the FDA and other U.S. federal and state regulatory bodies and comparable authorities in other countries. To ensure that medical products distributed domestically and internationally are safe and effective for their intended use, FDA and comparable authorities in other countries have imposed regulations that govern, among other things, the following activities that we or our partners perform and will continue to perform:

- product design and development;

- registration and listing;

- product testing (preclinical and clinical);

- product manufacturing;

- product labeling;

- product storage;

12

http://www.sec.gov/Archives/edgar/data/1239035/000095012310024798/g22498e10vk.htm    6/21/2012

JA-329

Table of Contents

- premarket clearance or approval;
- advertising and promotion;
- product marketing, sales and distribution; and
- post-market surveillance, including reporting deaths or serious injuries related to products and certain product malfunctions.

### FDA's Premarket Clearance and Approval Requirements

Unless an exemption applies, each medical device we wish to commercially distribute in the United States will require either prior 510(k) clearance or prior premarket approval from the FDA. The FDA classifies medical devices into one of three classes. Devices deemed to pose lower risk are placed in either class I or II, which in many cases requires the manufacturer to submit to the FDA a premarket notification or 510(k) submission requesting permission for commercial distribution. This process is known as requesting 510(k) clearance. Some low risk devices are exempt from this requirement. Devices deemed by the FDA to pose the greatest risk, such as many life-sustaining, life-supporting or implantable devices, or devices deemed not substantially equivalent to a legally marketable device, are placed in class III, requiring a PMA. Our current commercial products are class II devices marketed under FDA 510(k) premarket clearance. Both premarket clearance and PMA applications are subject to the payment of user fees, paid at the time of submission for FDA review.

### 510(k) Clearance Pathway

To obtain 510(k) clearance, we must submit a premarket notification demonstrating that the proposed device is substantially equivalent to a legally marketable device not requiring a PMA. Although statutorily mandated to clear or deny a 510(k) premarket notification within 90 days of submission of the application, FDA's 510(k) clearance pathway usually takes from three to twelve months, based on requests for additional information by FDA, but it can take significantly longer. Additional information can include clinical data to make a determination regarding substantial equivalence.

After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a new or major change in its intended use, will require a new 510(k) clearance or, depending on the modification, require a PMA. The FDA requires each manufacturer to determine whether the proposed change requires submission of a 510(k), or a PMA, but the FDA can review any such decision and can disagree with a manufacturer's determination. If the FDA disagrees with a manufacturer's determination, the FDA can require the manufacturer to cease marketing and/or recall the modified device until 510(k) clearance or a PMA is obtained. If the FDA requires us to seek 510(k) clearance or a PMA for any modifications to a previously cleared product, we may be required to cease marketing or recall the modified device until we obtain this clearance or approval. Also, in these circumstances, we may be subject to significant regulatory fines or penalties. We have made and plan to continue to make additional product enhancements to our AxiaLIF, AxiaLIF 2L (including AxiaLIF 2L+) and AxiaLIF 360° (including Vectre) products that we believe do not require new 510(k) clearances.

### Premarket Approval Pathway

A PMA application must be submitted if the device is not exempt and cannot be cleared through the 510(k) process. The PMA application process is generally more costly and time consuming than the 510(k) process. A PMA application must be supported by extensive data including, but not limited to, technical, preclinical, clinical trials, manufacturing and labeling to demonstrate to the FDA's satisfaction the safety and effectiveness of the device for its intended use.

After a PMA application is sufficiently complete, the FDA will accept the application and begin an in-depth review of the submitted information. By statute, the FDA has 180 days to review the "accepted application", although, generally, review of the application can take between one and three years, but it may take significantly longer. During this review period, the FDA may request additional information or

13

Table of Contents

clarification of information already provided. Also during the review period, an advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device. In addition, the FDA will conduct a preapproval inspection of the manufacturing facility to ensure compliance with quality system regulations. New PMA applications or PMA application supplements are required prior to marketing for product modifications that affect the safety and efficacy of the device. PMA supplements often require submission of the same type of information as a PMA application, except that the supplement is limited to information needed to support any changes from the device covered by the original PMA application, and may not require as extensive clinical data or the convening of an advisory panel. None of our products are currently approved under a PMA but devices in development may require it.

### Clinical Trials

Clinical trials are almost always required to support a PMA application and are sometimes required for a 510(k) premarket notification. In the U.S., these trials require submission of an application for an investigational device exemption, or IDE. The IDE application must be supported by appropriate data, such as animal and laboratory testing results, showing that it is safe to test the device in humans and that the testing protocol is scientifically sound. The IDE application must be approved in advance by the FDA for a specified number of patients, unless the product is deemed a non-significant risk device and eligible for more abbreviated IDE requirements. Clinical trials for a significant risk device may begin once the IDE application is approved by the FDA and the appropriate institutional review boards at the clinical trial sites. Future clinical trials of our motion preservation designs will require that we obtain an IDE from the FDA prior to commencing clinical trials and that the trial be conducted under the oversight of an institutional review board at the clinical trial site. Our clinical trials must be conducted in accordance with FDA regulations and federal and state regulations concerning human subject protection, including informed consent and healthcare privacy and financial disclosure by clinical investigators. A clinical trial may be suspended by FDA or the investigational review board at any time for various reasons, including a belief that the risks to the study participants outweigh the benefits of participation in the study. Even if a study is completed, the results of our clinical testing may not demonstrate the safety and efficacy of the device, or may be equivocal or otherwise not be sufficient to obtain clearance or approval of one of our products. Similarly, in Europe the clinical study must be approved by the local ethics committee and in some cases, including studies of high-risk devices, by the Competent Authority in the applicable country.

### Pervasive and Continuing FDA Regulation

After a device is placed on the market, numerous FDA and other regulatory requirements continue to apply. These include:

- quality system regulation, which requires manufacturers, including third-party contract manufacturers, to follow stringent design, testing, control, documentation, and other quality assurance controls, during all aspects of the manufacturing process;

- establishment registration and listing;

- labeling regulations, and FDA prohibitions against the promotion of products for uncleared or unapproved "off-label" uses;

- medical device reporting obligations, which require that manufacturers submit reports to the FDA if information reasonably suggests their device (i) may have caused or contributed to a death or serious injury, or (ii) malfunctioned and the device or a similar company device would likely cause or contribute to a death or serious injury if the malfunction were to recur; and

- other post-market surveillance requirements, which apply when necessary to protect the public health or to provide additional safety and effectiveness data for the device.

14

Case 7:12-cv-00023-F    Document 33-11    Filed 09/07/12    Page 23 of 113

JA-332

Table of Contents

We must register and list with FDA as medical device manufacturers and must obtain all necessary state permits or licenses to operate our business. As manufacturers, we are subject to announced and unannounced inspections by FDA to determine our compliance with quality system regulation and other regulations. We have not yet been inspected by the FDA. We believe that we are in substantial compliance with quality system regulation and other regulations.

Failure to comply with applicable regulatory requirements can result in enforcement action by the FDA, which may include, among other things, any of the following sanctions:

- warning letters, fines, injunctions, consent decrees and civil penalties;

- repair, replacement, refunds, recall or seizure of our products;

- operating restrictions, partial suspension or total shutdown of production;

- refusing our request for 510(k) clearance or premarket approval of new products, new intended uses or other modifications to existing products;

- withdrawing or suspending premarket approvals that are already granted; and

- criminal prosecution.

We are subject to announced and unannounced inspections by the FDA and these inspections may include the manufacturing facilities of our subcontractors.

### Fraud and Abuse

We may directly or indirectly be subject to various federal and state laws pertaining to healthcare fraud and abuse, including anti-kickback laws. In particular, the federal healthcare program anti-kickback statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing, arranging for or recommending a good or service, for which payment may be made in whole or part under federal healthcare programs, such as the Medicare and Medicaid programs. The anti-kickback statute is broad and prohibits many arrangements and practices that are lawful in businesses outside of the healthcare industry. In implementing the statute, the Office of Inspector General, or OIG, has issued a series of regulations, known as the "safe harbors," which began in July 1991. These safe harbors set forth provisions that, if all their applicable requirements are met, will assure healthcare providers and other parties that they will not be prosecuted under the anti-kickback statute. The failure of a transaction or arrangement to fit precisely within one or more safe harbors does not necessarily mean that it is illegal or that prosecution will be pursued. However, conduct and business arrangements that do not fully satisfy all requirements of an applicable safe harbor may result in increased scrutiny by government enforcement authorities such as the OIG. Penalties for violations of the federal anti-kickback statute include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

The federal False Claims Act prohibits persons from knowingly filing or causing to be filed a false claim to, or the knowing use of false statements to obtain payment from, the federal government. Suits filed under the False Claims Act, known as "qui tam" actions, can be brought by any individual on behalf of the government. These individuals, sometimes known as "relators" or, more commonly, as "whistleblowers," may share in any amounts paid by the entity to the government in fines or settlement. The number of filings of qui tam actions has increased significantly in recent years, causing more healthcare companies to have to defend a False Claim action. If an entity is determined to have violated the federal False Claims Act, it may be required to pay up to three times the actual damages sustained by the government, plus civil penalties of between $5,500 and $11,000 for each separate false claim. Various states have also enacted similar laws modeled after the federal False Claims Act which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor.

The Health Insurance Portability and Accountability Act of 1996, or HIPAA, created two new federal crimes: healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute

15

JA-334

Table of Contents

prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private payors. A violation of this statute is a felony and may result in fines, imprisonment or exclusion from government sponsored programs. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items, or services. A violation of this statute is a felony and may result in fines or imprisonment.

We are also subject to certain state laws that are analogous to each of the federal laws summarized above, such as anti-kickback and false claims laws that may apply to items or services reimbursed by any third-party payor, including commercial insurers, and state laws governing the privacy of certain health information, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.

While we have adopted comprehensive compliance programs to attempt to comply with these laws and regulations, if any of our operations are found to have violated or be in violation of any of the laws described above and other applicable state and federal fraud and abuse laws, we may be subject to penalties, among them being civil and criminal penalties, damages, fines, exclusion from government healthcare programs, and the curtailment or restructuring of our operations.

*International*

International sales of medical devices are subject to foreign government regulations, which vary substantially from country to country. The time required to obtain approval by a foreign country may be longer or shorter than that required for FDA clearance or approval, and the requirements may differ.

The European Union, which consists of 27 of the major countries in Europe, has adopted numerous directives and standards regulating the design, manufacture, clinical trials, labeling, and adverse event reporting for medical devices. Other countries, such as Switzerland, have voluntarily adopted laws and regulations that mirror those of the European Union with respect to medical devices. Devices that comply with the requirements of a relevant directive will be entitled to bear CE conformity marking and, accordingly, can be commercially distributed throughout the member states of the European Union, and other countries that comply with or mirror these directives. The method of assessing conformity varies depending on the type and class of the product, but normally involves a combination of self-assessment by the manufacturer and a third-party assessment by a "Notified Body," an independent and neutral institution appointed to conduct conformity assessments. This third-party assessment consists of audits of the manufacturer's quality system. An assessment by a Notified Body in one country within the European Union is required for each product in order for a manufacturer to commercially distribute the product throughout the European Union. Compliance with voluntary harmonizing standards ISO 9001 and ISO 13845 issued by the ISO establishes the presumption of conformity with the essential requirements for a CE mark. In August 2004, our quality system was initially certified by Intertek ETL-Semko, a Notified Body, under the European Union Medical Device Directive to be in compliance with ISO standards 9001:2000 and ISO 13485:2003. The system was recertified in September 2007 and is due for further recertification in September of 2010.

**Employees**

As of December 31, 2009, we had 148 employees, most of whom were full-time employees, with 95 employees in U.S. sales, marketing, customer service and training, 8 employees in international sales, marketing and training, 9 employees in manufacturing, 11 employees in research and development, 15 employees in general and administrative and 10 employees in clinical, regulatory and quality assurance. We believe that our future success will depend in part on our continued ability to attract, hire and retain qualified personnel. None of our employees are represented by a labor union, and we believe our employee relations are good.

16

JA-335

**Table of Contents**

### General Information

We were incorporated in Delaware in May 2000 under the name "aXiaMed, Inc." and changed our name to "TranS1 Inc." in February 2003. Our principal executive office is located at 301 Government Center Drive, Wilmington, North Carolina 28403 and our telephone number is (910) 332-1700. Our website is located at *www.trans1.com*. The information on, or that can be accessed through, our website is not incorporated by reference into this report and should not be considered to be a part of this report.

We make our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to these reports available on our website, at *www.trans1.com*, free of charge as soon as practicable after filing with the U.S. Securities and Exchange Commission, or SEC.

All such reports are also available free of charge via EDGAR through the SEC website at www.sec.gov. In addition, the public may read and copy materials filed by us with the SEC at the SEC's public reference room located at 100 F St., NE, Washington, D.C., 20549. Information regarding operation of the SEC's public reference room can be obtained by calling the SEC at 1-800-SEC-0330.

### Item 1A.  *Risk Factors*

*Investing in our common stock involves a high degree of risk. You should carefully consider the following risk factors, as well as the other information contained in this report, before deciding whether to invest in shares of our common stock. If any of the following risks actually occur, our business, financial condition, operating results and prospects would suffer. In that case, the trading price of our common stock would likely decline and you might lose all or part of your investment in our common stock. The risks described below are not the only ones we face. Additional risks that we currently do not know about or that we currently believe to be immaterial may also impair our operations and business results.*

### Risks Related to Our Business

***To be commercially successful, spine surgeons must accept that our products are a safe and effective alternative to existing surgical treatments of certain spine disorders.***

Our revenue is derived entirely from sales of our AxiaLIF products and related surgical instruments. We expect that sales of our AxiaLIF products will continue to account for a substantial portion of our revenues for the foreseeable future. We believe spine surgeons may not widely adopt our products unless they determine, based on experience, long-term clinical data and published peer reviewed journal articles, that our products provide a safe and effective alternative to conventional procedures used to treat certain spine disorders. Spine surgeons may be slow to adopt our technology for the following reasons, among others:

- lack of long-term clinical data supporting additional patient benefits;

- lack of experience with our products;

- lack of evidence supporting cost savings of our procedure over existing surgical alternatives;

- perceived liability risks generally associated with the use of new products and procedures;

- training time required to use a new product; and

- availability of adequate coverage and reimbursement for hospitals and surgeons.

If we are unable to effectively demonstrate to spine surgeons the benefits of our products as compared to existing surgical treatments of spine disorders and our products fail to achieve market acceptance, our future revenues will be adversely impacted. In addition, we believe recommendations and support of our products by influential spine surgeons are essential for market acceptance and adoption. If we do not receive support from these spine surgeons or do not have favorable long-term clinical data, spine surgeons may not use our products and our future revenues will be harmed and our stock price would likely decline.

17

Table of Contents

***The efficacy of our products is not yet supported by long-term clinical data and may therefore prove to be less effective than initially thought.***

We obtained 510(k) clearance to manufacture, market and sell all of our currently U.S. marketed products from the FDA. The FDA's 510(k) clearance process is less costly and rigorous than the PMA process and requires less supporting clinical data. As a result, we currently lack the breadth of published long-term clinical data supporting the efficacy of our AxiaLIF and AxiaLIF 360° products and the benefits they offer that might have been generated in connection with the PMA process. In addition, we may determine from post-market experience that certain patient characteristics, such as age or preexisting medical conditions, could affect fusion rates, which could lead to misleading or contradictory data on the efficacy of our products. For these reasons, spine surgeons may be slow to adopt our products. Also, we may not be able to generate the comparative data that our competitors have or are generating and we may be subject to greater regulatory and product liability risks. Further, any long-term safety or efficacy data we generate may not be consistent with our existing data and may demonstrate less favorable safety or efficacy. These results could reduce demand for our products, significantly reduce our ability to achieve expected revenues and could prevent us from becoming profitable. Moreover, if future results and experience indicate that our products cause unexpected or serious complications or other unforeseen negative effects, we could be subject to significant legal and regulatory liability and harm to our business reputation.

***The demand for our products and the prices which customers and patients are willing to pay for our products depend upon the ability of our customers to obtain adequate third-party coverage and reimbursement for their purchases of our products.***

Sales of our products depend in part on the availability of adequate coverage and reimbursement from governmental and private payors. In the United States, healthcare providers that purchase our products generally rely on third-party payors, principally Medicare, Medicaid and private health insurance plans, to pay for all or a portion of the costs and fees associated with the AxiaLIF procedure. Medicare coverage and reimbursement policies are developed by the Centers for Medicare and Medicaid Services, or CMS, the federal agency responsible for administering the Medicare program, and its contractors. In carrying out its responsibilities, the Agency must adhere to relevant terms of the Social Security Act, and federal regulations to ensure that it is complying with applicable Medicare law, regulations and guidance. For a wide variety of reasons, including the fact that the law permits coverage and reimbursement for "medically necessary" procedures approved by the Food and Drug Administration, AxiaLIF has strong justification for coverage under the Medicare Program. However, even when a product meets some of the criteria typically relied upon to receive reimbursement under the Medicare Program, it still must be "described adequately" under an American Medical Association Current Procedural Terminology, or CPT code, (typically used to describe services performed by physicians) or included within a Diagnosis-Related Group payment (broad payment categories used to reimburse hospitals).

As a result of some uncertainty regarding the CPT descriptions used to describe the AxiaLIF surgery, some physicians have found it more difficult to get reimbursed for the procedure. Moreover, since many commercial payors rely upon Medicare policies as a framework to establish commercial payment, some of the uncertainty experienced by providers in receiving reimbursement may not only negatively impact Medicare, and Medicaid utilization, but commercial purchases as well. Accordingly, any delays in obtaining, or an inability to clarify the reimbursement policies for procedures using our products could significantly affect the acceptance of our products and have a material adverse effect on our business. If uncertainty remains, or the reimbursement amount for a procedure declines, physicians may revert to other fusion surgeries where reimbursement is higher or more certain. Additionally, third-party payors continue to review their coverage policies carefully for existing and new therapies and can, without notice, deny coverage for treatments that include the use of our products. Our business would be negatively impacted to the extent any such changes reduce reimbursement for our products.

With respect to coverage and reimbursement outside of the United States, reimbursement systems in international markets vary significantly by country, and by region within some countries, and reimbursement approvals must be obtained on a country-by-country basis and can take up to 18 months, or longer. Many

18

Table of Contents

international markets have government-managed healthcare systems that govern reimbursement for new devices and procedures. In most markets, there are private insurance systems as well as government-managed systems. Additionally, some foreign reimbursement systems provide for limited payments in a given period and therefore result in extended payment periods. Reimbursement in international markets may require us to undertake country-specific reimbursement activities, including additional clinical studies, which could be time consuming, expensive and may not yield acceptable reimbursement rates.

Furthermore, healthcare costs have risen significantly over the past decade. There have been and may continue to be proposals by legislators, regulators and third-party payors to contain these costs. These cost-control methods include managed care models, prospective payment systems, capitated rates, group purchasing, redesign of benefits, pre-authorizations or second opinions prior to major surgery, encouragement of healthier lifestyles and exploration of more cost-effective methods of delivering healthcare. Healthcare providers may also attempt to control costs by authorizing fewer elective surgical procedures or by requiring the use of the least expensive devices possible. These cost-control methods also potentially limit the amount which healthcare providers may be willing to pay for medical devices. In addition, in the United States, no uniform policy of coverage and reimbursement for medical technology exists among all payors. Therefore, coverage of and reimbursement for medical technology can differ significantly from payor to payor. The continuing efforts of third-party payors, whether governmental or commercial, whether inside the United States or outside, to contain or reduce these costs, combined with closer scrutiny of such costs, could restrict our customers' ability to obtain adequate coverage and reimbursement from these third-party payors. The cost containment measures that healthcare providers are instituting both in the United States and internationally could harm our business by adversely affecting the demand for our products or the price at which we can sell our products.

### *Our future growth depends on increasing physician awareness of our pre-sacral approach and our related products for appropriate treatment, intervention and referral.*

We target our sales and education efforts to spine surgeons. However, the initial point of contact for many patients may be primary care physicians who commonly treat patients experiencing lower lumbar spine pain. We believe that we must educate physicians to change their screening and referral practices. If we do not educate referring physicians about lower lumbar spine conditions in general, and the existence of the pre-sacral approach and our related products in particular, they may not refer patients who are candidates for the procedures utilizing our pre-sacral approach to spine surgeons, and those patients may go untreated or receive conservative, non-operative therapies. If we are not successful in educating physicians about screening for lower lumbar spine conditions or about referral opportunities, our ability to increase our revenue may be impaired.

### *We have incurred losses since inception and we expect to incur increasing losses for the foreseeable future. We may never achieve or sustain profitability.*

We were incorporated in May 2000 and began commercial sales of our products in early 2005. We incurred net losses since our inception and through December 31, 2009, we had an accumulated deficit of $71.1 million. To date, we have financed our operations primarily through sales of our equity securities and have devoted substantially all of our resources to research and development of our products and the commercial launch of our AxiaLIF products. We expect our expenses to increase significantly in connection with our additional clinical trials and research and development activities, as well as to support the expansion of our sales and marketing efforts. As a result, we expect to continue to incur significant operating losses for the foreseeable future. These losses will continue to have an adverse effect on our stockholders' equity and we may never achieve or sustain profitability.

19

JA-340

Table of Contents

*We are in a highly competitive market segment, which is subject to rapid technological change. If our competitors are better able to develop and market products that are safer, more effective, less costly or otherwise more attractive than any products that we may develop, our ability to generate revenue will be reduced or eliminated.*

The market for treatment of spine disorders is highly competitive and subject to rapid and profound technological change. Our success depends, in part, upon our ability to maintain a competitive position in the development of technologies and products for use in the treatment of spine disorders. We face competition from both established and development stage companies. Many of the companies developing or marketing competing products are publicly traded or are divisions of publicly-traded companies, and these companies enjoy several competitive advantages, including:

- greater financial and human resources for product development, sales and marketing and patent litigation;

- significantly greater name recognition;

- established relationships with spine surgeons, customers and third-party payors;

- additional lines of products, and the ability to offer rebates or bundle products to offer greater discounts or incentives to gain a competitive advantage;

- established sales and marketing, and distribution networks; and

- greater experience in conducting research and development, manufacturing, clinical trials, preparing regulatory submissions and obtaining regulatory clearance or approval for products and marketing approved products.

Our competitors may develop and patent processes or products earlier than us, obtain regulatory clearance or approvals for competing products more rapidly than us, and develop more effective or less expensive products or technologies that render our technology or products obsolete or non-competitive. We also compete with our competitors in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient enrollment in clinical trials, as well as in acquiring technologies and technology licenses complementary to our products or advantageous to our business. If our competitors are more successful than us in these matters, our business may be harmed.

*Our failure to continue building effective sales and marketing capabilities for our products could significantly impair our ability to increase sales of our products.*

We commercially launched our AxiaLIF single-level product in 2005, our AxiaLIF 360° product in 2006, our AxiaLIF 2L product in 2008 and our AxiaLIF 2L+ product in 2010, and we have limited experience marketing and selling our products. We utilize a hybrid model of independent sales agents and direct sales representatives for product sales in the United States and rely on third-party distributors, direct sales representatives and agents for international sales. As of December 31, 2009, we employed 55 direct sales representatives in the United States and 4 direct sales representatives in Europe. In January 2010, we reduced our U.S. force to 45 representatives to better address current market opportunities. We have limited experience managing a direct sales force, which can be an expensive and time consuming process. If we are unable to efficiently manage those individuals, our sales will suffer. We also rely on marketing arrangements with independent sales agents in the United States and independent distributors in Europe, in particular their sales and service expertise and relationships with the customers in the marketplace. We do not control, nor monitor the marketing practices of our independent sales agents or distributors and they may not be successful in implementing our marketing plans or complying with applicable laws regarding marketing practices. Independent distributors and sales agents may terminate their relationship with us, or devote insufficient sales efforts to our products. Our failure to maintain our existing relationships with our independent sales agents or distributors, or our failure to recruit and retain additional skilled independent sales distributors and sales agents or directly-employed sales professionals, could have an adverse effect on our operations.

20

JA-341

Table of Contents

***Our future success depends on our ability to develop, receive regulatory clearance or approval, and introduce new products or product enhancements that will be accepted by the market in a timely manner.***

It is important to our business that we continue to build a more complete product offering for treatment of spine disorders. As such, our success will depend in part on our ability to develop and introduce new products and enhancements to our existing products to keep pace with the rapidly changing spine market. However, we may not be able to successfully develop and obtain regulatory clearance or approval for product enhancements, or new products or our future products, or these products may not be accepted by spine surgeons or the payors who financially support many of the procedures performed with our products.

The success of any new product offering or enhancement to an existing product will depend on several factors, including our ability to:

- properly identify and anticipate spine surgeon and patient needs;

- develop and introduce new products or product enhancements in a timely manner;

- avoid infringing upon the intellectual property rights of third parties;

- demonstrate, if required, the safety and efficacy of new products with data from preclinical studies and clinical trials;

- obtain the necessary regulatory clearances or approvals for new products or product enhancements;

- be fully FDA-compliant with marketing of new devices or modified products;

- provide adequate training to potential users of our products;

- receive adequate coverage and reimbursement for procedures performed with our products; and

- develop an effective and FDA-compliant, dedicated marketing and distribution network.

If we do not develop new products or product enhancements in time to meet market demand or if there is insufficient demand for these products or enhancements, our results of operations will suffer.

***If clinical trials of our current or future product candidates do not produce results necessary to support regulatory clearance or approval in the United States or elsewhere, we will be unable to commercialize these products.***

We have several product candidates in our development pipeline which might require a PMA from the FDA. A PMA application must be supported by extensive information including, technical data, preclinical and clinical trial data, and manufacturing and labeling information to demonstrate to the FDA's satisfaction the safety and effectiveness of the device for its intended use. As a result, to receive regulatory approval for our products requiring PMA approval, we must conduct, at our own expense, adequate and well controlled clinical trials to demonstrate efficacy and safety in humans for their intended uses. Clinical testing is expensive, typically takes many years and has an uncertain outcome. The initiation and completion of any of these studies may be prevented, delayed or halted for numerous reasons, including, but not limited to, the following:

- the FDA, institutional review boards or other regulatory authorities do not approve a clinical study protocol, force us to modify a previously approved protocol, or place a clinical study on hold;

- patients do not enroll in, or enroll at the expected rate, or complete a clinical study;

- patients or investigators do not comply with study protocols;

- patients do not return for post-treatment follow-up at the expected rate;

- patients experience serious or unexpected adverse side effects for a variety of reasons that may or may not be related to our products such as the advanced stage of co-morbidities that may exist at the time of treatment, causing a clinical study to be put on hold;

- sites participating in an ongoing clinical study may withdraw, requiring us to engage new sites;

JA-342

Appeal: 15-2579    Doc: 27-1    Filed: 04/14/2016    Pg: 350 of 471

**Table of Contents**

- difficulties or delays associated with bringing additional clinical sites on-line;

- third-party clinical investigators decline to participate in our clinical studies, do not perform the clinical studies on the anticipated schedule or consistent with the investigator agreement, clinical study protocol, good clinical practices, and other FDA and Institutional Review Board requirements;

- third-party organizations do not perform data collection and analysis in a timely or accurate manner;

- regulatory inspections of our clinical studies require us to undertake corrective action or suspend or terminate our clinical studies;

- changes in U.S. federal, state, or foreign governmental statutes, regulations or policies;

- interim results are inconclusive or unfavorable as to immediate and long-term safety or efficacy; or

- the study design is inadequate to demonstrate safety and efficacy.

Clinical failure can occur at any stage of the testing. Our clinical trials may produce negative or inconclusive results, and we may decide, or regulators may require us, to conduct additional clinical and/or non-clinical testing in addition to those we have planned. Our failure to adequately demonstrate the efficacy and safety of any of our devices would prevent receipt of regulatory clearance or approval and, ultimately, the commercialization of that device.

### *Our international operations subject us to certain operating risks, which could adversely impact our net revenues, results of operations and financial condition.*

Sales of our products outside the United States represented 5.9% of our revenue in 2009. Through December 31, 2009, we have sold our products in the following countries outside of the United States: United Kingdom, Italy, Austria, Australia, Germany, Switzerland, Turkey, the Netherlands, Belgium, Israel, Denmark, Spain, Greece, Hong Kong, Czech Republic, Slovenia, Japan and Singapore. The sale and shipment of our products across international borders, as well as the purchase of components and products from international sources, subject us to extensive U.S. and foreign governmental trade, import and export, and custom regulations and laws. Compliance with these regulations is costly and exposes us to penalties for non-compliance. Other laws and regulations that can significantly impact us include various anti-bribery laws, including the U.S. Foreign Corrupt Practices Act and anti-boycott laws. Any failure to comply with applicable legal and regulatory obligations could impact us in a variety of ways that include, but are not limited to, significant criminal, civil and administrative penalties, including imprisonment of individuals, fines and penalties, denial of export privileges, seizure of shipments, restrictions on certain business activities, and exclusion or debarment from government contracting. Also, the failure to comply with applicable legal and regulatory obligations could result in the disruption of our shipping and sales activities.

In addition, many of the countries in which we sell our products are, to some degree, subject to political, economic or social instability. Our international operations expose us and our distributors to risks inherent in operating in foreign jurisdictions. These risks include:

- the imposition of additional U.S. and foreign governmental controls or regulations;

- the imposition of costly and lengthy new export licensing requirements;

- the imposition of U.S. or international sanctions against a country, company, person or entity with whom we do business that would restrict or prohibit continued business with the sanctioned country, company, person or entity;

- economic instability;

- a shortage of high-quality sales people and distributors;

- changes in third-party reimbursement policies that may require some of the patients who receive our products to directly absorb medical costs or that may necessitate the reduction of the selling prices of our products;

JA-344

22

Table of Contents

- changes in duties and tariffs, license obligations and other non-tariff barriers to trade;

- the imposition of new trade restrictions;

- the imposition of restrictions on the activities of foreign agents, representatives and distributors;

- scrutiny of foreign tax authorities which could result in significant fines, penalties and additional taxes being imposed on us;

- pricing pressure that we may experience internationally;

- laws and business practices favoring local companies;

- longer payment cycles;

- difficulties in maintaining consistency with our internal guidelines;

- difficulties in enforcing agreements and collecting receivables through certain foreign legal systems; and

- difficulties in enforcing or defending intellectual property rights.

Any of these factors may adversely impact our operations. Our international sales are predominately in Europe. In Europe, healthcare regulation and reimbursement for medical devices vary significantly from country to country. This changing environment could adversely affect our ability to sell our products in some European countries, which could negatively affect our results of operations.

***The use, misuse or off-label use of our products may harm our image in the marketplace or result in injuries that lead to product liability suits, which could be costly to our business or result in FDA sanctions if we are deemed to have engaged in such promotion.***

Our currently marketed products have been cleared by the FDA's 510(k) clearance process for use under specific circumstances for the treatment of certain lower lumbar spine conditions. We cannot, however, prevent a physician from using our products or procedure outside of those indications cleared for use, known as off-label use. There may be increased risk of injury if physicians attempt to use our products off-label. We train our sales force not to promote our products for off-label uses. Furthermore, the use of our products for indications other than those indications for which our products have been cleared by the FDA may not effectively treat such conditions, which could harm our reputation in the marketplace among physicians and patients. Physicians may also misuse our products or use improper techniques if they are not adequately trained, potentially leading to injury and an increased risk of product liability. If our products are misused or used with improper technique, we may become subject to costly litigation by our customers or their patients. Product liability claims could divert management's attention from our core business, be expensive to defend and result in sizable damage awards against us that may not be covered by insurance. If we are deemed by FDA to have engaged in the promotion of any our products for off-label use, we could be subject to FDA prohibitions on the sale or marketing of our products or significant fines and penalties, and the imposition of these sanctions could also affect our reputation and position within the industry. Any of these events could harm our business and results of operations and cause our stock to decline.

***We purchase some of the key components of our products from single suppliers. The loss of these suppliers could prevent or delay shipments of our products or delay our clinical trials or otherwise adversely affect our business.***

Some of the key components of our products and related services are currently purchased from only single suppliers. We do not have long-term contracts with the third-party suppliers of our product components. If necessary or desirable, we could source our product components and related services from other suppliers. However, establishing additional or replacement suppliers for these components, and obtaining any additional regulatory clearances or approvals, if necessary, that may result from adding or replacing suppliers, will take a substantial amount of time and could result in increased costs and impair our ability to produce our products, which would adversely impact our business, operating results and prospects. In addition, some of our products,

Appeal: 15-2579     Doc: 27-1     Filed: 04/14/2016     Pg: 354 of 471

JA-347

Table of Contents

which we acquire from third parties, are highly technical and are required to meet exacting specifications, and any quality control problems that we experience with respect to the products supplied by third-party vendors could adversely and materially affect our reputation, our attempts to complete our clinical trials or commercialization of our products. We may also have difficulty obtaining similar components from other suppliers that are acceptable to the FDA or foreign regulatory authorities, and the failure of our suppliers to comply with strictly enforced regulatory requirements could expose us to regulatory action including, warning letters, product recalls, termination of distribution, product seizures or civil penalties, among others. Furthermore, since some of these suppliers may be located outside of the United States, we are subject to foreign export laws and U.S. import and customs statutes and regulations, which complicate and could delay shipments of components to us.

If we experience any delay or deficiency in the quality of products supplied to us by third-party suppliers, or if we have to switch to replacement suppliers, we may face additional regulatory delays and the manufacture and delivery of our products would be interrupted for an extended period of time, which would adversely affect our business, operating results and prospects. In addition, we may be required to obtain prior regulatory clearance or approval from the FDA or foreign regulatory authorities to use different suppliers or components. As a result, regulatory clearance or approval of our products may not be received on a timely basis, or at all, and our business, operating results and prospects would be harmed.

***We depend on our officers and other key employees, and if we are not able to retain and motivate them or recruit additional qualified personnel, our business will suffer.***

We are highly dependent on our officers and other key employees. Due to the specialized knowledge each of our officers and other key employees possesses with respect to the treatment of spine disorders and our operations, the loss of service of any of our officers and other key employees could delay or prevent the successful completion of our clinical trials, the growth of revenue from existing products and the commercialization of our new products. Each of our officers and key employees may terminate his or her employment without notice and without cause or good reason.

***If we fail to properly manage our anticipated growth, our business could suffer.***

The anticipated growth of our business could place a significant strain on our managerial, operational and financial resources and systems. To execute our anticipated growth successfully, we must attract and retain qualified personnel and manage and train them effectively. We must also review our internal business processes and capabilities and internal controls to create the scalability that a growing business demands. We will be dependent on our personnel and third parties to accomplish this, as well as to effectively market our products to an increasing number of spine surgeons. We will also depend on our personnel to develop next generation technologies.

Further, our anticipated growth will place additional strain on our suppliers and manufacturers, resulting in increased need for us to carefully monitor quality assurance. Any failure by us to manage our growth effectively could have an adverse effect on our ability to achieve our development and commercialization goals.

We expect to expand our operations and grow our research and development, product development, clinical, regulatory, operations, sales and marketing and administrative functions. Our growth will require hiring a significant number of qualified clinical, scientific, regulatory, quality, commercial and administrative personnel. Recruiting, motivating and retaining such personnel will be critical to our success. There is intense competition from other companies and research and academic institutions for qualified personnel in the areas of our activities. In addition, our operations are located in a geographic region which historically does not have a large number of medical device companies and it may be difficult to convince qualified personnel to relocate to our area. If we fail to identify, attract, retain and motivate these highly skilled personnel, we may be unable to continue our development and commercialization activities.

24

JA-348

Table of Contents

***If we need additional funding, we may be unable to raise capital when needed, which would force us to delay, reduce, eliminate or abandon our commercialization efforts or product development programs.***

We may need to raise substantial additional capital to:

- expand the commercialization of our products;

- fund our operations and clinical trials;

- continue our research and development;

- defend, in litigation or otherwise, any claims that we infringe third-party patents or other intellectual property rights;

- address FDA or other governmental, legal/enforcement actions and remediate underlying problems;

- commercialize our new products, if any such products receive regulatory clearance or approval for commercial sale; and

- acquire companies and in-license products or intellectual property.

We believe that our existing cash and cash equivalent balances and cash receipts generated from sales of our products, will be sufficient to meet our anticipated cash requirements for at least the next two years. However, our future funding requirements will depend on many factors, including:

- market acceptance of our products;

- availability of adequate coverage and reimbursement for hospitals and surgeons;

- the scope, rate of progress and cost of our clinical trials;

- the cost of our research and development activities;

- the cost of filing and prosecuting patent applications and defending and enforcing our patent and other intellectual property rights;

- the cost of defending, in litigation or otherwise, any claims that we infringe third-party patent or other intellectual property rights;

- the cost and timing of additional regulatory clearances or approvals;

- the cost and timing of establishing additional sales, marketing and distribution capabilities;

- the effect of competing technological and market developments; and

- the extent to which we acquire or invest in businesses, products and technologies, although we currently have no commitments or agreements relating to any of these types of transactions.

If we raise additional funds by issuing equity securities, our stockholders may experience dilution. Debt financing, if available, may involve covenants restricting our operations or our ability to incur additional debt. Any debt financing or additional equity that we raise may contain terms that are not favorable to us or our stockholders. If we raise additional funds through collaboration and licensing arrangements with third parties, it may be necessary to relinquish some rights to our technologies or our products, or grant licenses on terms that are not favorable to us. As a result of the recent and continuing economic uncertainty, it has been difficult for companies, particularly small cap medical device companies, to obtain equity or debt financing. If we are unable to raise adequate funds, we may have to liquidate some or all of our assets, or delay, reduce the scope of or eliminate some or all of our development programs.

If we do not have, or are not able to obtain, sufficient funds, we may have to delay development or commercialization of our products or license to third parties the rights to commercialize products or technologies that we would otherwise seek to commercialize. We also may have to reduce marketing, customer support or other resources devoted to our products or cease operations. Any of these factors could harm our operating results.

25

JA-350

Table of Contents

***If we choose to acquire new businesses, products or technologies, we may experience difficulty in the identification or integration of any such acquisition, and our business may suffer.***

Our success depends on our ability to continually enhance and broaden our product offerings in response to changing customer demands, competitive pressures and technologies. Accordingly, we may in the future pursue the acquisition of complementary businesses, products or technologies instead of developing them ourselves. We do not know if we will be able to identify or complete any acquisitions, or whether we will be able to successfully integrate any acquired business, product or technology or retain key employees. Integrating any business, product or technology we acquire could be expensive and time consuming. The diversion of our management's attention, and any delays or difficulties encountered in connection with any of our acquisitions, could result in the disruption of our ongoing business or inconsistencies in standards, controls, procedures and policies that could negatively affect our ability to maintain relationships with customers, suppliers, employees and others with whom we have business dealings. If we are unable to integrate any acquired businesses, products or technologies effectively, our business will suffer. In addition, any amortization or charges resulting from acquisitions could harm our operating results.

In addition, other companies, including those with substantially greater resources than ours, may compete with us for the acquisition of complementary businesses, products or technologies, resulting in the possibility that we devote resources to potential acquisitions or arrangements that are never completed. If we do engage in any such acquisition, we will incur a variety of costs, and we may never realize the anticipated benefits of the acquisition in light of those costs. If we fail to realize the expected benefits from acquisitions we may consummate in the future, whether as a result of unidentified risks, integration difficulties, regulatory setbacks or other events, our business, consolidated results of operations and financial condition could be adversely affected.

Furthermore, any strategic acquisition may require us to obtain additional debt or equity financing, resulting in increased debt obligations or dilution of ownership to our existing stockholders, as applicable. Therefore, we may not be able to finance acquisitions on terms satisfactory to us, if at all.

***Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of some suppliers from certain of our markets, which could have an adverse effect on our business, financial condition or results of operations.***

Because healthcare costs have risen significantly over the past decade, numerous initiatives and reforms initiated by legislators, regulators and third-party payors to curb these costs have resulted in a consolidation trend in the healthcare industry to create new companies with greater market power, including hospitals. As the healthcare industry consolidates, competition to provide products and services to industry participants has become and will continue to become more intense. This in turn has resulted and will likely continue to result in greater pricing pressures and the exclusion of certain suppliers from important market segments as group purchasing organizations, independent delivery networks and large single accounts continue to use their market power to consolidate purchasing decisions for some of our customers. We expect that market demand, government regulation, third-party reimbursement policies and societal pressures will continue to change the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers, which may reduce competition, exert further downward pressure on the prices of our products and may adversely impact our business, financial condition or results of operations.

***We face the risk of product liability or other claims and may not be able to obtain sufficient insurance coverage, if at all.***

Our business exposes us to the risk of product liability claims that is inherent in the testing, manufacturing and marketing of implantable medical devices. We may be subject to product liability claims if our products cause, or merely appear to have caused, an injury or death. Claims may be made by patients, consumers or healthcare providers. Although we have product liability and clinical trial liability insurance that we believe is appropriate for our current level of operations, this insurance is subject to deductibles and coverage limitations. Our current product liability insurance may not continue to be available to us on

Appeal: 15-2579    Doc: 27-1    Filed: 04/14/2016    Pg: 359 of 471

acceptable terms, if at all, and, if available, the coverages may not be adequate to protect us against any future product liability claims. If we are unable to obtain insurance at acceptable cost or on acceptable terms with adequate coverage or otherwise protect against potential product liability claims, we could be exposed to significant financial and other liabilities, which may harm our business. A product liability claim, product recall or other claim with respect to uninsured liabilities or for amounts in excess of insured liabilities could have a material adverse effect on our business, operating results and prospects.

We may be subject to claims against us even if the apparent injury is due to the actions of others. For example, we rely on the expertise of spine surgeons, nurses and other associated medical personnel to perform the medical procedure and related processes for our products. If these medical personnel are not properly trained or are negligent in their provision of care, the therapeutic effect of our products may be diminished or the patient may suffer critical injury, which may subject us to liability. In addition, an injury that is caused by the activities of our suppliers may be the basis for a claim against us.

In addition, medical malpractice carriers are withdrawing coverage in certain regions or substantially increasing premiums. In the event we become a defendant in a product liability suit in which the treating surgeon or hospital does not have adequate malpractice insurance, the likelihood of liability being imposed on us could increase.

These liabilities could prevent, delay or otherwise adversely interfere with our product commercialization efforts, and result in judgments, fines, damages and other financial liabilities which have adverse effects on our business, operating results and prospects. Defending a suit, regardless of merit, could be costly, could divert management's attention from our business and might result in adverse publicity, which could result in the withdrawal of, or inability to recruit, clinical trial patient participants or result in reduced acceptance of our products in the market. In addition to adversely impacting our business and prospects, such adverse publicity could materially adversely affect our stock price.

***If our independent contract manufacturers fail to timely deliver to us sufficient quantities of some of our products and components in a timely manner, our operations may be harmed.***

Our reliance on independent contract manufacturers to manufacture most of our products and components involves several risks, including:

- inadequate capacity of the manufacturer's facilities;

- financial difficulties experienced by manufacturers due to the current economic recession;

- interruptions in access to certain process technologies; and

- reduced control over product availability, quality, delivery schedules, manufacturing yields and costs.

Shortages of raw materials, production capacity or financial constraints, or delays by our contract manufacturers could negatively affect our ability to meet our production obligations and result in increased prices for affected parts. Any such reduction, constraint or delay may result in delays in shipments of our products or increases in the prices of components, either of which could have a material adverse effect on our business.

We do not have supply agreements with all of our current contract manufacturers and we often utilize purchase orders, which are subject to acceptance by the supplier. Failure to accept purchase orders could result in an inability to obtain adequate supply of our product or components in a timely manner or on commercially reasonable terms.

An unanticipated loss of any of our contract manufacturers could cause delays in our ability to deliver our products while we identify and qualify a replacement manufacturer, which delays could negatively impact our revenues.

The liquidity of our customers and suppliers may also be affected by the current economic and financial downturn. Our suppliers may experience credit or liquidity problems which could negatively affect sources of our products and components.

27

Table of Contents

***We operate at a single location. Any disruption in this facility or any inability to ship a sufficient number of our products to meet demand could adversely affect our business and results of operations.***

We operate at a single location in Wilmington, North Carolina. Our facility may be affected by man-made or natural disasters, such as a hurricane. While we currently rely on third parties to manufacture, assemble, package, label and sterilize our products and components, and to warehouse and ship a portion of our products, we might also be forced to rely on third parties to inspect, warehouse or ship all our products and components in the event our facilities were affected by a disaster. Our facility, if damaged or destroyed, could be difficult to replace and could require substantial lead-time to repair or replace. In the case of a device with a PMA approval, we might be required to obtain prior FDA, or notified body, approval of an alternate facility, which could delay or prevent our marketing of the affected product until this supplemental approval is obtained. Although we believe we possess adequate insurance for damage to our property and the disruption of our business from casualties, this insurance may not be sufficient to cover all of our potential losses and may not continue to be available to us on acceptable terms, or at all.

***Current challenges in the commercial and credit environment may adversely affect our business and financial condition.***

Unpredictable changes in economic conditions, including recession, inflation, increased government intervention, or other changes, may adversely affect our general business strategy. Our ability to generate cash flows from operations or enter into financing arrangements on acceptable terms could be adversely affected if there is a material decline in the demand for our products or in the solvency of our customers, deterioration in our key financial ratios or credit ratings, or other significantly unfavorable changes in conditions. While these conditions and the current economic uncertainty have not meaningfully impaired our ability to access credit markets or meaningfully adversely affected our operations to date, continuing volatility in the global financial markets could increase borrowing costs or affect our ability to access the capital markets. Current or worsening economic conditions may also adversely affect the business of our customers, including their ability to pay for our products and services, and the amount spent on healthcare generally. This could result in a decrease in the demand for our products and services, longer sales cycles, slower adoption of new technologies and increased price competition.

***Our future operating results are difficult to predict and may vary significantly from quarter to quarter, which may negatively impact our stock price in the future.***

We have only commercially distributed our products since 2005. Given this limited history, it is difficult to predict future revenues derived from sales of our products. Because of this and the uncertain effects of the following factors, our quarterly revenues and results of operations may fluctuate in the future due to, among others, the following reasons:

- market acceptance of our products;

- availability of adequate coverage and reimbursement for hospitals and surgeons;

- the conduct and results of clinical trials;

- the timing and expense of obtaining future regulatory approvals;

- fluctuations in our expenses associated with expanding our operations;

- the introduction of new products by our competitors; and

- changes in our pricing policies or in the pricing policies of our competitors or suppliers.

Because of these and possibly other factors, it is possible that in some future period our operating results will not meet investor expectations or those of public market analysts.

Any unanticipated change in revenues or operating results is likely to cause our stock price to fluctuate since such changes reflect new information available to investors and analysts. New information may cause investors and analysts to re-evaluate our stock, which could cause a decline in the trading price of our stock.

28

Table of Contents

### Risks Related to Regulatory Environment

***If we fail to maintain regulatory approvals and clearances, or are unable to obtain, or experience significant delays in obtaining, FDA clearances or approvals for our future products or product modifications, our ability to commercially distribute and market these products could suffer.***

Our products are subject to rigorous regulation by the FDA and numerous other federal, state and foreign governmental authorities. The process of obtaining regulatory clearances or approvals to market a medical device can be costly and time consuming, and we may not be able to obtain these clearances or approvals on a timely basis, if at all. In particular, the FDA permits commercial distribution of most new medical devices only after the device has received clearance under Section 510(k) of the Federal Food, Drug and Cosmetic Act, or is the subject of an approved PMA. The FDA will clear marketing of a non-exempt lower risk medical device through the 510(k) process if the manufacturer demonstrates that the new product is substantially equivalent to other legally marketed products not requiring PMA approval. High risk devices deemed to pose the greatest risk, such as life-sustaining, life-supporting, or implantable devices, or devices not deemed substantially equivalent to a legally marketed device, require a PMA. The PMA process is more costly, lengthy and uncertain than the 510(k) clearance process. A PMA application must be supported by extensive data, including, but not limited to, technical, preclinical, clinical trial, manufacturing and labeling data, to demonstrate to the FDA's satisfaction the safety and efficacy of the device for its intended use. Our currently commercialized products have been cleared through the 510(k) process. However, we may need to submit a PMA for future products we develop.

Certain of the FDA's policies and procedures are under review by new leadership and it is uncertain whether any changes arising from such review could adversely affect our products and business.

Our failure to comply with U.S. federal, state and foreign governmental regulations could lead to the imposition of injunctions, suspensions or loss of regulatory clearance or approvals, product recalls, termination of distribution, product seizures or civil penalties, among other things. In the most extreme cases, criminal sanctions or closure of our manufacturing facility are possible.

Foreign governmental authorities that regulate the manufacture and sale of medical devices have become increasingly stringent and, to the extent we market and sell our products internationally, we may be subject to rigorous international regulation in the future. In these circumstances, we would rely significantly on our foreign independent distributors to comply with the varying regulations, and any failures on their part could result in restrictions on the sale of our products in foreign countries.

***Modifications to our marketed products may require new 510(k) clearances or PMA approvals, or may require us to cease marketing or recall the modified products until clearances or approvals are obtained.***

Any modification to our currently marketed 510(k)-cleared devices that could significantly affect its safety or efficacy, or that would constitute a change in its intended use, requires a new 510(k) clearance or, possibly, a PMA. The FDA requires every manufacturer to make this determination in the first instance, but the FDA may review the manufacturer's decision. The FDA may not agree with our decisions regarding whether new clearances or approvals are necessary. If the FDA requires us to seek 510(k) clearance or a PMA for any modification to a previously cleared product, we may be required to cease marketing and distributing, or to recall the modified product until we obtain such clearance or approval, and we may be subject to significant regulatory fines or penalties. Further, our products could be subject to recall if the FDA determines, for any reason, that our products are not safe or effective because they are in violation of the FDCA. Any recall or FDA requirement that we seek additional approvals or clearances could result in significant delays, fines, increased costs associated with modification of a product, loss of revenue and potential operating restrictions imposed by the FDA.

29

Table of Contents

*Clinical trials necessary to support a PMA application will be expensive and will require the enrollment of large numbers of patients, and suitable patients may be difficult to identify and recruit. Delays or failures in our clinical trials will prevent us from commercializing any modified or new products and will adversely affect our business, operating results and prospects.*

Initiating and completing clinical trials necessary to support a PMA application and additional safety and efficacy data beyond that typically required for 510(k) clearances for possible future product candidates, will be time consuming and expensive and the outcomes uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product we advance into clinical trials may not have favorable results in later clinical trials.

Conducting successful clinical studies may require the enrollment of large numbers of patients, and suitable patients may be difficult to identify and recruit. Patient enrollment in clinical trials and completion of patient participation and follow-up depends on many factors, including the size of the patient population, the nature of the trial protocol, the attractiveness of, or the discomforts and risks associated with, the treatments received by enrolled subjects, the availability of appropriate clinical trial investigators, support staff, and proximity of patients to clinical sites. For example, patients may be discouraged from enrolling in our clinical trials if the trial protocol requires them to undergo extensive post-treatment procedures or follow-up to assess the safety and effectiveness of our products or if they determine that the treatments received under the trial protocols are not attractive or involve unacceptable risks or discomforts. Patients may also not participate in our clinical trials if they choose to participate in contemporaneous clinical trials of competitive products. In addition, patients participating in clinical trials may die before completion of the trial or suffer adverse medical events unrelated to investigational products.

Development of sufficient and appropriate clinical protocols and data to demonstrate safety and efficacy are required and we may not adequately develop such protocols to support clearance and approval. Further, the FDA may require us to submit data on a greater number of patients than we originally anticipated and/or for a longer follow-up period or change the data collection requirements or data analysis applicable to our clinical trials. Delays in patient enrollment or failure of patients to continue to participate in a clinical trial may cause an increase in costs and delays in the clearance or approval and attempted commercialization of our products or result in the failure of the clinical trial. In addition, despite considerable time and expense invested in our clinical trials, FDA may not consider our data adequate to demonstrate safety and efficacy. Such increased costs and delays or failures could adversely affect our business, operating results and prospects.

*If the third parties on which we rely to conduct our clinical trials and to assist us with pre-clinical development do not perform as contractually required or expected, we may not be able to obtain regulatory clearance or approval for or commercialize our products.*

We do not have the ability to independently conduct our pre-clinical and clinical trials for our products and we must rely on third parties, such as contract research organizations, medical institutions, clinical investigators and contract laboratories to conduct such trials. If these third parties do not successfully perform their contractual duties or regulatory obligations or meet expected deadlines, if these third parties need to be replaced, or if the quality or accuracy of the data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements or for other reasons, our pre-clinical development activities or clinical trials may be extended, delayed, suspended or terminated, and we may not be able to obtain regulatory clearance or approval for, or successfully commercialize, our products on a timely basis, if at all, and our business, operating results and prospects may be adversely affected. Furthermore, our third-party clinical trial investigators may be delayed in conducting our clinical trials for reasons outside of their control.

*Even if our products are approved by regulatory authorities, if we or our suppliers fail to comply with ongoing FDA or other foreign regulatory authority requirements, or if we experience unanticipated problems with our products, these products could be subject to restrictions or withdrawal from the market.*

Any product for which we obtain clearance or approval, and the manufacturing processes, reporting requirements, post-approval clinical data and labeling and promotional activities for such product, will be subject

30

JA-359

Table of Contents

to continued regulatory review, oversight and periodic inspections by the FDA and other domestic and foreign regulatory bodies. In particular, we and our suppliers are required to comply with the Quality System Regulations, or QSR, and MDD regulations, which may include ISO standards, for the manufacture of our products and other regulations which cover the methods and documentation of the design, testing, production, control, quality assurance, labeling, packaging, storage and shipping of any product for which we obtain clearance or approval. Regulatory bodies enforce the QSR and ISO regulations through inspections. The failure by us or one of our suppliers to comply with applicable statutes and regulations administered by the FDA and other regulatory bodies, or the failure to timely and adequately respond to any adverse inspectional observations or product safety issues, could result in, among other things, any of the following enforcement actions:

- warning letters or untitled letters;

- fines and civil penalties;

- unanticipated expenditures to address or defend such actions;

- delays in clearing or approving, or refusal to clear or approve, our products;

- withdrawal or suspension of approval of our products or those of our third-party suppliers by the FDA or other regulatory bodies;

- product recall or seizure;

- orders for physician notification or device repair, replacement or refund;

- interruption of production;

- operating restrictions;

- injunctions; and

- criminal prosecution.

If any of these actions were to occur it would harm our reputation and cause our product sales to suffer and may prevent us from generating revenue. Furthermore, our key component suppliers may not currently be or may not continue to be in compliance with all applicable regulatory requirements which could result in our failure to produce our products on a timely basis and in the required quantities, if at all.

Even if regulatory clearance or approval of a product is granted, such clearance or approval may be subject to limitations on the intended uses for which the product may be marketed and reduce our potential to successfully commercialize the product and generate revenue from the product. If the FDA determines that our promotional materials, labeling, training or other marketing or educational activities constitute promotion of an unapproved use, it could request that we cease or modify our training educational, labeling or promotional materials or subject us to regulatory enforcement actions. It is also possible that other federal, state or foreign enforcement authorities might take action if they consider our training educational, labeling or other promotional materials to constitute promotion of an unapproved use, which could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement.

In addition, we may be required to conduct costly post-market testing and surveillance to monitor the safety or effectiveness of our products, and we must comply with medical device reporting requirements, including the reporting of adverse events and certain malfunctions related to our products. Later discovery of previously unknown problems with our products, including unanticipated adverse events or adverse events of unanticipated severity or frequency, manufacturing problems, or failure to comply with regulatory requirements such as the QSR or GMP, may result in changes to labeling, restrictions on such products or manufacturing processes, withdrawal of the products from the market, voluntary or mandatory recalls, a requirement to repair, replace or refund the cost of any medical device we manufacture or distribute, fines, suspension of regulatory approvals, product seizures, injunctions or the imposition of civil or criminal penalties which would adversely affect our business, operating results and prospects.

31

JA-360

Table of Contents

***We may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse and health information privacy and security laws, and could face substantial penalties if we are unable to fully comply with such laws.***

Although we do not provide healthcare services, submit claims for third-party reimbursement, or receive payments directly from Medicare, Medicaid, or other third-party payors for our products or the procedures in which our products are used, healthcare regulation by federal and state governments could significantly impact our business. Healthcare fraud and abuse and health information privacy and security laws potentially applicable to our operations include:

- the federal Anti-Kickback Law, which constrains our marketing practices and those of our independent sales agents and distributors, educational programs, pricing policies, and relationships with healthcare providers, by prohibiting, among other things, soliciting, receiving, offering or providing remuneration, intended to induce the purchase or recommendation of an item or service reimbursable under a federal healthcare program (such as the Medicare or Medicaid programs);

- federal false claims laws which prohibit, among other things, knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid, or other third-party payors that are false or fraudulent;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, and its implementing regulations, which created federal criminal laws that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters and which also imposes certain regulatory and contractual requirements regarding the privacy, security and transmission of individually identifiable health information; and

- state laws analogous to each of the above federal laws, such as anti-kickback and false claims laws that may apply to items or services reimbursed by any third-party payor, including commercial insurers, and state laws governing the privacy of certain health information, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.

We have adopted comprehensive compliance programs to attempt to comply with these regulations. However, because of the breadth of these laws and regulations and the sometimes subjective nature of their application, it is possible that some of our business activities could be subject to challenge under one or more of such laws. If our past or present operations, or those of our independent sales agents and distributors, are found to be in violation of any of such laws or any other governmental regulations that may apply to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, exclusion from federal healthcare programs and/or the curtailment or restructuring of our operations. Similarly, if the healthcare providers or entities with whom we do business are found to be non-compliant with applicable laws, they may be subject to sanctions, which could also have a negative impact on us. Any penalties, damages, fines, curtailment or restructuring of our operations could adversely affect our ability to operate our business and our financial results. The risk of our being found in violation of these laws is increased by the fact that many of them have not been fully interpreted by the regulatory authorities or the courts, and their provisions are open to a variety of interpretations. Any action against us for violation of these laws, even if we successfully defend against them, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business.

### Risks Related to Our Intellectual Property

***Our ability to protect our intellectual property and proprietary technology through patents and other means is uncertain.***

Our success depends significantly on our ability to protect our proprietary rights to the procedures created with, and the technologies used in, our products. We rely on patent protection, as well as a combination of copyright, trade secret and trademark laws, and nondisclosure, confidentiality and other contractual restrictions to protect our proprietary technology. However, these legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep any competitive advantage. For example, our

32

Table of Contents

pending United States and foreign patent applications may not be approved, may not issue as patents in a form that will be advantageous to us, or may issue and be subsequently successfully challenged by others and invalidated. In addition, our pending patent applications include claims to material aspects of our products and procedures that are not currently protected by issued patents. Both the patent application process and the process of managing patent disputes can be time consuming and expensive. The patents we own may not be of sufficient scope or strength to provide us with any meaningful protection or commercial advantage, and competitors may be able to design around our patents or develop products which provide outcomes which are comparable to ours. Although we have taken steps to protect our intellectual property and proprietary technology, including entering into confidentiality agreements and intellectual property assignment agreements with our officers, employees, consultants and advisors, such agreements may not be enforceable or may not provide meaningful protection for our trade secrets or other proprietary information in the event of unauthorized use or disclosure or other breaches of such agreements. Furthermore, the laws of some foreign countries do not protect our intellectual property rights to the same extent as do the laws of the United States.

We rely on our trademarks, trade names, and brand names to distinguish our products from the products of our competitors, and have registered or applied to register many of these trademarks. However, our trademark applications may not be approved. Third parties may also oppose our trademark applications, or otherwise challenge our use of the trademarks. In the event that our trademarks are successfully challenged, we could be forced to rebrand our products, which could result in loss of brand recognition, and could require us to devote resources to advertising and marketing new brands. Further, our competitors may infringe our trademarks, or we may not have adequate resources to enforce our trademarks.

In the event a competitor infringes upon our patent or other intellectual property rights, enforcing those rights may be costly, difficult and time consuming. Even if successful, litigation to enforce our intellectual property rights or to defend our patents against challenge could be expensive and time consuming and could divert our management's attention. We may not have sufficient resources to enforce our intellectual property rights or to defend our patents or other intellectual property rights against a challenge.

***Any lawsuit, whether initiated by us to enforce our intellectual property rights or by a third party against us alleging infringement, may cause us to expend significant financial and other resources, and may divert our attention from our business and adversely affect our business, operating results and prospects.***

The medical device industry is characterized by the existence of a large number of patents and frequent litigation based on allegations of patent infringement. Patent litigation can involve complex factual and legal questions and its outcome is uncertain. Any claim relating to infringement of patents that is successfully asserted against us may require us to pay substantial damages. Even if we were to prevail, any litigation could be costly and time-consuming and would divert the attention of our management and key personnel from our business operations. Our success will also depend in part on our not infringing patents issued to others, including our competitors and potential competitors. If our products are found to infringe the patents of others, our development, manufacture and sale of such products could be severely restricted or prohibited. In addition, our competitors may independently develop similar technologies. Because of the importance of our patent portfolio and unpatented proprietary technology to our business, we may lose market share to our competitors if we fail to protect our patent rights.

As the number of entrants into our market increases, the possibility of a patent infringement claim against us grows. Our products and methods may be covered by patents held by our competitors. Some of our competitors have considerable resources available to them to engage in this type of litigation. We, on the other hand, are an early stage company with comparatively few resources available to us to engage in costly and protracted litigation. Because some patent applications are maintained in secrecy for a period of time after they are filed, there is a risk that we could adopt a technology without knowledge of a pending patent application, which technology would infringe a third-party patent once that patent is issued. In addition, our competitors may assert that future products we may market infringe their patents.

A patent infringement suit or other infringement or misappropriation claim brought against us or

any of our strategic partners or licensees may force us or any of our strategic partners or licensees to stop or delay

33

Table of Contents

developing, manufacturing or selling potential products that are claimed to infringe a third party's intellectual property, unless that party grants us or any strategic partners or licensees rights to use its intellectual property. In such cases, we may be required to obtain licenses to patents or proprietary rights of others in order to continue to commercialize our products. However, we may not be able to obtain any licenses required under any patents or proprietary rights of third parties on acceptable terms, or at all. Even if our strategic partners or licensees or we were able to obtain rights to the third party's intellectual property, these rights may be non-exclusive, thereby giving our competitors access to the same intellectual property. Ultimately, we may be unable to commercialize some of our potential products or may have to cease some of our business operations as a result of patent infringement claims, which could severely harm our business.

In any infringement lawsuit, a third party could seek to enjoin, or prevent, us from commercializing our existing or future products, and/or may seek damages from us, and any such lawsuit would likely be expensive for us to defend against. A court may determine that patents held by third parties are valid and infringed by us and we may be required to:

- pay damages, including, but not limited to, treble damages and attorneys' fees, which may be substantial;

- cease the development, manufacture, use and sale of products that infringe the patent rights of others, through a court-imposed sanction called an injunction;

- expend significant resources to redesign our technology so that it does not infringe others' patent rights, or develop or acquire non-infringing intellectual property, which may not be possible;

- discontinue manufacturing or other processes incorporating infringing technology; or

- obtain licenses to the infringed intellectual property, which may not be available to us on acceptable terms, or at all.

Any development or acquisition of non-infringing products or technology or licenses could require the expenditure of substantial time and other resources and could have a material adverse effect on our business and financial results. If we are required to, but cannot, obtain a license to valid patent rights held by a third party, we would likely be prevented from commercializing the relevant product. We believe that it is unlikely that we would be able to obtain a license to any necessary patent rights controlled by companies against which we would, directly or indirectly, compete. If we need to redesign products to avoid third-party patents, we may suffer significant regulatory delays associated with conducting additional studies or submitting technical, manufacturing or other information related to the redesigned product and, ultimately, in obtaining regulatory approval.

### Risks Related to our Common Stock

***A sale of a substantial number of shares of our common stock may cause the price of our common stock to decline.***

If our stockholders sell substantial amounts of our common stock in the public market, including shares issued upon the exercise of options, the market price of our common stock could decline. At December 31, 2009, we had 20,648,447 shares of common stock outstanding. All of these shares are freely tradable, without restriction, in the public market, of which 7,484,856 shares are held by directors, executive officers and other affiliates and are subject to volume limitations under Rule 144 under the Securities Act. In addition, the 2,216,026 shares of our common stock that are subject to outstanding options as of December 31, 2009 will be eligible for sale in the public market to the extent permitted by the provisions of the various vesting agreements and Rules 144 and 701 under the Securities Act. If these additional shares are sold, or it is perceived they will be sold, the trading price of our common stock could decline. These sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem reasonable or appropriate.

34

JA-365

Table of Contents

*Our directors, officers and principal stockholders have significant voting power and may take actions that may not be in the best interests of our other stockholders.*

At December 31, 2009, our officers, directors and principal stockholders, each holding more than 5% of our common stock, collectively controlled approximately 56% of our outstanding common stock. As a result, these stockholders, if they act together, are able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. This concentration of ownership may not be in the best interests of our other stockholders.

*If securities or industry analysts do not publish research or reports about our business, if they change their recommendations regarding our stock adversely or if our operating results do not meet their expectations, our stock price and trading volume could decline.*

The trading market for our stock may be influenced by the research and reports that industry or securities analysts publish about us or our business. If one or more of these analysts cease coverage of us or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline. Moreover, if one or more of the analysts who cover us downgrade our stock or if our operating results do not meet their expectations, our stock price could decline.

*Trading in our stock over the last twelve months has been limited, so investors may not be able to sell as much stock as they want at prevailing prices.*

The average daily trading volume in our common stock for the year ended December 31, 2009 was approximately 76,000 shares. If limited trading in our stock continues, it may be difficult for investors to sell their shares in the public market at any given time at prevailing prices. Moreover, the market price for shares of our common stock may be made more volatile because of the relatively low volume of trading in our common stock. When trading volume is low, significant price movement can be caused by the trading in a relatively small number of shares. Volatility in our common stock could cause stockholders to incur substantial losses.

*Volatility in the stock price of other companies may contribute to volatility in our stock price.*

The Nasdaq Global Market, particularly in recent years, has experienced significant volatility with respect to medical technology, pharmaceutical, biotechnology and other life science company stocks. The volatility of medical technology, pharmaceutical, biotechnology and other life science company stocks often does not relate to the operating performance of the companies represented by the stock. Further, there has been particular volatility in the market price of securities of early stage life science companies. These broad market and industry factors may seriously harm the market price of our common stock, regardless of our operating performance. In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been instituted. A securities class action suit against us could result in substantial costs, potential liabilities and the diversion of management's attention and resources.

*Our amended and restated certificate of incorporation, amended and restated bylaws and Delaware law contain provisions that could discourage a takeover.*

Anti-takeover provisions of our amended and restated certificate of incorporation, amended and restated bylaws and Delaware law may have the effect of deterring or delaying attempts by our stockholders to remove or replace management, engage in proxy contests and effect changes in control. The provisions of our charter documents include:

- a classified board so that only one of the three classes of directors on our board of directors is elected each year;

- procedures for advance notification of stockholder director nominations and proposals;

JA-366

35

Case 7:12-cv-00023-F   Document 33-11   Filed 09/07/12   Page 58 of 113

JA-367

Table of Contents

- the ability of our board of directors to amend our bylaws without stockholder approval;

- a supermajority stockholder vote requirement for amending certain provisions of our amended and restated certificate of incorporation and our amended and restated bylaws; and

- the ability of our board of directors to issue up to 5,000,000 shares of preferred stock without stockholder approval upon the terms and conditions and with the rights, privileges and preferences as our board of directors may determine.

In addition, as a Delaware corporation, we are subject to Delaware law, including Section 203 of the Delaware General Corporation Law, or DGCL. In general, Section 203 prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years following the date that the stockholder became an interested stockholder unless certain specific requirements are met as set forth in Section 203. These provisions, alone or together, could have the effect of deterring or delaying changes in incumbent management, proxy contests or changes in control.

**We do not anticipate declaring any cash dividends on our common stock.**

We have never declared or paid cash dividends on our common stock and do not plan to pay any cash dividends in the near future. Our current policy is to retain all funds and any earnings for use in the operation and expansion of our business. If we do not pay dividends, our stock may be less valuable to you because a return on your investment will only occur if our stock price appreciates.

**Item 1B.  *Unresolved Staff Comments.***

None.

**Item 2.  *Properties.***

At December 31, 2009, we leased approximately 30,000 square feet of space in a single-user building located in an industrial park in Wilmington, North Carolina. Of that amount, approximately 19,800 square feet were used for manufacturing and warehousing, approximately 8,400 square feet were used for office space and approximately 1,800 square feet were used for research and development activities. This lease was terminated in February 2010. In February 2010, we moved into a new facility of approximately 30,000 square feet, also located in Wilmington, North Carolina. Of that amount, approximately 5,000 square feet are used for manufacturing and warehousing, approximately 18,000 square feet are used for office space and approximately 7,000 square feet are used for research and development activities. This lease expires in December 2019. We believe that our current facility will be sufficient to meet our needs through that time.

**Item 3.  *Legal Proceedings.***

We are not currently party to any material legal proceedings. We may be subject to various claims and legal actions arising in the ordinary course of business from time to time.

**Item 4.  *Submission of Matters to a Vote of Security Holders.***

No matter was submitted to a vote of our security holders during the quarter ended December 31, 2009.

36

Table of Contents

## PART II

**Item 5.** *Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

### Price of Common Stock

Our common stock is traded on the NASDAQ Global Market under the symbol "TSON." The following table sets forth the high and low sales prices of our common stock as quoted on the NASDAQ Global Market for the periods indicated.

| | Price Range | |
| --- | --- | --- |
| | High | Low |
| Fiscal 2009: | | |
| Fourth quarter | $ 5.00 | $3.26 |
| Third quarter | 6.83 | 4.08 |
| Second quarter | 8.74 | 5.65 |
| First quarter | 7.66 | 4.55 |
| Fiscal 2008: | | |
| Fourth quarter | $ 9.54 | $5.82 |
| Third quarter | 14.25 | 7.45 |
| Second quarter | 15.74 | 9.93 |
| First quarter | 17.24 | 8.96 |

The closing price for our common stock as reported by the NASDAQ Global Market on March 8, 2010 was $3.93 per share.

As of March 8, 2010, we had approximately 40 stockholders of record based upon the records of our transfer agent, which does not include beneficial owners of our common stock whose shares are held in the names of various securities brokers, dealers and registered clearing agencies.

### Uses of Proceeds from Sale of Registered Securities

On October 22, 2007, we completed our initial public offering of 6,325,000 shares of common stock (inclusive of 825,000 shares sold to the underwriters upon exercise of their over-allotment option) at the initial public offering price of $15.00 per share. We effected the offering through a Registration Statement on Form S-1 (Registration No. 333-144802), which was declared effective by the SEC on October 16, 2007, and through a Registration Statement on Form S-1 filed pursuant to Rule 462(b) under the Securities Act (Registration No. 333-146753), which became effective upon filing on October 17, 2007 pursuant to Rule 462(b) (collectively, the "Registration Statement"). The offering commenced on October 17, 2007 and terminated on October 22, 2007 after all of the 6,325,000 shares of common stock registered under the Registration Statement were sold. Our initial public offering resulted in aggregate proceeds to us of approximately $86.7 million, net of underwriting discounts and commissions of approximately $6.6 million and offering expenses of approximately $1.6 million. Lehman Brothers Inc. and Piper Jaffray & Co. acted as joint book-running managers for the offering with Cowen and Company, LLC and Wachovia Capital Markets, LLC acting as co-managers.

No offering expenses were paid directly or indirectly to any of our directors or officers (or their associates) or person owning ten percent or more of any class of our equity securities or to any other affiliates. All offering expenses were paid directly to others.

As of December 31, 2009, we had used all of the net proceeds for sales, marketing, general administrative and research and development activities.

Case 7:12-cv-00023-F    Document 33-11    Filed 09/07/12    Page 60 of 113
http://www.sec.gov/Archives/edgar/data/1230353/000095012310024198/g22785e10vk.htm    6/21/2012

JA-369

Table of Contents

**Dividend Policy**

We have never declared or paid any cash dividends on our capital stock. We currently intend to retain future earnings, if any, for development of our business and do not anticipate that we will declare or pay cash dividends on our capital stock in the foreseeable future.

**Securities Authorized For Issuance Under Equity Compensation Plans**

| Plan Category | (a) Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | (b) Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | (c) Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 2,216,026 | $ 6.96 | 1,032,914 |
| Equity compensation plans not approved by security holders | — | — | |
| Total | 2,216,026 | $ 6.96 | 1,032,914 |

38

**Table of Contents**

**Stock Price Performance Graph**

The following graph compares the cumulative total stockholder return on our common stock from October 17, 2007 (the date our common stock began trading on the NASDAQ Global Market) through December 31, 2009 to that of the cumulative return over such period for (i) The NASDAQ Stock Market Composite Index, and (ii) NASDAQ Medical Equipment Index. Total stockholder return assumes $100.00 invested at the beginning of the period in our common stock and in each of the comparative indices. The graph further assumes that such amount was initially invested in our common stock at the closing market price on the first day of trading, and that any dividends have been reinvested. We have not paid any dividends on our common stock. The stock price performance on the following graph is not necessarily indicative of future stock price performance.



*The material in the above performance graph does not constitute soliciting material and should not be deemed filed or incorporated by reference into any other Company filing, whether under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made on, before or after the date of this report and irrespective of any general incorporation language in such filing, except to the extent we specifically incorporate this performance graph by reference therein.*

39

Table of Contents

Item 6.  *Selected Financial Data.*

    The selected financial data has been derived from our audited consolidated financial statements. You should read the following financial information together with the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the notes included elsewhere in this report.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| | (In thousands, except share data) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 29,807 | $ 25,304 | $ 16,473 | $ 5,812 | $ 1,469 |
| Cost of revenue | 5,687 | 4,315 | 3,042 | 1,580 | 386 |
| Gross profit | 24,120 | 20,989 | 13,431 | 4,232 | 1,083 |
| **Operating expenses** | | | | | |
| Research and development | 6,439 | 4,081 | 3,885 | 3,816 | 2,100 |
| Sales and marketing | 34,098 | 29,375 | 15,706 | 9,288 | 2,635 |
| General and administrative | 7,184 | 7,116 | 3,801 | 1,596 | 1,637 |
| Total operating expenses | 47,721 | 40,572 | 23,392 | 14,700 | 6,372 |
| Operating loss | (23,601) | (19,583) | (9,961) | (10,468) | (5,289) |
| Interest income | 405 | 2,548 | 1,384 | 858 | 264 |
| Other income (expense) | — | — | — | 131 | (17) |
| Net loss | $ (23,196) | $ (17,035) | $ (8,577) | $ (9,479) | $ (5,042) |
| Net loss per common share - basic and diluted | $ (1.13) | $ (0.84) | $ (1.46) | $ (3.91) | $ (2.25) |
| Weighted average common shares outstanding — basic and diluted | 20,603,600 | 20,288,711 | 5,872,008 | 2,423,223 | 2,243,018 |

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and short-term investments | $ 55,251 | $ 77,266 | $ 93,921 | $ 14,962 | $ 25,994 |
| Working capital | 63,467 | 84,174 | 98,351 | 17,448 | 26,696 |
| Total assets | 68,991 | 90,491 | 102,856 | 20,004 | 28,013 |
| Preferred stock | — | — | — | 40,089 | 40,089 |
| Common stock | 2 | 2 | 2 | — | — |
| Additional paid in capital | 136,402 | 133,507 | 130,325 | 820 | 219 |
| Total stockholders' equity/(deficit) | 65,280 | 85,586 | 99,439 | (21,529) | (12,654) |

40

JA-372

Table of Contents

**Item 7.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following discussion of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and the related notes to our consolidated financial statements included in this report. The following discussion contains forward-looking statements. See "Cautionary Note Regarding Forward-Looking Statements" on page 1 of this report.

## Overview

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using this pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the intervertebral space. We developed our pre-sacral approach to allow spine surgeons to access and treat intervertebral spaces without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market in the United States and Europe two single-level fusion products, AxiaLIF and AxiaLIF 360°, and a two-level fusion product, the AxiaLIF 2L, which include the Vectre and Avatar posterior fixation systems for lumbar fixation supplemental to AxiaLIF fusion. All of our AxiaLIF products are delivered using our pre-sacral approach.

From our incorporation in 2000 through 2004, we devoted substantially all of our resources to research and development and start-up activities, consisting primarily of product design and development, clinical trials, manufacturing, recruiting qualified personnel and raising capital. We received FDA 510(k) clearance for our AxiaLIF product in the fourth quarter of 2004, and commercially introduced our AxiaLIF product in the United States in the first quarter of 2005. We received FDA 510(k) clearance for our AxiaLIF 360° product in the United States in the third quarter of 2005 and began commercialization in the United States in the third quarter of 2006. We received a CE mark to market AxiaLIF in the European market in the first quarter of 2005 and began commercialization in the first quarter of 2006. For AxiaLIF 360°, we received a CE mark in the first quarter of 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2006 and began commercialization in the European market in the fourth quarter of 2006. We received 510(k) clearance for the AxiaLIF 2L from the FDA and began marketing this product in the United States in the second quarter of 2008. In November 2009, we commenced the limited market release of our next generation Vectre facet screw system. Our AxiaLIF 2L+ product received FDA 510 (k) clearance, and we began marketing the product, in January 2010. In January 2010, we also entered into a partnership agreement with Life Spine, Inc to distribute Avatar, a minimally invasive pedicle screw system. We currently sell our products through a direct sales force, independent sales agents and international distributors.

We rely on third parties to manufacture most of our products and their components. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which allows us to compete with larger volume manufacturers of spine surgery products.

Since inception, we have been unprofitable. As of December 31, 2009, we had an accumulated deficit of $71.1 million.

We expect to continue to invest in maintaining our sales and marketing infrastructure for our products in order to gain wider acceptance for them. We also expect to continue to invest in research and development and related clinical trials, and increase general and administrative expenses as we grow. As a result, we will need to generate significant revenue in order to achieve profitability.

41

JA-373

Table of Contents

### Financial Operations

#### *Revenue*

We generate revenue from the sales of our procedure kits and implants used in our AxiaLIF fusion procedure for the treatment of degenerative disc disease and instability. Our revenue is generated by our direct sales force, independent sales agents and independent distributors. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. The other sales method is for sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine revenue recognition on a case by case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment of our products to our independent distributors. Although we intend to continue to expand our international sales and marketing efforts, we expect that a substantial amount of our revenues will be generated in the United States in future periods.

#### *Cost of Revenue*

Cost of revenue consists primarily of material and overhead costs related to our products. Cost of revenue also includes facilities-related costs, such as rent, utilities and depreciation.

#### *Research and Development*

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within our product development, regulatory and clinical functions and the costs of clinical studies and product development projects. In future periods, we expect research and development expenses to grow as we continue to invest in basic research, clinical trials, product development and in our intellectual property.

#### *Sales and Marketing*

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to our direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities, and participation in medical conferences. In future periods, we expect sales and marketing expenses to increase as we expand our sales and marketing efforts.

#### *General and Administrative*

General and administrative expenses consist of personnel costs, including stock-based compensation, related to the executive, finance, business development and information technology and human resource functions, as well as professional service fees, legal fees, accounting fees, insurance costs and general corporate expenses. We expect general and administrative expenses to increase as we grow our business.

#### *Interest Income*

Interest income is primarily composed of interest earned on our cash, cash equivalents and available-for-sale securities.

JA-374

Table of Contents

### Results of Operations

*Comparison of the Years Ended December 31, 2009, 2008 and 2007*

*Revenue.* Revenue increased to $29.8 million in 2009 from $25.3 million in 2008 and $16.5 million in 2007. The $4.5 million increase in revenue from 2008 to 2009, and the $8.8 million increase in revenue from 2007 to 2008, was primarily attributable to an increase in the number of products sold, which we believe resulted from the continued market acceptance of our AxiaLIF, AxiaLIF 360°, and AxiaLIF 2L products. None of this increase was attributable to price increases. Beginning in the second quarter of 2009, our revenue was negatively impacted by lower than expected case volume as a result of concerns and uncertainty in the marketplace surrounding physician reimbursement for our AxiaLIF procedure. We are addressing these issues with increased education and support resources for our current and prospective surgeon users. These issues have more of an impact on our AxiaLIF 360° procedure where ours is the only procedure being performed. In cases where our procedure is being performed in conjunction with other techniques or in complex cases, we have seen a less-pronounced impact on cases. Domestically, sales of our AxiaLIF 360° product decreased to $7.8 million in 2009 from $8.5 million in 2008, which was an increase from $6.8 million in 2007. Sales of our AxiaLIF 2L product, which began commercialization in the United States in the second quarter of 2008 and which has a higher selling price than our other products, increased to $8.0 million in 2009 from $3.3 million in 2008. As a result, average selling prices in the United States increased to approximately $10,500 in 2009 from approximately $9,850 in 2008 and $9,250 in 2007. In 2009, 2008 and 2007, we recorded 2,578, 2,280 and 1,591 domestic AxiaLIF cases, respectively. This included 780, 852 and 677 AxiaLIF 360° cases in 2009, 2008 and 2007, respectively, and 596 and 229 AxiaLIF 2L cases in 2009 and 2008, respectively. Additionally, in 2009, 2008 and 2007, we generated $953,000, $868,000 and $359,000, respectively, in revenues from stand alone sales of our facet screw system. Revenue generated outside the United States decreased to $1.8 million in 2009 from $2.0 million in 2008, which was an increase from $1.4 million in 2007. In 2009, 2008 and 2007, initial stocking shipments to new distributors were $122,000, $382,000 and $438,000, respectively. In 2009, we began direct sales through our own sales representatives and agents in Europe and generated revenue of $543,000. In 2009, 2008 and 2007, 94%, 92% and 92%, respectively, of our revenues were generated in the United States.

*Cost of Revenue.* Cost of revenue increased to $5.7 million in 2009 from $4.3 million in 2008 and $3.0 million in 2007. The $1.4 million increase from 2008 to 2009 and the $1.3 million increase from 2007 to 2008 were primarily the result of higher material and overhead costs associated with increased sales volumes of our AxiaLIF, AxiaLIF 360° and AxiaLIF 2L products. As a percentage of revenue, cost of revenue was 19.1% in 2009, 17.1% in 2008 and 18.5% in 2007. The increase in cost of revenue as a percentage of revenue from 2008 to 2009 was primarily related to specific inventory reserves of $0.4 million taken in 2009 for excess inventory and the under-absorption of manufacturing overhead of $0.2 million as we reduced inventory purchases in response to lower than anticipated business volume. The decrease in cost of revenue as a percentage of revenue from 2007 to 2008 was primarily attributable to increased efficiencies associated with higher production and sales volumes.

*Research and Development.* Research and development expenses increased to $6.4 million in 2009 from $4.1 million in 2008 and $3.9 million in 2007. The $2.3 million increase in expense from 2008 to 2009 was primarily the result of increased research and development and clinical project-related spending. The $0.2 million increase in expense in 2008 compared to 2007 was primarily the result of increases in personnel related costs, including stock-based compensation expense, of $0.4 million, partially offset by reductions in project related research and development and clinical trial costs of $0.2 million.

*Sales and Marketing.* Sales and marketing expenses increased to $34.1 million in 2009 from $29.4 million in 2008 and $15.7 million in 2007. The increase in expense from 2008 to 2009 of $4.7 million was primarily attributable to increased personnel related costs, including commissions and stock-based compensation expense, of $3.6 million, as we continued to build out our sales and marketing organization in order to continue to drive global market acceptance of our AxiaLIF products, increased training costs of $0.6 million and increased promotional activities of $0.5 million. The increase in expenses from 2007 to 2008 of $13.7 million was primarily attributable to increased personnel related costs, including commissions and stock-

43

JA-376

Table of Contents

based compensation expense, of $7.2 million, increased travel costs of $2.7 million related to our expanded sales force, increased training costs of $1.7 million and increased tradeshow and promotional activities of $1.2 million. In January 2010, we reduced our U.S. sales force to better address current market opportunities.

*General and Administrative.* General and administrative expenses increased to $7.2 million in 2009 from $7.1 million in 2008 and $3.8 million in 2007. The increase in expenses from 2008 to 2009 of $0.1 million was primarily attributable to increased personnel related costs, including stock-based compensation expenses, of $0.5 million, partially offset by a decrease in consulting expenses, of $0.4 million. The increase in expenses from 2007 to 2008 of $3.3 million was primarily attributable to increased personnel related costs, including stock-based compensation expenses, of $1.0 million, increased professional fees of $1.5 million related to our operating as a public company, including accounting, legal and board of director expenses, increased directors and officers insurance expense of $0.3 million and higher franchise taxes of $0.2 million.

*Other and Interest Income (Expense).* Other and interest income decreased to $0.4 million in 2009 from $2.5 million in 2008 and $1.4 million in 2007. The decrease of $2.1 million in other and interest income from 2008 to 2009 was primarily the result of historically low interest rates, the conservative and liquid nature of the investment portfolio and lower investment balances. The increase $1.1 million from 2007 to 2008 was primarily due to interest income on higher average cash and investment balances from the net proceeds to the Company of $86.7 million from our October 2007 IPO.

## Liquidity and Capital Resources

### *Sources of Liquidity*

Since our inception in 2000, we have incurred significant losses and, as of December 31, 2009, we had an accumulated deficit of $71.1 million. We have not yet achieved profitability, and anticipate that we will continue to incur losses in the near term. We expect that research and development, sales and marketing and general and administrative expenses will continue to grow and, as a result, we will need to generate significant revenues to achieve profitability. To date, our operations have been funded primarily with proceeds from the sale of preferred stock and, most recently, the net proceeds from our October 2007 initial public offering. Gross proceeds from our preferred stock sales totaled $40.5 million to date, and the net proceeds from our October 2007 initial public offering were approximately $86.7 million.

As of December 31, 2009, we did not have any outstanding debt financing arrangements, we had working capital of $63.5 million and our primary source of liquidity was $55.3 million in cash, cash equivalents and short-term investments. We currently invest our cash and cash equivalents primarily in money market treasury funds and our short-term investments primarily in U.S. agency backed debt instruments.

*Cash,* cash equivalents and short-term investments decreased from $77.3 million at December 31, 2008 to $55.3 million at December 31, 2009. The decrease of $22.0 million was primarily the result of net cash used in operating activities of $20.8 million and purchases of property and equipment of $1.3 million.

*Cash,* cash equivalents and short-term investments decreased from $93.9 million at December 31, 2007 to $77.3 million at December 31, 2008. The decrease of $16.6 million was primarily the result of net cash used in operating activities of $15.7 million and purchases of property and equipment of $1.1 million.

### *Cash Flows*

*Net Cash Used in Operating Activities.* Net cash used in operating activities was $20.8 million in 2009, $15.7 million in 2008 and $7.3 million in 2007. For each of these periods, net cash used in operating activities was attributable primarily to net losses after adjustment for non-cash items, such as depreciation, stock-based compensation expense, inventory reserves and increases in working capital requirements to support the increased market acceptance of our AxiaLIF products. The increase in working capital requirements for 2009 was driven by the growth in inventories, and for 2008 and 2007

by the growth in inventories and related payables, along with smaller changes in all years in prepaid assets and accrued liabilities due to the timing of activities in those accounts.

44

**Table of Contents**

*Net Cash Provided by (Used In) Investing Activities.* Net cash provided by investing activities was $8.0 million in 2009. Net cash used in investing activities was $7.1 million in 2008 and $19.8 million in 2007. For each of these periods, this amount reflected purchases or sales and maturities of investments and purchases of property and equipment, primarily for research and development, information technology, manufacturing operations and capital improvements to our facilities.

*Net Cash Provided by Financing Activities.* Net cash provided by financing activities in 2009 and 2008 was $0.1 million and $0.2 million, respectively, representing proceeds from the issuance of shares of our common stock upon the exercise of stock options. Net cash provided by financing activities in 2007 was $86.8 million, which represented the net proceeds to the Company of our October 2007 initial public offering of 6,325,000 shares of our common stock, resulting in net proceeds to us, after deducting underwriting discounts, commissions and offering expenses, of approximately $86.7 million and $0.1 million in proceeds from the issuance of shares of our common stock upon the exercise of stock option.

*Operating Capital and Capital Expenditure Requirements*

We believe that our existing cash and cash equivalents, together with cash received from sales of our products, will be sufficient to meet our cash needs for at least the next two years. We intend to spend substantial sums on sales and marketing initiatives to support the ongoing commercialization of our products and on research and development activities, including product development, regulatory and compliance, clinical studies in support of our currently marketed products and future product offerings, and the enhancement and protection of our intellectual property. We may need to obtain additional financing to pursue our business strategy, to respond to new competitive pressures or to take advantage of opportunities that may arise. The sale of additional equity or convertible debt securities could result in dilution to our stockholders. If additional funds are raised through the issuance of debt securities, these securities could have rights senior to those associated with our common stock and could contain covenants that would restrict our operations. Any additional financing may not be available in amounts or on terms acceptable to us, if at all. If we are unable to obtain this additional financing, we may be required to reduce the scope of our planned product development and marketing efforts.

*Contractual Obligations*

The following table discloses information about our contractual obligations by the year in which payments are due as of December 31, 2009:

| Contractual Obligations | Total | Payments Due by Year | | | |
|---|---|---|---|---|---|
| | | Less Than 1 Year | 1-3 Years | 3-5 Years | After 5 Years |
| | | ( In thousands) | | | |
| Operating leases(1) | $4,128 | $374 | $695 | $735 | $2,324 |

(1) We rent office space under an operating lease which expires in 2019.

*Off-Balance Sheet Arrangements*

As of December 31, 2009, we did not have any outstanding debt or available debt financing arrangements or off-balance sheet liabilities.

*Critical Accounting Policies and Estimates*

Our discussion and analysis of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses, and disclosures of contingent assets and liabilities at the date of the financial statements. On an on-going basis, we evaluate our estimates, including those related to revenue recognition, accounts receivable, inventories, income taxes and stock-based compensation. We use authoritative

pronouncements, historical experience and other

45

Table of Contents

assumptions as the basis for making estimates. Actual results could differ from those estimates under different assumptions or conditions.

We believe the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements.

*Revenue Recognition.* We recognize revenue based on the following criteria: (i) persuasive evidence that an arrangement exists with the customer; (ii) the delivery of the products and/or services has occurred (title has transferred); (iii) the selling price has been fixed for the products or services delivered; and (iv) the collection is reasonably assured. Revenue is generated from the sale of our implants and procedure kits, which consist of disposable instruments. We have two distinct sale methods. The first method is when procedure kits are sold directly to hospitals or surgical centers. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to our corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. The other sales method is for sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine revenue recognition on a case by case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment.

*Accounts Receivable and Allowances.* We monitor collections and payments from our customers and maintain an allowance for doubtful accounts based upon our historical experience and any specific customer collection issues that we have identified. While our credit losses have historically been within our expectations and the allowance established, we may not continue to experience the same credit loss rates that we have in the past. We make estimates on the collectability of customer accounts based primarily on analysis of historical trends and experience and changes in customers' financial condition. Management uses its best judgment, based on the best available facts and circumstances, and records a reserve against the amounts due to reduce the receivable to the amount that is expected to be collected.

These reserves are reevaluated and adjusted as additional information is received that impacts the amount reserved.

*Inventory.* We state our inventories at the lower of cost or market, computed on a standard cost basis, which approximates actual cost on a first-in, first-out basis and market being determined as the lower of replacement cost or net realizable value. Costs are monitored on an annual basis and updated as necessary to reflect changes in supplier costs and the rate of our overhead absorption is adjusted based on projections of our manufacturing department costs and production plan. Inventory reserves are established when conditions indicate that the selling price could be less than cost due to obsolescence, usage, or we deem we hold excessive levels of inventory based on market demand.

*Accounting for Income Taxes.* Significant management judgment is required in determining our provision for income taxes, our deferred tax assets and liabilities and any valuation allowance recorded against our net deferred tax assets. We have recorded a full valuation allowance on our net deferred tax assets as of December 31, 2009 due to uncertainties related to our ability to utilize our deferred tax assets in the foreseeable future.

*Stock-Based Compensation.* Effective January 1, 2006, we adopted Accounting Standards Codification, ("ASC") 718 (formerly Statement of Financial Accounting Standards No. 123R ("SFAS 123R"), *Share-Based Payment*) using the prospective transition method, which requires the measurement and recognition of compensation expense for all share-based payment awards granted, modified and settled to our employees and directors after January 1, 2006. The fair value of stock options was estimated using a Black-Scholes option pricing model. This model requires the input of subjective assumptions, including expected stock price volatility, expected life and estimated forfeitures of each award. The fair value of equity-based awards is

46

amortized over the vesting period of the award, and we have elected to use the straight-line method of amortization. Due to the limited amount of historical data available to us, particularly with respect to stock-price volatility, employee exercise patterns and forfeitures, actual results could differ materially from our expectations.

**Recent Accounting Pronouncements**

*New Accounting Standards*

In February 2008, the Financial Accounting Standards Board ("FASB") issued ASC 820 (formerly Staff Position No. FAS 157-2, "Fair Value Measurements"), which delayed the effective date of ASC 820 for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. We adopted ASC 820 for our non-financial assets and non-financial liabilities on January 1, 2009, and it did not have a material impact on our consolidated financial statements.

In June 2009, the FASB issued the FASB Accounting Standards Codification ("ASC"). The Codification has become the single source for all authoritative GAAP recognized by the FASB to be applied for financial statements issued for periods ending after September 15, 2009. We applied the Codification to our Annual Report on Form 10-K for the period ending December 31, 2009. The Codification does not change GAAP and did not have an effect on our consolidated financial position or results of operations.

In May 2009, the FASB issued ASC 855 (formerly SFAS No. 165, "Subsequent Events"), which establishes general standards of accounting for and disclosures of events that occur after the balance sheet date but before the financial statements are issued or are available to be issued. ASC 855 provides guidance on the period after the balance sheet date during which management of a reporting entity should evaluate events or transactions that may occur for potential recognition or disclosure in the financial statements, the circumstances under which an entity should recognize events or transactions occurring after the balance sheet date in its financial statements and the disclosures that an entity should make about events or transactions that occurred after the balance sheet date. We adopted ASC 855 during the second quarter of 2009, and its application did not have a material impact on our consolidated financial statements.

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on us.

**Item 7A.** *Quantitative and Qualitative Disclosures About Market Risk*

Our exposure to interest rate risk at December 31, 2009 is related to our investment portfolio. We invest our excess cash primarily in money market funds and debt instruments of the U.S. government and its agencies. Due to the short-term nature of these investments, we have assessed that there is no material exposure to interest rate risk arising from our investments. Thus, a hypothetical 100 basis point adverse move in interest rates along the entire interest rate yield curve would not materially affect the fair market value of our interest-sensitive financial investments. Declines in interest rates over time will, however, reduce our investment income, while increases in interest rates over time will increase our interest expense. Historically, and as of December 31, 2009, we have not used derivative instruments or engaged in hedging activities.

Although substantially all of our sales and purchases are denominated in U.S. dollars, future fluctuations in the value of the U.S. dollar may affect the competitiveness of our products outside the United States. We do not believe, however, that we currently have significant direct foreign currency exchange rate risk and have not hedged exposures denominated in foreign currencies.

47

Table of Contents

Item 8.  *Consolidated Financial Statements and Supplementary Data.*

The consolidated financial statements and supplementary data required by this item are set forth under Item 15.

Item 9.  *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.*

None.

Item 9A.  *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of December 31, 2009. We maintain disclosure controls and procedures that are designed to provide a reasonable assurance level that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of December 31, 2009, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

**Internal Control Over Financial Reporting**

*Management's annual report on internal control over financial reporting.*  Management's report on our internal control over financial reporting is included on page 64 hereof. The report of our independent registered public accounting firm related to their assessment of the effectiveness of internal control over financial reporting is included on page 65 hereof.

*Changes in Internal Control over Financial Reporting.*  There has been no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Item 9B.  *Other Information.*

None.

<div align="center">PART III</div>

Item 10.  *Directors, Executive Officers and Corporate Governance.*

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2009, and delivered to stockholders in connection with our annual meeting of stockholders.

Item 11.  *Executive Compensation.*

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2009, and delivered to stockholders in connection with our annual meeting of stockholders.

Appeal: 15-2579    Doc: 27-1      Filed: 04/14/2016     Pg: 392 of 471

JA-385

The material incorporated herein by reference to the material under the caption "Compensation Committee Report" in the Proxy Statement shall be deemed furnished, and not filed, in this report and shall not be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, as a result of this furnishing, except to the extent that we specifically incorporate it by reference.

**Item 12.  *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.***

With the exception of the information regarding securities authorized for issuance under our equity compensation plans, which is set forth in Item 5 of this report under the heading "Securities Authorized For Issuance under Equity Compensation Plans" and incorporated herein by reference, the information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2009, and delivered to stockholders in connection with our annual meeting of stockholders.

**Item 13.  *Certain Relationships and Related Transactions, and Director Independence.***

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2009, and delivered to stockholders in connection with our annual meeting of stockholders.

**Item 14.  *Principal Accounting Fees and Services.***

The information required by this Item is incorporated herein by reference to our definitive Proxy Statement, which will be filed within 120 days of December 31, 2009, and delivered to stockholders in connection with our annual meeting of stockholders.

<div align="center">

**PART IV**

</div>

**Item 15.  *Exhibits, Financial Statement Schedules.***

(a) Financial Statements

(1) Index to Financial Statements

|  | Page |
|---|---|
| Management Report on Internal Control Over Financial Reporting | 52 |
| Report of Independent Registered Public Accounting Firm | 53 |
| Consolidated Balance Sheets | 54 |
| Consolidated Statements of Operations | 55 |
| Consolidated Statements of Stockholders' Equity (Deficit) | 56 |
| Consolidated Statements of Cash Flows | 57 |
| Notes to Consolidated Financial Statements | 58 |
| (2) Financial Statement Schedule: Schedule II — Valuation Accounts | 71 |

All other financial statement schedules have been omitted because they are not applicable, not required or the information required is shown in the financial statements or the notes thereto.

(3) Exhibits                                                                                                             72

The exhibits filed with this Annual Report on Form 10-K are listed in the Exhibit Index immediately following the financial statement schedules, which Exhibit Index is incorporated herein by reference.

JA-386

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**TranS1 Inc.**

By: /s/  Richard Randall
_____
Richard Randall
President and Chief Executive Officer

Date: March 12, 2010

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Richard Randall and Michael Luetkemeyer, jointly and severally, his attorneys-in-fact, each with the power of substitution, for him in any and all capacities, to sign any amendments to this Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/  Richard Randall<br>Richard Randall | President and Chief Executive Officer<br>(Principal Executive Officer) | March 12, 2010 |
| /s/  Michael Luetkemeyer<br>Michael Luetkemeyer | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | March 12, 2010 |
| /s/  Michael Carusi<br>Michael Carusi | Director | March 12, 2010 |
| /s/  Mitchell Dann<br>Mitchell Dann | Director | March 12, 2010 |
| /s/  Paul LaViolette<br>Paul LaViolette | Director | March 12, 2010 |
| /s/  Jonathan Osgood<br>Jonathan Osgood | Director | March 12, 2010 |
| /s/  James Shapiro<br>James Shapiro | Director | March 12, 2010 |

| /s/ Joseph Slattery | Director | March 12, 2010 |
| Joseph Slattery | | |

50

**TranS1 Inc.**

**Index to Consolidated Financial Statements**

| | Page |
|---|---|
| Management Report on Internal Control Over Financial Reporting | 52 |
| Report of Independent Registered Public Accounting Firm | 53 |
| Consolidated Balance Sheets | 54 |
| Consolidated Statements of Operations | 55 |
| Consolidated Statements of Stockholders' Equity (Deficit) | 56 |
| Consolidated Statements of Cash Flows | 57 |
| Notes to Consolidated Financial Statements | 58 |

51

JA-389

Table of Contents

### Management Report on Internal Control Over Financial Reporting

The management of TranS1 is responsible for establishing and maintaining adequate internal control over financial reporting. TranS1's internal control system was designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation and fair presentation of published financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

TranS1's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2009. In making this assessment, it used the criteria set forth in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on management's assessment, we concluded that, as of December 31, 2009, our internal control over financial reporting was effective based on those criteria.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2009 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

52

**Table of Contents**

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of TranS1 Inc.

In our opinion, the accompanying consolidated financial statements for 2009 and the financial statements for 2008 listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of TranS1 Inc. and its subsidiaries at December 31, 2009 and 2008, and the results of their operations and their cash flows for each of the three year in the period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements, on the financial statement schedule and on the Company's internal control over financial reporting based on our integrated audits which were integrated audits in 2009 and 2008. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/  PricewaterhouseCoopers LLP

Raleigh, NC
March 12, 2010

53

Table of Contents

**TranS1 Inc.**

**Consolidated Balance Sheets**

| | December 31, | |
| | 2009 | 2008 |
|---|---|---|
| | (In thousands, except share amounts) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 29,298 | $ 42,051 |
| Short-term investments | 25,953 | 35,215 |
| Accounts receivable, net | 3,926 | 4,812 |
| Inventory | 7,325 | 6,369 |
| Prepaid expenses and other assets | 676 | 632 |
| Total current assets | 67,178 | 89,079 |
| Property and equipment, net | 1,813 | 1,412 |
| Total assets | $ 68,991 | $ 90,491 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,442 | $ 2,896 |
| Accrued expenses | 1,269 | 2,009 |
| Total current liabilities | 3,711 | 4,905 |
| Commitments (Note 5) | | |
| Stockholders' equity: | | |
| Common stock, $0.0001 par value; 75,000,000 shares authorized, 20,648,447 and 20,538,333 shares issued and outstanding at December 31, 2009 and 2008,respectively | 2 | 2 |
| Preferred stock, $0.0001 par value; 5,000,000 shares authorized, none issued and outstanding at December 31, 2009 and 2008. | — | — |
| Additional paid-in capital | 136,402 | 133,507 |
| Accumulated other comprehensive income | (5) | — |
| Accumulated deficit | (71,119) | (47,923) |
| Total stockholders' equity | 65,280 | 85,586 |
| Total liabilities and stockholders' equity | $ 68,991 | $ 90,491 |

The accompanying notes are an integral part of these consolidated financial statements.

54

JA-393

Table of Contents

## TranS1 Inc.

### Consolidated Statements of Operations

|  | Year Ended December 31, | | |
|  | 2009 | 2008 | 2007 |
|  | (In thousands, except per share amounts) | | |
| Revenue | $ 29,807 | $ 25,304 | $16,473 |
| Cost of revenue | 5,687 | 4,315 | 3,042 |
| Gross profit | 24,120 | 20,989 | 13,431 |
| Operating expenses: |  |  |  |
|     Research and development | 6,439 | 4,081 | 3,885 |
|     Sales and marketing | 34,098 | 29,375 | 15,706 |
|     General and administrative | 7,184 | 7,116 | 3,801 |
| Total operating expenses | 47,721 | 40,572 | 23,392 |
| Operating loss | (23,601) | (19,583) | (9,961) |
| Interest income | 405 | 2,548 | 1,384 |
| Net loss | $(23,196) | $(17,035) | $(8,577) |
| Net loss per common share — basic and diluted | $ (1.13) | $ (0.84) | $ (1.46) |
| Weighted average common shares outstanding — basic and diluted | 20,604 | 20,289 | 5,872 |

The accompanying notes are an integral part of these consolidated financial statements.

55

JA-394

Table of Contents

**TranS1 Inc.**

**Consolidated Statements of Stockholders' Equity (Deficit)**

| | Common Stock Number | Amount | Additional Paid-In Capital | Notes Receivable | Accumulated Other Comprehensive Income | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | | | (In thousands, except share data) | | | | |
| **Balance at December 31, 2006** | 2,435,484 | $ — | $ 820 | $ (38) | $ — | $ (22,311) | $ (21,529) |
| Issuance of common stock from exercised options | 290,292 | | 123 | | | | 123 |
| Issuance of common stock from initial public offering | 6,325,000 | 1 | 86,658 | | | | 86,659 |
| Conversion of preferred stock to common stock | 10,793,165 | 1 | 40,088 | | | | 40,089 |
| Stock based compensation | | | 2,636 | | | | 2,636 |
| Repayment of note receivable | | | | 38 | | | 38 |
| Net loss | | | | | | (8,577) | (8,577) |
| **Balance at December 31, 2007** | 19,843,941 | 2 | 130,325 | — | — | (30,888) | 99,439 |
| Issuance of common stock from exercised options | 694,392 | | 203 | | | | 203 |
| Stock based compensation | | | 2,979 | | | | 2,979 |
| Net loss | | | | | | (17,035) | (17,035) |
| **Balance at December 31, 2008** | 20,538,333 | 2 | 133,507 | — | — | (47,923) | 85,586 |
| Issuance of common stock from exercised options | 110,114 | | 96 | | | | 96 |
| Stock based compensation | | | 2,799 | | | | 2,799 |
| Other comprehensive income | | | | | (5) | | (5) |
| Net loss | | | | | | (23,196) | (23,196) |
| **Balance at December 31, 2009** | 20,648,447 | $ 2 | $136,402 | $ — | $ (5) | $ (71,119) | $ 65,280 |

The accompanying notes are an integral part of these consolidated financial statements.

56

JA-395

Table of Contents

**TranS1 Inc.**

**Consolidated Statements of Cash Flows**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| | (In thousands) | | |
| **Cash flows from operating activities:** | | | |
| Net loss | $(23,196) | $(17,035) | $ (8,577) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation | 909 | 804 | 540 |
| Stock-based compensation | 2,799 | 2,979 | 2,636 |
| Allowance for excess and obsolete inventory | 505 | 400 | 306 |
| Provision for bad debts | 80 | 101 | 95 |
| Changes in operating assets and liabilities: | | | |
| (Increase) decrease in accounts receivable | 806 | (1,688) | (1,700) |
| Increase in inventory | (1,461) | (2,744) | (2,251) |
| Increase in prepaid expenses | (44) | (35) | (367) |
| Increase (decrease) in accounts payable | (454) | 1,265 | 788 |
| Increase (decrease) in accrued liabilities | (745) | 223 | 1,185 |
| Net cash used in operating activities | (20,801) | (15,730) | (7,345) |
| **Cash flows from investing activities:** | | | |
| Purchase of property and equipment | (1,310) | (1,128) | (516) |
| Purchases of investments | (50,872) | (55,761) | (30,687) |
| Sales of investments | 60,134 | 49,791 | 11,370 |
| Net cash provided by (used in) investing activities | 7,952 | (7,098) | (19,833) |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of common stock | 96 | 203 | 86,820 |
| Net cash provided by financing activities | 96 | 203 | 86,820 |
| Net increase (decrease) in cash and cash equivalents | (12,753) | (22,625) | 59,642 |
| Cash and cash equivalents, beginning of period | 42,051 | 64,676 | 5,034 |
| Cash and cash equivalents, end of period | $ 29,298 | $ 42,051 | $ 64,676 |
| **Supplemental disclosure of noncash financing activities:** | | | |
| Conversion of preferred stock to common stock | $ — | $ — | $ 40,089 |

The accompanying notes are an integral part of these consolidated financial statements.

57

Table of Contents

## TranS1 Inc.

### Notes to Consolidated Financial Statements

### 1. Organization

TranS1 Inc., a Delaware corporation (the "Company"), was incorporated in May 2000 and is headquartered in Wilmington, North Carolina. The Company is a medical device company focused on designing, developing and marketing products that implement its minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine and operates in one business segment. The Company has developed and currently markets two single-level fusion products, the AxiaLIF® and the AxiaLIF 360°™ and a two-level fusion product, the AxiaLIF 2L™. All of the Company's products are delivered using its pre-sacral approach. The AxiaLIF product was commercially released in January 2005, the AxiaLIF 360° product was commercially released in July 2006 and the AxiaLIF 2L product was commercially released in Europe in the fourth quarter of 2006. The Company received 510(k) clearance for the AxiaLIF 2L from the FDA and began marketing this product in the United States in the second quarter of 2008. The Company generates revenue from the sale of implants and procedure kits. The Company sells its products directly to hospitals and surgical centers in the United States and in certain European countries and to independent distributors outside the United States.

The Company is subject to a number of risks similar to other companies in the medical device industry. These risks include rapid technological change, uncertainty of market acceptance of our products, uncertainty of regulatory approval, competition from substitute products and larger companies, the need to obtain additional financing, compliance with government regulation, protection of proprietary technology, product liability, and the dependence on key individuals.

### 2. Summary of Significant Accounting Policies

*Basis of Presentation*

The Company has prepared the accompanying consolidated financial statements in conformity with accounting principles generally accepted in the United States of America. The Company's fiscal year ends on December 31. On October 5, 2007, the Company's Board of Directors approved an amendment to the Company's existing certificate of incorporation effecting a 0.9-for-1 reverse stock split. All share and per share information in the accompanying consolidated financial statements and notes to the consolidated financial statements has been retroactively restated to reflect the effect of the stock split.

On October 22, 2007, all of the outstanding preferred shares were converted into 10,793,165 common shares and the Company completed its initial public offering of 6,325,000 shares of common stock, at an offering price of $15.00 per share. The net proceeds of this offering, after deducting the underwriting discounts, commissions and offering expenses, were approximately $86.7 million.

In the second quarter of 2009, the Company revised the classification of patent-related legal costs from research and development expense to general and administrative expense as such costs typically would be excluded from research and development costs as defined by Accounting Standards Codification 730 (formerly Statement of Financial Accounting Standards No. 2, "Accounting for Research and Development Costs"). Amounts related to prior periods are not considered material to the financial statements taken as a whole, but were revised for purposes of comparability. Such amounts for the years ended December 31, 2008 and 2007 were $940,000 and $900,000, respectively. The revision did not affect previously reported total operating expenses, net loss, loss per share, assets, liabilities, stockholders' equity or cash flows.

*Principles of Consolidation:*

These consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany transactions and accounts have been eliminated in consolidation.

58

Table of Contents

<div align="center">

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

</div>

### Use of Estimates

The consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. These principles require management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. The principal estimates relate specifically to accounts receivable reserves, inventory reserves, stock-based compensation, accrued expenses and income tax valuations.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents. Cash and cash equivalents include money market funds and commercial paper. Cash equivalents are carried at fair market value. Related unrealized gains and losses were insignificant as of December 31, 2009 and 2008.

### Investments

All marketable investments are classified as available-for-sale and therefore are carried at fair market value. Related unrealized gains and losses were insignificant as of December 31, 2009 and 2008. Realized gains and losses on the sale of all such investments are reported in earnings and computed using the specific identification cost method and were insignificant for the years ended December 31, 2009 and 2008. All of the Company's investments as of December 31, 2009 have maturities of one year or less. The following table presents the components of the Company's available-for-sale investments:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2008** |
|  | (In thousands) | |
| **Short-term investments:** | | |
| U.S. government securities | $25,953 | $ 9,035 |
| Commercial paper | — | 4,978 |
| Corporate debt securities | — | 18,972 |
| Certificate of deposit | — | 2,230 |
| Total short-term investments | $25,953 | $35,215 |

### Fair Value of Financial Instruments

The carrying values of cash equivalents, short-term investments, accounts receivable, and accounts payable at December 31, 2009 and 2008 approximated their fair values due to the short-term nature of these items.

At December 31, 2009, the Company holds certain assets that are required to be measured at fair value on a recurring basis. These assets include available for sale securities classified as cash equivalents and short-term investments. Accounting Standards Codification ("ASC") 820-10 (formerly Statement of Financial Accounting Standards No. 157 (SFAS 157), "Fair Value Measurements"), requires the valuation of investments using a three tiered approach, which requires that fair value measurements be classified and disclosed in one of three tiers. These tiers are: Level 1, defined as quoted prices in active markets for identical assets or liabilities; Level 2, defined as valuations based on observable inputs other than those included in Level 1, such as quoted prices for similar assets and liabilities in active markets, or other inputs that are observable or can be corroborated by observable input data; and Level 3, defined as valuations based on unobservable inputs

59

Table of Contents

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants.

At December 31, 2009, all available for sale securities are classified as Level 1 assets with a fair value of $54.9 million, which included money market funds of $28.9 million and short-term investments of $26.0 million. At December 31, 2008, all available for sale securities are classified as Level 1 assets with a fair value of $76.8 million, which included money market funds of $41.6 million and short-term investments of $35.2 million. The Company had no Level 2 or Level 3 assets or liabilities at December 31, 2009 or 2008.

*Accounts Receivable*

Accounts receivable are presented net of an allowance for uncollectible accounts. Estimates on the collectability of customer accounts are based primarily on an analysis of historical trends and experience and changes in customers' financial condition. The following table presents the components of accounts receivable:

|  | December 31, | |
|---|---|---|
|  | 2009 | 2008 |
|  | (In thousands) | |
| Gross accounts receivable | $4,119 | $5,005 |
| Allowance for uncollectible accounts | (193) | (193) |
| Total accounts receivable, net | $3,926 | $4,812 |

*Concentration of Credit Risk and Significant Customers*

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents.

The Company places cash deposits with a federally insured financial institution, in amounts which at times exceed the federally insured limit, which was $250,000 at December 31, 2009 and 2008. The total amount of deposits in excess of federally insured limits was $71,000 and $1,914,000 at December 31, 2009 and 2008, respectively.

In 2009, 2008 and 2007 no customer accounted for 10% or more of revenues. As of December 31, 2009 and 2008, no single customer accounted for 10% or more of the accounts receivable balance.

*Inventories*

Inventories consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2009 | 2008 |
|  | (In thousands) | |
| Raw materials | $ 220 | $ 437 |
| Work-in-process | 3,993 | 3,334 |
| Finished goods | 3,112 | 2,598 |
| Total inventories | $7,325 | $6,369 |

Inventories are stated at the lower of cost or market, computed on a standard cost basis, which approximates actual cost on a first-in, first-out basis and market being determined as the lower of replacement cost or net realizable value. Inventory reserves are established when conditions indicate that the selling price could be less than cost due to obsolescence or the Company determines that it holds excessive levels of inventory based on market demand.

60

JA-402

Table of Contents

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

*Property and Equipment*

Property and equipment are recorded at cost and depreciated over their estimated useful lives using the straight-line method. Leasehold improvements are amortized over the shorter of the lease term or the estimated useful life of the related asset. Maintenance and repairs are charged to expense as incurred. Upon retirement or sale, the cost of assets disposed of and the related accumulated depreciation and amortization are removed from the accounts and any resulting gain or loss is credited or charged to income.

The estimated useful lives are:

| | |
|---|---|
| Furniture and fixtures | 5-10 years |
| Equipment | 3-5 years |
| Other depreciable assets | 2-10 years |
| Leasehold improvements | Lesser of estimated useful life or lease term |

*Revenue Recognition*

Revenue is recognized based on the following criteria: (i) persuasive evidence that an arrangement exists with the customer; (ii) the delivery of the products and/or services has occurred (title has transferred); (iii) the selling price has been fixed for the products or services delivered; and (iv) the collection is reasonably assured. Revenue is generated from the sale of implants and procedure kits, which consist of disposable instruments. The Company has two distinct sale methods. The first method is when procedure kits are sold directly to hospitals or surgical centers. The Company's sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. The Company recognizes revenue upon the confirmation that the procedure kit has been used in a surgical procedure. The other sales method is for sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. The Company determines revenue recognition on a case by case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment.

*Shipping and Handling Costs*

Shipping and handling costs in the United States are expensed as incurred and are included in the cost of revenue. These costs are not reimbursed by the Company's customers. Shipping costs to distributors outside the United States are either paid directly by the distributor to the freight carrier or charged to the distributor and reimbursed to the Company.

*Sales and Marketing Expenses*

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to the Company's direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities, and participation in medical conferences. All costs of advertising and promotional activities are expensed as incurred. Advertising expenses were $1.8 million, $1.7 million and $0.7 million for the years ending December 31, 2009, 2008 and 2007, respectively.

61

JA-403

Table of Contents

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

*Research and Development Expenses*

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within the Company's product development, regulatory and clinical functions and the costs of clinical studies and product development projects. Research and development expenses are expensed as incurred.

*Patent Costs*

Costs associated with the submission of a patent application are expensed as incurred given the uncertainty of the patents resulting in probable future economic benefits to the Company.

*Income Taxes*

The Company accounts for income taxes using the liability method which requires the recognition of deferred tax assets or liabilities for the temporary differences between financial reporting and tax bases of the Company's assets and liabilities and for tax carryforwards at enacted statutory tax rates in effect for the years in which the differences are expected to reverse. The effect on deferred taxes of a change in tax rates is recognized in the period that includes the enactment date. In addition, valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized.

*Stock-Based Compensation*

The Company accounts for stock-based compensation under the fair value provisions of ASC 718, (formerly SFAS 123R, *Share-Based Payment*). ASC 718 requires the recognition of compensation expense, using a fair-value-based method, for costs related to all share-based payments including stock options. ASC 718 requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model. The Company adopted ASC 718 using the prospective transition method, which requires that for nonpublic entities that used the minimum value method for either pro forma or financial statements recognition purposes, ASC 718 shall be applied to option grants or modifications to existing options after the required effective date. For options granted prior to the new ASC 718 effective date and for which the requisite service period has not been performed as of January 1, 2006, the Company has continued to apply the intrinsic value provisions of Accounting Principles Board Opinion No. 25 (APB 25), *Accounting for Stock Issued to Employees*, on the remaining unvested awards. All options granted after January 1, 2006 are expensed on a straight-line basis over the vesting period.

The Company accounts for stock-based compensation arrangements with nonemployees in accordance with ASC 505-50 (formerly the Emerging Issues Task Force Abstract No. 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling Goods or Services)*. The Company records the expense of such services based on the estimated fair value of the equity instrument using the Black-Scholes pricing model. The value of the equity instruments is charged to earnings over the term of the service agreement.

*Net Loss Per Common Share*

Basic net loss per common share ("Basic EPS") is computed by dividing net loss available to common stockholders by the weighted average number of common shares outstanding. Diluted net loss available to common stockholders per common share ("Diluted EPS") is computed by dividing net loss available to common stockholders by the weighted average number of common shares and dilutive potential common share equivalents then outstanding. The Company's potential dilutive common shares, which consist of shares issuable upon the exercise of stock options and conversion of convertible preferred stock, have not been included in the computation of diluted net loss per share for all periods as the result would be anti-dilutive.

62

Table of Contents

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

The following table sets forth the potential shares of common stock that are not included in the calculation of diluted net loss per share as the result would be anti-dilutive as of the end of each period presented:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2009 | 2008 | 2007 |
| Weighted average stock options outstanding | 2,110,689 | 1,915,687 | 1,928,495 |

### Segment and Geographic Reporting

The Company applies ASC 280 (formerly SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information"). ASC 280 establishes standards for the reporting by business enterprises of information about operating segments, products and services, geographic areas, and major customers. The Company has determined that it did not have any separately reportable segments as of December 31, 2009, 2008 or 2007.

Revenue by geographic area was:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2009 | 2008 | 2007 |
|  | (In thousands) | | |
| United States | $28,045 | $23,322 | $15,085 |
| Europe | 1,602 | 1,854 | 1,183 |
| Other | 160 | 128 | 205 |
|  | $29,807 | $25,304 | $16,473 |

Long-lived assets are primarily located in the United States.

### Recently Issued Accounting Standards

In February 2008, the FASB issued ASC 820 (formerly Staff Position No. FAS 157-2, "Fair Value Measurements"), which delayed the effective date of ASC 820 for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. The company adopted ASC 820 for its non-financial assets and non-financial liabilities on January 1, 2009, and it did not have a material impact on the Company's consolidated financial statements.

In June 2009, the FASB issued the FASB Accounting Standards Codification ("ASC"). The Codification has become the single source for all authoritative GAAP recognized by the FASB to be applied for financial statements issued for periods ending after September 15, 2009. The Company applied the Codification to its Annual Report on Form 10-K for the period ending December 31, 2009. The Codification does not change GAAP and did not have an effect on the Company's consolidated financial position or results of operations.

In May 2009, the FASB issued ASC 855 (formerly SFAS No. 165, "Subsequent Events"), which establishes general standards of accounting for and disclosures of events that occur after the balance sheet date but before the financial statements are issued or are available to be issued. ASC 855 provides guidance on the period after the balance sheet date during which management of a reporting entity should evaluate events or transactions that may occur for potential recognition or disclosure in the financial statements, the circumstances under which an entity should recognize events or transactions occurring after the balance sheet date in its financial statements and the disclosures that an entity should make about events or transactions that occurred after the balance sheet date. The Company adopted ASC 855 during the second quarter of 2009, and its application did not have a material impact on its consolidated financial statements.

JA-406

63

Table of Contents

TranS1 Inc.

Notes to Consolidated Financial Statements — (Continued)

No other recently issued, but not yet effective, accounting standards are believed to have a material impact on the Company.

### 3. Property and Equipment

Property and equipment consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| | (In thousands) | |
| Furniture and fixtures | $ 210 | $ 186 |
| Equipment | 2,620 | 2,061 |
| Computer software | 410 | 415 |
| Leasehold improvements | 380 | 380 |
| Tools | 73 | 73 |
| Construction in process | 588 | 14 |
| | 4,281 | 3,129 |
| Less: accumulated depreciation and amortization | (2,468) | (1,717) |
| | $ 1,813 | $ 1,412 |

Depreciation and amortization expense for the years ended December 31, 2009, 2008 and 2007 was $909,000, $804,000, and $540,000, respectively.

### 4. Accrued Expenses

Accrued expenses consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| | (In thousands) | |
| Commissions | $ 597 | $1,178 |
| Vacation | 186 | 163 |
| Franchise taxes | 122 | 121 |
| Consulting | 120 | 66 |
| Legal and professional fees | 90 | 69 |
| Travel & entertainment | 50 | 50 |
| Bonus | 10 | 270 |
| Clinical | 10 | 20 |
| Other | 84 | 72 |
| Total accrued expenses | $1,269 | $2,009 |

64

JA-408

Table of Contents

TranS1 Inc.

Notes to Consolidated Financial Statements — (Continued)

**5. Lease Obligations**

The Company rents office space under the terms of an operating lease, which expires in 2019.

Future minimum lease payments under operating lease obligations at December 31, 2009 are as follows (in thousands):

**Year ending December 31,**

| | |
|---|---:|
| 2010 | $ 374 |
| 2011 | 332 |
| 2012 | 363 |
| 2013 | 363 |
| 2014 and after | 2,696 |
| | $4,128 |

Rent expense related to operating leases for the years ended December 31, 2009, 2008 and 2007 was $204,000, $157,000 and $152,000, respectively.

**6. Stockholders' Equity**

At December 31, 2009 and 2008, the Company's Amended and Restated Certificate of Incorporation, which was adopted in connection with the Company's initial public offering, authorized up to 80,000,000 shares of capital stock, of which 75,000,000 shares were designated as common stock with a par value of $0.0001 and up to 5,000,000 shares were designated as preferred stock with a par value of $0.0001. At December 31, 2009 and 2008, there were 20,648,447 and 20,538,333 shares of common stock issued and outstanding, respectively, and there were no shares of preferred stock issued and outstanding.

In 2009, the Company issued 110,114 shares of the common stock to employees and consultants for $96,000 upon the exercise of stock options. In 2008, the Company issued 694,392 shares of common stock to employees and consultants for $203,000 upon the exercise of stock options. In 2007, the Company issued 290,292 shares of common stock to employees and consultants for $123,000 upon the exercise of stock options.

**7. Stock Incentive Plans and Stock-Based Compensation**

*2007 Employee Stock Purchase Plan*

The Company's board of directors adopted the 2007 Employee Stock Purchase Plan (the "ESPP") in July 2007. The ESPP became effective upon the completion of the Company's initial public offering. A total of 250,000 shares of common stock are available for sale. In addition, the ESPP provides for annual increases in the number of shares available for issuance under the ESPP on the first day of each fiscal year beginning in 2008, equal to the lesser of (i) 2.0% of the outstanding shares of common stock on the first day of such fiscal year or (ii) an amount determined by the administrator of the ESPP. The Company's Compensation Committee administers the ESPP.

Shares shall be offered pursuant to the ESPP in six-month periods commencing on the first trading day on or after June 1 and December 1 of each year, or on such other date as the administrator may determine.

Our ESPP permits participants to purchase common stock through payroll deductions of up to 10% of their eligible compensation, which includes a participant's base straight time gross earnings, certain commissions, overtime and shift premium, but exclusive of payments for incentive compensation, bonuses and other compensation. A participant may purchase a maximum of 2,500 shares during a six-month purchase period. Amounts deducted and accumulated by the

participant are used to purchase shares of the Company's common

65

http://www.sec.gov/Archives/edgar/data/1230355/000095012510024198/g22448e10vk.htm    6/21/2012

JA-410

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

stock at the end of each six-month purchase period. The purchase price of the shares will be 95% of the fair market value of Company common stock on the exercise date. Participants may end their participation at any time during an offering period, and will be paid their accrued payroll deductions that have not yet been used to purchase shares of common stock. Participation ends automatically upon termination of employment with the Company. Pursuant to ASC 718, the Company is not required to recognize compensation expense in connection with purchases under the ESPP.

During fiscal years ended December 31, 2009, 2008 and 2007, no shares were issued to participants under the ESPP.

*2000 and 2007 Stock Incentive Plans*

The Company established the TranS1 Inc. Stock Incentive Plan in 2000, (as amended, the "2000 Plan") and the 2007 Stock Incentive Plan (the "2007 Plan") in October 2007 (collectively, the "Plans") . Under the 2000 Plan and the 2007 Plan, the Company may grant options to employees, directors or service providers and contractors for a maximum of 3,159,108 and 1,400,000 shares, respectively, of the Company's common stock. Options granted under the Plans may be incentive stock options or non-qualified stock options. Non-qualified stock options may be granted to service providers and incentive stock options may be granted only to employees. The exercise periods may not exceed ten years for options. However, in the case of an incentive stock option granted to an optionee who, at the time of the option grant owns stock representing more than 10% of the outstanding shares, the term of the option shall be five years from the date of the grant. The exercise price of incentive stock options cannot be less than 100% of the fair market value per share of the Company's common stock on the grant date. The exercise price of a nonqualified option under the 2000 Plan and the 2007 Plan shall not be less than 85% and 100%, respectively, of the fair market value per share on the date the option is granted. If an optionee owns more than 10% of the outstanding shares, the exercise price cannot be less than 110% of the fair market value of the stock on the date of the grant. Options granted under the Plans generally vest over periods ranging from three to four years.

The following table summarizes the activity of the Company's 2000 Plan and 2007 Plan, including the number of shares under options ("Number") and the weighted average exercise price ("Price"):

|  | Number | Price |
|---|---|---|
| **Outstanding as of December 31, 2008** | 2,247,733 | $7.12 |
| Options granted | 495,500 | 6.53 |
| Options exercised | (110,114) | 0.91 |
| Options forfeited | (417,093) | 8.88 |
| **Outstanding as of December 31, 2009** | 2,216,026 | $6.96 |

The following table summarizes information about the Company's stock options at December 31, 2009:

| Range of Exercise Prices | Number Outstanding | Weighted Average Contractual Life (Years) | Weighted Average Exercise Price | Number of Options Exercisable |
|---|---|---|---|---|
| $ 0.11 - $ 2.00 | 569,756 | 5.5 | $ 0.81 | 539,862 |
| $ 2.01 - $ 6.00 | 689,770 | 8.1 | 5.69 | 255,923 |
| $ 6.01 - $10.00 | 385,375 | 8.4 | 8.78 | 174,175 |
| $12.00 - $13.00 | 380,084 | 7.9 | 12.39 | 186,875 |
| $14.00 - $20.00 | 191,041 | 7.7 | 15.36 | 129,241 |
|  | 2,216,026 | 7.4 | 6.96 | 1,286,076 |

---

Appeal: 15-2579    Doc: 27-1    Filed: 04/14/2016    Pg: 419 of 471

Table of Contents

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

The aggregate intrinsic value of outstanding stock options at December 31, 2009 was $1.8 million. At December 31, 2009, exercisable stock options had an aggregate intrinsic value of $1.7 million, a weighted average contractual life of 6.8 years and a weighted average exercise price of $5.88.

### Stock-Based Compensation for Non-employees

During 2009, the Company issued options to purchase 2,500 shares of common stock with an exercise price of $6.00 per share to consultants. These options vest over 3 years and expire 10 years from the date of issuance. During 2008, the Company issued options to purchase 35,000 shares of common stock with an average exercise price of $12.43 per share to consultants. These options vest over a range of 1 to 3 years and expire 10 years from the date of issuance. During 2007, the Company issued options to purchase 50,207 shares of common stock with an average exercise price of $7.52 per share to consultants. These options vest over a range of zero to three years and expire 10 years from the date of issuance. The Company determined the estimated fair value of the options issued to the consultants using the Black-Scholes pricing model. The Company used the following assumptions in the Black-Scholes pricing model for 2009 grants: 60% volatility, 0% dividend yield, 2.65% risk-free rate and a 6 year expected legal life. The Company used the following assumptions in the Black-Scholes pricing model for 2008 grants: 54% volatility, 0% dividend yield, 1.54% risk-free rate and 6 year expected life. The Company used the following assumptions in the Black-Scholes pricing model for 2007 grants: 45% volatility, 0% dividend yield, 4.92% risk-free rate and 6 year expected life.

Stock-based compensation expense charged to operations on options granted to non-employees for years ended December 31, 2009, 2008 and 2007 was $8,000, $118,000 and $1.1 million, respectively. As of December 31, 2009, there was $3,000 of total unrecognized compensation costs related to non-vested stock option awards which is expected to be recognized over a weighted-average period of 0.5 years.

### Employee Stock-Based Compensation

Under ASC 718, compensation cost for employee stock-based awards is based on the estimated grant-date fair value and is recognized over the vesting period of the applicable award on a straight-line basis. For the period from January 1, 2006 to December 31, 2009, the Company issued employee stock-based awards in the form of stock options. The Company recorded stock-based compensation expense of $2.8 million, $2.9 million and $1.5 million for the years ended December 31, 2009, 2008 and 2007, respectively. The weighted average estimated fair value of the employee stock options granted for the years ended December 31, 2009, 2008 and 2007 were $6.53, $11.77 and $10.34 per share, respectively. The aggregate intrinsic value of stock options (the amount by which the market price of the stock on the date of exercise exceeded the exercise price of the option) exercised for the years ended December 31, 2009, 2008 and 2007, was $0.6 million, $5.4 million, and $3.8 million, respectively.

The Company uses the Black-Scholes pricing model to determine the fair value of stock options. The determination of the fair value of stock-based payment awards on the date of grant is affected by our stock price as well as assumptions regarding a number of complex and subjective variables. These variables include our expected stock price volatility over the term of the awards, actual and projected employee stock option exercise behaviors, risk-free interest rates and expected dividends. Prior to the Company's initial public offering, the Board of Directors, with the assistance of management, performed contemporaneous fair value analyses to determine the fair value of the common stock at the time of the stock option grants. The estimated grant-date fair values of the employee stock options were calculated using the Black-Scholes valuation model, based on the following assumptions for the years ended December 31, 2009, 2008 and 2007:

*Expected Life.* The expected life of six years is based on the "simplified" method described in

the SEC Staff Accounting Bulletin No. 110, which provides guidance regarding the application of ASC 718.

*Volatility.* Through October 17, 2007, the Company was a private entity with no historical data regarding the volatility of its common stock. Accordingly, the expected volatility used for 2007 was based

67

JA-414

Table of Contents

**TranS1 Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

on volatility of similar entities, referred to as "guideline" companies. In 2009 and 2008, the expected volatility was based on a weighted average of the actual volatility of the Company for the current year and the guideline companies for prior periods. In evaluating similarity, the Company considered factors such as industry, stage of life cycle and size. The Company utilized an expected volatility range of 54% to 58% for 2009, 45% to 54% for 2008 and 45% for 2007.

*Risk-Free Interest Rate.* The risk-free rate is based on U.S. Treasury zero-coupon issues with remaining terms similar to the expected term on the options. The risk-free rates were:

| Option Grant Year | Risk-Free Rate Range |
|---|---|
| 2009 | 1.79% to 2.52% |
| 2008 | 2.68% to 3.21% |
| 2007 | 4.58% to 4.92% |

*Dividend Yield.* The Company has never declared or paid any cash dividends and does not plan to pay cash dividends in the foreseeable future, and, therefore, used an expected dividend yield of zero in the valuation model.

*Forfeitures.* ASC 718 also requires the Company to estimate forfeitures at the time of grant, and revise those estimates in subsequent periods if actual forfeitures differ from those estimates. The Company uses historical data to estimate pre-vesting option forfeitures and record stock-based compensation expense only for those awards that are expected to vest. All stock-based payment awards are amortized on a straight-line basis over the requisite service periods of the awards, which are generally the vesting periods.

As of December 31, 2009, there was $4.4 million of total unrecognized compensation costs related to non-vested employee stock option awards granted after January 1, 2006, which is expected to be recognized over a weighted-average period of 2.8 years.

## 8. Income Taxes

No provision for federal or state income taxes has been recorded as the Company has incurred net operating losses since inception.

Significant components of the Company's deferred tax assets and liabilities consist of the following:

|  | 2009 | 2008 |
|---|---|---|
|  | (In thousands) | |
| **Deferred tax assets** | | |
| Domestic net operating loss carryforwards | $ 20,707 | $ 14,350 |
| Inventory | 272 | 200 |
| Fixed assets | 532 | 242 |
| Other | 638 | 485 |
| Research and development credit | 1,031 | 716 |
| Total deferred tax assets | 23,180 | 15,993 |
| Valuation allowance for deferred assets | (23,180) | (15,993) |
| Deferred tax assets | — | — |
| **Deferred tax liabilities** | | |
| Fixed assets | — | — |
| Total deferred tax liabilities | — | — |
| Net deferred tax assets (liabilities) | $ — | $ — |

Appeal: 15-2579    Doc: 27-1        Filed: 04/14/2016      Pg: 423 of 471

Table of Contents

TranS1 Inc.

Notes to Consolidated Financial Statements — (Continued)

The Company provided a full valuation allowance against its net deferred tax assets since realization of these benefits could not be reasonably assured. The increase in valuation allowance resulted primarily from the additional net operating loss carryforward generated.

As of December 31, 2009, the Company had federal and state net operating loss carryforwards of approximately $54.7 million and $51.7 million, respectively. These net operating loss carryforwards begin to expire in 2021 and 2016 for federal and state tax purposes, respectively. Additionally, as of December 31, 2009, the Company had research credit carryforwards of $1.1 million for federal tax purposes. These credit carryforwards begin to expire in 2021. The utilization of the federal net operating loss carryforwards may be subject to limitations under the rules regarding a change in stock ownership as determined by the Internal Revenue Code.

A reconciliation of differences between the U.S. federal income tax rate and the Company's effective tax rate for the years ended December 31 is as follows:

|  | 2009 | | 2008 | | 2007 | |
|  | Amount | % of Net Loss | Amount | % of Net Loss | Amount | % of Net Loss |
| --- | --- | --- | --- | --- | --- | --- |
|  |  | | (In thousands) | | | |
| Tax at statutory rate | $(8,119) | 35.0% | $(5,962) | 35.0% | $(3,002) | 35.0% |
| State taxes | (59) | 0.3% | (447) | 2.6% | (394) | 4.6% |
| Non deductible items | 1,129 | (4.9)% | 1,168 | (6.9)% | 998 | (11.6)% |
| Other | 215 | (0.9)% | (470) | 2.8% | 53 | (0.6)% |
| R&D credits | (486) | 2.1% | (148) | 0.9% | (115) | 1.3% |
| Change in valuation allowance | 7,320 | (31.6)% | 5,859 | (34.4)% | 2,460 | (28.7)% |
| Total | $ — | 0.0% | $ — | 0.0% | $ — | 0.0% |

As of January 1, 2007, the Company adopted the provisions of ASC 740 (formerly FASB Interpretation No. 48 or FIN 48, "Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109"), which clarifies the accounting for uncertainty in tax positions. As of that date, the Company had $1.1 million of unrecognized tax benefits related to the adoption of ASC 740. This would be recorded as a component of income tax expense once the valuation allowance is released. For the year ended December 31, 2009, the Company increased its unrecognized tax benefits by $13,000. The change was recorded as a reduction to the respective deferred tax asset which was reflected as an increase in the valuation allowance. As of December 31, 2009, the Company had $0.9 million of unrecognized tax benefits which, if recognized, would be recorded as a component of income tax expense. The Company's policy is to record estimated interest and penalties related to the underpayment of income taxes as a component of its income tax provision. As of December 31, 2007, 2008 and 2009, the Company had no accrued interest or tax penalties recorded. A reconciliation of the beginning and ending uncertain tax positions is as follows (in thousands):

| Balance at December 31, 2007 | $1,114 |
| --- | --- |
| Gross decreases related to current period tax positions | (227) |
| Balance at December 31, 2008 | 887 |
| Gross increases related to current period tax positions | 13 |
| Balance at December 31, 2009 | $ 900 |

In many cases, uncertain tax positions are related to tax years that remain subject to examination by the relevant tax authorities. Given the losses accumulated to date, periods open for examination are 2002 to 2009 for the primary taxing jurisdictions of the United States and North Carolina. The Company currently does not expect a significant change in the FIN 48 liability in the next 12 months.

69

JA-417

Table of Contents

TranS1 Inc.

Notes to Consolidated Financial Statements — (Continued)

### 9.  Comprehensive Loss

The following table presents the components of other comprehensive loss:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2009 | 2008 | 2007 |
| Net loss | $(23,196) | $(17,035) | $(8,577) |
| Other comprehensive income (loss): | | | |
| Translation adjustments | (5) | — | — |
| Total comprehensive loss | $(23,201) | $(17,035) | $(8,577) |

### 10.  Quarterly Data (Unaudited)

The following unaudited quarterly financial data, in the opinion of management, reflects all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of results for the periods presented (in thousands, except per share data):

| | Year Ended December 31, 2009 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total revenues | $ 8,678 | $ 7,938 | $ 6,912 | $ 6,279 |
| Gross profit | 7,136 | 6,423 | 5,546 | 5,015 |
| Total operating expenses | 12,517 | 13,293 | 11,171 | 10,740 |
| Net loss | $(5,164) | $(6,759) | $(5,571) | $(5,702) |
| Basic and diluted net loss per common share | $ (0.25) | $ (0.33) | $ (0.27) | $ (0.28) |

| | Year Ended December 31, 2008 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total revenues | $ 5,978 | $ 5,951 | $ 6,021 | $ 7,354 |
| Gross profit | 4,940 | 4,814 | 5,010 | 6,225 |
| Total operating expenses | 8,319 | 10,801 | 10,363 | 11,089 |
| Net loss | $(2,439) | $(5,299) | $(4,764) | $(4,533) |
| Basic and diluted net loss per common share | $ (0.12) | $ (0.26) | $ (0.23) | $ (0.22) |

70

**Table of Contents**

TRANS1 INC.

SCHEDULE II

**VALUATION AND QUALIFYING ACCOUNTS**
**FOR THE YEARS ENDED DECEMBER 31, 2009, 2008 AND 2007**

| | Balance at Beginning of Period | Additions(1) | Deductions(2) | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| Accounts Receivable Reserve: | | | | |
| Year ended December 31, 2009 | $193 | $ 80 | $80 | $193 |
| Year ended December 31, 2008 | 110 | 101 | 18 | 193 |
| Year ended December 31, 2007 | 29 | 95 | 14 | 110 |

| | Balance at Beginning of Period | Additions(3) | Deductions(4) | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| Inventory Reserve: | | | | |
| Year ended December 31, 2009 | $397 | $505 | $321 | $581 |
| Year ended December 31, 2008 | 295 | 400 | 298 | 397 |
| Year ended December 31, 2007 | 57 | 306 | 68 | 295 |

| | Balance at Beginning of Period | Additions | Deductions | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| Valuation Allowance for Deferred Tax Assets: | | | | |
| Year ended December 31, 2009 | $15,993 | $7,559 | $ 372 | $23,180 |
| Year ended December 31, 2008 | 9,524 | 6,469 | — | 15,993 |
| Year ended December 31, 2007 | 8,121 | 2,460 | 1,057 | 9,524 |

(1) Amount represents customer balances deemed uncollectible.

(2) Uncollectible accounts written-off.

(3) Amount represents excess and obsolete reserve recorded to cost of sales.

(4) Excess and obsolete inventory written-off against reserve.

http://www.sec.gov/Archives/edgar/data/1230353/000095012310024798/g22449e10vk.htm    6/21/2012

JA-419

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of TranS1 Inc. (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007). |
| 3.2 | Amended and Restated Bylaws of TranS1 Inc. (incorporated by reference to Exhibit 3.4 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007. |
| 4.1 | Specimen common stock certificate (incorporated by reference to Exhibit 4.1 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007. |
| 10.1 | Amended and Restated 2000 Stock Incentive Plan (incorporated by reference to Exhibit 10.1 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.2 | Form of Stock Option Agreement under Amended and Restated 2000 Stock Incentive Plan (incorporated by reference to Exhibit 10.2 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.3 | 2007 Stock Incentive Plan, as amended (incorporated by reference to Appendix A to the Definitive Proxy Statement on Schedule 14A, as filed with the Commission on April 30, 2009.* |
| 10.4 | Form of Stock Option Agreement under 2007 Stock Incentive Plan (incorporated by reference to Exhibit 10.4 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.5 | 2007 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.5 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007).* |
| 10.6 | Lease, dated July 30, 2009, between TranS1 Inc. and Market Place Group, LLC (incorporated by reference to Exhibit 10.1 of TranS1's Current Report on Form 8-K filed with the Commission on March 11, 2010). |
| 10.7 | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.7 to the Registration Statement on Form S-1, as amended (File No. 333-144802), and as declared effective on October 16, 2007. |
| 10.7.1 | Schedule of Parties to Indemnification Agreement.** |
| 10.8 | Offer Letter, dated December 11, 2009, between TranS1 Inc. and Kenneth Reali (incorporated by reference to Exhibit 10.1 of TranS1's Current Report on Form 8-K filed with the Commission on January 12, 2010).* |
| 10.9 | Separation Agreement, dated February 23, 2010, between TranS1 Inc. and Michael Luetkemeyer (incorporated by reference to Exhibit 10.1 of TranS1's Current Report on Form 8-K filed with the Commission on February 25, 2010).* |
| 23.1 | Consent of Independent Registered Public Accounting Firm.** |
| 24.1 | Power of Attorney (included in the signature page). |
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934.** |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934.** |
| 32.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350.** |
| 32.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350.** |

* These exhibits are identified as management contracts or compensatory plans or arrangements of the Registrant pursuant to Item 15(a)(3) of Form 10-K.

** Filed herewith.

EX-31.1 4 g22448exv31w1.htm EX-31.1

<div align="right">**EXHIBIT 31.1**</div>

<div align="center">**CERTIFICATION**</div>

I, Richard Randall, certify that:

1.  I have reviewed this annual report on Form 10-K of TranS1 Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 12, 2010

/s/ Richard Randall
Richard Randall
President and Chief Executive Officer

EX-31.2 5 g22448exv31w2.htm EX-31.2

**EXHIBIT 31.2**

## CERTIFICATION

I, Michael Luetkemeyer, certify that:

1.  I have reviewed this annual report on Form 10-K of TranS1 Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 12, 2010

/s/ Michael Luetkemeyer
Michael Luetkemeyer
Chief Financial Officer

# Exhibit 11

JA-423

8-K 1 g23306e8vk.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### The Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): May 4, 2010**

# TRANS1 INC.
### (Exact name of registrant as specified in its charter)

| **Delaware** | **001-33744** | **33-0909022** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**301 Government Center Drive**
**Wilmington, North Carolina 28403**
(Address of principal executive offices)
(Zip Code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02 Results of Operations and Financial Condition.**

On May 4, 2010, TranS1 Inc. (the "Company") issued a press release to report its financial results for the quarter ended March 31, 2010. The release is furnished herewith as Exhibit 99.1 and incorporated herein by this reference.

Also on May 4, 2010, following the issuance of the press release referred to above, the Company conducted a conference call to discuss its financial results for the quarter ended March 31, 2010. A copy of the transcript of the conference call is furnished herewith as Exhibit 99.2 and incorporated herein by this reference.

The information in this Current Report on Form 8-K, including Exhibits 99.1 and 99.2, are being furnished pursuant to Item 2.02 and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section, nor shall they be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits.**

**(d) Exhibits.**

| *Exhibit Number* | *Description* |
| --- | --- |
| 99.1 | Press release, dated May 4, 2010. |
| 99.2 | Conference call transcript, dated May 4, 2010. |

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRANS1 INC.

May 6, 2010

By: /s/ Joseph P. Slattery
Joseph P. Slattery
Executive Vice President and Chief
Financial Officer

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press release, dated May 4, 2010. |
| 99.2 | Conference call transcript, dated May 4, 2010. |

EX-99.1 2 g23306exv99w1.htm EX-99.1

Exhibit 99.1

**TranS1 Inc. Reports Operating Results for the First Quarter of 2010,
Issues Second Quarter Guidance**

*- First quarter revenues were $6.7 million -
- 692 TranS1 procedures performed globally in the quarter -
- Net loss per share was $0.31 for the quarter -
- Excluding special items, net loss per share was $0.22 for the quarter\* -*

WILMINGTON, NC — (GLOBE NEWSWIRE)— May 4, 2010—TranS1 Inc. (NASDAQ:TSON), a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine, today announced its financial results for the first quarter ended March 31, 2010.

Comparison of Selected Financial Results (in millions, except per share data)

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2010 | 2009 |
| As reported: |  |  |
| Total revenue | $ 6.7 | $ 8.7 |
| Net loss | (6.4) | (5.2) |
| Net loss per common share | (0.31) | (0.25) |
| Excluding special items\*: |  |  |
| Net loss | (4.6) | (4.5) |
| Net loss per common share | (0.22) | (0.22) |

---

\*    See "Reconciliation of GAAP Financial Information to Non-GAAP Financial Information" below.

Revenues were $6.7 million in the first quarter of 2010, representing a 23% decrease over revenues of $8.7 million in the first quarter of 2009. Domestic revenues were $6.0 million in the first quarter of 2010, compared to $8.2 million in the first quarter of 2009. Gross margin was 78.7% in the first quarter of 2010 as compared to 82.2% in the first quarter of 2009.

Net loss was $6.4 million and $5.2 million for the quarters ended March 31, 2010 and 2009, respectively. Net loss per common share was $0.31 in the first quarter of 2010 compared to a net loss per share of $0.25 in the first quarter of 2009.

Excluding special items, net loss in the first quarter of 2010 was $4.6 million, or $0.22 per common share, compared to net loss excluding special items of $4.5 million, or $0.22 per common share in the first quarter of 2009. Special items in the first quarter of 2010 consisted of management transition costs of $0.9 million, employee and director equity-based compensation of $0.5 million and inventory obsolescence reserves of $0.3 million. Special items in the first quarter of 2009 consisted of employee and director equity-based compensation of $0.6 million.

Cash, cash-equivalents and investments were $49.7 million as of March 31, 2010.

"We saw early signs of stabilization in our AxiaLIF product line this quarter as we continue to work with our current and prospective surgeon users, the payor community and the spine societies to help navigate the current reimbursement landscape," commented Rick Randall, Chief Executive Officer of TranS1 Inc. "Additionally, the limited releases of our AxiaLIF 2L+, Avatar and Vectre product lines have all gone well and we are encouraged by surgeon feedback."

**TranS1 Outlook**

For the second quarter ending June 30, 2010, the company expects total revenues in the range of $6.0 — $7.0 million.

**Conference Call**

TranS1 will host a conference call today at 5:30 pm ET to discuss its first quarter financial results. To listen to the conference call on your telephone, please dial (877) 881-2183 for domestic callers and (970) 315-0453 for international callers approximately ten minutes prior to the start time. The call will be concurrently webcast. To access the live audio broadcast or the archived recording, use the following link at http://ir.trans1.com/events.cfm.

**Reconciliation of GAAP Financial Information to Non-GAAP Financial Information**

To supplement the Company's consolidated financial statements presented in accordance with GAAP, the Company uses non-GAAP measures of certain components of financial performance, including net loss and loss per share, which are adjusted from results based on GAAP. Although "as adjusted" financial measures are non-GAAP financial measures, the Company believes that the presentation of "as adjusted" financial measures calculated to exclude "special items" are useful adjuncts to the GAAP "as reported" financial measures. "Special items" consist of an adjustment for equity-based employee and director compensation expense for each period, management transition costs incurred in the first quarter of 2010, including severance, recruiting and other personnel-related expenses, and inventory obsolescence reserves taken in the first quarter of 2010 for an existing product that is being replaced. These non-GAAP measures are provided to enhance investors' overall understanding of the Company's current financial performance and the Company's prospects for the future. We believe that providing a non-GAAP measure that adjusts for significant non-cash expenses, such as equity-based compensation expense and inventory obsolescence reserves, and significant non-recurring management transition expenses, allows comparison of our core operations from period to period. These non-GAAP measures may be considered in addition to results prepared in accordance with generally accepted accounting principles, but should not be considered a substitute for, or superior to, GAAP results. The non-GAAP

measures included in this press release have been reconciled to the most directly comparable GAAP measure.

**About TranS1 Inc.**

TranS1 is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. TranS1 currently markets the AxiaLIF family of products for single and multilevel lumbar fusion and the Vectre and Avatar posterior fixation systems for lumbar fixation supplemental to AxiaLIF fusion. TranS1 was founded in May 2000 and is headquartered in Wilmington, North Carolina. For more information, visit www.trans1.com.

*This press release includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, the accuracy of which are necessarily subject to risks and uncertainties. These risks and uncertainties include, among other things, risks associated with the adoption of a new technology by spine surgeons, product development efforts, regulatory requirements, maintenance and prosecution of adequate intellectual property protection and other economic and competitive factors. These forward looking statements are based on the company's expectations as of the date of this press release and the company undertakes no obligation to update information provided in this press release. For a discussion of risks and uncertainties associated with TranS1's business, please review the company's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2009.*

**TranS1 Inc.**
**Consolidated Statements of Operations**
**(in thousands, except per share amounts)**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Revenue | $ 6,713 | $ 8,678 |
| Cost of revenue | 1,429 | 1,542 |
| Gross profit | 5,284 | 7,136 |
| | | |
| Operating expenses: | | |
| Research and development | 1,255 | 1,326 |
| Sales and marketing | 7,697 | 9,150 |
| General and administrative | 2,639 | 2,041 |
| | | |
| Total operating expenses | 11,591 | 12,517 |
| | | |
| Operating loss | (6,307) | (5,381) |
| | | |
| Interest and other income (loss) | (49) | 217 |
| | | |
| Net loss | $ (6,356) | $ (5,164) |
| | | |
| Net loss per common share - basic and diluted | $ (0.31) | $ (0.25) |
| | | |
| Weighted average common shares outstanding — basic and diluted | 20,655 | 20,552 |
| | | |
| Stock-based compensation is included in operating expenses in the following categories: | | |
| Cost of revenue | $ 10 | $ 18 |
| Research and development | 17 | 44 |
| Sales and marketing | 273 | 388 |
| General and administrative | 230 | 193 |
| | $ 530 | $ 643 |

Reconciliation of GAAP Financial Information to Non-GAAP Financial Information
(in thousands, except per share amounts)
(Unaudited)

|  | Three Months Ended March 31, | |
|  | 2010 | 2009 |
|---|---|---|
| GAAP net loss | $ (6,356) | $ (5,164) |
| Special items: |  |  |
|     Management transition costs | 939 | — |
|     Inventory obsolescence reserve | 266 | — |
|     Stock based compensation | 530 | 643 |
| Net loss excluding special items | $ (4,621) | $ (4,521) |
|  |  |  |
| GAAP net loss per share | $ (0.31) | $ (0.25) |
| Special items: |  |  |
|     Management transition costs | 0.05 | — |
|     Inventory obsolescence reserve | 0.01 | — |
|     Stock based compensation | 0.03 | 0.03 |
| Net loss per share excluding special items | $ (0.22) | $ (0.22) |
|  |  |  |
| Shares used in computing GAAP and non-GAAP loss per share | 20,655 | 20,552 |

**TranS1 Inc.**
**Consolidated Balance Sheets**
**(in thousands)**
**(Unaudited)**

|  | March 31, 2010 | December 31, 2009 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 28,751 | $ 29,298 |
| Short-term investments | 20,960 | 25,953 |
| Accounts receivable, net | 4,577 | 3,926 |
| Inventory | 6,856 | 7,325 |
| Prepaid expenses and other assets | 658 | 676 |
| Total current assets | 61,802 | 67,178 |
| Property and equipment, net | 1,776 | 1,813 |
| Total assets | $ 63,578 | $ 68,991 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,141 | $ 2,442 |
| Accrued expenses | 1,980 | 1,269 |
| Total current liabilities | 4,121 | 3,711 |
| | | |
| Stockholders' equity | | |
| Common stock | 2 | 2 |
| Additional paid-in capital | 136,943 | 136,402 |
| Accumulated other comprehensive income (loss) | (13) | (5) |
| Accumulated deficit | (77,475) | (71,119) |
| Total stockholders' equity | 59,457 | 65,280 |
| Total liabilities and stockholders' equity | $ 63,578 | $ 68,991 |

**TranS1 Inc.**
**Consolidated Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2010 | 2009 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (6,356) | $ (5,164) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 231 | 229 |
| Stock-based compensation | 530 | 643 |
| Allowance for excess and obsolete inventory | 276 | 35 |
| Provision for bad debts | 18 | 24 |
| Loss on sale of fixed assets | 71 | — |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in accounts receivable | (669) | (659) |
| (Increase) decrease in inventory | 193 | (191) |
| (Increase) decrease in prepaid expenses | 18 | 30 |
| Increase (decrease) in accounts payable | (301) | 48 |
| Increase (decrease) in accrued expenses | 711 | 50 |
| Net cash used in operating activities | (5,278) | (4,955) |
| | | |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (265) | (277) |
| Purchases of investments | (3,986) | (2,973) |
| Sales and maturities of short-term investments | 8,979 | 18,919 |
| Net cash provided by (used in) investing activities | 4,728 | 15,669 |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 3 | 21 |
| Net cash provided by (used in) financing activities | 3 | 21 |
| Net increase (decrease) in cash and cash equivalents | (547) | 10,735 |
| Cash and cash equivalents, beginning of period | 29,298 | 42,051 |
| Cash and cash equivalents, end of period | $ 28,751 | $ 52,786 |

**CONTACT:**
Investors:
TranS1 Inc.
Joe Slattery, 910-332-1700
Executive Vice-President and Chief Financial Officer

or

Westwicke Partners
Mark Klausner, 443-213-0501
mark.klausner@westwicke.com

Source: TranS1 Inc.

EX-99.2 3 g23306exv99w2.htm EX-99.2

**Exhibit 99.2**

Operator: Good day, ladies and gentlemen and welcome to the TranS1, Inc. First Quarter 2010 Earnings Conference Call. At this time, all participants are in a listen-only mode. Later we will conduct a question-and-answer session and instructions will be given at that time. [Operator Instructions] As a reminder, this conference call is being recorded.

I would now like to hand the conference over to your host, Mr. Mark Klausner. Sir you may begin.

**Mark R. Klausner, Managing Partner, Westwicke Partners, LLC**

Thanks, operator. Joining us on today's call are TranS1's Chief Executive Officer, Rick Randall; President and Chief Operating Officer, Ken Reali; and Chief Financial Officer, Joe Slattery. Before we begin, I would like to caution listeners that certain information discussed by management during this conference call will include forward-looking statements covered under the Safe Harbor Provisions of the Private Securities Litigation Reform Act of 1995.

Actual results could differ materially from those stated or implied by our forward-looking statements, due to risks and uncertainties associated with the company's business. The company undertakes no obligation to update information provided on this call. For a discussion of risks and uncertainties associated with TranS1's business, I encourage you to review the company's filings with the Securities and Exchange Commission, including its annual report on Form 10-K for the year ended December 31, 2009.

With that, it's my pleasure to turn the call over to TranS1's CEO, Rick Randall.

**Rick Randall, Chief Executive Officer**

Thanks, Mark. Good afternoon and thank you for joining us today to discuss TranS1's first quarter results. On today's call, I will discuss the key highlights of the quarter and our new CFO, Joe Slattery, will provide you with the details of our financial results. I then would like to share with you some additional perspective on the key developments in our business after which Ken, Joe and I will take your questions.

Worldwide, 692 TranS1 procedures were performed and we generated $6.7 million in revenue during the first quarter. While we are encouraged by the case and revenue performance in the quarter, as Joe will detail in a few minutes, we benefited from the limited release of our AxiaLIF 2L+ and Avatar products, which will transition to full release later this year.

We are continuing to take a cautious stance towards the businesses. We see how our new products gain traction and we work with our surgeons as well as the spine societies and payers on reimbursement. Before I turn the call over to Joe, I would like to highlight some recent operational developments, which I will detail after Joe discusses our financial performance.

One of the most important accomplishments of the year so far is the significant additions that we have made to our senior management team. Ken Reali joined us as President and COO in January, Dwayne Montgomery joined us in March as our Vice President of Sales and Joe Slattery joined us recently as our Executive Vice President and CFO. Ken, Dwayne and Joe all bring significant operating and medical device industry expertise to the team, which will help us execute on our business strategy.

On the product front, we have commenced the limited market release of the AxiaLIF 2L+ along with both the Avatar pedicle screw system and our next generation Vector facet screw system. Early cases have gone well and surgeon feedback has been strong. We continue to have early success in the complex spine market. We held our first Association of Pre-Sacral Spine Surgeons or APSS meeting focused on deformity surgeons in January and intend to hold another one in June.

In addition, we are beginning to see some good clinical data published on the use of our product in this area. We continue to work through reimbursement, as our reimbursement personnel work with our current and prospective surgeon users, the payers and the spine societies.

We recently had one peer reviewed paper published and have been informed of an additional peer reviewed paper that has been accepted for publication, which will build upon the strong clinical evidence supporting the use of our products.

I would now like to turn the call over to Joe to review our financial results. Joe?

**Joseph Slattery, Executive Vice President and Chief Financial Officer**

Thanks, Rick. Good afternoon everyone. Let me start by conveying how excited I am to join the team here. Having been involved as a Board member over the last couple of years I have been able to hit the ground running since joining the company last month and I look forward to working with you all.

Revenues in the first quarter of 2010 were $6.7 million, an increase of approximately $400,000 or 7% over the fourth quarter of 2009. Versus the prior year's first quarter, revenues were down about $2 million or 23%. The decrease from the prior year's Q1 was due to the impacts of the reimbursement environment, which began to cause a headwind in the second quarter of 2009. Within the $6.7 million revenue figure, U.S. revenues were $6.0 million, an increase of $100,000 or 1.5% above the fourth quarter of 2009.

As Rick mentioned, we initiated our 2L+ limited market release during the quarter. We have already met our minimum enrollment requirement and we'll continue selling under our limited release program in the second quarter. Based on historical 2-level case run rate, we believe that the limited release contributed about $300,000 in revenue in the quarter that may be non-recurring in the second quarter, because we will be awaiting data and preparing for a full launch in the beginning of Q3.

Since it will take some time to train our existing surgeon base, as well as new surgeon users following the launch, we expect the fourth quarter to be the first in which we see the full impact of the 2L+ product. 537 domestic cases were performed in the first quarter of 2010 using our products, a small drop from the 550 cases performed in the fourth quarter of 2009. On the 2L versus single-level mix, 26% of cases were 2-Level, up from 21% in the previous quarter.

Average revenue per AxiaLIF case of approximately $11,000, was up nicely over last quarter's ASP of $10,300, reflecting stable to slightly improved underlying prices and mix shifts to higher priced 2-Level procedures, as well as an increase in the penetration of our other products, such as our Avatar Pedicle Screw System into our AxiaLIF cases.

Revenues generated outside of AxiaLIF cases were about $100,000 in the quarter. On the International front, revenues for the quarter were approximately $700,000, an increase of almost 100% over the fourth quarter of 2009 and about 50% over the first quarter of 2009. Last year, we began to transition to a higher mix of direct revenues and these results show the benefit of recognizing end-user sales. Because of this transition, in the past we had reserved for the potential return of inventory from terminated distributors.

Now that the landscape has settled, in the current quarter we recognized approximately $80,000 in revenues associated with these accounting treatments. When we normalize revenues for the quarter after considering the impact of the 2L+ launch of about $300,000 and the deferred revenues in Europe of about $80,000, the underlying run rate for the quarter was about $6.3 million.

Taking into account this adjusted run rate, in terms of guidance for the second quarter of 2010, we expect revenues in the range of $6 million to $7 million. Gross margin for the quarter was 78.7%. The decrease from the prior quarter was due primarily to an increase in inventory reserves associated with our current 2L inventory, a significant portion of which is likely to become obsolete upon the full 2L+ launch.

This increase in reserves had a 396 basis point impact on gross margin, implying a normalized gross margin of about 83%.

Moving on to operating expenses, total operating expenses were down 7.4% in the first quarter of 2010 as compared to the first quarter of 2009, as a result of cost management efforts undertaken over the last year.

2

JA-437

In the first quarter of 2010, we incurred approximately $875,000 of non-recurring costs associated with organizational transition and facility relocation, primarily related to changes in the management team. Excluding these costs, operating expenses are about 14% lower versus the same period last year and were approximately equal to operating expenses in the fourth quarter of 2009.

Some of these organizational transition costs are ongoing and we expect another $500 to $600,000 over the balance of 2010. We finished the quarter with a little under $50 million in cash and investments. Accounts receivable DSO was 61 at quarter end, which is a little higher than last quarter, but the difference had mostly to do with the timing of revenue in the quarter.

Inventory turns improved from 0.7 to 0.8 turns. We expect to continue to see inventory turns improving in the coming quarters, as several efforts are underway to reduce inventory through better forecasting and the implementation of improved systems to manage field inventory. Cash burn for the quarter was $5.5 million.

When we factor in all the non-recurring items I've mentioned above, the underlying cash burn for the quarter on a normalized $6.3 million in revenue was about $4.7 million. We continue to believe that we have adequate cash and investments to sustain the business for the foreseeable future. Rick?

**Rick Randall, Chief Executive Officer**

Thanks, Joe. Before we open the call up for questions, I'd like to add some color on our operations and recent developments. As we mentioned on our last call, we had a number of new products in the market in limited release in the first quarter and we have been encouraged by their early success. Our 2L+ product was introduced in January to a select number of our experienced users.

The 2L+ is a 2-piece modular design of our AxiaLIF 2-Level device that provides surgeons more control during the operation and allows them to dial in the amount of distraction between the L5 and S1 level. Additionally, the shape and dimensions of the device is modified to provide a more robust and stable implant construct. The feedback from surgeons participating in our limited release has been positive, and based on this feedback we are optimistic that this product addresses the limitations of our first generation 2L product.

We expect to complete our limited release follow-up during the second quarter, during which time 2L+ volume will likely remain muted. We expect that our full release will take place at the beginning of the third quarter and that our surgeon training efforts will continue throughout the quarter.

Therefore, we expect to see our first full quarter of 2L+ commercialization in the fourth quarter of this year. Our Avatar mini open pedicle screw product is also still early in its limited release. While we are enthusiastic about this technology, we are taking a measured approach to introducing the device through our sales force, as it is a completely new product for us, and a new system for our surgeon customers. We continue to expect full launch of this product in the second half of 2010. Our second-generation percutaneous facet screw product, the Vector system was also in limited market release in the quarter.

The Vector is easier and more efficient to use in our original percutaneous facet screw system and also had some added tools to facilitate additional posterior fusion. The feedback from our surgeons indicates that this is clearly an improved system over our earlier product and we expect that we will move into full launch in the second quarter.

As we think about prudently investing in R&D over the course of the year, we intend to continue to improve in our current products — on our current products and instrument sets and will look opportunistically at products like the Avatar system that complement our existing product family. Along with our new product introductions, we are continuing our focus on penetrating the complex spine market and we continue to see new deformity surgeon users on an ongoing basis.

To further educate surgeons on the use of our products in complex spine cases, we will hold our second deformity-focused Association of Pre-Sacral Spine Surgeons, or APSS Meeting in early June. Additionally, we are expecting to see early biomechanical results presented at IMAST over this summer. Further, we are sponsoring a

3

http://www.sec.gov/Archives/edgar/data/1230355/000095012310045472/g23306exv99w2....   8/27/2012

JA-438

sacroiliac fixation study with a few of our surgeons that we expect will be completed by the end of the year. The study compares our product with other methods of fixation at the base of the spine to illustrate the biomechanical differences between approaches. We believe that studies like these will continue to highlight the advantages of our product in complex spine that our current users are seeing in the clinic.

Turning to reimbursement, our reimbursement team continues to execute on our plans to work with current and prospective surgeons, the payer community and the spine societies. While this continues to be a long process, it does feel like we are seeing early signs of stabilization in the market. We are enthusiastic about the addition of Dwayne to the team to head up the sales effort and anticipate making selective investments in our distribution channels as we move — as market conditions warrant in the second half of the year.

As our business develops, we will continue to evaluate the market and make the investment in direct reps or independent distribution, based on what is most appropriate in each geography. On the clinical front, we had one peer reviewed journal article published in neurosurgery focus in March that highlighted the use of our product in adult deformity cases.

And at both one and two-year follow-ups, the key findings of the article were that at both one and two years, we demonstrated 100% fusion at the lumbosacral junction and a stable construct at the base of the spine. Additionally, we have received notice of acceptance for publication of a paper that examines a series of single level AxiaLIF patients performed at one site with one-year follow-up.

Before I open the call up for questions, I'd like to comment briefly on the Spine Arthroplasty Society Meeting that was held last week in New Orleans. TranS1 was discussed prominently in four podium presentations and eight posters. The highlight of the meeting for us was data that was presented from one — from the podium on a retrospective analysis of a series of 154 patients across multiple sites with two-year follow-ups. The data showed 90-plus percent fusion rate, low complication rates, limited blood loss, early hospital discharge, and rapid recovery with sustained results.

This data along with the other data presented adds to the mounting clinical evidence around our procedure that will be helpful in our sales process and reimbursement discussions.

With that I'd like to open the call up to take your questions.

## QUESTION AND ANSWER SECTION

Operator: Thank you. [Operator Instructions] First question comes from Doug Schenkel from Cowen. Pardon me, Mr. Schenkel, your line is open. If you have your phone on mute, can you unmute your phone, please.

&lt;Q — Brigham Hyde&gt;: Hi, this is Brigham in for Doug. I think we're on two different lines. Hey guys. Just briefly talk, if you could, about some of the reimbursement management you guys have been doing. I know that you discussed recently some of the intricacies of coding in maybe more complex spine, and maybe a kind of a change of strategy heading into the year. Could you talk maybe about how that's going and if surgeons and payers are receiving that well?

&lt;A — Ken Reali&gt;: This is Ken Reali. I can comment on what our strategy is. I think it's too early to comment on the success or not of that strategy. But I would think about our strategy in three pathways that we are pursuing, which were highlighted on the call today. First off, it is working with the payers to remove our experimental designation over time and this has to be done on a payer-by-payer basis. Secondarily, it's working with the spine societies to gain endorsement and acceptance of our procedure in a broad manner. And thirdly, it's working with our physician customers getting further clinical data published and presented at key meetings such as the SAS Meeting that was discussed last week.

&lt;Q — Brigham Hyde&gt;: Okay, thanks. And just one follow-on. What percent of procedures would be 2Ls without the 2L+ and is this kind of the right run rate to think about for Q2 and Q3, as you model out just base 2L?

4

**<A — Joseph Slattery>**: Yeah, this is Joe. I would say about — maybe about 15% of the cases in the quarter, 15% to 20% of the 2L cases in the quarter were the 2L+ cases.

**<Q — Brigham Hyde>**: Great. I'll hop back in the queue. Thanks guys.

Operator: Our next question comes from Doug Schenkel from Cowen and Company. Good morning, Mr. Schenkel. Your line is open. If you have any questions, please un-mute your phone. Our next question comes from Matt Miksic from Piper Jaffray.

**<Q — Matt Miksic>**: Hey, good evening. Thanks for taking our questions. Can you hear me okay?

**<A — Rick Randall>**: Yeah. Hi Matt.

**<Q — Matt Miksic>**: Hi, Rick. So, one question on some of the results that you are seeing, and the data looked great at SAS — and one of the things that I guess I've noticed and you may have noticed if you have talked to surgeons, there are some folks who seem to be doing quite well with this procedure and a lot of excitement around some of the folks in complex spine who are picking this up. But then there are some folks who have either tried it but stopped using it and they feel like or they talk about having mixed results. And the data is the data, which would suggest that in a clinical setting with follow-up across the multi-center format that the results are good. I guess how do you reconcile that and maybe what can you do to start recapturing some of those folks who sort of wandered off after getting what they felt are mixed results? Any kind of thoughts on that will be helpful and then I have one follow-up.

**<A — Rick Randall>**: Sure, Matt. Yes, when we analyzed surgeons that we lost to the procedure, I think the two most common reasons we've lost them is a) — or maybe three reasons, a) they didn't have an expanded clinical need for the technology. They were very narrow in their indications. And so they just weren't using the technology enough to really stimulate them to — to invest the time and effort to improve their results and get better with the technology. Secondly, if someone — I think our total experience in over 9,000 patients treated is right around 50 bowel injuries, but we — if we had one of those, if a surgeon experienced one of those early on, more likely than not that surgeon didn't come back to the operation, and thirdly, it's technique..

There is variability amongst users. Even in that paper I cited that was present — that you saw presented last week, Matt, there was some variability within that group from the mid 80s all the way up to the high 90s in fusion rates. So what are we doing about it? I think over the next couple of quarters you are going to hear us talk about some products that we think address all of those things.

Firstly, we have a soft tissue project that we can't wait to talk about. We should be in the clinic with it shortly where we completely change the way we're protecting the bowel during the operation. Obviously, we are going to go running back to the surgeons who are uncomfortable with that aspect of the operation or who left us because of that discomfort.

Secondly, we have a whole series of dispreparation tools that we have actually used sparingly in the clinic early on, we are going to be doing some more work over the next quarter with that and hopefully we'll release that to the market. And the purpose of that is we feel that these tools will kind of level the playing field from a technique standpoint, that even with a less perfect technique that we should increase the reproducibility from operator to operator on getting a good discectomy. And regardless of what you use in the disc space, the key to a good solid robust fusion, it starts with a good discectomy.

Most of our surgeons spend a lot of time on that part of the operation to get great results. We think that we can make it less operator dependent. And lastly, what you saw again at that meeting, the marketplace is now telling the story that the indications for AxiaLIF are a lot broader than just low back pain that — that it's a great tool for spondylolisthesis. As minimally invasive surgery grows and we reach that tipping point with minimally invasive surgery, we're finding with all techniques that the most difficult part of the anatomy to reach and sustain a good safe result where the complications are limited is the L4, L5, and L5-S1 segment. And what we're seeing now is these patients who have moved on to these multi-level, minimally invasive approaches, especially with products like the

5

2L+ and that's what we've seen in the limited market release, they are more comfortable utilizing this approach for both of those segments and we have no nerve damage, we have no patients with extended thigh pain.

Our complication rate is extremely low. So the marketplace is telling the rest of the world that this solves an unmet clinical need when it comes to MIS, which is a better fixation and a safer, more reproducible fusion at L4 through S1. So it's a long answer, but I think it covers all aspects of the question you asked.

<Q — Matt Miksic>: Very helpful. And one follow-up on reimbursement. You talked about seeing some stabilization, and I guess, stabilization in what way? Is that — is that sort of the loss of — surgeons stabilize or is this improvement in the process, some of the things that Ken talked about, working with payers or some sense of what you mean by that. And is the end — I think we understand the sort of shift in near-term strategy, but is the end game here you're still to get Level 1 code and if so when does that finally happen?

<A — Ken Reali>: Yeah, Matt, this is Ken Reali. Let me answer your question. First of all, it's still too early to project the success of our current strategy, as I mentioned. I think what we mean is — by stabilization is just in our results itself, we are not seeing a decline quarter-over-quarter like we saw in the second half of 2009. What contributes to that? Certainly, we feel some of that is related to our three-pronged approach on our reimbursement strategy, which is the current strategy that we are going forward with, and to your point, the end game is the category 1 code.

Now it is important to remember that the current code we have, which is a T code, is not an experimental code, it is a tracking code. What we hope to do in the near term is work with payers to get that tracking code covered. Over time, as we evolve on this strategy and we penetrate the market, a decision will be made when we would apply for a category 1 code. But until we are successful in all parts of our strategy relative to payer acceptance and spine society endorsement and continued publications we will not submit for a category 1 code.

<Q — Matt Miksic>: Okay. And just one follow-up on that topic Ken is, Rick talked about, the broadening indications where AxiaLIF can be helpful to patients. What happens, I guess, with those indications? Are those things that you look at for clinical development, other things you — I guess how do you go about developing those or is the game plan now is just to sort of continue to focus on stabilization based on your current T code and current labeling and then tackle this maybe after you get to this next step of progress in the reimbursement front?

<A — Ken Reali>: Matt, I think it actually — it needs to be done concurrently. Certainly some of these areas that Rick mentioned such as deformity, which is a key market segment focus for us or spondylolisthesis, our new emerging areas beyond just the typical degenerative disc disease patients. So tapping into that — those market segments is critical part of our strategy and critical part of our market penetration strategy that we have to continue to execute on despite our reimbursement challenges. So that will be done in concurrence with our reimbursement strategy. We will work to collect clinical data in those market segments because we feel that will help broaden the acceptance of AxiaLIF.

<Q — Matt Miksic>: Great, very helpful. Thanks for taking the questions.

<A — Ken Reali>: Thank you.

<A — Rick Randall>: Thanks, Matt.

Operator: [Operator Instructions] We have a question from Michael Matson from Wells Fargo.

<Q — Michael Matson>: Hi. Given the push into the deformity market, I was just wondering if you had any numbers around the size of that opportunity in terms of either dollars or procedures, I guess U.S. and globally?

<A — Rick Randall>: Yes, Michael, we have measured it. Off of the top of my head, I can't recollect the — do you have that number, Joe?

6

**<A — Joseph Slattery>**: Well, I mean, what I can tell you is that we look at a 5-1 as about a 45,000 procedure market in the U.S. and four to five that is included with the 5-1 is about another 45,000 procedures. Within that since that's what's done in the market today that would include the long construct cases.

**<Q — Michael Matson>**: Okay. So that's inclusive of non-deformity and deformity procedures?

**<A — Joseph Slattery>**: That's all — that's all — yeah that's right. That's all procedures are fusions of those joints.

**<Q — Michael Matson>**: Okay. And in terms of what percent the deformity cases would make up out of those numbers?

**<A — Rick Randall>**: I think it's a relatively small percentage of those numbers.

**<A — Joseph Slattery>**: Yeah, maybe you can answer this Rick. Iliac bolts doesn't count as a fusion now. So, there wouldn't be any existing market, right. So, to the extent that it is 5-1, then it is additive to the market.

**<Q — Michael Matson>**: Okay. And then, did you give the number — the number of sales people that you have currently, and if not, can you give it to us?

**<A — Ken Reali>**: Yeah, Michael it is Ken Reali. Currently, we have 49 direct sales people. That does not include our distribution channel.

**<Q — Michael Matson>**: Okay. And then just curious about what you're seeing out there in terms of pricing. Obviously there is some pretty intense price pressure in the spine market more broadly, but has any of that filtered down to your products? I imagine you're pretty small, so you are probably not really in the hospital radar screens, but is there any risk that you could see some price pressure or is your product unique enough that you should be able to avoid that?

**<A — Joseph Slattery>**: Yeah, Mike, this is Joe. We've actually held at that unit price level pretty well over the last couple of quarters. I think what we are experiencing is the impacts of some price increases offset by some hospitals being woke up by price increases. So, by and large, our standalone pricing has been stable to slightly ticking up.

**<Q — Michael Matson>**: Okay. And that's kind of what you expect going forward, obviously, in the remainder of the year?

**<A — Rick Randall>**: Yeah. And just to add a little color to that, now that we are selling pedicle screws and we've been selling facet screws, just from an environmental standpoint, I can tell you that there are more — there is more pressure on those products than what we've seen traditionally with AxiaLIF. The fact of the matter is, we are the only one with AxiaLIF and when you run the economics of AxiaLIF with patients leaving the next day it's still a pretty good deal for the hospital, but now that we have a competitive screw system along with a whole host of other vendors, I can tell you we're getting into those discussions more when it comes to those products. Michael, just one further, when you talked about the — the [inaudible] market size for the complex spine or multi-level spine, the numbers we have roughly are in the neighborhood of about 130,000 procedures that are greater than three levels. Now 58,000 of those do not involve L4 to S1, the rest do. So, just to give you some numbers from some data we have.

**<Q — Michael Matson>**: Okay, that's helpful. Thanks. And then my follow-up question is just kind of a housekeeping question, and you probably gave this but I didn't get it. The total number of procedures in the quarter globally, and I got the U.S. number but I didn't get the OUS or the global number, either of those would be fine?

**<A — Joseph Slattery>**: Sure. Hold on, let me get that for you. 692.

**<Q — Michael Matson>**: Okay. That's all I have. Thanks a lot.

**<A — Joseph Slattery>**: Great. Thanks.

7

Operator: This concludes our question-and-answer session for today. I would now like to turn the conference back over for any closing remarks.

**Rick Randall, Chief Executive Officer**

Okay, thank you. Let me close by thanking all of you for taking the time to join us on our call today. We sincerely appreciate your interest in TranS1 and look forward to updating you on our continued progress.

Operator: Ladies and gentlemen, thank you for participating in today's conference. This concludes our program for today. You may all disconnect and have a wonderful day.

8

# Exhibit 12

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2010

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period _____ to _____

Commission File Number 001-33744

# TRANS1 INC.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | 33-0909022 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |

**301 GOVERNMENT CENTER DRIVE, WILMINGTON, NC 28403**
(Address of principal executive office) (Zip code)

**(910) 332-1700**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes☐  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.:

Large accelerated filer ☐    Accelerated filer ☑        Non-accelerated filer ☐        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☑

The number of shares of the registrant's common stock outstanding as of May 3, 2010 was 20,656,793 shares.

TRANS1 INC.
FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2010
TABLE OF CONTENTS

**PART I.  FINANCIAL INFORMATION**

**Item 1. Consolidated Financial Statements** (unaudited)
    Consolidated Statements of Operations     1
    Consolidated Balance Sheets     2
    Consolidated Statements of Cash Flows     3
    Notes to Consolidated Financial Statements     4
**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**     8
**Item 3. Quantitative and Qualitative Disclosures About Market Risk**     13
**Item 4. Controls and Procedures**     14

**PART II. OTHER INFORMATION**

**Item 6. Exhibits**     14

**SIGNATURES**     15

**EXHIBIT INDEX**     16
    **Exhibit 31.1**
    **Exhibit 31.2**
    **Exhibit 32.1**
    **Exhibit 32.2**
EX-31.1
EX-31.2
EX-32.1
EX-32.2

**Table of Contents**

PART I. FINANCIAL INFORMATION

Item 1. Consolidated Financial Statements.

**TranS1 Inc.**
**Consolidated Statements of Operations**
**(in thousands, except per share amounts)**
**(Unaudited)**

|  | Three Months Ended March 31, | |
|  | 2010 | 2009 |
|---|---|---|
| Revenue | $ 6,713 | $ 8,678 |
| Cost of revenue | 1,429 | 1,542 |
| Gross profit | 5,284 | 7,136 |
|  |  |  |
| Operating expenses: |  |  |
| Research and development | 1,255 | 1,326 |
| Sales and marketing | 7,697 | 9,150 |
| General and administrative | 2,639 | 2,041 |
| Total operating expenses | 11,591 | 12,517 |
| Operating loss | (6,307) | (5,381) |
| Interest and other income (loss) | (49) | 217 |
| Net loss | $ (6,356) | $ (5,164) |
|  |  |  |
| Net loss per common share — basic and diluted | $   (0.31) | $   (0.25) |
|  |  |  |
| Weighted average common shares outstanding — basic and diluted | 20,655 | 20,552 |

The accompanying notes are an integral part of these financial statements.

1

JA-447

Table of Contents

**TranS1 Inc.**
**Consolidated Balance Sheets**
**(in thousands)**
**(Unaudited)**

|  | March 31, 2010 | December 31, 2009 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 28,751 | $ 29,298 |
| Short-term investments | 20,960 | 25,953 |
| Accounts receivable, net | 4,577 | 3,926 |
| Inventory | 6,856 | 7,325 |
| Prepaid expenses and other assets | 658 | 676 |
| Total current assets | 61,802 | 67,178 |
| Property and equipment, net | 1,776 | 1,813 |
| Total assets | $ 63,578 | $ 68,991 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,141 | $ 2,442 |
| Accrued expenses | 1,980 | 1,269 |
| Total current liabilities | 4,121 | 3,711 |
| | | |
| Stockholders' equity | | |
| Common stock | 2 | 2 |
| Additional paid-in capital | 136,943 | 136,402 |
| Accumulated other comprehensive income (loss) | (13) | (5) |
| Accumulated deficit | (77,475) | (71,119) |
| Total stockholders' equity | 59,457 | 65,280 |
| Total liabilities and stockholders' equity | $ 63,578 | $ 68,991 |

The accompanying notes are an integral part of these financial statements.

2

JA-448

Table of Contents

**TranS1 Inc.**
**Consolidated Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (6,356) | $ (5,164) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Depreciation | 231 | 229 |
| Stock-based compensation | 530 | 643 |
| Allowance for excess and obsolete inventory | 276 | 35 |
| Provision for bad debts | 18 | 24 |
| Loss on sale of fixed assets | 71 | — |
| Changes in operating assets and liabilities: | | |
| Increase in accounts receivable | (669) | (659) |
| (Increase) decrease in inventory | 193 | (191) |
| Decrease in prepaid expenses | 18 | 30 |
| Increase (decrease) in accounts payable | (301) | 48 |
| Increase in accrued expenses | 711 | 50 |
| Net cash used in operating activities | (5,278) | (4,955) |
| | | |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (265) | (277) |
| Purchases of investments | (3,986) | (2,973) |
| Sales and maturities of investments | 8,979 | 18,919 |
| Net cash provided by investing activities | 4,728 | 15,669 |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 3 | 21 |
| Net cash provided by financing activities | 3 | 21 |
| Net increase (decrease) in cash and cash equivalents | (547) | 10,735 |
| Cash and cash equivalents, beginning of period | 29,298 | 42,051 |
| Cash and cash equivalents, end of period | $ 28,751 | $ 52,786 |

The accompanying notes are an integral part of these financial statements.

3

Table of Contents

**TranS1 Inc.**
Notes to Consolidated Financial Statements
(Unaudited)

**1. Description of Business**

TranS1 Inc., a Delaware corporation (the "Company"), was incorporated in May 2000 and is headquartered in Wilmington, North Carolina. The Company is a medical device company focused on designing, developing and marketing products that implement its proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. The Company operates in one business segment. The Company has developed and currently markets the AxiaLIF® family of products for single and multilevel lumbar fusion and the Vectre and Avatar™ posterior fixation systems for lumbar fixation supplemental to AxiaLIF fusion. All of the Company's products are delivered using its pre-sacral approach. The AxiaLIF product was commercially released in January 2005 and the AxiaLIF 360° product was commercially released in July 2006. The AxiaLIF 2L™ product was commercially released in Europe in the fourth quarter of 2006 and in the United States in the second quarter of 2008. In November 2009, the Company commenced the limited market release of its next generation Vectre facet screw system. The Company began marketing its AxiaLIF 2L+ product, in January 2010. In January 2010, the Company entered into a partnership agreement with Life Spine, Inc. to distribute Avatar, a minimally invasive pedicle screw system. The Company generates revenue from the sale of implants and procedure kits. The Company sells its products directly to hospitals and surgical centers in the United States and certain European countries, and to independent distributors elsewhere.

The Company owns seven trademark registrations in the United States and seven trademark registrations in the European Union. The Company also owns five pending trademark applications in the United States, two pending trademark applications in the European Union and eight pending trademark applications in Canada.

The Company is subject to a number of risks similar to other companies in the medical device industry. These risks include, without limitation, rapid technological change, uncertainty of market acceptance of our products, uncertainty of regulatory clearance or approval, uncertainty of reimbursement from third-party payors, competition from substitute products and larger companies, the need to obtain additional financing, compliance with government regulation, protection of proprietary technology, product liability, and the dependence on key individuals.

**2. Basis of presentation**

The Company has prepared the accompanying consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). The consolidated financial statements are unaudited and reflect all adjustments (consisting of normal recurring adjustments) which are, in the opinion of the Company's management, necessary for a fair statement of the Company's consolidated financial position, results of operations and cash flows. These principles require management to make estimates and assumptions

4

JA-450

that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. The principal estimates relate specifically to accounts receivable reserves, inventory reserves, stock-based compensation, accrued expenses and income tax valuations. Actual results could differ from those estimates. Operating results for the interim periods presented are not necessarily indicative of the results that may be expected for the full year. The year-end balance sheet data was derived from audited financial statements, but does not include all disclosures required by accounting principles generally accepted in the United States. All intercompany accounts and transactions have been eliminated in consolidation.

In the second quarter of 2009, the Company revised the classification of patent-related legal costs from research and development expense to general and administrative expense as such costs typically would be excluded from research and development costs as defined by Accounting Standards Codification 730 (formerly Statement of Financial Accounting Standards No. 2, "Accounting for Research and Development Costs"). Amounts related to prior periods are not considered material to the financial statements taken as a whole, but were revised for purposes of comparability. Such amount for the three month period ended March 31, 2009 was $208,000. The revision did not affect previously reported total operating expenses, net loss, loss per share, assets, liabilities, stockholders' equity or cash flows.

**Impact of Recently Issued Accounting Standards**

There have been no recently issued accounting standards that have an impact on the Company's financial statements.

**3. Income Taxes**

No provisions for federal or state income taxes have been recorded as the Company has incurred net operating losses since inception.

**4. Net Loss Per Common Share**

Basic net loss per common share ("Basic EPS") is computed by dividing the net loss available to common stockholders by the weighted average number of common shares outstanding. Diluted net loss per common share ("Diluted EPS") is computed by dividing the net loss available to common shareholders by the weighted average number of common shares and potential dilutive common share equivalents then outstanding. The Company's potential dilutive common shares, which consist of shares issuable upon the exercise of stock options, have not been included in the computation of diluted net loss per share for all periods as the result would be anti-dilutive.

5

JA-451

**Table of Contents**

The following table sets forth the potential shares of common stock that are not included in the calculation of diluted net loss per share as the result would be anti-dilutive as of the end of each period presented:

| | Three Months Ended March 31, | |
| | 2010 | 2009 |
|---|---|---|
| Weighted average stock options outstanding | 2,308,038 | 2,264,005 |

## 5. Cash, Cash Equivalents and Investments

The Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents. Cash and cash equivalents include money market treasury funds. Short-term investments consist of U.S. agency backed debt instruments.

At March 31, 2010, the Company holds certain assets that are required to be measured at fair value on a recurring basis. These assets include available for sale securities classified as cash equivalents and short-term investments. ASC 820 requires that fair value measurements be classified and disclosed in one of three tiers. These tiers are: Level 1, defined as quoted prices in active markets for identical assets or liabilities; Level 2, defined as valuations based on observable inputs other than those included in Level 1, such as quoted prices for similar assets and liabilities in active markets, or other inputs that are observable or can be corroborated by observable input data; and Level 3, defined as valuations based on unobservable inputs reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants.

At March 31, 2010, all available for sale securities are classified as Level 1 assets with a fair value of $49.7 million, which included money market funds of $28.7 million and short-term investments of $21.0 million. At December 31, 2009, all available for sale securities were classified as Level 1 assets with a fair value of $54.9 million, which included money market funds of $28.9 million and short-term investments of $26.0 million. The Company had no Level 2 or Level 3 assets or liabilities at March 31, 2010 or December 31, 2009.

## 6. Accounts Receivable, Net

The following table presents the components of accounts receivable:

| | March 31, 2010 | December 31, 2009 |
|---|---|---|
| | (In thousands) | |
| Gross accounts receivable | $ 4,757 | $ 4,119 |
| Allowance for uncollectible accounts | (180) | (193) |
| Total accounts receivable, net | $ 4,577 | $ 3,926 |

## 7. Inventories

The following table presents the components of inventories:

6

Table of Contents

| | March 31, 2010 | | December 31, 2009 |
|---|---|---|---|
| | (In thousands) | | |
| Work-in-process | $ 3,828 | $ | 3,993 |
| Finished goods | 2,823 | | 3,112 |
| Raw materials | 205 | | 220 |
| Total inventories | $ 6,856 | $ | 7,325 |

## 8. Accrued Expenses

The following table presents the components of accrued expenses:

| | March 31, 2010 | | December 31, 2009 |
|---|---|---|---|
| | (In thousands) | | |
| Commissions | $ 665 | $ | 597 |
| Salaries and severance | 375 | | 47 |
| Vacation | 279 | | 186 |
| Bonus | 233 | | 10 |
| Legal and professional fees | 107 | | 90 |
| Franchise tax | 95 | | 122 |
| Consulting | 93 | | 120 |
| Other | 133 | | 97 |
| Total accrued expenses | $ 1,980 | $ | 1,269 |

## 9. Comprehensive Loss

The following table presents the components of other comprehensive loss:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2010 | 2009 |
| | (In thousands) | |
| Net loss | $(6,356) | $(5,164) |
| Other comprehensive income (loss): | | |
| Translation adjustments | (8) | — |
| Total comprehensive loss | $(6,364) | $(5,164) |

7

JA-453

**Table of Contents**

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and the related notes to our consolidated financial statements included in this report. In addition to historical financial information, this report contains forward-looking statements that have been made pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 and concern matters that involve risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements. All statements other than statements of historical fact contained in this report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should" or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Readers are urged to carefully review and consider the various disclosures made by us, which attempt to advise interested parties of the risks, uncertainties, and other factors that affect our business, operating results, financial condition and stock price, including without limitation the disclosures made under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report and in the consolidated financial statements and notes thereto included elsewhere in this report, as well as the disclosures made under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Risk Factors", "Consolidated Financial Statements" and "Notes to Consolidated Financial Statements" included in our Annual Report on Form 10-K for the year ended December 31, 2009. Furthermore, such forward-looking statements speak only as of the date of this report. We expressly disclaim any intent or obligation to update any forward-looking statements after the date hereof to conform such statements to actual results or to changes in our opinions or expectations. References in this report to "TranS1", "we", "our", "us", or the "Company" refer to TranS1 Inc.*

**Overview**

We are a medical device company focused on designing, developing and marketing products that implement our proprietary minimally invasive surgical approach to treat degenerative disc disease and instability affecting the lower lumbar region of the spine. Using our pre-sacral approach, a surgeon can access discs in the lower lumbar region of the spine through a 1.5 cm incision adjacent to the tailbone and can perform an entire fusion procedure through a small tube that provides direct access to the intervertebral space. We developed our pre-sacral approach to allow spine surgeons to access and treat intervertebral spaces without compromising important surrounding soft tissue. We believe this approach enables fusion procedures to be performed with low complication rates, low blood loss, short hospital stays, fast recovery times and reduced pain. We have developed and currently market our single-level fusion products, the AxiaLIF® and the AxiaLIF 360°™ and our two-level fusion products, the AxiaLIF 2L™ and the AxiaLIF 2L+, which include the Vectre and Avatar™ posterior fixation systems for lumbar fixation supplemental to AxiaLIF fusion.

8

JA-454

Table of Contents

From our incorporation in 2000 through 2004, we devoted substantially all of our resources to research and development and start-up activities, consisting primarily of product design and development, clinical trials, manufacturing, recruiting qualified personnel and raising capital. We received 510(k) clearance from the U.S. Food and Drug Administration, or FDA, for our AxiaLIF product in the fourth quarter of 2004, and commercially introduced our AxiaLIF product in the United States in the first quarter of 2005. We received FDA 510(k) clearance for our AxiaLIF 360° product in the United States in the third quarter of 2005 and began commercialization in the United States in the third quarter of 2006. We received a CE mark to market AxiaLIF in the European market in the first quarter of 2005 and began commercialization in the first quarter of 2006. For AxiaLIF 360°, we received a CE mark in the first quarter of 2006. We received a CE mark for our AxiaLIF 2L product in the third quarter of 2006 and began commercialization in the European market in the fourth quarter of 2006. We received FDA 510(k) clearance for our AxiaLIF 2L product and began marketing this product in the United States in the second quarter of 2008. In November 2009, we commenced the limited market release of our next generation Vectre facet screw system. Our AxiaLIF 2L+ product received FDA 510(k) clearance, and we began marketing the product, in January 2010. In January 2010, we entered into a partnership agreement with Life Spine, Inc. to distribute Avatar, a minimally invasive pedicle screw system. We currently sell our products through a direct sales force, independent sales agents and international distributors.

We rely on third parties to manufacture most of our products and their components. We believe these manufacturing relationships allow us to work with suppliers who have the best specific competencies while we minimize our capital investment, control costs and shorten cycle times, all of which allows us to compete with larger volume manufacturers of spine surgery products.

Since inception, we have been unprofitable. As of March 31, 2010, we had an accumulated deficit of $77.5 million.

We expect to continue to invest in creating a sales and marketing infrastructure for our AxiaLIF, AxiaLIF 360°, AxiaLIF 2L and AxiaLIF 2L+ products in order to gain wider acceptance for these products. We also expect to continue to invest in research and development and related clinical trials, and increase general and administrative expenses as we grow. As a result, we will need to generate significant revenue in order to achieve profitability.

**Financial Operations**

**Revenue**

We generate revenue from the sales of our procedure kits and implants used in our AxiaLIF fusion procedure for the treatment of degenerative disc disease and instability. Our revenue is generated by our direct sales force, independent sales agents and independent distributors. Our sales representatives or independent sales agents hand deliver the procedure kit to the customer on the day of the surgery or several days prior to the surgery. The sales representative or independent agent is then responsible for reporting the delivery of the procedure kit, and the date of the operation to the corporate office for proper revenue recognition. We recognize revenue upon the confirmation that the procedure kit has been used in a surgical procedure. The other sales method is for sales to distributors outside the United States. These distributors order multiple procedure kits at one time to have on hand. These transactions require the customer to send in a purchase order before shipment will be made to the customer. We determine

9

JA-455

Table of Contents

revenue recognition on a case by case basis dependent upon the terms and conditions of each individual distributor agreement. Under the distributor agreements currently in place, a distributor only has the right of return for defective products and, accordingly, revenue is recognized upon shipment of our products to our independent distributors. Although we intend to continue to expand our international sales and marketing efforts, we expect that a substantial amount of our revenues will be generated in the United States in future periods.

**Cost of Revenue**

Cost of revenue consists primarily of material and overhead costs related to our products. Cost of revenue also includes facilities-related costs, such as rent, utilities and depreciation.

**Research and Development**

Research and development expenses consist primarily of personnel costs, including stock-based compensation expense, within our product development, regulatory and clinical functions and the costs of clinical studies and product development projects. In future periods, we expect research and development expenses to grow as we continue to invest in basic research, clinical trials, product development and intellectual property.

**Sales and Marketing**

Sales and marketing expenses consist of personnel costs, including stock-based compensation expense, sales commissions paid to our direct sales representatives and independent sales agents, and costs associated with physician training programs, promotional activities and participation in medical conferences. In future periods, we expect sales and marketing expenses to increase as we expand our sales and marketing efforts.

**General and Administrative**

General and administrative expenses consist of personnel costs, including stock-based compensation, related to the executive, finance, business development, information technology and human resource functions, as well as professional service fees, legal fees, accounting fees, insurance costs and general corporate expenses. We expect general and administrative expenses to increase as we grow our business.

**Interest and Other Income (Loss)**

Interest and other income (loss) is primarily composed of interest earned on our cash, cash equivalents and available-for-sale securities and the gain or loss on disposal of fixed assets.

**Results of Operations**

**Comparison of the Three Months Ended March 31, 2009 and 2010**

Revenue. Revenue decreased from $8.7 million in the three months ended March 31, 2009 to $6.7 million in the three months ended March 31, 2010. The $2.0 million decrease in revenue from 2009 to 2010 was related to lower than expected case volume as a result of concerns and uncertainty in the marketplace surrounding physician reimbursement for our AxiaLIF procedure. We are addressing these issues with increased education and support resources for our current and prospective surgeon users. Domestically, sales of our AxiaLIF 2L product decreased from $2.3 million in the three months ended March 31, 2009 to $1.9 million in the three months ended March 31, 2010 and sales of our AxiaLIF 360° product decreased from $2.6 million in the three months ended March 31, 2009 to $1.4 million in

10

JA-456

the three months ended March 31, 2010. New products accounted for revenue of $132,000 in the first quarter of 2010. Average selling prices in the United States increased from approximately $10,600 in the three months ended March 31, 2009 to approximately $10,700 in the three months ended March 31, 2010. In the three months ended March 31, 2009 and 2010, we recorded 751 and 537 domestic AxiaLIF cases, respectively, including 261 AxiaLIF 360° cases and 168 AxiaLIF 2L cases in the first quarter of 2009, and 134 AxiaLIF 360° cases and 141 AxiaLIF 2L cases in the first quarter of 2010. Additionally, during the three months ended March 31, 2009 and 2010, we generated $297,000 and $125,000, respectively, in revenues from stand alone sales of our percutaneous facet and Vectre screw systems.

Revenue generated outside the United States increased from $452,000 in the three months ended March 31, 2009 to $684,000 in the three months ended March 31, 2010. In February 2009, we began to sell directly to hospitals in Germany through our own sales force, which previously had been done through a distributor. In the three months ended March 31, 2009, there was $87,000 in initial stocking shipments to new distributors outside the United States compared to no initial stocking shipments in the three months ended March 31, 2010. In the three months ended March 31, 2009 and 2010, 95% and 90%, respectively, of our revenues were generated in the United States.

Cost of Revenue. Cost of revenue decreased from $1.5 million in the three months ended March 31, 2009 to $1.4 million in the three months ended March 31, 2010. The $113,000 decrease in cost of revenue resulted primarily from lower material and overhead costs associated with decreased sales volume for our products, partially offset by an inventory obsolescence reserve of $266,000 related to excess inventory for our AxiaLIF 2L product, as we introduce our AxiaLIF 2L+ product. As a percentage of revenue, cost of revenue increased from 17.8% in the three months ended March 31, 2009 to 21.3% in the three months ended March 31, 2010. The increase in cost of revenue as a percent of revenue from 2009 to 2010 was primarily attributable to the inventory obsolescence reserve recorded in 2010.

Research and Development. Research and development expenses remained consistent at $1.3 million in the three months ended March 31, 2009 and 2010. Expenses in the three months ended March 31, 2009 included $0.2 million for the exclusive rights to negotiate for a potential product acquisition. Expenses in the three months ended March 31, 2010 included management transition costs of $0.1 million.

Sales and Marketing. Sales and marketing expenses decreased from $9.2 million in the three months ended March 31, 2009 to $7.7 million in the three months ended March 31, 2010. The decrease in expenses from 2009 to 2010 of $1.5 million was primarily due to lower commissions of $0.8 million, related to the lower revenue, and decreased personnel-related costs of $0.8 million, as we reduced our U.S. sales force to focus our investment. These lower expenses were partially offset by severance costs of $0.4 million for employees affected by the sales force reduction.

General and Administrative. General and administrative expenses increased from $2.0 million in the three months ended March 31, 2009 to $2.6 million in the three months ended March 31, 2010. The increase in expenses from 2009 to 2010 of $0.6 million was primarily due to an increase in personnel- related costs related to management transition that occurred in the first quarter of 2010. These costs included compensation, recruiting and severance related expenses.

11

Table of Contents

Interest and Other Income (Loss). Interest and other income (loss) decreased from income of $217,000 in the three months ended March 31, 2009 to a loss of $49,000 in the three months ended March 31, 2010. The decrease of $266,000 from 2009 to 2010 was primarily related to lower interest income of $195,000 due to lower interest rates and our lower average cash and investment balance and a loss on disposal of fixed assets of $71,000.

**Liquidity and Capital Resources**

**Sources of Liquidity**

Since our inception in 2000, we have incurred significant losses and, as of March 31 2010, we had an accumulated deficit of $77.5 million. We have not yet achieved profitability, and anticipate that we will continue to incur losses in the near term. We expect that research and development, sales and marketing and general and administrative expenses will grow and, as a result, we will need to generate significant revenues to achieve profitability. To date, our operations have been funded primarily with proceeds from the sale of preferred stock and the net proceeds from our October 2007 initial public offering. Gross proceeds from our preferred stock sales totaled $40.5 million to date, and the net proceeds from our initial public offering were approximately $86.7 million.

As of March 31 2010, we did not have any outstanding debt financing arrangements, we had working capital of $57.7 million and our primary source of liquidity was $49.7 million in cash, cash equivalents and short-term investments. We currently invest our cash and cash equivalents primarily in money market treasury funds and our short-term investments primarily in U.S. agency backed debt instruments.

Cash, cash equivalents and short-term investments decreased from $55.3 million at December 31, 2009 to $49.7 million at March 31, 2010. The decrease of $5.6 million was primarily the result of net cash used in operating activities of $5.3 million and purchases of property and equipment of $265,000.

**Cash Flows**

Net Cash Used in Operating Activities. Net cash used in operating activities was $5.3 million in the three months ended March 31, 2010. This amount was attributable primarily to the net loss after adjustment for non-cash items, such as depreciation, stock-based compensation expense, inventory and receivable reserves, and the loss on sale of fixed assets, combined with an increase in accrued expenses, primarily personnel related, partially offset by an increase in accounts receivable related to the increase in revenue in the first quarter of 2010 compared to the fourth quarter of 2009, and changes in accounts payable due to the timing of activity.

Net Cash Provided by Investing Activities. Net cash provided by investing activities was $4.7 million in the three months ended March 31, 2010. This amount reflected net purchases or sales and maturities of short-term investments of $5.0 million, offset by purchases of property and equipment of $265,000, primarily for capital improvements to our facility.

Net Cash Provided by Financing Activities. Net cash provided by financing activities in the three months ended March 31, 2010 was $3,000 which primarily represented proceeds from the issuance of shares of our common stock upon the exercise of stock options.

12

Table of Contents

**Operating Capital and Capital Expenditure Requirements**

We believe that our existing cash, cash equivalents and short-term investments, together with cash received from sales of our products, will be sufficient to meet our cash needs for at least the next two years. We intend to spend substantial sums on sales and marketing initiatives to support the ongoing commercialization of our products and on research and development activities, including product development, regulatory and compliance, clinical studies in support of our currently marketed products and future product offerings, and the enhancement and protection of our intellectual property. We may need to obtain additional financing to pursue our business strategy, to respond to new competitive pressures or to take advantage of opportunities that may arise. The sale of additional equity or convertible debt securities could result in dilution to our stockholders. If additional funds are raised through the issuance of debt securities, these securities could have rights senior to those associated with our common stock and could contain covenants that would restrict our operations. Any additional financing may not be available in amounts or on terms acceptable to us, if at all. If we are unable to obtain this additional financing, we may be required to reduce the scope of our planned product development and marketing efforts.

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses, and disclosures of contingent assets and liabilities at the date of the financial statements. On an on-going basis, we evaluate our estimates, including those related to revenue recognition, accounts receivable, inventories, accrued expenses, income taxes and stock-based compensation. We use authoritative pronouncements, historical experience and other assumptions as the basis for making estimates. Actual results could differ from those estimates under different assumptions or conditions.

For a description of our critical accounting policies and estimates, please refer to the "Critical Accounting Policies and Estimates" section of the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section contained in our Annual Report on Form 10-K for the year ended December 31, 2009. There have been no material changes in any of our accounting policies since December 31, 2009.

**New Accounting Standards**

There have been no recently issued accounting standards that have an impact on our financial statements.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

Our exposure to interest rate risk at March 31, 2010 is related to our investment portfolio. We invest our excess cash primarily in money market funds and debt instruments of the U.S. government and its agencies. Due to the short-term nature of these investments, we have assessed that there is no material exposure to interest rate risk arising from our investments. Thus, a hypothetical 100 basis point adverse move in interest rates along the entire interest rate yield curve would not materially affect the fair market value of our interest-sensitive financial investments. Declines in interest rates over time will, however, reduce our investment income, while increases in interest rates over time will increase our interest expense. Historically, and as of March 31, 2010, we have not used derivative instruments or engaged in hedging activities.

13

Table of Contents

Although most of our sales and purchases are denominated in U.S. dollars, future fluctuations in the value of the U.S. dollar may affect the competitiveness of our products outside the United States. We do not believe, however, that we currently have significant direct foreign currency exchange rate risk and have not hedged exposures denominated in foreign currencies.

### Item 4. Controls and Procedures.

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of March 31, 2010. We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of March 31 2010, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective and operating at the reasonable assurance level.

### Changes in Internal Control over Financial Reporting

There has been no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### PART II. OTHER INFORMATION

### Item 6. Exhibits

A list of the exhibits required to be filed as part of this report is set forth in the "Exhibit Index," which immediately precedes such exhibits, and is incorporated herein by reference.

14

---

JA-460

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**TranS1 Inc.**

Date: May 10, 2010                    By:  /s/ Richard Randall  _____
                                          Richard Randall
                                          Chief Executive Officer


Date: May 10, 2010                    By:  /s/ Joseph Slattery  _____
                                          Joseph Slattery
                                          Executive Vice-President and
                                          Chief Financial Officer

15

JA-461

**Table of Contents**

<div align="center">

**TranS1 Inc.**
**Exhibit Index**

</div>

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934. |
| 32.1 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |
| 32.2 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(b) / 15d-14(b) of the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. |

<div align="center">

16

</div>

EX-31.1 2 g23373exv31w1.htm EX-31.1

**EXHIBIT 31.1**

### Certification

I, Richard Randall, certify that:

1. I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2010

/s/ Richard Randall
Richard Randall
Chief Executive Officer

EX-31.2 3 g23373exv31w2.htm EX-31.2

**EXHIBIT 31.2**

### Certification

I, Joseph Slattery, certify that:

1. I have reviewed this quarterly report on Form 10-Q of TranS1 Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 10, 2010

/s/ Joseph Slattery
Joseph Slattery
Executive Vice-President and
Chief Financial Officer